John P. Melko
713-276-5727 (*direct dial*)
713-276-6727 (*direct fax*)
jmelko@gardere.com
Michael K. Riordan
713-276-5178 *(direct dial)*
713-276-6178 *(direct fax)*
mriordan@gardere.com
**GARDERE WYNNE SEWELL LLP**
1000 Louisiana, Suite 2000
Houston, Texas  77002-5011

*Proposed Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| GMI USA MANAGEMENT, INC., *et al[1]* | § | CASE NO. _____ |
| | § | |
| Debtors. | § | (Joint Administration Requested) |

**DECLARATION OF JUSTIN KNOWLES IN SUPPORT OF ORIGINAL PETITIONS,**
**FIRST DAY PLEADINGS AND IN ACCORDANCE WITH**
**LOCAL BANKRUPTCY 1007-2**

JUSTIN KNOWLES declares as follows:

1.     My name is Justin Knowles, and I am a principal of Dean Marine Advisers, a consultancy engaged in maritime advisory, recovery and investment consulting work. I have been retained as the Chief Restructuring Officer of the Debtors herein.

2.     I am generally familiar with the Debtors' operations, business affairs and books and records. As more fully described in the sections below, the Debtors and certain non-debtor affiliates, are engaged in three segments of the dry bulk shipping markets, utilizing Freight

---

[1] The Debtors in these Chapter 11 cases consists of GMI USA Management, Inc., Global Maritime Investments Holdings Cyprus Limited, Global Maritime Investments Vessel Holdings Pte. Limited, Global Maritime Investments Cyprus Limited and Global Maritime Investments Resources (Singapore) Pte. Limited.

Forward Agreements ("FFAs"), physical "trading" or supplying of ships for hire, and management of a dry bulk shipping pool on behalf of ships owned directly or indirectly by the Debtors, as well as for third party owners.

3.      On the date of filing of this Declaration (the "Petition Date") , the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court, Southern District of New York, Manhattan Division (the "Court"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to §§1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee has been appointed in any of these cases.

4.      The overwhelming majority of the Debtors' currently known obligations are compromised of funded debt, in the form of several tranches of unsecured loans as described below. There is no secured debt, other than the possibility of maritime liens, and a relatively small amount of trade debt. There are potential claims from owners of ships for future charter hire, which may be significant. There is no prepetition committee.

5.      Debtor GMI USA Management, Inc. is a recently formed New York corporation. All of the other Debtors are foreign corporations, and all of the Debtors are based in either Singapore or Cyprus. By its very nature, shipping is a worldwide business. The Debtors' ships regularly call on U.S. ports, and various of the Debtors have been involved in litigation in the United States District Courts for the Southern District of New York, and the Southern District of Texas both as either plaintiff or defendant.

6.      To minimize disruption to their international operations and preserve the value of their businesses, the Debtors have filed motions with this Court requesting standard "first-day" relief

(collectively, the **"First Day Motions"**). I am familiar with the contents of each First Day Motion (including the exhibits thereto).

7.     I submit this declaration in support of the First Day Motions pursuant to Local Rule 1007-2. The information required by the Rule is set forth below, or attached to the Original Petitions. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of information supplied to me by other members of the Debtors' management and professionals, my review of relevant documents, or my experience with, and knowledge of, the shipping industry generally, and the Debtors' operations and financial condition. If called as a witness, I could and would testify competently to the facts set forth herein. I am authorized to speak on behalf of the Debtors with respect to the matters covered herein.

## BACKGROUND

8.     The Debtors formed their business in 2011 through the purchase by Debtor Global Maritime Investments Cyprus Limited ("Cyprus Tradeco") of non-Debtor Global Maritime Investments Limited ("GMI Ltd."), a physical and futures maritime freight fund formed in 2006 and managed through a management company by Messrs. Stuart Rae and Stephen Rodley (together with Paul Barbour, the business's chief financial officer, the "UK Principals"). The Debtors' business operates as a joint venture arrangement (the "Joint Venture") among the UK Principals and certain investors. The Joint Venture is governed by a joint venture agreement (as supplemented and amended from time to time, the "JVA"). During the period 2011 through 2012, the Debtors employed a fleet of over 60 vessels, all of which were "chartered in" to the Debtors.

9.     In each of 2012, 2013, and 2014, the Debtors experienced net losses of approximately $93.0 million, $7.0 million, and $47.8 million, respectively. In response to ongoing losses and other considerations, in June 2013, the parties to the JVA agreed to restructure the Joint Venture and certain debt and equity instruments of the Debtors. Again, in November 2014, the parties to

3

the JVA agreed to further restructure certain debt and equity instruments of the Debtors and entered into an addendum to the JVA (the "JVA Addendum") to document the restructuring. In connection with that restructuring, the parties to the JVA and the UK Principals agreed to effectuate a controlled wind-down of the Debtors' trading book. In addition, Francolin, a limited company incorporated under the laws of the Cayman Islands ("Francolin") and one of the investors in the ___Joint Venture, and Debtor Global Maritime Investments Holdings Cyprus Limited ("Slipway") entered into a credit agreement (the "Slipway Credit Agreement"). Pursuant to the JVA Addendum and the Slipway Credit Agreement, Francolin could make advances to Slipway under the Slipway Credit Agreement. The terms of the Slipway Credit Agreement require that such advances were to be used by Debtor Global Maritime Investments Vessel Holdings PTE. Limited ("Vessel Holdings") to fund the acquisition and operation of dry bulk shipping vessels by subsidiaries of Vessel Holdings in furtherance of the Joint Venture. Subsequently, Francolin funded a series of advances to Slipway under the Slipway Credit Agreement.

10.     Despite these restructuring efforts, in fiscal year 2015, the Debtors experienced a net loss of approximately $67,570,939. The dry bulk shipping market in which the Debtors operate has been especially hard hit by the economic downturn. In June 2015, in an effort to increase revenue, the Debtors formed non-Debtor GMI Panamax Pool Limited ("Poolco"), a pooling entity into which the Joint Venture and other third-parties would contribute their vessels in a vessel pool structure. This required another amendment to the JVA, which was done with the consent of its members.

11.     Despite the formation of Poolco, the Debtors' business has continued to suffer losses. The shipping industry is highly cyclical, with associated volatility in charter hire rates and profitability. Although charter rates were at record levels in 2007 and 2008, charter rates in recent

4

years in many sectors of the shipping industry have plummeted to decade-low levels as a result of an excess supply of ships. Under the pressure of extremely low charter rates for its vessels, the Debtors have faced difficulty in servicing their debt and funding operating expenses.

12.   Since Slipway's entry into the Slipway Credit Agreement, Francolin declared that numerous defaults and events of default have occurred under the Slipway Credit Agreement, including events of default resulting from the substantial operating losses incurred by Slipway. Following these declarations of numerous and continuing defaults and events of default, in August 2015, Francolin informed Slipway that Francolin would no longer fund advances to Slipway under the Slipway Credit Agreement.

13.   The Debtors filed these chapter 11 cases to wind down their businesses and operations and liquidate their assets in an orderly fashion.

### CAPITAL STRUCTURE[2]

14.   Slipway currently has 5,075,044 shares of common stock outstanding, split into three classes that rank *pari passu* in almost all respects. The shareholders of Slipway consist of Francolin (approximately 48%), Activity SA, a limited company incorporated under the laws of Panama ("Activity") (approximately 10%), and GMI Ventures LLP, a UK limited liability partnership (approximately 42%).

15.   Slipway is a holding company that owns 100% of the outstanding shares of each of (i) Debtor GMI USA Management, Inc. ("US MgmtCo"), (ii) Debtor Cyprus Tradeco, (ii) Debtor Vessel Holdings, and (iv) non-Debtor Poolco. Cyprus Tradeco owns 100% of the outstanding shares of Debtor Global Maritime Investments Resources (Singapore) Pte. Limited ("Singapore

---

[2] Nothing herein constitutes a concession or acknowledgment of any amount owed or as to the validity of any debt, claim or lien. In the event of any inconsistencies between the summaries set forth herein and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

Tradeco") and non-Debtor GMI Ltd.[3]   An organizational chart showing Slipway and its subsidiaries is shown in the following chart.

## Slipway Organizational Structure



16.    In connection with the formation of the Debtors' business in 2011, the UK Principals (and certain of their key personnel) established a new management company GMI Resources UK

---

[3] The financial information set forth in this Declaration excludes non-Debtors Poolco and GMI Ltd.

LLP ("UK Brokerage LLP")[4] to provide services to Slipway's subsidiaries and to third parties. Prior to the Petition Date, UK Brokerage LLP provided management services to the Debtors.

Debt Structure

17.     As of the Petition Date, the substantial majority of the Debtors' liabilities—in excess of $169 million in principal amount—consisted of funded debt (*i.e.*, not trade debt or derivative liability) composed of the following: (a) the Tradeco Credit Facility (as defined below); (b) the Slipway Credit Facility (defined below); (c) the VIR Credit Facility (defined below); and (d) the ADM Credit Facility (defined below). These liabilities, which are described below, are unsecured obligations.

### A. The Tradeco Credit Facility

18.     On August 17, 2011, Cyprus Tradeco, as borrower, Francolin as lender, and Slipway, as guarantor, entered into that certain amended and restated credit agreement (as entered on June 28, 2013 and amended on November 1, 2014, the "Tradeco Credit Agreement") with Francolin, as lender.[5]   The Tradeco Credit Agreement provides for a $90 million unsecured credit facility maturing on December 31, 2017 (the "Initial Tradeco Credit Facility"). The Initial Tradeco Credit Facility is divided into two tranches—a $60 million Credit Line Commitment (as defined in the Tradeco Credit Agreement) and a $30 million Additional Credit Line Commitment (as defined in the Tradeco Credit Agreement). As of the beginning of 2015, the entire $90,000,000 available under the Initial Tradeco Credit Facility (the entire amount of the Credit Line Commitment and the Additional Credit Line Commitment) had been fully advanced and remains outstanding.

---

[4] Slipway holds a residual profits interest in UK Brokerage LLP.
[5] The Tradeco Credit Agreement fully amended and restated an earlier credit agreement entered into by and among the same parties on August 17, 2011.

19.    In early 2015, Francolin agreed to increase the amount available to Cyprus Tradeco under the Tradeco Credit Agreement by a total of $10 million through two $5 million advances, the first on January 15, 2015 (the "First Excess Funding Advance") and the second on February 26, 2015 (the "Second Excess Funding Advance," and together with First Excess Funding Advance and the Initial Tradeco Credit Facility, the "Current Tradeco Credit Facility"). These advances, which were documented by an Acknowledgement executed by Cyprus Tradeco, as borrower, and Slipway, as guarantor, are subject to individually specified interest rates and maturity dates but are otherwise subject to the terms and conditions set forth in the Tradeco Credit Agreement. The First Excess Funding Advance matured on March 15, 2015, and the Second Excess Funding Advance matured on May 27, 2015. Slipway has not made any payments in respect of the First Excess Funding Advance or the Second Excess Funding Advance.

20.    As of the date hereof, the full $100 million[6] advanced to Slipway pursuant to the Current Tradeco Credit Facility remains outstanding plus accrued and unpaid interest. The rate of interest on the Credit Line Commitment is LIBOR plus 4% per annum on the first $50 million borrowed and LIBOR plus 5% per annum on the additional $10M borrowed. The rate of interest on the Additional Credit Line Commitment is LIBOR plus 6% per annum on the first $10 million borrowed, LIBOR plus 7% per annum on the second $10 million borrowed, and LIBOR plus 8% per annum on the third $10 million borrowed. The rate of interest on the First Excess Funding Advance and the Second Excess Funding Advance is LIBOR plus 8% per annum.

### B. The Slipway Credit Facility

21.    As noted above, on November 1, 2014, Slipway entered into the Slipway Credit Agreement, which provides for a discretionary $135.77 million unsecured credit facility maturing

---

[6] All references to outstanding amounts in this description of the "Capital Structure" reflect only the outstanding principal amount and do not include any other fees and/or claims which may exist.

on November 1, 2024 (the "Slipway Credit Facility"). The Slipway Credit Facility is divided into two tranches— a $55.5 million Time-Charter Commitment (as defined in the Slipway Credit Agreement) and an approximately $80.27 Vessel Holdings Commitment (as defined in the Slipway Credit Agreement). Based on the declarations of default described above, pursuant to the terms of the Slipway Credit Agreement, Francolin will not advance any amounts under the Slipway Credit Facility to Slipway.

22.    Advances made under the Slipway Credit Facility accrue interest at a rate of either 12.5% or 15% per annum, depending on how the funds advanced are used by the Debtors. In addition, certain undrawn amounts under the Time-Charter Commitment accrue interest at a rate of 1% per annum.

23.    As noted above, in August 2015, Francolin notified Slipway of its decision not to provide further funding to Slipway under the Slipway Credit Facility based on a number of factors, including the existence of events of default under the Slipway Credit Agreement. As of the date hereof, $32,616,184 principal amount is outstanding under the Slipway Credit Facility plus accrued and unpaid interest.

### C. The Variable Interest Rate Debt

24.    On June 28, 2013, Slipway, as borrower, and Francolin and Activity, as lenders, entered into that certain variable interest rate credit agreement (as amended on November 1, 2014, the "VIR Credit Agreement"). The VIR Credit Agreement provides for a $36.825 million unsecured credit facility maturing on December 31, 2022 (the "VIR Credit Facility"). On June 28, 2013, as evidenced by two promissory notes issued by Slipway, Francolin and Activity advanced to Slipway the entire amount available under the VIR Credit Facility, of which Francolin advanced $31,675,000 and Activity advanced $5,150,000. As of the date hereof, $36,825,000 principal amount remains outstanding under the VIR Credit Agreement.

9

### D. The ADM Credit Facility

25.    On April 16, 2013, Cyprus Tradeco, as borrower, and ADM Investor Services International Limited ("ADM"), as lender, entered into that certain letter agreement (the "ADM Facility Agreement 1"). The ADM Facility Agreement 1 provides for a $3 million unsecured credit facility ("ADM Credit Facility 1"), which is payable on demand. In addition, on October 22, 2013, Cyprus Tradeco, as borrower, and ADM, as lender, entered into that certain letter agreement (the "ADM Facility Agreement 2"). The ADM Facility Agreement 2 provides for a $6 million unsecured credit facility (the "ADM Credit Facility 2," and together with ADM Credit Facility 1, the "ADM Credit Facilities"), which is payable on demand. Interest under the ADM Credit Facilities is charged on existing margin deficit at 2% above ADM's overnight cost of funds rate. The current balance of the ADM Credit Facilities is $1,890,349. The ADM Credit Facilities have been used to close out exposure on the FFA trading book.

### E. The Debtors' Ships and Associated Chartering Liabilities

26.    The Debtors charter ships from owners under a variety of long term charter agreements. Some of these are long term time charters, whereas others may be viewed as a form of secured financing. Those ships are then sub-chartered out to the Debtors' customers, generally on the spot market either on a voyage or time charter basis or used to service contracts of affreightment. Ship operating companies look to charter in ships at lower rates than are available on the spot market, and the Debtors sought to capitalize on this difference as part of their business model.

Currently, the Debtors have the following ships in their fleet:

CAPE CENTURY

CAPE NORTHVILLE

CAPE PROVIDENCE

CAPE SPENCER

DONG A ARTEMIS

SUNRISE

ECOSTAR GO

EMS

GMI ATHINOULA

GMI JANE

INFINITY

ISTRIA

JIA DA

JIA FOISON

PRIMROSE

27.    As of the Petition Date, the associated charter obligations exceed the value of the Debtors' interests in the ships in an undetermined amount.

### F. Other Assets

28.    The remaining assets of the Debtors are cash, accounts receivable and, at the Slipway level, the investment in Poolco.  The approximate values as of the Petition Date of those assets on a consolidated basis are approximately:

| | |
|---|---|
| Cash | $59,000 |
| Accounts Receivable | 2,657,068 |
| Investment in Poolco | (undetermined) |

29.    The Debtors' other assets include an undivided interest in the retainers they have provided to their proposed counsel and financial advisors, as well as an interest in the funds an escrow account with Ropes & Gray LLP maintained with the Citibank N.A. in New York, New York, in connection with that certain Credit Agreement and that certain Escrow Agreement dated September 15, 2015 between the debtors and Francolin

### First Day Motions

30.    Following is a discussion of the First Day Motions the Debtors have filed, a brief summary of the relief sought in each, and my reasons for believing each is necessary and in the best interests of the estate.

### A. Debtors' Motion for Order Directing Procedural Joint Administration of Affiliated Debtors Pursuant to Federal Rule of Bankruptcy Procedure 1015(b) -- (the "Joint Administration Motion").

31.    Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity. For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration of the these chapter 11 cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of 5 independent chapter 11 cases.

32.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

33.    Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B. Motion For the Entry of an Order Authorizing the Debtors to (A) File a Consolidated Creditor Matrix and (B) File a Consolidated List of the Debtors' 50 Largest Creditors –(the "Consolidated List Motion")**

34.     Pursuant to the Consolidated List Motion, the Debtors seek entry of an order authorizing the Debtors to: (1) file a consolidated creditor matrix in lieu of submitting separate matrices for each Debtor; and (2) file a list of the Debtors top 50 unsecured creditors on a consolidated basis. The Debtors operate as an integrated business entity, but some Debtors have only a small handful of creditors (*e.g.*, a holding company with primarily mezzanine financing debt and a couple of nominal overhead creditors). Filing separate matrices and separate top 20 unsecured creditors lists would only serve to increase the administrative burden of providing the requisite notices to the Debtors' creditors and it would impede, rather than aid, the U.S. Trustee's efforts to appoint a representative creditors' committee. Maintaining a consolidated matrix and top 50 unsecured creditor list rather than preparing and filing separate matrices and top 20 lists will maximize efficiency and accuracy and reduce costs. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Consolidated List Motion should be granted.

**C. Motion For Entry of Interim Order and a Final Order (A) Authorizing the Debtors to Obtain Superpriority Post-Petition Financing and (B) Prescribing Form and Manner of Notice and Scheduling a Final Hearing For Entry of a Final Order – (the "DIP Financing Motion")**

35.     Pursuant to the DIP Financing Motion, the Debtors request entry of an Interim Order and a Final Order (A) authorizing the Debtors to obtain superpriority post-petition financing and (B) prescribing form and manner of notice and scheduling a Final Hearing for entry of a Final Order. The Debtors have faced a number of financial challenges that placed a strain on their liquidity situation, all of which ultimately led to the filing of these Chapter 11 Cases. As described in more detail in the First Day Declaration, these challenges include, among others: (a) an extraordinary downturn in the Debtors' industry over the past three years, due in large part to

13

charter and spot rates that declined with the start of the global economic crisis, (b) increased competition, and (c) a substantial debt burden.

36. The Debtors' declining cash flows ultimately resulted in the Debtors being unable to service its long-term debt obligations in addition to its working capital needs.

37. Thereafter, the Debtors engaged in discussions with its principal lenders in an attempt to reach a consensual out-of-court restructuring. Ultimately, those efforts were unsuccessful, and the Debtors determined that a structured wind-down in a formal insolvency proceeding would be necessary. The Debtors and their advisors entered into extensive arm's-length negotiations with Francolin, their principal prepetition lender, regarding the terms of potential debtor-in-possession financing necessary to provide the Debtors with sufficient liquidity enact an orderly wind down though chapter 11 proceedings that would preserve the value of the Debtors business for creditors. During the negotiation process, the Debtors' financial advisors, in cooperation with the Debtors' professionals, reached out to several other prospective lenders to see if they would be willing to potentially provide post-petition financing. However, none of these other prospective lenders were willing to offer financing on an unsecured basis, and none were willing to offer financing on even roughly similar terms to those being offered by Francolin. The Debtors Board of Directors , in cooperation with the Debtors' advisors, determined that, because of the Debtors' limited assets in comparison to their outstanding debt no other lender would realistically offer financing on even roughly similar terms to those being offered by Francolin, and that allocating further resources to reaching out to potential lenders with no expectation of productive dialogue would only serve to detract from other restructuring tasks.

38. Without the proposed DIP Facility, the Debtors do not have sufficient cash or other available sources of working capital and financing to enact an orderly wind-down. Accordingly,

the Debtors urgently need access to the DIP Facility to continue to fund operations and pay management fees to UK Brokerage LLP to cover employees during the wind down, vendors, and to otherwise implement the Debtors' wind-down efforts.

39.    The proposed DIP Facility (all pursuant to the DIP Budget) will provide the Debtors with sufficient funds to accomplish all of the tasks described above. The Debtors expect that the proposed DIP Facility will be sufficient to satisfy all administrative expense obligations that the Debtors reasonably expect to incur during the pendency of these Chapter 11 Cases.

40.    Finally, the DIP Facility is the most favorable source of financing available to the Debtors at this time. The Debtors, in consultation with their advisors, have determined that it would not be possible to obtain financing (i) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, (ii) solely as an administrative expense under section 364(a)-(b) of the Bankruptcy Code, or (iii) solely in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors have no known secured debt, and under the DIP Facility the DIP Lender receives senior priority liens only on unencumbered assets of the Debtors. To the extent that any of the Debtors' assets are subject to a perfected security interest, Francolin has agreed to accept a junior lien and does not seek to prime such prior perfected security interest holders, if any.

41.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the DIP Financing Motion should be granted.

   **D. Motion for an Order (i) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Foreign Vendors, Service Providers, Governments, Maritime Lien Holders, and Certain Critical Vendors, and (ii) Authorizing Financial Institutions to Honor all Related Checks and Electronic Payment Requests – (the "Critical Vendor Motion")**

42.     Pursuant to the Critical Vendor Motion, the Debtors request entry of an order
authorizing the Debtors to (i) pay or honor prepetition obligations to foreign vendors, service
providers, governments, maritime lien holders, and certain critical vendors, and (ii) authorizing
financial institutions to honor all related checks and electronic payment requests. In their ordinary
course of business, the Debtors rely on the Critical Vendors[7] to supply goods, materials and
services without which the Debtors' business either could not operate or would operate at
significantly reduced profitability. The Critical Vendors provide the Debtors with the following
categories of goods and services:

(a)     Agents' Expenses and Costs. Agents provide the crew with assistance in
joining/signing off of the Vessels, including travel expenses. Moreover,
they arrange for necessary ship provisions and repairs, and organize the
supply, transport and the handling of goods. It is essential that the agents
are paid so as not to disturb the smooth operations of the Vessels worldwide.

(b)     Port Expenses. Numerous port expenses are accrued by the Vessels as they
conduct their business throughout the world. Pilotage, docking masters,
towage, mooring, tugs, harbor dues, tonnage dues, etc. are incurred in ports
throughout the world. It is essential that such foreign debts be paid in order
to ensure the Vessels can continue to conduct business in foreign ports of
call.

(c)     Bunkers. Bunker fuel is liquid fuel which powers the Debtors' Vessels.
Bunker fuel is provided by local vendors in the applicable port at the time
because it is necessary for such vendors to be in close physical proximity to
the Vessels. It is essential to the locomotion of the Vessels that the Debtors
maintain healthy relationships with those vendors who provide them with
bunker fuel.

(d)     ***Insurance. At least one of the Debtors' liability policies becomes due
shortly after the Petition Date. The covered period includes the beginning
of September. While the Debtors will attempt to negotiate a short period
coverage, it may be necessary to pay the entire period.***

(e)     Charter Hire Payments. Under certain charters, the owner of the ship has
the right to arrest cargo belonging to third party customers, thereby creating
delay charges and possible cargo damage claims. In these circumstances

---

[7] Capitalized terms used in this Section ____ --Relief Sought In First Day Motions but not defined in this
Declaration shall have the meaning ascribed to them in the relevant motion.

damage claims can be avoided by payment of a legally due charter hire payment.

(f)   Ship Construction Supervision Charges. The Debtors are the charterers of several ships being built by third party owners for long term charter to the Debtors. Negotiations have been continuing for the Debtors to sell or assign its interests in these ships. Debtors' management believes that the Debtors may realize a profit if it can sell or assign those interests. Unpaid supervision charges could result in a complication or loss of any such sale or assignment.

43.   The Debtors believe that the payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts. Critical Vendors are, in many cases, the only source or the most preferred source from which the Debtors can procure certain goods and services within a timeframe and at a price that will permit the Debtors to continue to smoothly operate their businesses. A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendor refusing to provide goods and services to the Debtors postpetition and may force the Debtors to obtain such goods and services elsewhere at a much higher price or in a quantity or quality that is insufficient to satisfy the Debtors' requirements. This could, in turn, diminish the recoveries available to other creditors.

44.   A vendor may be the exclusive or preferred supplier of products or services to the Debtors for a number of reasons. In some cases, it may be the case that the only way that the Debtors are able to purchase products or services in quantities of the desired amount is through a particular vendor in a particular port.. It is vital for the charterers of the Vessels to arrive and leave ports on time in order to meet their shipping obligations. In other cases, the Debtors have an established relationship with one vendor, and there is simply no available supply from any other vendor or the time and expense of sourcing another vendor in a timely and cost effective manner. In other instances, due to preferred pricing from existing business relationships, procuring a particular supply of a certain product from an alternative source would be too expensive.

45.    Absent the ability to pay certain prepetition amounts owed to Critical Vendors, the Debtors may be denied access to certain ports, and their access to necessary goods and services would be extinguished as the Critical Vendors will refuse to continue doing business with the Debtors or may only do business if the Debtors provide trade term accommodations such as advance deposits or payment prior to delivery.

46.    Most importantly, and unique to maritime cases, any Critical Vendor which supplies the Debtors' Vessels with goods or services that could be considered "necessaries" as that term is understood under the maritime laws of the U.S. and most jurisdictions[8] may claim a maritime lien against the Debtors' Vessels. Maritime liens are "secret liens" in that a lien claimant need not take any steps to attach or perfect its lien. Any such claimant could seek to attach and arrest the respective Debtor vessel should it come to port.  Moreover, even if a vendor is not entitled to a lien, it may seek to attach a ship, its cargo or its bunkers, for example under Rule B of the U.S. Admiralty Rules of Procedure.

47.    While the automatic stay is likely to provide protection from such attachment and arrest with regard to American vendors, there is no guarantee that international companies outside this Court's jurisdiction will respect the power of Bankruptcy Code § 362, especially as the Vessels enter ports all over the world. Some of these jurisdictions may eventually recognize the automatic stay of United States bankruptcy law, but only after considerable delay and considerable effort on the part of the Debtors, all the while the Debtors could be losing revenue, as well as their reputation for timely delivering cargo. Of course, other jurisdictions are unlikely to ever recognize United States bankruptcy law.

---

[8] The Debtors make no admission as to the nature of any claim or lien against any vessels based on necessaries, and reserve all rights with regard to same.

18

48.   Since the Critical Vendors may arguably be secured creditors and may have the ability

to arrest the Debtors' Chartered Vessels in foreign ports around the world, it is in the best interests

of all parties to satisfy the Critical Vendor Claims of foreign vendors as described herein.

**E.   Motion for an Order (i) Authorizing Continued Use of Existing Business Forms and Records, (ii) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System, and (iii) Waiving the Requirements of Bankruptcy Code § 345(b) – (the "Cash Management Motion")**

49.   Pursuant to the Cash Management Motion, the Debtors request entry of an order (i)

authorizing continued use of existing business forms and records, (ii) authorizing maintenance of

existing corporate bank accounts and cash management system, and (iii) waiving the requirements

of Bankruptcy Code § 345(b).  Prior to commencing the Chapter 11 Cases, in the ordinary course

of their businesses, the Debtors used a Cash Management System to efficiently collect, transfer,

and disburse funds generated by their business operations.

50.   The Debtors respectfully request authority to maintain their bank accounts and the Cash

Management System in accordance with their usual and customary practices to ensure a smooth

transition into chapter 11 with minimal disruption to operations and, in connection therewith, seek

a waiver of the requirements of Bankruptcy Code § 345(b). The Debtors also request authority to

close any of their bank accounts if, in the exercise of their business judgment, the Debtors

determine that such action is in the best interest of their estates.

51.   In order to conduct their postpetition business, the Debtors need to be able to issue

checks to vendors, service providers, and others. Additionally, their bank accounts are maintained

with financial institutions that are financially stable.

52.   To open new accounts and obtain checks for those accounts will cause delay and

disruption to the Debtors' business and a delay in receipt of funds needed for the Debtors'

operations.

53. The Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, among other things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtors' reorganization efforts.

54. The relief requested in this motion is vital to ensuring the Debtors' seamless transition into bankruptcy. Authorizing the Debtors to maintain their Cash Management System, as modified, will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 cases.

55. The Debtors seek a waiver of the Guidelines' requirement that they open a new set of books and records as of the Petition Date. Opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. The Debtors, in the ordinary course of their business, use many invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtors are engaged and the numerous other parties with whom they deal, the Debtors need to use their existing business forms without alteration or change. Printing new business forms would take an undue amount of time and expense. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

F. **Motion for the Entry of an Order Enforcing the Protections of Sections 105, 362, 365, and 525 of the Bankruptcy Code (the "Stay Enforcement Motion")**

56. Pursuant to the Stay Enforcement Motion, the Debtors request entry of an order enforcing the protections of Sections 105, 362, 365, and 525 of the Bankruptcy Code. The Debtors' business operations are conducted worldwide with significant assets moving through international

20

waters at any given time. As a result, the Debtors have many foreign creditors and counterparties to contracts who may not be well versed in the restrictions of the Bankruptcy Code. Many of these creditors do not transact business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor in possession's authority to conduct its business. These creditors may be unfamiliar with the operation of the automatic stay and other provisions of the Bankruptcy Code.

57.    Thus, various interested parties may attempt to seize assets located outside of the United States to the detriment of the Debtors, their estates and creditors, or take other actions in contravention of the automatic stay of Bankruptcy Code § 362. In addition, upon learning of the Debtors' bankruptcy, counterparties to leases and executory contracts may attempt to terminate those leases or contracts pursuant to *ipso facto* provisions in contravention of Bankruptcy Code § 365. Further, governmental units may seek to revoke or otherwise limit grants to which the Debtors are entitled based on the Debtors status as debtors in the Chapter 11 Cases, in contravention of Bankruptcy Code § 525.

58.    Though I am advised by proposed counsel for the Debtors that the automatic stay, *ipso facto*, and non-discrimination protections, are fundamental aspects of the Bankruptcy Code that arise as a matter of law upon the commencement of a chapter 11 case, in my experience I know that not all parties affected or potentially affected by the commencement of a chapter 11 case are aware of the aforementioned Bankruptcy Code provisions. Nor are all parties cognizant of the significance and impact of these provisions. Experience has shown that it is often necessary to advise third parties of the existence and effect of the automatic stay, the invalidation of *ipso facto* provisions, and the prohibition against discriminating against a debtor in bankruptcy solely because of its debtor status, particularly in cases in which the debtor conducts significant business

21

in foreign jurisdictions. Occasionally, it is necessary to commence proceedings in the bankruptcy court to enforce these provisions. Accordingly, it is not uncommon for a bankruptcy court to issue an order embodying and restating the provisions of Bankruptcy Code §§ 362 and 365.

59.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Stay Enforcement Motion should be granted.

### G. Motion to Schedule Expedited Hearing and to Limit Notice of Certain "First Day" Matters – (the "First Day Scheduling Motion")

60.     Pursuant to the First Day Scheduling Motion, the Debtors request entry of an order scheduling an expedited hearing and limiting notice of certain "first day" matters. Expedited consideration of the First Day Matters is critical to the maintenance of the Debtors' estates. The Debtors presently lack sufficient liquidity to support their operations. In fact, the Debtors have almost no cash with which to operate. The Debtors need expedited consideration of the First Day Matters in order to meet current operating expenses, including, without limitation, insurance, fuel, docking fees, lease, and UK Brokerage LLP obligations. Without expedited consideration of the First Day Matters, the value of the Debtors' assets could be negatively affected.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the First Day Scheduling Motion should be granted.

Pursuant to 28 U.S.C. §1746 (1) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 15 day of September 2015.

Justin Knowles

22

7052228v.6