John P. Melko
713-276-5727 (*direct dial*)
713-276-6727 (*direct fax*)
jmelko@gardere.com
Michael K. Riordan
713-276-5178 *(direct dial)*
713-276-6178 *(direct fax)*
mriordan@gardere.com
**GARDERE WYNNE SEWELL LLP**
1000 Louisiana, Suite 2000
Houston, Texas  77002-5011

*Proposed Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| GMI USA MANAGEMENT, INC., *et al*[1] | § | CASE NO. _____ |
| | § | |
| Debtors. | § | (Joint Administration Requested) |

**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE
DEBTORS TO OBTAIN SECURED SUPERPRIORITY POST-PETITION FINANCING;
AND (B) PRESCRIBING FORM AND MANNER OF NOTICE AND
SCHEDULING A FINAL HEARING**

GMI USA Management, Inc., Global Maritime Investments Holdings Cyprus Limited

("GMI Holdings"), Global Maritime Investments Vessel Holdings Pte. Limited, Global Maritime

Investments Cyprus Limited, and Global Maritime Investments Resources (Singapore) Pte.

Limited, (the "Debtors", and each a "Debtor"), hereby file this motion (the "Motion") for entry

of an interim order (the "Interim Order") and a final order (the "Final Order" and together with

the Interim Order, collectively, the "DIP Orders") (A) authorizing the Debtors to obtain

---

[1] The Debtors in these Chapter 11 cases consists of GMI USA Management, Inc., Global Maritime
Investments Holdings Cyprus Limited, Global Maritime Investments Vessel Holdings Pte. Limited,
Global Maritime Investments Cyprus Limited and Global Maritime Investments Resources (Singapore)
Pte. Limited.

superpriority post-petition financing and (B) prescribing form and manner of notice and scheduling a final hearing (the "Final Hearing") for entry of a Final Order (providing for similar relief on a final basis).   In support of the Motion, the Debtors rely upon the *First Day Declaration of Justin Knowles*, filed contemporaneously herewith (the "First Day Declaration"), and respectfully state as follows:

## I.
## PRELIMINARY STATEMENT

1.   The Debtors seek court authorization to enter into a debtor-in-possession financing facility for up to $2 million in discretionary term loans (the "DIP Financing") with Francolin as lender (the "DIP Lender"). The DIP Financing provides the Debtors with an infusion of funds to (i) address the Debtors' current liquidity needs, (ii) make immediate payments to critical and foreign vendors to minimize disruption to their international operations, and (iii) provide the Debtors sufficient time to effectuate an orderly wind-down of their business.

2.   As an international shipping business, the Debtors operate in numerous ports around the world.  As more fully discussed in the Debtors' motion to pay critical and foreign vendors, it is possible that certain foreign creditors, if not timely paid, could seek to arrest the Debtors' vessels (the "Vessels") in foreign ports or otherwise hinder the operation of these Vessels operating outside of the United States. The continued, orderly, and timely completion of the Debtors' ongoing business obligations is dependent upon the Debtors obtaining immediate access to the funds provided under the proposed DIP Financing. The proposed DIP Financing will allow the Debtors to timely pay their vendors and employees, and properly maintain and operate their remaining business operations with as little disruption to the business as possible to permit a smooth transition to winding up the business.

## II.
## JURISDICTION AND VENUE

3.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This matter concerns the administration of this bankruptcy estate; accordingly, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.   The predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 362, 363, 364(c), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Rule 4001-2.

## III.
## RELIEF REQUESTED

5.   Pursuant to sections 105(a), 362, 363, 364(c), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2, the Debtors respectfully request the relief set forth in the Interim Order (in substantially the form annexed hereto as Exhibit A), and the Final Order,[2] including the following:

- **The DIP Financing:**  authority to obtain postpetition financing in the form of a credit facility up to a maximum aggregate principal amount of $2,000,000 (the "DIP Loans" and any loans or other extensions of credit thereunder, the "DIP Facility"), pursuant to the terms and conditions of the debtor-in-possession credit agreement (the "DIP Credit Agreement"), in substantially the form annexed hereto as Exhibit B, including:

  - o  **a.** authority to execute and deliver the DIP Credit Agreement and all agreements, documents, and instruments entered into in connection with the DIP Facility (collectively, the "DIP Loan Documents");

  - o  **b.** authority to borrow, on an interim basis, during the period from the Petition Date through and including the date of entry of a Final Order (the "Interim Period"), up to a maximum aggregate principal

---

[2] The Final Order will be filed with the Court prior to the Final Hearing.

amount of $450,000 (the "<u>Initial DIP Loan</u>") in accordance with the DIP Budget (as defined below); and

o **c.** authority to use proceeds of the DIP Financing in accordance with the budget prepared by the Debtors and approved by the DIP Agent (as defined below), annexed hereto as Exhibit D (as updated from time to time in accordance with the DIP Credit Agreement, the "<u>DIP Budget</u>");

  o <u>provided, however</u>, that the DIP Superpriority Claim and the DIP Liens are subject to the Carve-Out.

- **DIP Liens / Claims:** authority to grant:

  o **a.** superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "<u>DIP Superpriority Claim</u>");

  o **b.** a first priority and senior lien on, and security interests in, all of the Debtors' unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code; and

  o **c.** a junior lien on all of the Debtors' encumbered assets pursuant to section 364(c)(3) (together with the liens granted pursuant to clause (b) above, collectively, the "<u>DIP Liens</u>").

  o <u>provided</u>, <u>however</u>, that the DIP Superpriority Claim and the DIP Liens are subject to the Carve-Out.

- **Automatic Stay:** authority to modify the automatic stay to the extent necessary to implement the terms and provisions of the DIP Loan Documents and the DIP Orders.

- **Waiver of Stay:** waive any stay applicable to, and provide for the immediate effectiveness of, the Interim Order.

- **Final Hearing:** (a) schedule a Final Hearing to allow entry of the Final Order, to be held no earlier than 14 days after service of this Motion, and no later than 30 days from the Petition Date, and (b) establish notice procedures in respect of the Final Hearing.

**IV.**

**CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001, LOCAL RULE 4001-2, AND SOUTHERN DISTRICT OF NEW YORK GENERAL ORDER NO. M-274[3]**

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| **Parties**<br><br>*Preamble to DIP Credit Agreement*<br><br>*Preamble to Interim Order* | <u>Borrowers</u>: the Debtors (on a joint and several basis)<br><br><u>DIP Lender</u>: Francolin |
| **DIP Commitments**<br><br>*DIP Credit Agreement §2.1*<br><br>*Preamble to Interim Order* | Interim DIP Loan: up to $450,000 term loan[4]<br><br>Final DIP Loan: up to $2,000,000 discretionary term loan |
| **Use of Proceeds**<br><br>*DIP Credit Agreement §9.1(f)*<br><br>*Interim Order ¶6* | Proceeds may be used in accordance with the Budget for working capital purposes, general corporate purposes in the ordinary course of the business of the Debtors, to pay Chapter 11 expenses, and to pay such other amounts as ordered by the Court. |

---

[3] The description of the DIP Facility provided herein is only intended as a summary. In the event of any inconsistency between the description set forth herein and the terms of the Interim Order or DIP Loan Documents, as applicable, the terms of the Interim Order or the DIP Loan Documents shall govern.

[4] The amount of the anticipated Interim DIP Loan, $450,000, is held in New York, New York in an escrow account by Ropes & Gray, LLP, as escrow agent. The escrow account has been funded by Francolin. Disbursement of funds to the Borrowers is conditioned upon entry of the Interim Order.

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| **Limitations on Use of Proceeds**<br><br>*DIP Credit Agreement §9.2(f)*<br><br>*Interim Order ¶16* | Debtors may not, without the prior written consent of the DIP Lender, use any portion of the DIP Loans or the Collateral (as defined in the DIP Loan Documents) (including the Carve-Out or any "cash collateral" as defined in section 363(a) of the Bankruptcy Code):<br><br>• to finance an action or investigation adverse to the interests of any or all of the Releasees[5] or their respective rights and remedies under financing orders entered in this case, the DIP Loan Documents, or certain prepetition agreements with the DIP Lender; or to finance any other action which with the giving of notice or passing of time would result in an Event of Default, <u>provided</u>, however, that, notwithstanding the foregoing, up to $50,000 in the aggregate of any proceeds of the DIP Loans or the Collateral may be used to pay any allowed fees and expenses of estate professionals retained by the Debtors or any official committee of unsecured creditors (a "<u>Committee</u>") that are incurred in connection with investigating the matters covered by the release contained in §13 of the DIP Credit Agreement (the "<u>Investigation Budget</u>"). |
| **Interest Rates**<br><br>*DIP Credit Agreement §2.2* | <u>Non Default Interest Rate</u>: 8% per annum.<br><br><u>Default Interest Rate</u>: A rate per annum which is equal to the sum of (i) 8% per annum plus (ii) two percent (2%) per annum until amounts then payable under the DIP Loan Documents are paid in full (after as well as before judgment) or (as the case may be) such Event of Default has been cured or waived in writing by the DIP Lender. |
| **Scheduled Maturity Date**<br><br>*DIP Credit Agreement §1* | The date which is the earliest of (a) February 1, 2016, (b) the date on which payment of the Obligations (as defined in the DIP Credit Agreement) is accelerated by the DIP Lender as provided in §10 of the DIP Credit Agreement, (c) the effective date of a Plan, and (d) thirty (30) days after the Petition Date, in the event that the Final Order shall not have been entered on or before such date. |
| **Fees**<br><br>*DIP Credit Agreement §4*<br><br>*Interim Order ¶17* | Debtors to pay fees, costs and expenses (including any taxes, legal, appraisal, environmental consulting, accounting and other professional fees) incurred by the DIP Lender in connection with its due diligence or the preparation, negotiation, execution, amendment, administration or enforcement of any of the Obligations or the DIP Loan Documents, including, without limitation, the obtaining of perfection, protection or priority of any DIP Liens upon any of the Collateral, the review of court papers or proceedings in the Debtors' chapter 11 cases (the "<u>Chapter 11 Cases</u>") or this Court or other court appearances in connection with any of the foregoing. |

---

[5] As used herein, "<u>Releasees</u>" means the DIP Lender, Harvard Management Company, Inc., and their respective officers, directors, trustees, managers, partners, employees, affiliates, agents, attorneys, advisors, shareholders, representatives, and controlling persons.

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| **DIP Liens and Priority**<br><br>*DIP Credit Agreement §6*<br><br>*Interim Order ¶11* | The DIP Lender will receive a Lien and security interests on all of the Debtors' assets and property, except as provided below.<br><br>Section 364(c)(2) Liens – The DIP Lender will have a first priority lien on all unencumbered Collateral.<br><br>Section 364(c)(3) Liens – The DIP Lender will have a junior lien on all Collateral subject to security interests.<br><br>The Collateral shall not include any rights of the Debtors under sections 544, 547, 548, 549, 550, and 553 of the Bankruptcy Code; *provided*, *however*, that the Collateral shall include any claims and causes of action against the Releasees, including causes of action, if any, under sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code. |
| **Superpriority Administrative Claim Status**<br><br>*DIP Credit Agreement §1, 6*<br><br>*Interim Order ¶10* | The DIP Lender will receive superpriority claims with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims under sections 105, 326, 328, 330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code (the "Superpriority Claims"); provided that all Superpriority Claims shall be subject to the Carve-Out. |
| **Carve-Out**<br><br>*DIP Credit Agreement §1, 6*<br><br>*Interim Order ¶15* | The liens and claims of or granted to the DIP Lender shall be subject and subordinate to the payment of the following fees and claims (collectively, the "Carve-Out"):<br><br>1.  unpaid professional fees and expenses of the Debtors not to exceed $250,000 in the aggregate;<br><br>2.  unpaid professional fees and expenses for any Committee, not to exceed $100,000 in the aggregate;<br><br>3.  allowed but unpaid professional fees and expenses of the Debtors and any Committee accrued from and after the delivery of a Carve-Out Notice, not to exceed $100,000 in the aggregate;<br><br>4.  the payment of fees pursuant to 28 U.S.C. § 1930, plus any interest pursuant to 31 U.S.C. § 3717; and<br><br>5.  approved professional fees and expenses incurred by any court-appointed trustee in a case under chapter 7, not to exceed $50,000 in the aggregate. |
| **Acceptable Plan**<br><br>*DIP Credit Agreement §6(c)* | Debtors shall not propose or support any plan of reorganization or liquidation that is not conditioned upon the payment in full in cash of all amounts owed under the DIP Facility, on or prior to the earlier to occur of (A) the effective date of such plan and (B) sixty (60) days following the confirmation date of such plan. |

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Required Disclosure** | **Terms** |
| **Covenants**<br><br>*DIP Credit Agreement §9.1, 9.2* | Customary and appropriate affirmative and negative covenants for financings of this type and for this transaction in particular, including regular delivery of cash flow reports (receipts less disbursements) and balance reports. |
| **Events of Default**<br><br>*DIP Credit Agreement §10*<br><br>*Interim Order ¶19* | Standard and customary events of default, including:<br><br>• default under any agreement or agreements (other than the DIP Loan Documents) evidencing post-petition debt; or any prepetition Indebtedness if, by order of this Court issued or previously issued at the time of reference thereto with respect to such debt, a default thereunder would entitle the holder thereof to relief from the automatic stay of Section 362(a) of the Bankruptcy Code, in excess of $50,000 in aggregate principal amount, or the Debtors shall otherwise fail to pay such debt when due or within any applicable period of grace;<br><br>• granting relief from the automatic stay to any creditor holding or asserting a lien or reclamation claim on a material portion (*i.e.*, more than $50,000 per creditor or $50,000 in the aggregate) of the assets of the Debtors taken as a whole or where the deprivation of the Debtors of such assets will, in the reasonable opinion of the DIP Lender, have a material adverse effect;<br><br>• the Debtors shall not have filed a plan of reorganization or liquidation with this Court that provides for payment in full in cash of the Obligations on the effective date of such plan (a "<u>Plan</u>"), a disclosure statement for such Plan, and a motion to approve the disclosure statement for such Plan, on or before 11:59 P.M. (ET) on November 13, 2015;<br><br>• this Court shall not have entered an order approving a disclosure statement for a Plan, on or before 11:59 P.M. (ET) on December 15, 2015;<br><br>• this Court shall not have entered an order confirming a Plan, on or before 11:59 P.M. (ET) on January 15, 2016; and<br><br>• the effective date of a Plan shall not have occurred on or before 11:59 P.M. (ET) on January 29, 2016. |
| **Modification of Automatic Stay**<br><br>*DIP Credit Agreement §10*<br><br>*Interim Order ¶13* | The automatic stay is modified as necessary to effectuate the terms of the Interim Order, including the granting of liens contemplated by the Interim Order and to allow for the exercise of remedies following an Event of Default. |

| MATERIAL TERMS OF THE DIP FACILITY | |
| --- | --- |
| **Required Disclosure** | **Terms** |
| **Prepayments**<br><br>*DIP Credit Agreement §2.4* | <u>Voluntary</u>: The Debtors may, upon prior written or telephonic notice, prepay, without premium or penalty, the Loan in in an aggregate minimum amount of $10,000 and integral multiples of $5,000.  Any such voluntary prepayment shall be applied to reduce the outstanding principal balance of the DIP Loan and may not be reborrowed.<br><br><u>Mandatory</u>: Until such time as the Obligations have been repaid in full in cash, the Obligations shall be permanently prepaid in an amount equal to (i) 100% of the net cash proceeds of any asset sale (in one or a series of related transactions), after payment of debt to the extent secured by prior liens permitted under the DIP Credit Agreement and (ii) 100% of the net cash proceeds of any casualty event. |
| **Releases**<br><br>*DIP Credit Agreement §13*<br><br>*Interim Order ¶18* | If the Debtors or the Committee do not assert any claims on behalf of the Debtors' estates by the expiration of the Challenge Period, (i) the Debtors and their estates shall be deemed to have released the Releasees of and from any and all claims and causes of action related to the Debtors, and (ii) the foregoing release shall be binding upon the Debtors, their estates, and their successors (including any Chapter 7 or Chapter 11 trustee appointed or elected for the Debtors), any Committee, and all other parties in interest. |
| **Indemnification**<br><br>*DIP Credit Agreement §14*<br><br>*Interim Order ¶17, 25* | The Debtors jointly and severally agree to indemnify and hold harmless the Releasees from and against any and all losses, claims, damages and liabilities to which any such Releasee may be subject arising out of or in connection with the DIP Credit Agreement and the other DIP Loan Documents or any of the transactions contemplated hereby <u>provided</u>, <u>however</u>, that the foregoing indemnity will not, as to any Releasee, apply to losses, claims, damages, liabilities or related expenses to the extent that they have been determined by a court of competent jurisdiction by final, non-appealable order to arise from the bad faith, willful misconduct or gross negligence of such Releasee. |
| **Challenge Period**<br><br>*DIP Credit Agreement §13*<br><br>*Interim Order ¶18* | Subject to the limitations on use of proceeds and the Investigation Budget, the Debtors or any Committee may timely commence a contested matter or adversary proceeding (a "<u>Challenge</u>") to assert any claims or causes of action on behalf of the Debtors' estates against the DIP Lender until the later of (i) if no Committee has been appointed, seventy-five (75) days from the Petition Date, or (ii) if a Committee has been appointed within the seventy-five-(75)-day period provided in clause (i) above, sixty (60) days after the appointment of such Committee. |

# V.
## PROVISIONS TO BE HIGHLIGHTED TO THE COURT

6.    As a condition to obtaining the proposed financing, the DIP Lender has required and the

Debtors have agreed to certain provisions that may be considered key provisions to be

highlighted to the Court. These provisions include the following:

- **Lien on Certain Avoidance Actions:** Under the DIP Credit Agreement, the Collateral shall not include any rights of the Debtors under sections 544, 547, 548, 549, 550, and 553 of the Bankruptcy Code; *provided*, *however*, that the Collateral shall include any claims and causes of action against the Releasees, including causes of action, if any, under sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

- **Carve-Out**: The liens and claims of or granted to the DIP Lender in this Interim Order and/or the DIP Loan Documents shall be subject and subordinate to the payment of the Carve-Out.

- **506(c) and 552(b) Waiver:** subject to the entry of the Final DIP Order, no costs or expenses of administration shall be surcharged or otherwise imposed against the DIP Lender's collateral under section 506(c) of the Bankruptcy Code or otherwise, and any right to assert the "equities of the case" exception in Section 552 of the Bankruptcy Code shall be waived.

- **Investigation**. Limitations on use of proceeds of the DIP Facility or Carve-Out shall not apply to investigations of the Debtors or the Committee of the matters covered by the Debtors' releases of the DIP Lender in an aggregate amount up to $50,000. The Interim DIP Order also provides that the Debtors' release of the DIP Lender and the other Releasees will be binding upon the Debtors, their estates, and their successors (including any Chapter 7 and Chapter 11 trustee appointed or elected for the Debtors), any Committee, and all other parties in interest, unless the Debtors or a Committee has filed an adversary proceeding or contested matter within the Challenge Period.

- **Adequacy of the Budget.** The Debtors are required to deliver to the DIP Lender a budget for the 13 weeks commencing with the week that includes the Petition Date. Such budget will be updated and extended in the following months with the prior written consent of the DIP Lender (DIP Credit Agreement¶ 9.1(a)(ii)).  The Debtors have reason to believe that the DIP Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing or the budget.

## VI.
## BACKGROUND

7.  On September 15, 2015 (the "Petition Date"), each Debtor filed a voluntary petition for

relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the

"Bankruptcy Code").

8.  The Debtors continue to operate and to manage their business as "debtors-in-possession"

pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been

appointed in the Chapter 11 Cases pursuant to section 1104 of the Bankruptcy Code.  No official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

9.   A description of the Debtors' businesses can be found in the First Day Declaration.

**VII.**
**THE DEBTORS' LIQUIDITY NEEDS**

10. The Debtors have faced a number of financial challenges that placed a strain on their liquidity situation, all of which ultimately led to the filing of these Chapter 11 Cases. As described in more detail in the First Day Declaration, these challenges include, among others: (a) an extraordinary downturn in the Debtors' industry over the past three years, due in large part to charter and spot rates that declined with the start of the global economic crisis and worsened in the past year due to the decline in oil prices, (b) increased competition, and (c) a substantial debt burden.

11. The Debtors' declining cash flows ultimately resulted in the Debtors being unable to service their long-term debt obligations in addition to their working capital needs.

12. Thereafter, the Debtors engaged in discussions with Francolin, their principal prepetition lender, in an attempt to reach a consensual out-of-court restructuring.[6] Ultimately, those efforts were unsuccessful, and the Debtors determined that a structured wind-down in a formal insolvency proceeding would be necessary.  The Debtors and their advisors entered into extensive arm's-length negotiations with Francolin, regarding the terms of potential debtor-in-possession financing necessary to provide the Debtors with sufficient liquidity enact an orderly wind down though chapter 11 proceedings that would preserve the value of the Debtors business

---

[6] In addition to being the Debtors' principal pre-petition lender, Francolin holds approximately 48% of the equity interests in the Debtors and has a right to appoint one of the three members of the Board of Directors of GMI Holdings.

for creditors.  During the negotiation process, the Debtors' senior management, in cooperation with the Debtors' advisors, reached out to three other prospective lenders to see if they would be willing to potentially provide post-petition financing.  However, none of these other prospective lenders were willing to offer financing on an unsecured basis, and none were willing to offer financing on even roughly similar terms to those being offered by Francolin.   Senior management, in cooperation with the Debtors' advisors, determined that, based on the results of these discussions with other lenders, as well as their historical experience running the Debtors' business and extensive prior experience in the maritime industry, that because of the Debtors' limited assets in comparison to their outstanding debt no other lender would realistically offer financing on even roughly similar terms to those being offered by Francolin, and that allocating further resources to reaching out to potential lenders with no expectation of productive dialogue would only serve to detract from senior management's other restructuring tasks.

## VIII.
## BASIS FOR RELIEF

13. Without the proposed DIP Facility, the Debtors do not have sufficient cash or other available sources of working capital and financing to enact an orderly wind-down. Accordingly, the Debtors urgently need access to the DIP Facility to continue to fund operations and pay their employees, vendors, and to otherwise implement the Debtors' wind-down efforts.

14. The proposed DIP Facility (all pursuant to the DIP Budget) will provide the Debtors with sufficient funds to accomplish all of the tasks described above. The Debtors expect that the proposed DIP Facility will be sufficient to satisfy all administrative expense obligations that the Debtors reasonably expect to incur during the pendency of these Chapter 11 Cases.

15. Finally, the DIP Facility is the most favorable source of financing available to the Debtors at this time. The Debtors, in consultation with their advisors, have determined that it would not be possible to obtain financing (i) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, (ii) solely as an administrative expense under section 364(a)-(b) of the Bankruptcy Code, or (iii) solely in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code.   The Debtors have no known secured debt, and under the DIP Facility, the DIP Lender receives senior priority liens only on unencumbered assets of the Debtors. To the extent that any of the Debtors' assets are subject to a perfected security interest, Francolin has agreed to accept a junior lien and does not seek to prime such prior perfected security interest holders, if any.

16. Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority secured basis pursuant to section 364(c) of the Bankruptcy Code.

**A.      The Debtors Satisfy the Requirement for Obtaining Postpetition Credit on a Secured and Superpriority Basis Pursuant to Sections 364(c) of the Bankruptcy Code**

17. Section 364 of the Bankruptcy Code governs requests for approval of postpetition financing. If a debtor cannot obtain postpetition credit on an unsecured, administrative expense basis, section 364(c) of the Bankruptcy Code authorizes a debtor to incur debt that is entitled to superpriority administrative expense status, secured by a lien on otherwise unencumbered property, or secured by a junior lien on encumbered property. 11 U.S.C. § 364(c); *see In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (discussing financing options under section 364).

18. Courts review a variety of factors to determine whether a debtor has satisfied the requirements of sections 364(c) of the Bankruptcy Code. Such factors include whether: (i) alternative financing is available on any other basis; (ii) the financing is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the debtor's business; (iii) the financing is in the best interests of the debtor's creditors and estates; (iv) entry into the financing constitutes an exercise of the debtor's sound and reasonable business judgment; (v) the terms of the financing are fair, reasonable and adequate; and (vi) the financing was negotiated in good faith and at arm's- length between the debtor, on the one hand, and the agents and the lenders on the other. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003); Transcript of Record at 733, *In re Lyondell Chemical Company*, Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (citing Farmland factors); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005) (citing Farmland factors); *see, also In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2008) (applying a subset of the above-listed factors in reliance on *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987)).

19. Here, the Debtors propose to incur senior indebtedness as a superpriority administrative expense, which is secured by (i) a first priority senior lien on all unencumbered Collateral and (ii) a junior lien on all Collateral that is encumbered by security interests that were attached and perfected on the Petition Date.  For the reasons set forth below, the DIP Facility satisfies each of the relevant factors for obtaining credit pursuant to section 364(c) of the Bankruptcy Code.

     (a)      **The DIP Facility Is the Best Source of Postpetition Financing Under the Circumstances**

20. To obtain secured financing pursuant to sections 364(c) of the Bankruptcy Code, a debtor must show that unsecured financing was not available. 11 U.S.C. §§ 364(c). However, a debtor is not required to seek alternative financing from every conceivable source. *See Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); *495 Central Park Ave.*, 136 B.R. at 630-31. Instead, a debtor must show that it has made a "reasonable" or "good faith" effort to seek other sources of credit on more favorable terms. See *Ames Dep't Stores*, 115 B.R. at 40.

21. The sufficiency of a debtor's efforts to obtain alternative financing will be informed by the likelihood that other lenders would be willing to extend financing on more favorable terms. *See, e.g., In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (noting it would be "unrealistic and unnecessary" to require debtor to conduct an exhaustive search for financing where, due to debtor's geographical location, financial stress, and lack of unencumbered property, only existing secured lenders or lenders with a tie to the community would be likely to provide financing); *Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to find alternative financing where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received). In light of the Debtors' financial condition, substantial secured debt, and lack of any material unencumbered assets, the likelihood of obtaining unsecured financing or financing secured only by junior liens was remote at best.

22. Having made good-faith efforts to explore other options, the Debtors and their advisors focused their efforts on negotiating a postpetition financing package with Francolin on terms favorable to the Debtors.

> (b)    **Entry into the DIP Facility is in the Best Interests of the Estate and the Debtors' Creditors**

23. The Debtors' decision to enter into the proposed DIP Facility is manifestly in the best interests of all creditors. Absent the DIP Financing, the Debtors will be unable to operate their business or prosecute their Chapter 11 Cases. The Debtors urgently need access to postpetition financing to continue to pay their vendors. The Vessels require crew and provisions, and the engines, which must remain running, require fuel. The failure to pay for any of these necessities could result in the imposition of maritime liens and potential arrest of the Debtors' ships. Mounting maritime liens would be detrimental to all interested parties.

24. As noted above, the DIP Financing is structured and financed to enable the orderly wind-down of the Debtors' business. Providing the Debtors with sufficient liquidity to preserve the value of their assets to the extent possible, while pursuing an orderly wind-down, is in the best interest of all stakeholders.

> (c)    **The Debtors have Exercised Their Sound Business Judgment in Entering into the DIP Facility**

25. A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See Ames Dep't Stores*, 115 B.R. at 40 (noting that courts defer to a debtor's business judgment "so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); *Barbara K. Enters*, 2008 WL 2439649, at *14.

26. The business judgment standard is a deferential one. In particular, in the context of postpetition financing, courts have held that it is appropriate to interfere with a debtor's management of its affairs only if the debtor's decision is clearly erroneous or is made arbitrarily, in bad faith, with fraudulent intent, on the basis of inadequate information, in violation of fiduciary duties, or in violation of the Bankruptcy Code. *See, e.g., Mid-State Raceway*, 323 B.R. at 58; *Farmland Indus.*, 294 B.R. at 881. Courts look to whether the debtor and its professionals have made efforts to negotiate the best terms that they could. See Transcript of Record at 734, *In re Lyondell Chemical Company*, Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009); *see, also Barbara K. Enters.*, 2008 WL 2439649, at *14 (noting, in context of discussion of business judgment, that "debtor should provide evidence of a potential benefit for the estate in obtaining the financing").

27. Here, the Debtors' decision to obtain the DIP Facility is an exercise of their sound business judgment that the Court should approve. Before the Petition Date, the Debtors and their advisors undertook a detailed investigation as to the Debtors' projected financing needs during a potential bankruptcy, and the results of this investigation are reflected in the DIP Budget, which the Debtors and their advisors have independently determined should be sufficient to support the orderly wind-down of the Debtors and administration of these Chapter 11 Cases (including payment of the administrative expenses incurred in connection therewith). The Debtors, in consultation with their advisors, determined that the proposed DIP Facility to be provided by the DIP Lender pursuant to the terms of the DIP Credit Agreement is the most favorable available under the circumstances.

28. Specifically, as noted above, the DIP Loan Documents, in accordance with the DIP Budget, will provide the Debtors with immediate access to up to $450,000 of new postpetition advances under the DIP Facility and up to a total of $2,000,000 after entry of the Final Order. The DIP Budget, which has 13-week projections, contemplates that the proceeds of the DIP Loans would provide the Debtors with sufficient funds to consummate a successful reorganization and to pay the administrative expenses that the Debtors reasonably anticipate to incur during the course of these Chapter 11 Cases.

29. In light of all factors outlined above, entering into the DIP Facility and obtaining the use of the Cash Collateral constitute an exercise of the Debtors' sound business judgment that should be approved by the Court.

(d)    **The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate**

30. In considering whether the terms of postpetition financing are fair and reasonable, courts "examine all the facts and circumstances," and will generally "permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." *Ames Department Stores*, 115 B.R. at 39- 40; *see, also Farmland Indus.*, 294 B.R. at 886 (evaluating reasonableness of terms in light of the "relative circumstances of the parties"). Courts recognize that debtors oftentimes "enjoy little negotiating power with a proposed lender, particularly where the lender has a Prepetition lien on cash collateral." *Ames Department Stores*, 115 B.R. at 38. Thus, "debtors may have to enter into hard bargains to acquire (or continue to receive) the funds needed." *Farmland Indus.*, 294 B.R. at 885-86.

31. Here, the terms and conditions of the DIP Financing are fair and reasonable, and will enable the Debtors to reorganize. Moreover, the terms of the DIP Credit Agreement are typical of debtor-in-possession financing agreements of this nature, especially in the current credit markets. As set forth in the *First Day Affidavit of Justin Knowles*, the proposed fees under the DIP Facility are well within the parameters of market fee structures for similar postpetition financings. Importantly, the Debtors have concluded – after arm's length negotiations with the DIP Lender – that the terms of the DIP Credit Agreement represent the most favorable terms on which the DIP Lender would agree to make the DIP Facility available.

(e)    **The DIP Facility Was Negotiated in Good Faith and at Arm's Length and the DIP Lender Should Therefore Be Afforded the Protections of Section 364(e) of the Bankruptcy Code**

32. Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. *See* 11 U.S.C. § 364(e). The Bankruptcy Code does not define "good faith" as used in Section 364(e). However, courts have held that the forms of misconduct that would defeat good faith status include "fraud, collusion, or an attempt to take grossly unfair advantage of others." *Keltic Fin. Partners, LP v. Foreside Mgmt. Co., LLC (In re Foreside Mgmt. Co., LLC)*, 402 B.R. 446, 452-53 (1st Cir. B.A.P. 2009); *see also, Evergreen Int'l Airlines, Inc. v. Pan Am Corp. (In re Pan Am Corp.)*, Case No. 91 Civ. 8319, 1992 WL 154200, *4 (S.D.N.Y. June 18, 1992).

33. Here, the terms of the DIP Facility were negotiated in good faith and at arm's-length between the Debtors and the DIP Lender. As explained above, the DIP Loan Documents are the result of the Debtors' sound business determination that the terms and conditions of the DIP Loan Documents are fair and reasonable and inure to the benefit of their estates and all parties-

in-interest. Moreover, the proceeds of the DIP Facility will be extended by the DIP Lender in

good faith and will be used only for purposes that are permissible under the Bankruptcy Code.

Accordingly, the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the

Bankruptcy Code, and is entitled to all of the protections afforded by that section.

**B.      The Debtors Require Immediate Access to the DIP Loans**

34. Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), the Court may grant interim relief in

respect of a motion filed pursuant to either section 363(c) or 364 of the Bankruptcy Code where,

as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate

pending a final hearing." In examining requests for interim relief under this rule, courts generally

apply the same business judgment standard applicable to the debtors' other business decisions.

See, e.g., *Ames Dep't Stores*, 115 B.R. at 36.

35. In the case at hand, the Debtors and their estates will suffer immediate and irreparable

harm if the interim relief requested herein, including authorizing the Debtors to borrow the Initial

DIP Loan in the amount of up to $450,000, is not granted promptly after the Petition Date. As

described above, the Debtors have an immediate need for access to liquidity to, among other

things, pay claims of employees, utilities, critical and foreign vendors and other short-term costs

pending successful reorganization, and preserve the value of the Debtors' assets for the benefit of

all creditors and other parties-in-interest.

36. The importance of a debtor's ability to secure postpetition financing to prevent immediate

and irreparable harm to its estate has been repeatedly recognized in this district in similar

circumstances. *See*, *e.g.*, *In re Sbarro, Inc., et al.*, Case No. 11-11527 (S.D.N.Y. Apr. 5, 2011)

(order approving postpetition financing on an interim basis); *In re Great Atlantic & Pacific Tea

Company, Inc., et al.*, Case No. 10-24549 (S.D.N.Y. Dec. 13, 2010) (same); *In re St. Vincents*

*Catholic Medical Centers of New York, et al.*, Case No. 10-11962 (S.D.N.Y. Apr. 16, 2010) (same); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (same); *In re Lyondell Chemical Company*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (same); *In re Lenox Sales, Inc.*, Case No. 08-14679 (S.D.N.Y. Nov. 25, 2008) (same); *In re Wellman, Inc.*, Case No. 08-10595 (S.D.N.Y. Feb. 27, 2008) (same). Accordingly, for all of the reasons set forth above, prompt entry and effectiveness of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## C.    Modification of the Automatic Stay is Warranted

37. The DIP Loan Documents and the proposed Interim DIP Order contemplate that during the continuance of an Event of Default, the automatic stay arising under section 362 of the Bankruptcy Code will be deemed automatically vacated without further action or order of the Court to permit the DIP Lender to exercise all of its rights and remedies under the DIP Credit Agreement. The proposed Interim DIP Order provides, however, that the DIP Lender must provide the Debtors and various other parties, including the United States Trustee for the Bankruptcy Court for the Southern District of New York and counsel to any committee appointed in these Chapter 11 Cases, with seven (7) business days' prior written notice before exercising any enforcement rights or remedies, which will allow the Debtors and other interested parties to seek an expedited hearing before the Court.

38. Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. *See*, *e.g.*, *In re Insight Health Servs. Holdings Corp.*, Case No 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011); *In re Sbarro, Inc., et al.*, Case No. 11-11527 (S.D.N.Y.

Apr. 5, 2011); *In re Great Atlantic & Pacific Tea Company, Inc., et al.*, Case No. 10-24549

(S.D.N.Y. Dec. 13, 2010).

**D.      Waiver of Stay Pending Appeal**

39. The Debtors further seek a waiver of any stay of the effectiveness of the order approving

this Motion pursuant to Bankruptcy Rule 6004(h). As set forth above, the DIP Financing is

critical to the Debtors' ability to continue operations and reorganize. Accordingly, the Debtors

submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy

Rule 6004(h), to the extent it applies.

**E.      The Debtors Request Scheduling of the Final Hearing**

40. Pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2), the Debtors request that the

Court set a date, which is no sooner than 14 days after service of this Motion and no later than 30

days after the Petition Date, to hold a hearing to consider entry of the Final Order. The Debtors

also request authority to serve a copy of the signed Interim Order, which fixes the time and date

for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice

parties listed below, and further request that the Court deem service thereof sufficient notice of

the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

# IX.
## NOTICE

41. The Debtors have provided or will provide notice of this Motion, including a copy of the

DIP Loan Documents, by electronic mail, facsimile and/or overnight mail to: (a) the Office of

the U.S. Trustee for the Southern District of New York; (b) the Debtors' material prepetition

lenders or any agent therefor; (c) counsel to the DIP Lender; (d) Activity S.A., or counsel

therefor; (e) the holders of the 50 largest unsecured claims against the Debtors on a consolidated

basis; (g) the Internal Revenue Service; (h) the U.S. Securities and Exchange Commission; and (i) the other parties required to be provided with notice of this Motion pursuant to the Local Rules (collectively, the "Notice Parties"). Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

## X.
## NO PRIOR REQUEST

42. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that this Court (a) enter the Interim DIP Order and the Final DIP Order granting the relief requested herein and (b) grant such other and further relief as is just and proper.

*[remainder of page intentionally blank]*

Dated: September 15, 2015
      Houston, Texas

                    Respectfully submitted,

                    /s/ *John P. Melko*_____

                    John P. Melko
                    Texas State Bar No. 13919600
                    713-276-5727 (*direct dial*)
                    713-276-6727 (*direct fax*)
                    jmelko@gardere.com
                    Michael K. Riordan
                    Texas State Bar No. 24070502
                    713-276-5178 (*direct dial*)
                    713-276-6178 (*direct fax*)
                    mriordan@gardere.com
                    GARDERE WYNNE SEWELL LLP
                    1000 Louisiana, Suite 2000
                    Houston, Texas  77002-5011

                    PROPOSED COUNSEL FOR THE DEBTORS

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

In re                                                    :        Chapter 11

                                                         :

GMI USA MANAGEMENT, INC., *et al.*[1]    :        Case No. 15-_____ ( )

                                                         :        (Jointly Administered)

                                 Debtors.                :

------------------------------------------------------x

## INTERIM ORDER AUTHORIZING DEBTORS TO ENTER INTO
## POST-PETITION FINANCING AGREEMENT WITH FRANCOLIN

Upon the motion (the "Motion")[2] of the Debtors for entry of an interim order pursuant to

sections 105(a), 362, 363, 364(c), and 507 of the Bankruptcy Code, Rules 2002, 4001, 6004, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2

of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy

Rules") seeking, among other things: (1) pursuant to Bankruptcy Rule 4001, that an interim

hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of this

interim order (the "Interim Order"); (2) authority, pursuant to the Interim Order, to execute and

enter into the Post-Petition Financing Agreement (as amended, supplemented, or otherwise

modified from time to time in accordance with the terms hereof, the "DIP Agreement," and

together with the other documents entered into in connection therewith, including the other

Financing Documents (as defined in the DIP Agreement), as each may be amended,

supplemented, or otherwise modified from time to time in accordance with the terms hereof, the

"DIP Documents") and to obtain secured postpetition financing on the terms and conditions set

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax
or registration identification number, are: GMI USA Management, Inc. ([  ]), Global Maritime Investments Holdings
Cyprus Limited ([    ]), Global Maritime Investments Vessel Holdings Pte. Limited ([    ]), Global Maritime
Investments Cyprus Limited ([  ]), and Global Maritime Investments Resources (Singapore) Pte. Limited ([  ]).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

forth in the DIP Agreement (the "DIP Facility"); (3) authority, pursuant to this Interim Order, to immediately obtain loans under the DIP Facility up to a maximum aggregate principal amount outstanding of $450,000, in accordance with the terms and conditions set forth in the DIP Agreement; and (4) that this Court schedule a final hearing on the Motion (the "Final Hearing") to consider entry of a final order (the "Final Order") granting all of the relief requested in the Motion on a final basis and authorizing the Debtors to obtain secured postpetition financing on substantially the same terms as the Interim Order; and it appearing that the relief requested in the Motion is necessary to provide the Debtors with sufficient capital to fund the orderly wind down of their business and operations and the liquidation of their assets; and it further appearing that notice of the Motion was provided in the form and manner set forth in the Motion; and it also appearing that notice of the Interim Hearing and copies of the proposed form of order approving the Motion and a draft of the DIP Agreement were filed and served on the Notice Parties, and any other party that filed a request for notices with this Court; and such notice constituting good and sufficient notice of the Interim Hearing under the circumstances in accordance with Bankruptcy Rules 2002, 4001(c) and 4001(d), section 102(1) of the Bankruptcy Code, and Local Bankruptcy Rule 4001-2, as required by section 364(c) of the Bankruptcy Code in light of the nature of the relief requested in the Motion; and for good cause shown;

Upon the record made by the Debtors at the Interim Hearing on September [●], 2015; and upon the *First Day Declaration of Justin Knowles*, filed contemporaneously with the Motion; and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction*.    This Court has jurisdiction over the Debtors' chapter 11 cases (the "Chapter 11 Cases"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b).  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief granted herein are sections 105(a), 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Bankruptcy Rule 4001-2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*.  Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 2002 and 4001(c) and (d) and Local Bankruptcy Rule 4001-2, and no other notice is required or need be given except as set forth herein.

3.      *Findings Regarding the Financing*

(a) Good and sufficient cause has been shown for the entry of this Interim Order.

(b) The Debtors have an immediate need to obtain financing under the DIP Agreement in order to permit, among other things, the orderly wind down of their business and operations and the liquidation of their assets.  The immediate access of the Debtors to sufficient working capital and liquidity through the incurrence of additional indebtedness for borrowed money is vital to complete the Debtors' wind-down efforts.  The Debtors have been unable to obtain from sources other than the DIP Lender, on terms more favorable than the terms of the DIP Facility, (i) adequate unsecured credit allowable under sections 364(b) and 364(c)(l) of the Bankruptcy Code, or (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code.

(c) The terms of the DIP Agreement appear to be fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(d) The DIP Agreement has been negotiated at arms' length and in good faith between the Debtors and Francolin (the "DIP Lender"), and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facility and the DIP Documents, shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise reversed or modified, on appeal or otherwise.

(e) Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Documents on an interim basis is therefore in the best interest of the Debtors' estates.

4.        *No Objections; Approval of the Motion.*  Except to the extent as may be related to final approval of the DIP Documents, there were no objections or reservations of rights with respect to the interim relief sought in the Motion. The Motion is granted in all respects on an interim basis as provided herein.

5.        *Authorization of the DIP Agreement.*

(a) The DIP Agreement is approved in all respects on an interim basis.  The Debtors are hereby authorized to enter into and execute the DIP Documents on an interim basis.  The

-4-

Debtors are hereby authorized to immediately borrow money pursuant to and subject to the terms of the DIP Agreement up to a maximum aggregate principal amount of $450,000 (in accordance with the terms of the DIP Agreement), subject to any limitations of borrowings under the DIP Documents, and in accordance with the terms of this Interim Order and the DIP Documents, which shall be used solely in accordance with the terms of the DIP Documents.

(b) In furtherance of the foregoing and without further approval of this Court, each Debtor is expressly authorized and directed on an interim basis to perform all acts, to make, execute and deliver all instruments and documents, to perform all obligations thereunder and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents, including, without limitation: (i) the negotiation, execution, delivery and performance of the DIP Documents, and (ii) the performance of all other acts required under or in connection with the DIP Documents.

6.      *Use of DIP Extensions of Credit*.  The Debtors are hereby authorized to use the proceeds of any borrowings under the DIP Facility in accordance with the Budget (as defined below) and the other terms and conditions set forth in this Interim Order and the DIP Documents.

7.      *Budget*.  The budget annexed hereto as <u>Exhibit A</u> (and as it may be updated periodically with the prior written consent of the DIP Lender) is hereby approved.  Proceeds of the DIP Facility under this Interim Order shall be used by the Debtors only in accordance with the Budget and this Interim Order.  Subject to the Carve-Out (as defined below), the DIP Lender's consent to the Budget shall not be construed as consent to the use of proceeds of the DIP Facility beyond the "Maturity Date" (as defined in the DIP Agreement), regardless of whether the aggregate funds shown on the Budget have been expended.  The Debtors shall

provide a copy of any revised or updated budget to the United States Trustee and counsel to the Committee, if any.

8.      *Modifications of DIP Documents.*   The Debtors are hereby authorized, without further order of this Court, to enter into agreements with the DIP Lender, providing for any non-material modifications to the the DIP Documents or any other modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim Order; *provided*, *however*, that the Debtors shall not enter into any material modification or amendment to the DIP Documents that is adverse to the Debtors' estates absent further order of this Court.

9.      *Valid, Binding Obligations*.   Upon execution and delivery of the DIP Documents and the entry of this Interim Order, each of the DIP Documents shall constitute a valid and binding obligation of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of such DIP Document.   The DIP Obligations of the Debtors shall be joint and several.

10.      *Superpriority Claims*.   Pursuant to section 364(c)(1) of the Bankruptcy Code, the obligations of the Debtors under the DIP Agreement and the other DIP Documents (collectively, including all "Obligations" as defined in the DIP Agreement, the "DIP Obligations") shall constitute obligations of the Debtors with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims under sections 105, 326, 328, 330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code (the "Superpriority Claims"); provided that all Superpriority Claims shall be subject to the Carve-Out.   The Superpriority Claims shall be payable from all property of each Debtor's estate.

11.    *DIP Liens*.  As security for the Debtors' DIP Obligations as provided for under the DIP Documents, effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other similar documents, the DIP Lender is hereby granted the following security interests and liens, subject in each case to the Carve-Out (all property identified in clauses (a) and (b) below and all "Collateral" as defined in the DIP Documents being collectively referred to as the "Collateral"; and all such liens and security interests granted to the DIP Lender pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a) *First Lien on Unencumbered Property*.  A valid, binding, continuing, enforceable, fully-perfected first priority security interest in and lien upon all tangible and intangible prepetition and postpetition property, rights, and assets of the Debtors and their respective estates wherever located, whether real or personal, whether owned, licensed, leased, or consigned, and any proceeds and products thereof, whether existing on the date of filing of the Debtors' chapter 11 petitions (the "Petition Date") or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens (if any) in existence immediately prior to the Petition Date.

(b) *Liens Junior to Existing Liens*.  A valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all tangible and intangible prepetition and postpetition property, rights, and assets of the Debtors and their respective estates, wherever located, whether real or personal, whether owned, licensed, leased, or consigned, and any proceeds and products thereof, whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected and unavoidable liens (if any) in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition

-7-

Date but perfected thereafter as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Existing Liens").

(c) The Collateral shall not include any rights of the Debtors under sections 544, 547, 548, 549, 550, and 553 of the Bankruptcy Code; *provided*, *however*, that the Collateral shall include any claims and causes of action against the DIP Lender, Harvard Management Company, Inc., and their respective officers, directors, trustees, managers, partners, employees, affiliates, agents, attorneys, advisors, shareholders, representatives, and controlling persons (collectively, the "Releasees"), including causes of action, if any, under sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

12.    *DIP Lien Priority*.    The DIP Liens shall be senior to any liens granted by any Debtor on or after the Petition Date (including, without limitation, any liens granted pursuant to an order of this Court, including an order approving the use of any cash collateral).

13.    *Protection of DIP Lender's Rights*.

(a) The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to permit the DIP Lender to exercise, during the continuance of an Event of Default, all rights and remedies under the DIP Documents; provided, that, notwithstanding anything to the contrary contained herein or in the DIP Documents, no less than seven (7) days written notice shall first be provided to counsel to the Debtors, counsel to any statutory creditors' committee appointed in these Chapter 11 Cases (a "Committee"), and the United States Trustee prior to the exercise of any such right.

(b) In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default

has occurred and is continuing, and the Debtors hereby waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lender set forth in this Interim Order or the DIP Documents.

14.     *Perfection of DIP Liens*.  The DIP Lender is hereby authorized, but not required, to file or record financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to it hereunder and under the DIP Documents.  Whether the DIP Lender shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid and perfected at the time and on the date of entry of the Interim Order.

15.     *Carve-Out*.  Notwithstanding anything to the contrary contained in this Interim Order or other order of this Court, the liens and claims of or granted to the DIP Lender in this Interim Order and/or the DIP Documents shall be subject and subordinate to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out"):

(a) unpaid professional fees and expenses of the Debtors not to exceed $250,000 in the aggregate that (x) have accrued prior to the delivery of a written notice delivered by the DIP Lender to the Debtors, counsel to the Debtors, counsel to any Committee, and the United States Trustee (a "Carve-Out Notice") and (y) are allowed, whether prior to or after the delivery of such Carve-Out Notice;

-9-

(b) unpaid professional fees and expenses for any Committee, not to exceed $100,000 in the aggregate, that (x) have accrued prior to the delivery of a Carve-Out Notice, and (y) are allowed, whether prior to or after the delivery of such Carve-Out Notice;

(c) allowed but unpaid professional fees and expenses of the Debtors and any Committee accrued from and after the delivery of a Carve-Out Notice, not to exceed $100,000 in the aggregate;

(d) the payment of fees pursuant to 28 U.S.C. § 1930, plus any interest pursuant to 31 U.S.C. § 3717; and

(e) approved professional fees and expenses incurred by any court-appointed trustee in a case under chapter 7, not to exceed $50,000 in the aggregate.

Notwithstanding the foregoing, so long as a Carve-Out Notice has not been issued, the Debtors shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals to the extent set forth in the Budget and that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and the DIP Lender, as the same may be due and payable.

16.    *Limitation on Use of Loan Proceeds*.  Without the prior written consent of the DIP Lender, no portion of the DIP Facility or the DIP Collateral (including, for the avoidance of doubt, the Carve-Out or any "cash collateral" as defined in section 363(a) of the Bankruptcy Code) shall be utilized (i) for any purpose that is prohibited under the Bankruptcy Code or this Interim Order; or (ii) for the payment of professional fees and expenses incurred in connection with or to finance in any way (x) any adversary action, suit, arbitration, proceeding, application,

motion, contested matter or other litigation or challenge of any type (or any investigation of the foregoing) adverse to the interests of any or all of the Releasees or their respective rights and remedies under the Financing Documents, this Interim Order, the Final Order, or the Prepetition Documents (as defined in the DIP Agreement) or (y) any other action which with the giving of notice or passing of time would result in an Event of Default under any of the DIP Documents; provided, however, that, notwithstanding the foregoing, up to $50,000 in the aggregate of any proceeds of the DIP Facility or the DIP Collateral may be used to pay any allowed fees and expenses of estate professionals retained by the Debtors or any Committee that are incurred in connection with investigating the matters covered by the release contained in paragraph 21 of this Interim Order (the "Investigation Budget").

17.    *Fees and Expenses of DIP Lender.*  The Debtors shall pay to the DIP Lender all fees, costs and expenses incurred by the DIP Lender, as provided in the DIP Documents, within five (5) Business Days, upon presentment of an invoice to the Debtors, in customary detail (redacted for privilege and work product), with a copy of such invoice to be presented contemporaneously to the United States Trustee and counsel to the Committee (if any).  The Debtors are authorized and directed to indemnify and hold harmless the Releasees as provided in the DIP Documents.  For the avoidance of doubt, all fees, expenses, and indemnities of the DIP Lender shall constitute DIP Obligations and shall be secured by the DIP Liens and the Superpriority Claims and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.

18.    *Other Use of DIP Extensions of Credit.*  Subject to the terms and conditions set forth in this Interim Order, the Final Order, and the DIP Documents, the Debtors may use proceeds of the DIP Facility in accordance with the Budget.

-11-

19.    *Events of Default*.  Except as otherwise provided herein, or to the extent the DIP

Lender may otherwise agree in writing, (i) any violation of any of the terms of this Interim

Order, or (ii) any occurrence of an "Event of Default" under the DIP Agreement or the other DIP

Documents, as applicable, shall be deemed to be an Event of Default under this Interim Order.

20.    *Sections 552(b) and 506(c); Marshaling*.  In light of the subordination of the DIP

Lender's Liens and Superpriority Claims to the Carve Out, (a) the DIP Lender is entitled to,

subject to entry of a Final Order, a waiver of any "equities of the case" claims under Section

552(b) of the Bankruptcy Code, and (b) subject to entry of a Final Order, the DIP Lender is

entitled to a waiver of the provisions of Bankruptcy Code section 506(c).  In no event shall the

DIP Lender be subject to the equitable doctrine of marshaling or any similar doctrine with

respect to the DIP Collateral.

21.    *Challenge Period; Release*.  Subject to the limitations set forth in paragraph 16

hereof (including the Investigation Budget), the Debtors or any Committee may timely

commence a contested matter or adversary proceeding (a "Challenge") to assert any claims or

causes of action on behalf of the Debtors' estates against the DIP Lender until the later of (i) if

no Committee has been appointed, seventy-five (75) days from the Petition Date, or (ii) if a

Committee has been appointed within the seventy-five-(75)-day period provided in clause (i)

above, sixty (60) days after the appointment of such Committee (the "Challenge Period").  If no

such Challenge is timely commenced as of such date, then, without further order of this Court,

(i) the Debtors and their estates shall be deemed to have released the Releasees of and from any

and all claims, controversies, disputes, liabilities, obligations, demands, judgments, damages,

costs, losses, expenses (including attorneys' fees), debts, liens, actions and causes of action of

any and every nature whatsoever, both at law or in equity, whether known or unknown, which

-12-

arose at any time prior to the date hereof, or which hereafter could arise based on any act, fact, transaction, cause, matter, or thing which accrued prior to the date hereof related to the Debtors, including, without limitation, any so-called "lender liability" claims or defenses, and any claims and causes of action arising under Prepetition Documents or the Bankruptcy Code, including any causes of action under sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and (ii) the foregoing release shall be binding upon the Debtors, their estates, and their successors (including any Chapter 7 or Chapter 11 trustee appointed or elected for the Debtors), any Committee, and all other parties in interest.  If any such adversary proceeding or contested matter is timely filed by the Debtors or a Committee within the Challenge Period, the release contained in this paragraph shall remain binding and preclusive upon the Debtors, their estates, and their successors (including any Chapter 7 or Chapter 11 trustee appointed or elected for the Debtors), any Committee, and all other parties in interest, except as to claims raised in such adversary proceeding or contested matter prior to the expiration of the Challenge Period; and the resolution of such adversary proceeding or contested matter by judgment, final order, settlement, or otherwise shall be binding and preclusive upon the Debtors, their estates, and their successors (including any Chapter 7 or Chapter 11 trustee appointed or elected for the Debtors), any Committee, and all other parties in interest.

22.    *Order Governs*.  In the event of any conflict between the provisions of the DIP Documents and this Interim Order, the provisions of this Interim Order shall govern.

23.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including, without limitation, all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Lender, any Committee, any other committee appointed in these Chapter 11 Cases, and the Debtors and their respective

-13-

successors and assigns (including any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender and the Debtors and their respective successors and assigns; provided, however, that the DIP Lender shall have no obligation to extend any financing to any Chapter 7 trustee, Chapter 11 trustee, or similar responsible person appointed for the estates of the Debtors.  This Interim Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise.

24.    *No Third Party Rights*.  Except as explicitly provided herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

25.    *No Deemed Control*.  In making decisions to advance any extensions of credit under the DIP Facility, or in taking any other actions related to this Interim Order or the DIP Documents, the DIP Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtors and the DIP Lender's relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind.  Further, the Debtors are authorized and directed to indemnify the Releasees against any liability arising in connection with the DIP Agreement or the DIP Documents to the extent set forth in the DIP Agreement and the DIP Documents.

26.    *Final Hearing*.  The Final Hearing is scheduled for [●], 2015 at [●] [a.m./p.m.] before this Court.

27.    The Debtors shall promptly mail copies of this Interim Order and a notice of the Final Hearing (which shall constitute adequate notice of the Final Hearing) to the Notice Parties.

-14-

28.     Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) the United States Trustee; (b) counsel to the Debtors, Gardere Wynne Sewell LLP, 2000 Wells Fargo Plaza, 1000 Louisiana Street, Houston, Texas 77002, Attention: John Melko; (c) counsel to the DIP Lender, Ropes & Gray LLP, Prudential Tower, 800 Boylston Street, Boston, Massachusetts, Attention: James Wilton; and (d) counsel to the Committee (if any); and shall be filed with the Clerk of the United States Bankruptcy Court, Southern District New York, in each case to allow actual receipt by the foregoing no later than [●] at 5:00 p.m., prevailing Eastern time.

Dated: _____, 2015
          New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

-15-

[Execution Copy]

## POST-PETITION FINANCING AGREEMENT

This **POST-PETITION FINANCING AGREEMENT** (this "<u>Agreement</u>") is made as of September 15, 2015, by and among GMI USA MANAGEMENT, INC., a New York corporation, GLOBAL MARITIME INVESTMENTS HOLDINGS CYPRUS LIMITED, a private limited company organized under the laws of Cyprus ("<u>Slipway</u>"), GLOBAL MARITIME INVESTMENTS VESSEL HOLDINGS PTE. LIMITED, a private limited company incorporated under the laws of Singapore, GLOBAL MARITIME INVESTMENTS CYPRUS LIMITED, a private limited company incorporated under the laws of Cyprus, and GLOBAL MARITIME INVESTMENTS RESOURCES (SINGAPORE) PTE. LIMITED, a private limited company incorporated under the laws of Singapore (collectively, the "<u>Borrowers</u>"), and FRANCOLIN, a limited company incorporated under the laws of the Cayman Islands (the "<u>Lender</u>").

## RECITALS

WHEREAS, on September 15, 2015 (the "<u>Filing Date</u>"), each of the Borrowers filed a petition under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Southern District of New York.  The Borrowers have requested the Lender to provide postpetition financing, as more fully described herein.  Subject to the terms and conditions set forth herein, the Lender has agreed to provide such postpetition financing.

§1.    **<u>Definitions</u>**:    Certain capitalized terms are defined below:

"<u>Agreed Administrative Expense Priorities</u>":  Amounts payable pursuant to 28 U.S.C. § 1930(a)(6).

"<u>Agreement</u>":  As defined in the preamble, which term shall include this Agreement as amended and in effect from time to time.

"<u>Asset Sale</u>" means the sale by any Borrower to any Person of any assets that constitute Collateral.

"<u>Bankruptcy Code</u>":  As defined in the recitals.

"<u>Bankruptcy Court</u>":  The United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Cases.

"<u>Base Rate</u>":  As defined in §2.2.

"<u>Borrowers</u>":  As defined in the preamble, which term shall include the Borrowers as debtors and debtors in possession as contemplated by this Agreement.

"<u>Budget</u>":  The budget of anticipated cash receipts and disbursements attached to the Interim Order, as it may be updated periodically with the prior written consent of the Lender.

"Business Day":   A day other than a Saturday, Sunday, or other day on which commercial banks in New York, New York are authorized or required by law to close.

"Carve-Out":   An amount equal to the sum of: (i) unpaid professional fees and expenses of the Borrowers not to exceed $250,000 in the aggregate that (x) have accrued prior to the delivery of a Carve-Out Notice and (y) are allowed, whether prior to or after the delivery of such Carve-Out Notice; (ii) unpaid professional fees and expenses for any Committee, not to exceed $100,000 in the aggregate, that (x) have accrued prior to the delivery of a Carve-Out Notice, and (y) are allowed, whether prior to or after the delivery of such Carve-Out Notice; (iii) allowed but unpaid professional fees and expenses of the Borrowers and any Committee accrued from and after the delivery of a Carve-Out Notice, not to exceed $100,000 in the aggregate; (iv) the payment of fees pursuant to 28 U.S.C. § 1930, plus any interest pursuant to 31 U.S.C. § 3717; and (v) approved professional fees and expenses incurred by any court-appointed trustee in a case under chapter 7, not to exceed $50,000 in the aggregate.

"Carve-Out Notice":   A written notice delivered by the Lender to the Borrowers, counsel to the Borrower, counsel to any Committee, and the United States Trustee.

"Cases":   The Borrowers' cases under Chapter 11 of the Bankruptcy Code pending in the Bankruptcy Court.

"Casualty Event"   means the damage or destruction by any casualty or condemnation whatsoever of any property of any Borrower.

"Challenge":   As defined in §13.

"Challenge Period":   As defined in §13.

"Charter Documents":   In respect of any entity, the certificate or articles of incorporation or organization and the by-laws of such entity, partnership agreement or other constitutive documents of such entity.

"Collateral":   All Collateral as that term is defined in the Security Agreement.

"Committee"   shall mean an official committee of unsecured creditors appointed by the United States Trustee for the Southern District of New York pursuant to Section 1102 of the Bankruptcy Code in the Case, if any.

"Consent":   In respect of any person or entity, any permit, license or exemption from, approval, consent of, registration or filing with any governmental or regulatory agency or authority (whether local, state, federal, or pertaining to the government of any other nation) required under applicable law.

"Default":   An event or act which, with the giving of notice and/or the lapse of time, would become an Event of Default.

"Disbursement Date":   Any date on which amounts of the proceeds of the Loans are disbursed by the Lender to Slipway for the benefit of the Borrowers.

2

"Disbursement Request": As defined in §2.1(b).

"Environmental Laws": All laws pertaining to environmental matters, including without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Acts of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Federal Oil Pollution Act, the Toxic Substances Control Act or equivalent laws in non-U.S. jurisdictions, in each case as amended, and all rules, regulations, judgments, decrees, orders and licenses arising under all such laws.

"ERISA": The Employee Retirement Income Security Act of 1974, as amended, and all rules, regulations, judgments, decrees, and order arising thereunder.

"Event of Default": Any of the events listed in §10.

"Filing Date": As defined in the recitals.

"Final Order": As defined in §8(a)(v).

"Financing Documents": This Agreement, the Orders, the Note, and the Security Documents, in each case as from time to time amended or supplemented, and all of the instruments, agreements and documents executed in connection therewith.

"GAAP": Generally accepted accounting principles consistent with those adopted by the Financial Accounting Standards Board and its predecessor, as in effect from time to time, consistently applied.

"Indebtedness": In respect of any entity, all obligations, contingent and otherwise, that in accordance with GAAP should be classified as liabilities, including without limitation (a) all debt obligations, (b) all liabilities secured by Liens, (c) all guarantees and (d) all liabilities in respect of bankers' acceptances or letters of credit.

"Intellectual Property": United States and foreign patents, patent applications, invention disclosures, trade secrets, proprietary information including software and computer models used to predict properties of the technology known as catalytic extraction processing, registered and unregistered trademarks and service marks and related applications for registration, copyrights and licenses of any of the foregoing.

"Interim Order": An order of the Bankruptcy Court in the Cases authorizing and approving this Agreement on an interim basis under Section 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001, in form and substance satisfactory to the Lender in its sole discretion, substantially in the form of Exhibit C hereto. The Interim Order shall, among other things, (a) have been entered on such prior notice to parties in interest in the Cases as may be satisfactory to the Lender and its counsel and approved by the Bankruptcy Court, (b) have authorized extensions of credit, in a principal amount not greater than the aggregate stated principal amount of the Note and granted the Super-Priority Claim status and Liens described in §6(a), and shall prohibit the granting of additional Liens on the assets of the Borrowers, and (c) provide that such Liens are automatically perfected upon the entry of the Interim Order and also grant to the

Lender relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Lender, if it elects to do so in its sole discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Lender to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of nonbankruptcy law and to exercise its rights and remedies to enforce its claims and liens under the Financing Documents.

"Investigation Budget":  As defined in §9.2(f).

"Joint Venture Agreement":  That certain Second Amended and Restated Slipway Joint Venture Agreement, dated June 28, 2013, among Slipway, certain other Persons, and the Lender.

"Lender":  As defined in the preamble.

"Liens:  Any lien, encumbrance, mortgage, pledge, hypothecation, charge, restriction or other security interest of any kind securing any obligation of any entity or person.

"Loan":  As defined in §2.1(a).

"Material Adverse Effect":  Any material adverse effect on either the Lender's first priority, perfected security interest in the Collateral, or the financial condition or business operations of the Borrowers, taken as a whole, or any material impairment of the ability of the Borrowers to perform their obligations hereunder or under any of the other Financing Documents.

"Maturity Date":  The date which is the earliest of (a) February 1, 2016, (b) the date on which payment of the Obligations is accelerated by the Lender as provided in §10, (c) the effective date of a Plan, and (d) thirty (30) days after the Filing Date, in the event that the Final Order shall not have been entered on or before such date.

"Minimum Operating Expenses":  Operating expenses necessary for the Borrowers to preserve the value of Collateral, which shall exclude expenses for research and development, capital expenditures and capital improvements except to the extent authorized in writing by the Lender.

"Net Cash Proceeds":  With respect to any Asset Sale or Casualty Event, cash (freely convertible into Dollars) received by any Borrower from such Asset Sale or the receipt of proceeds from such Casualty Event (including (x) any cash received by way of deferred payment pursuant to a promissory note or otherwise, but only as and when received, and (y) any purchase price adjustment or earn-out in respect of such Asset Sale), after (a) deduction of an amount equal to estimated federal, state, and local taxes in connection with such Asset Sale or Casualty Event, and determined in good faith by the Borrowers, (b) payment of all usual and customary brokerage commissions and all other reasonable fees and expenses related to such Asset Sale (including reasonable attorneys' fees and closing costs incurred in connection with such Asset Sale), (c) deduction of appropriate amounts to be provided by the Borrowers as a reserve, in accordance with GAAP, against any liabilities retained by the Borrowers after such Asset Sale, which liabilities are associated with the asset or assets being sold, including, without limitation, post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations or purchase price adjustments associated with such Asset Sale, and

(d) deduction for the amount of any Indebtedness (other than the Obligations) secured by the respective asset or assets being sold or subject to such Casualty Event, which Indebtedness is senior to the Obligations and required to be repaid as a result of such Asset Sale or Casualty Event.

"Note": As defined in §2.1(a).

"Obligations":  All indebtedness, obligations and liabilities of the Borrowers to the Lender, arising or incurred under the Note, this Agreement or any other Financing Document, existing on the date of this Agreement or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, including, without limitation, principal, interest, indemnification obligations, fees, and expenses.

"Orders":  The Interim Order and the Final Order.

"Payment Notice Date":  As defined in §2.1(b).

"Permitted Liens":  As defined in §9.2(c).

"Permitted Prior Liens":  Liens existing as of the Filing Date which are listed on Schedule 1 hereto (securing debt in amounts not in excess of the amounts set forth on such schedule) to the extent valid, perfected and enforceable and which are not avoided or subordinated by order of the Bankruptcy Court or consent of the Borrowers in any of the Cases.

"Person":  Any natural person, corporation, limited liability company, trust, business trust, joint venture, association, company, partnership, governmental or regulatory authority, or other entity.

"Plan" means a plan of reorganization or liquidation filed by the Borrowers with the Bankruptcy Court that provides for payment in full in cash of the Obligations on the effective date of such plan.

"Prepetition Documents":  As defined in §9.2(f).

"Releasees":  The Lender, Harvard Management Company, Inc., and their respective officers, directors, trustees, managers, partners, employees, affiliates, agents, attorneys, advisors, shareholders, representatives, and controlling persons.

"Requirement of Law":  In respect of any person or entity, any law, treaty, rule, regulation or determination of an arbitrator, court, or other governmental authority, in each case applicable to or binding upon such person or entity or affecting any of its property.

"Security Agreement":  The security agreement of the Borrowers in favor of the Lender, substantially in the form of Exhibit B hereto.

"Security Documents":  The Security Agreement and all other security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, assignments, financing

statements, or other instruments or documents, in form and substance satisfactory to the Lender, which shall grant or confirm to the Lender security interests in all of the Collateral.

"Slipway": As defined in the preamble.

"Subsidiary": In respect of the Borrowers, any business entity of which the Borrowers at any time own or control directly or indirectly more than fifty percent (50%) of the outstanding shares of stock or other beneficial interests or having more than fifty percent (50%) of the voting power, regardless of whether such right to vote depends upon the occurrence of a contingency.

"Super-Priority Claim": A claim against any of the Borrowers or any of their estates in any of the Cases which is in accordance with Section 364(c)(1) of the Bankruptcy Code, an administrative expense claim having priority over (a) any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and (b) unsecured claims now existing or hereafter arising including, without limitation, administrative expenses or other claims under sections 105, 326, 328, 330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code, subject only to the Agreed Administrative Expense Priorities.

"TradeCo Credit Agreement": That certain Amended and Restated Credit Agreement, dated as of June 28, 2013, among Global Maritime Investments Cyprus Limited, as borrower, Slipway, as guarantor, and the Lender, as lender.

"Uniform Commercial Code": The Uniform Commercial Code as in effect from time to time in the State of New York; provided that if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Variable Interest Rate Credit Agreement": That certain Variable Interest Rate Credit Agreement, dated as of June 28, 2013, among Slipway, as borrower, and Activity SA and the Lender, as lenders.

"Vessel Funding Credit Agreement": That certain Credit Agreement, dated as of November 1, 2014, among Slipway, as borrower, and the Lender, as lender.

## §2.    **Post-Petition Financing.**

## §2.1    **Discretionary Loans.**

(a)    Upon the terms and subject to the conditions of this Agreement, and further subject to the terms of and to any limitations on borrowing or other extensions of credit contained in the Interim Order or the Final Order, whichever is then in effect, the Lender has established an escrow account with the New York office of Ropes & Gray LLP on September 15, 2015 and shall on the date hereof, or as soon thereafter as practicable, fund into such escrow account by wire transfer to Citibank N.A., Routing No. 021000089, Account No. 9951647994 the amount of $450,000 to be disbursed as directed by GMI USA Management, Inc. for the

benefit of the Borrowers conditioned upon entry of the Interim Order and in accordance with an escrow agreement between the Lender, GMI USA Management, Inc. and Ropes & Gray LLP, as escrow agent in an amount not to exceed the amount authorized to be advanced under the Interim Order, and, following entry of the Final Order and including amounts authorized to be advanced pursuant to the Interim Order, may disburse in the Lenders' sole discretion an amount not to exceed $2,000,000 in the aggregate (collectively, the "Loan"). The Loan shall be evidenced by the Borrowers' Joint and Several Promissory Note in the aggregate original principal amount of Two Million Dollars ($2,000,000) in the form attached as Exhibit A to this Agreement (the "Note").

(b)     The Borrowers shall notify the Lender in writing or telephonically (promptly confirmed in writing to the Lender), not later than 12:00 Noon (New York, New York time) on the Business Day (the "Payment Notice Date") which precedes the Disbursement Date (both the Payment Notice Date and the Disbursement Date must be Business Days) of the amount of the disbursement being requested (a "Disbursement Request").

(c)     The Borrowers acknowledge and agree that amounts of the Loan advanced are security for payment in full in cash of the Obligations. The Borrowers shall use best efforts to maintain amounts of the Loan advanced and all other cash of the Borrowers in deposit accounts or securities accounts in the United States, in compliance with Section 345 of the Bankruptcy Code.

§2.2    **Interest**.   So long as no Event of Default has occurred and is continuing, the Borrowers shall pay interest on the original principal amount of the Note, less the amount of any principal which has been repaid, and on any other amounts payable under the Financing Documents at a rate per annum which is equal to eight percent (8%) per annum (the "Base Rate"). Interest shall accrue and be paid in cash on the Maturity Date or any accelerated maturity date of the Loan. While an Event of Default is continuing and after notice thereof from the Lender to the Borrowers, or without notice after the Maturity Date, amounts payable under any of the Financing Documents, including, without limitation, the Note, shall bear interest (compounded monthly and payable on demand in respect of overdue amounts) at a rate per annum which is equal to the sum of (i) Base Rate, plus (ii) two percent (2%) per annum until such amount is paid in full (after as well as before judgment) or (as the case may be) such Event of Default has been cured or waived in writing by the Lender.

§2.3    **Repayments**.

The Borrowers hereby jointly and severally agree to pay the Lender on the Maturity Date the entire unpaid principal of and interest on all Obligations, including, without limitation, all Obligations due and payable under the Note.

§2.4    **Prepayments**.

(a)     Voluntary Prepayments.   The Borrowers may, upon prior written or telephonic notice given to the Lender by 12:00 Noon (New York, New York time) on the date of the proposed prepayment and, if given by telephone, promptly confirmed in writing to the Lender, at any time and from time to time prepay, without premium or penalty, the Loan on any

7

Business Day in whole or in part in an aggregate minimum amount of $10,000 and integral multiples of $5,000. Notice of prepayment having been given as aforesaid, the principal amount of the Loan specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied to reduce the outstanding principal balance of the Loan and may not be reborrowed.

(b)    Mandatory Prepayments.    Until such time as the Obligations have been repaid in full in cash, the Obligations shall be permanently prepaid in an amount equal to (i) 100% of the Net Cash Proceeds of any Asset Sale (in one or a series of related transactions), after payment of Indebtedness to the extent secured by Permitted Prior Liens and (ii) 100% of the Net Cash Proceeds of any Casualty Event. All mandatory prepayments of the Loan shall be made immediately upon receipt by the Borrowers of such Net Cash Proceeds. All mandatory prepayments of the Loan shall be applied (i) *first*, to accrued and unpaid fees and expenses under the Financing Documents, (ii) *second*, to any accrued and unpaid interest on the Obligations through the date of such prepayment, and (iii) *third*, to the outstanding principal balance of the Loan. Any such mandatory prepayment may not be reborrowed.

§3.    **[Reserved]**.

§4.    **Costs and Payments**.

(a)    Whether or not the transactions contemplated hereby are consummated, the Borrowers jointly and severally agree to pay to the Lender within five (5) Business Days following demand all fees, costs and expenses (including any taxes, legal, appraisal, environmental consulting, accounting and other professional fees) incurred by the Lender in connection with its due diligence or the preparation, negotiation, execution, amendment, administration or enforcement of any of the Obligations or the Financing Documents (including the Note and the Orders), including, without limitation, the obtaining of perfection, protection or priority of any Liens upon any of the Collateral, the review of court papers or proceedings in the Cases or any Bankruptcy Court or other court appearances in connection with any of the foregoing.

(b)    All payments to be made by the Borrowers hereunder or under any of the other Financing Documents shall be made in U.S. dollars in immediately available funds to such account as the Lender may designate from time to time in writing to the Borrowers not later than 12:00 Noon (New York, New York time) on the date when due without setoff or counterclaim and without any withholding or deduction whatsoever. If any payment hereunder is required to be made on a day which is not a Business Day, it shall be paid on the immediately succeeding Business Day, with interest and any applicable fees adjusted accordingly. All computations of interest shall be made by the Lender on the basis of actual days elapsed over a 360 day year and actual days elapsed.

§5.    **[Reserved]**.

§6.    **Priority, Liens and Guaranty**.

(a)    Super-Priority Claims and Collateral Security.    Each of the Borrowers hereby represents, warrants and covenants that, upon entry of the Interim Order or the Final

8

Order, whichever first occurs, (i) the Obligations shall at all times constitute a Super-Priority Claim, pursuant to Section 364(c)(1), subject only to the Agreed Administrative Expense Priorities, and (ii) pursuant to Section 364(c)(2) and (3) of the Bankruptcy Code, the Orders, and the Security Documents, the Obligations shall at all times be secured by a first priority perfected Lien upon the Collateral, subject, however, to (A) Permitted Prior Liens, (B) the Agreed Administrative Expense Priorities, and (C) the Carve-Out.  So long as no Event of Default shall have occurred and be continuing, the Borrowers shall be permitted to pay, as and when the same become due and payable, administrative expenses of the kind specified in 11 U.S.C. §503(b) incurred in the ordinary course of business of the Borrowers or otherwise approved by the Bankruptcy Court after notice and hearing, and compensation and reimbursement expenses allowed and payable under 11 U.S.C. §330 and 11 U.S.C. §331, including periodic payments on account thereof as permitted by the Bankruptcy Court; in each case to the extent set forth in the Budget and to the extent that such payment is otherwise not prohibited by any of the terms of this Agreement.  The Borrowers agree that the Lender shall have the right to contest the amount of such expenses.

(b)     Collateral Security Perfection.  Each of the Borrowers agrees to take all action that the Lender may reasonably request as a matter of nonbankruptcy law to perfect and protect the Lender's Liens upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such financing statements, providing such notices and assents of third parties, obtaining such governmental approvals and providing such other instruments and documents in recordable form as the Lender may reasonably request, provided, however, that the failure to provide documentation and other arrangements to perfect the Lender's interests in Collateral to the satisfaction of the Lender prior to entry of the Final Order shall be an Event of Default hereunder.

(c)     No Discharge; Survival of Claims.  Each of the Borrowers agrees that, (i) the Obligations shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation (and each of the Borrowers pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge), (ii) the Super-Priority Claim granted to the Lender pursuant to the Orders and the Liens granted to the Lender pursuant to the Orders and the Security Documents shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation, (iii) the Borrowers shall not propose or enter into a credit facility pursuant to which a lender, other than the Lender, is granted a priority claim or Lien pursuant to §364 of the Bankruptcy Code, except simultaneously with payment in full in cash of the Obligations, and (iv) the Borrowers shall not propose or support any plan of reorganization or liquidation that is not conditioned upon the payment in full in cash, on or prior to the earlier to occur of (A) the effective date of such plan and (B) sixty (60) days following the confirmation date of such plan, of all of the Obligations and which does not provide with respect to Obligations arising pursuant to §14 after such date for the payment in full of such Obligations in cash when due and payable.

(d)     Joint & Several Obligation; Borrowers' Waivers.  The Obligations of the Borrowers hereunder are joint and several.  Each of the Borrowers hereby (i) waives any and all suretyship defenses relating to any action or omission to act by the Lender with respect to any of the other Borrowers, and (ii) until the prior final and indefeasible payment in full in cash of all of

the Obligations (whether contingent or otherwise), (A) subordinates all rights of such Borrower to contribution from any other Borrower and (B) agrees that such Borrower shall not be entitled to be subrogated to any claim, interest, right or remedy of the Lender against any other Borrower or its property.

§7.   **Representations and Warranties**.   Each of the Borrowers represents and warrants to the Lender on the date hereof and on the date of any Disbursement Request:

(a)   Each of the Borrowers is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and is duly qualified and in good standing in every other jurisdiction where it is doing business and where failure to qualify would have a Material Adverse Effect, and the execution, delivery and performance by each of the Borrowers each of the Financing Documents to which it is a party (i) are within its corporate authority, (ii) have been duly authorized by all necessary corporate action, and (iii) do not conflict with or contravene its Charter Documents.

(b)   Upon entry of the Interim Order or the Final Order, whichever occurs first, and the execution and delivery of the Financing Documents by the respective parties thereto, each Loan Document shall constitute the legal, valid and binding obligation of the Borrowers party thereto.

(c)   Each of the Borrowers has good and marketable title to all its material properties, subject only to the Permitted Prior Liens, and possesses all assets, including intellectual properties, franchises and Consents, adequate for the conduct of its business as now conducted, without known conflict with any rights of others.  The Borrowers maintain insurance from financially responsible insurers covering such risks and in such amounts and with such deductibles as are customary in the Borrowers' businesses and are adequate.

(d)   Except for the commencement of the Cases or as set forth on Schedule 7(d), there are no legal or other proceedings or investigations pending or to Borrowers' knowledge threatened against any of the Borrowers before any court, tribunal or regulatory or legislative authority.  The Borrowers have paid all post-petition taxes as are due and payable (except those being contested in good faith by appropriate proceedings and for which adequate reserves have been taken) and have funded all employee payrolls (including all required withholdings) on a periodic basis in the ordinary course of their businesses and as required by law.

(e)   Except for entry of the Interim Order or the Final Order, whichever occurs first, the execution, delivery, performance of its obligations, and exercise of its rights under the Financing Documents by each of the Borrowers, including borrowing under this Agreement, (i) do not require any Consents; and (ii) are not and will not be in conflict with or prohibited or prevented by (A) any Requirement of Law, or (B) any Charter Document, corporate minute or resolution, or any provision of any post-petition instrument, post-petition agreement or assumed executory contract, in each case binding on it or affecting the property of the Borrowers.

(f)   Except as specifically disclosed in Schedule 7(f), none of the Borrowers is in violation of (A) any Charter Document, corporate minute or resolution, (B) any post-petition

10

instrument, post-petition agreement or assumed executory contract, in each case binding on it or affecting its property, which violation could have a Material Adverse Effect, or (C) any Requirement of Law, in a manner which could have a Material Adverse Effect, including, without limitation, all applicable federal and state tax laws, ERISA and Environmental Laws. None of the Borrowers is a party to a collective bargaining agreement.

(g)     Upon execution and delivery of this Agreement and the other Financing Documents and entry of the Interim Order or Final Order, whichever occurs first, the Lender shall have first-priority perfected Liens in the Collateral, subject only to (A) Permitted Prior Liens, (B) Agreed Administrative Expense Priorities, and (C) the Carve-Out, with no financing statements, mortgages or similar filings on record anywhere which conflict with such first-priority Liens after taking into account the provisions of the Interim Order or the Final Order, whichever is then in effect.

(h)     There are no Liens on any assets of any of the Borrowers other than Permitted Liens.

(i)     All of the Subsidiaries of the Borrowers are set forth on Schedule 7(i).

(j)     Except as specifically disclosed in Schedule 7(j), there is no non-compliance with any Environmental Laws nor any liability under any Environmental Laws that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  To the Borrowers' knowledge, except as specifically disclosed in Schedule 7(j), no hazardous material the release of which is restricted under Environmental Laws has been disposed of or released or otherwise exists, on, or under or onto any real property owned or operated by any Borrower in quantities requiring reporting or remediation under applicable Environmental Laws.

(k)     The Borrowers own or are licensed or otherwise have the right to use all Intellectual Property that is reasonably necessary for the operation of their businesses as presently conducted, without infringement upon the rights of any other person.  The Borrowers hold all material state and federal governmental permits and approvals necessary for the operation of their businesses as presently conducted, which permits and approvals are in full force and effect.

(l)     The Borrowers have not received resignations and have no knowledge of any threatened resignation of any employees, which resignations individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

§8.   **Conditions Precedent**.

(a)     The Loan shall be advanced in the Lender's sole discretion.  In addition, this Agreement and the advance of the Loan is subject to satisfaction by Borrowers or waiver by the Lender of the following conditions precedent, in addition to those set forth in §8(b):

(i)     This Agreement, the Note and the Security Agreement shall have been duly executed and delivered by the respective parties thereto, and all Financing Documents shall be in full force and effect and shall be in form and substance satisfactory to the Lender.

11

(ii)     All motions and other documents filed with the Bankruptcy Court relating to the Loan and all "first day" orders and "second day" orders shall be in form and substance satisfactory to the Lender in its sole discretion.

(iii)    All corporate action, third-party consents and governmental approvals necessary for the valid execution, delivery and performances by each of the Borrowers of each of the Financing Documents to which it is a party shall have been duly and effectively taken or (as the case may be) obtained and evidence thereof satisfactory to the Lender shall have been provided to the Lender.

(iv)    To the extent requested by the Lender, all Uniform Commercial Code and title searches in non-U.S. filing offices shall have been made, all Uniform Commercial Code financing statements, releases except with respect to Permitted Liens and notices and assents shall have been executed and delivered (in recordable form where applicable) to the Lender, all relevant insurances shall have been modified to include the Lender, as assignee, additional insured or loss payee as applicable, all Collateral in which a security interest may be perfected only by the secured party's possession shall, if so requested by the Lender, have been delivered to the Lender or its nominee, and all other actions necessary or in the reasonable opinion of the Lender desirable for the perfection and protection and to achieve the priority, as contemplated hereby, of all Liens in favor of the Lender shall have been taken to the satisfaction of the Lender and its counsel.

(v)     The Interim Order or the Final Order have been entered, shall be in full force and effect and shall not have been reversed, modified or amended in any respect without the prior written consent of the Lender, provided, that on or before thirty (30) days after the Filing Date, the Bankruptcy Court shall enter a final order (the "Final Order") authorizing and approving this Agreement pursuant to Section 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001, in form and substance satisfactory to the Lender and its counsel in their sole discretion, which Final Order shall be in full force and effect, and shall not have been reversed, modified or amended in any respect without the prior written consent of the Lender.  If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of such Order, the purchase of the Note, the disbursement of any portion of the proceeds of the Loan or the performance by any of the Borrowers of any of their obligations under any of the Financing Documents shall be the subject of a stay pending appeal.  The Borrowers and the Lender shall be entitled to rely in good faith upon the Orders notwithstanding objection thereto or appeal therefrom by any interested party.  The Borrowers and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

(b)     The advance of the Loan pursuant to a Disbursement Request is subject to the satisfaction by Borrowers or waiver by the Lender of the following further conditions precedent:

(i)     Each of the representations and warranties of each of the Borrowers to the Lender herein or in any of the other Financing Documents or any document,

12

certificate or other paper or notice in connection herewith shall be true and correct in all material respects as of the time made or deemed to have been made or repeated.

   (ii) The Maturity Date shall not have occurred and no Default or Event of Default shall have occurred and be continuing.

   (iii) All documents and certificates in connection with the transactions contemplated hereby shall be in form and substance satisfactory to the Lender, and the Lender shall have received all information as it may have reasonably requested.

   (iv) The Lender shall have received, in form and detail satisfactory to the Lender in its sole discretion, (i) a current thirteen (13) week cash flow projection covering the period following the date of the Disbursement Request, and (ii) the Budget for the then current period.

  §9. **Covenants**.

  §9.1 **Affirmative Covenants**.  Each of the Borrowers agrees that until the payment and satisfaction in full in cash of all of the Obligations, each Borrower will comply with its obligations as set forth throughout this Agreement and to:

   (a) furnish the Lender:

   (i) as soon as available copies of all reports or other documents required to be filed with the Office of the United States Trustee;

   (ii) as soon as available, but in any event within seven days after the end of each calendar week, a statement showing actual cash receipts and disbursements for such week compared with cash receipts and disbursements as shown on the Budget;

   (iii) as soon as available, any forecast of the operations of the Borrowers for any future period, together with variations of actual performance from such previous forecast;

   (iv) promptly copies of all pleadings, notices, orders and other papers filed in any of the Cases; and

   (v) from time to time such other information concerning the Borrowers or any of the Cases as the Lender may reasonably request.

   (b) keep true and accurate books of account in accordance with GAAP, maintain its current fiscal year and permit the Lender or its designated representatives during normal business hours to inspect the Borrowers' premises and to examine and be advised as to the Borrowers' business records upon the request of the Lender;

   (c) maintain its corporate existence, business and assets, keep its business and assets adequately insured by responsible insurers, continue to engage in the same lines of business, fund its payroll, periodically in the ordinary course of its business consistent with past

practices, on a current basis (including all withholdings), pay all post-petition taxes as and when due and payable (except where contested in good faith by appropriate proceedings and for which adequate reserves have been taken) and comply with all other Requirements of Law, including Environmental Laws, except where failure to do so will not have a Material Adverse Effect;

(d)    notify the Lender promptly in writing of (i) the occurrence of any Default or Event of Default, (ii) any noncompliance with or obligation under ERISA or any Environmental Law or proceeding in respect thereof which could have a Material Adverse Effect, (iii) any change of address, (iv) any pending or, to the knowledge of the Borrowers, threatened litigation or similar proceeding affecting the Borrowers or any material change in any such litigation or proceeding previously reported, where such litigation or proceeding, if determined adversely to any of the Borrowers, could have a Material Adverse Effect, (v) any post-petition claims against any assets or properties of the Borrowers constituting Collateral and (vi) any testing or environmental site assessments conducted at any real properties of any of the Borrowers as a result of a release of hazardous materials or an incident outside of the ordinary course of business of the Borrowers or an investigation by governmental authorities pursuant to any Environmental Law, together with copies of all laboratories results and consulting reports with respect thereto;

(e)    comply with all of the requirements of Sections 1113 and 1114 of the Bankruptcy Code;

(f)    use the proceeds of the Loan in accordance with the Budget for working capital purposes and general corporate purposes in the ordinary course of the business of the Borrowers and to pay Chapter 11 expenses;

(g)    cooperate with the Lender, take such action, execute such documents (including security documents), and provide such information as the Lender may from time to time reasonably request in order further to effect the transactions contemplated by and the purposes of the Financing Documents and, if requested by the Lender for regulatory reasons or following the occurrence of an Event of Default, deliver to the Lender at the Borrowers' expense appraisals, title insurance, surveys or environmental assessments relating to the real estate of Borrowers;

(h)    notify the Lender prior to rejecting any contract or making any motion to reject any contract, setting forth in such notice the Borrowers' reasons why such rejection (i) will be in the best interests of the Borrowers and (ii) will not have a Material Adverse Effect; and

(i)    notify the Lender prior to making any motion to sell any assets of any Borrower outside the ordinary course of business.

§9.2    **Negative Covenants**.    Each of the Borrowers agrees that until the payment and satisfaction in full of all the Obligations, the Borrowers will not:

(a)    seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Orders; (ii) a priority claim for any administrative expense or unsecured claim against the Borrowers (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense of the kind specified in Section 503(b),

506(c) or 507(b) of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations, except for Agreed Administrative Expense Priorities; (iii) a priority claim pursuant to Section 364 of the Bankruptcy Code equal or superior to the priority claim of the Lender in respect of the Obligations; and (iv) any Lien on any Collateral, having a priority equal or superior to the Liens in favor of the Lender in respect of the Obligations, except for Permitted Prior Liens;

(b)    create, incur or assume any indebtedness other than (i) Indebtedness to the Lender arising under the Financing Documents, (ii) Indebtedness in respect of the acquisition of property or capitalized leases which does not exceed $50,000 in cumulative aggregate amount and refinancings thereof which do not exceed the amount refinanced, (iii) current liabilities of the Borrowers not incurred through the borrowing of money or the obtaining of credit except credit on an open account customarily extended, (iv) Indebtedness in respect of taxes or other governmental charges contested in good faith and by appropriate proceedings and for which adequate reserves have been taken; and (v) Indebtedness in existence on the Filing Date.

(c)    create or incur any Liens on any of the property or assets of the Borrowers except (collectively, "Permitted Liens") (i) Liens securing the Obligations; (ii) non-consensual maritime Liens under foreign law; (iii) Permitted Prior Liens, all of which are listed on Schedule 1 hereto; (iv) Liens securing taxes or other governmental charges not yet due; (v) deposits for utilities, reasonable retainers to professionals, deposits or pledges made in connection with workmen's compensation, unemployment insurance or other social security obligations or to secure the performance of tenders, bids and other contracts in the ordinary course of business of any of the Borrowers consistent with past practices; (vi) Liens of carriers, warehousemen, mechanics and materialmen and similar non-consensual liens arising by operation of law, less than 120 days old as to obligations not yet due; (vii) easements, rights-of-way, zoning restrictions and similar minor Liens which individually and in the aggregate do not have a Material Adverse Effect; (viii) purchase money security interests in or purchase money mortgages on real or personal property securing purchase money Indebtedness or capitalized leases permitted by Section 9.2(b)(ii), covering only the property so acquired or leased; and (ix) deposits to obtain goods or services and not exceeding $50,000 in the aggregate at any one time outstanding;

(d)    purchase securities, make loans, issue guaranties or other financial accommodations or to make any other investments other than investments in (i) any other Borrower, or (ii) operating bank accounts, bank certificates of deposit, bank eurodollar deposits, bank money market funds, government securities, commercial paper, repos and other cash equivalent securities, in each case having maturities of thirty days or less and reasonably acceptable to the Lender;

(e)    effect any disposition of assets (other than dispositions of assets approved by order of the Bankruptcy Court proceeds of which are used to repay the Loan in accordance with §2.4), or purchase, lease or otherwise acquire assets other than in the ordinary course;

(f)    without the prior written consent of the Lender, use any portion of the Loan or the Collateral (including, for the avoidance of doubt, the Carve-Out or any "cash collateral" as defined in section 363(a) of the Bankruptcy Code) (i) for any purpose that is

15

prohibited under the Bankruptcy Code or the Interim Order and the Final Order; or (ii) to finance in any way: (x) any adversary action, suit, arbitration, proceeding, application, motion, contested matter or other litigation or challenge of any type (or any investigation of the foregoing) adverse to the interests of any or all of the Releasees or their respective rights and remedies under the Financing Documents, the Interim Order, the Final Order, the Joint Venture Agreement, the TradeCo Credit Agreement, the Variable Interest Rate Credit Agreement, or the Vessel Funding Credit Agreement and all other agreements, instruments, and documents executed at any time in connection therewith (collectively, the "Prepetition Documents") or (y) any other action which with the giving of notice or passing of time would result in an Event of Default hereunder or under any of the Financing Documents; provided, however, that, notwithstanding the foregoing, up to $50,000 in the aggregate of any proceeds of the Loan or the Collateral may be used to pay any allowed fees and expenses of estate professionals retained by the Borrowers or any Committee that are incurred in connection with investigating the matters covered by the release contained in §13 (the "Investigation Budget").

§10.    **Events of Default: Acceleration**.  If any of the following events ("Events of Default") shall occur:

(a)    the Borrowers shall fail to pay when due and payable (whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment, or otherwise) any principal of the Note, when the same becomes due and payable hereunder, or any interest or other Obligation due under any of the Financing Documents, when the same becomes due and payable hereunder or thereunder;

(b)    the Borrowers shall fail to perform any term, covenant or agreement contained in §9. l(d)(i) or (ii), §9.1(f), or §9.2.;

(c)    the Borrowers shall fail to perform any other term, covenant or agreement contained in this Agreement or any of the other Financing Documents after the Lender has given written notice of such failure to the Borrowers and a period of five (5) days has passed without such failure having been cured or remedied;

(d)    any representation or warranty of the Borrowers in any of the Financing Documents or in any document, certificate or other paper or notice given in connection therewith shall have been false or misleading in any material respect at any time made or deemed to have been made or repeated;

(e)    the Borrowers shall be in default under any agreement or agreements (other than the Financing Documents) evidencing post-petition Indebtedness; or any prepetition Indebtedness if, by order of the Bankruptcy Court issued or previously issued at the time of reference thereto with respect to such Indebtedness, a default thereunder would entitle the holder thereof to relief from the automatic stay of Section 362(a) of the Bankruptcy Code, in excess of $50,000 in aggregate principal amount, or the Borrowers shall otherwise fail to pay such Indebtedness referred to in this clause (e) when due or within any applicable period of grace;

(f)    any of the Financing Documents executed and delivered shall cease to be in full force and effect, or the Lender's Liens on substantially all of the Collateral shall fail to be

16

perfected at any time following the later to occur of the date hereof or the entry of the Interim Order or the Final Order, whichever shall be entered first, or shall fail to have the priority contemplated hereby at any time after such date;

(g)    the Bankruptcy Court shall enter any order (i) amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying any Order without the consent of the Lender, (ii) appointing a Chapter 11 trustee or appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) in any of the Cases; (iii) dismissing any of the Cases or converting any of the Cases to a Chapter 7 case or (iv) granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on a material portion (*i.e.*, more than $50,000 per creditor or $50,000 in the aggregate) of the assets of the Borrowers taken as a whole or where the deprivation of the Borrowers of such assets will, in the reasonable opinion of the Lender, have a Material Adverse Effect;

(h)    an application shall be filed by the Borrowers or any other interested party for the approval of any other Super-Priority Claim or Lien in any of the Cases which is pari passu with or senior to the claims or Liens of the Lender against the Borrowers hereunder or under any of the other Financing Documents (unless after giving effect to the transactions contemplated by such application, all Obligations (whether contingent or otherwise) shall be paid in full in cash), or there shall arise any such Super-Priority Claim or Lien;

(i)    the Borrowers shall be unable to pay their post-petition debts as they mature;

(j)    there shall remain undischarged for more than thirty (30) days any final post-petition judgment or execution action against the Borrowers, or relief from the automatic stay of Section 362(a) of the Bankruptcy Code shall be granted to any creditor or creditors of the Borrowers, with respect to assets having an aggregate value in excess of $50,000 or where the deprivation of the Borrowers of such assets will, in the reasonable opinion of the Lender, have a Material Adverse Effect;

(k)    the Borrowers shall pay or discharge any pre-petition Indebtedness, exclusive of (i) Indebtedness required to be paid and in fact paid in connection with the assumption of executory contracts which are not financial accommodations, (ii) payments effected by involuntary set-offs and (iii) pre-petition payrolls paid or authorized to be paid on or within 35 days following the Filing Date;

(l)    a plan of reorganization or disclosure statement shall be proposed by the Borrowers or approved by the Bankruptcy Court in any of the Cases which does not satisfy the requirements of §6(c);

(m)    the Borrowers shall not have filed a Plan, a disclosure statement for such Plan, and a motion to approve the disclosure statement for such Plan, on or before 11:59 P.M. (ET) on November 13, 2015;

(n)    the Bankruptcy Court shall not have entered an order approving a disclosure statement for a Plan, on or before 11:59 P.M. (ET) on December 15, 2015;

17

(o)     the Bankruptcy Court shall not have entered an order confirming a Plan, on or before 11:59 P.M. (ET) on January 15, 2016;

(p)     the effective date of a Plan shall not have occurred on or before 11:59 P.M. (ET) on January 29, 2016;

(q)     a Plan or the order confirming a Plan is amended, supplemented, withdrawn, terminated, or otherwise modified without the prior written consent of the Lender; or

(r)     any of the Borrowers shall be enjoined from conducting any part of its business as a debtor in possession, or there shall occur any disruption to such business, which could have a Material Adverse Effect.

THEN, or at any time thereafter the Lender may deliver a Carve-Out Notice and, by written notice (an "Acceleration Notice") to the Borrowers (and to the Bankruptcy Court to the extent required by the Orders), declare and require (i) the unpaid principal amount of the Loan and all interest accrued and unpaid thereon forthwith to be due and payable, and (ii) all other amounts payable hereunder and under the other Financing Documents to be forthwith due and payable, in each case without further order of or application to the Bankruptcy Court, presentment, demand, protest or further notice of any kind all of which are hereby expressly waived by the Borrowers.

If an Event of Default occurs, the Lender may, subject to the provisions of the Orders, exercise the rights and remedies which the Lender may have hereunder or under any of the other Financing Documents or at law (including but not limited to the Bankruptcy Code and the Uniform Commercial Code) or in equity or otherwise. **UPON THE OCCURRENCE OF THE MATURITY DATE OR AN EVENT OF DEFAULT, THE AUTOMATIC STAY PROVIDED FOR UNDER SECTION 362(a) OF THE BANKRUPTCY CODE SHALL BE DEEMED WAIVED AND MODIFIED, WITHOUT FURTHER ORDER OF OR APPLICATION TO THE BANKRUPTCY COURT, TO THE EXTENT NECESSARY TO PERMIT THE LENDER TO EXERCISE ANY AND ALL OF ITS RIGHTS AND REMEDIES FOR PURPOSES OF ENFORCING ITS CLAIMS AND LIENS UNDER THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS.** No remedy herein conferred upon the Lender is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and in addition to every other remedy hereunder, now or hereafter existing at law or in equity or otherwise.

§11.   **SETOFF AND OTHER REMEDIES.   IF AN EVENT OF DEFAULT OCCURS, REGARDLESS OF THE ADEQUACY OF ANY COLLATERAL FOR ANY OF THE OBLIGATIONS, ANY SUMS CREDITED BY OR DUE FROM THE LENDER TO THE BORROWERS MAY BE APPLIED BY THE LENDER TO OR SET-OFF AGAINST ANY PRINCIPAL, INTEREST, FEES AND ANY OTHER AMOUNTS OR OBLIGATIONS DUE FROM THE BORROWERS TO THE LENDER AT ANY TIME WITHOUT FURTHER ORDER OF OR APPLICATION TO THE BANKRUPTCY COURT, NOTICE TO THE BORROWERS, OR COMPLIANCE WITH ANY OTHER PROCEDURE IMPOSED BY STATUTE OR OTHERWISE, ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY THE BORROWERS.**

§12.    **Lender as Party in Interest**.  The Borrowers hereby stipulate and agree that the Lender is and shall remain a party in interest in the Cases and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith and to appeal therefrom.   Neither the failure to so participate, object or be heard nor anything in this Agreement or any other Financing Document shall be deemed to be a waiver of the Lender's rights or remedies thereunder or under applicable law.  Without limitation of the foregoing, the Lender shall have the right to make any motion or raise any objection which it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the purchase of the Note, payment of professional fees and expenses or the amount thereof, sales or other transactions outside the ordinary course of business or assumption or rejection of any executory contract or lease) whether or not the action or inaction by the Borrowers which is the subject of such motion or objection violates or is expressly permitted by any covenant or provisions of this Agreement or any other Financing Document.

§13.    **Challenge Period; Release.**

Subject to the limitations set forth in §9.2(f) hereof (including the Investigation Budget), the Borrowers or any Committee may timely commence a contested matter or adversary proceeding (a "Challenge") to assert any claims or causes of action on behalf of the Borrowers' estates against the Lender until the later of (i) if no Committee has been appointed, seventy-five (75) days from the Filing Date, or (ii) if a Committee has been appointed within the seventy-five-(75)-day period provided in clause (i) above, sixty (60) days after the appointment of such Committee  (the "Challenge Period").  If no such Challenge is timely commenced as of such date, then, without further order of the Bankruptcy Court, (i) the Borrowers and their estates shall be deemed to have released the Releasees of and from any and all claims, controversies, disputes, liabilities, obligations, demands, judgments, damages, costs, losses, expenses (including attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, both at law or in equity, whether known or unknown, which arose at any time prior to the date hereof, or which hereafter could arise based on any act, fact, transaction, cause, matter, or thing which accrued prior to the date hereof related to the Borrowers, including, without limitation, any so-called "lender liability" claims or defenses, and any claims and causes of action arising under Prepetition Documents or the Bankruptcy Code, including any causes of action under sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code and (ii) the foregoing release shall be binding upon the Borrowers, their estates, and their successors (including any Chapter 7 or Chapter 11 trustee appointed or elected for the Borrowers), any Committee, and all other parties in interest.  If any such adversary proceeding or contested matter is timely filed by the Borrowers or a Committee within the Challenge Period, the release contained in this paragraph shall remain binding and preclusive upon the Borrowers, their estates, and their successors (including any Chapter 7 or Chapter 11 trustee appointed or elected for the Borrowers), any Committee, and all other parties in interest, except as to claims raised in such adversary proceeding or contested matter prior to the expiration of the Challenge Period; and the resolution of such adversary proceeding or contested matter by judgment, final order, settlement, or otherwise shall be binding and preclusive upon the Borrowers, their estates, and their successors (including any Chapter 7 or Chapter 11 trustee appointed or elected for the Borrowers), any Committee, and all other parties in interest.

§14.    **Miscellaneous.**

(a)     The Borrowers jointly and severally agree to indemnify and hold harmless the Releasees from and against any and all losses, claims, damages and liabilities to which any such Releasee may be subject arising out of or in connection with this Agreement and the other Financing Documents or any of the transactions contemplated hereby or thereby or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not such Releasee is a party hereto or thereto, and to reimburse each of such Releasees, from time to time upon its, his or her demand, for any reasonable legal or other expenses incurred in connection with investigating or defending any of the foregoing, whether or not the transactions contemplated hereby are consummated; provided, however, that the foregoing indemnity will not, as to any Releasee, apply to losses, claims, damages, liabilities or related expenses to the extent that they have been determined by a court of competent jurisdiction by final, non-appealable order to arise primarily from the bad faith, willful misconduct or gross negligence of such Releasee.  In litigation, or the preparation therefor, the Releasee will be entitled to select their own counsel and, in addition to the foregoing indemnity, the Borrowers agree to pay promptly the reasonable fees and expenses of such counsel, provided that, such Releasee shall reimburse the Borrowers for such amounts paid for counsel if such amounts were incurred by a Releasee in a litigation in which the Borrowers are determined by a final, non-appealable order of a court of competent jurisdiction not to be obligated to indemnify such Releasee hereunder.

(b)     Any communication to be made hereunder shall (i) be made in writing, but unless otherwise stated, may be made by telex, facsimile transmission or letter, and (ii) be made or delivered to the address of the party receiving notice which is identified below (unless such party has by five (5) days' written notice specified another address), and shall be deemed made or delivered, when dispatched, left at that address, or five (5) days after being mailed, postage prepaid, to such address.

Address of the Borrowers:

> c/o GMI USA Management, Inc.
> 21 Whitefriars Street
> London, UK  EC4Y 8JJ
> Attention:  Tom Oliphant
> Facsimile:  +44 207 842 4999
> E-mail:  tomoliphant@gmilimited.com

> with a copy to:

> Gardere Wynne Sewell LLP
> 2000 Wells Fargo Plaza
> 1000 Louisiana Street
> Houston, Texas 77002
> Attention:  John Melko
> Fax:  1.713.276.6727
> E-mail:  jmelko@gardere.com

Address of the Lender:

c/o Maples Corporate Services Limited
PO Box 309, Ugland House
Grand Cayman
KY1-1104
Cayman Islands
Attention: The Directors
Fax: 1.345.949.8080
E-mail: McDonald@hmc.harvard.edu

with a copy to:

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Attention: James Wilton
Fax: 1.617.235.0398
E-mail: james.wilton@ropesgray.com

(c)    This Agreement shall be binding upon and inure to the benefit of each party hereto and its successors and assigns, but none of the Borrowers may assign its rights or obligations' hereunder.  The Lender may assign any or all of the Obligations, including, without limitation, the Note, or any participation therein.

(d)    This Agreement may not be amended or waived except by a written instrument signed by the Borrowers and the Lender, and any such amendment or waiver shall be effective only for the specific purpose given.  No failure or delay by the Lender to exercise any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other right, power or privilege.  The provisions of this Agreement are severable and if any one provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, such invalidity or unenforceability shall affect only such provisions in such jurisdiction.  This Agreement, together with all Schedules hereto, expresses the entire understanding of the parties with respect to the transactions contemplated hereby.  This Agreement and any amendment hereof may be executed in several counterparts, each of which shall be an original, and all of which shall constitute one agreement.  In proving this Agreement, it shall not be necessary to produce more than one such counterpart executed by the party to be charged.  **THIS AGREEMENT AND THE NOTE ARE CONTRACTS UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED IN ACCORDANCE THEREWITH AND GOVERNED THEREBY.  EACH OF THE BORROWERS, AS AN INDUCEMENT TO THE LENDER TO ENTER INTO THIS AGREEMENT, HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER FINANCING DOCUMENT.**

*[Remainder of Page Left Intentionally Blank]*

Each of the undersigned has caused this Agreement to be executed and delivered as of the date first written above.

**BORROWERS**

**GMI USA MANAGEMENT, INC.**

By _____
    Name:    Justin Knowles
    Title:    Chief Restructuring Officer

**GLOBAL MARITIME INVESTMENTS HOLDINGS CYPRUS LIMITED**

By _____
    Name:    Justin Knowles
    Title:    Chief Restructuring Officer

**GLOBAL MARITIME INVESTMENTS VESSEL HOLDINGS PTE. LIMITED**

By _____
    Name:    Justin Knowles
    Title:    Chief Restructuring Officer

**GLOBAL MARITIME INVESTMENTS CYPRUS LIMITED**

By _____
    Name:    Justin Knowles
    Title:    Chief Restructuring Officer

**GLOBAL MARITIME INVESTMENTS RESOURCES (SINGAPORE) PTE. LIMITED**

By _____
    Name:    Justin Knowles
    Title:    Chief Restructuring Officer

**<u>LENDER</u>**

**FRANCOLIN**

By _____
      Name:     Kevin F. Shannon
      Title:      Director


By _____
      Name:     Kathryn I. Murtagh
      Title:      Director

**Exhibit A**

Joint and Several Promissory Note

[See Attached]

**Exhibit B**

Security Agreement

[See Attached]

**Exhibit C**

Interim Order

**[See Attached]**

**Schedule 1**

<u>Permitted Prior Liens</u>

**Schedule 7(d)**

<u>Pending Legal or Other Proceedings or Investigations</u>

**Schedule 7(f)**

Violations of Charter Documents, Contracts, and  Requirements of Law

**Schedule 7(i)**

<u>Subsidiaries of the Borrowers</u>

GMI Panamax Pool Limited

GMI Ltd.

**Schedule 7(j)**

Non-Compliance with Environmental Laws/Hazardous Materials