John P. Melko
713-276-5727 (*direct dial*)
713-276-6727 (*direct fax*)
jmelko@gardere.com
Michael K. Riordan
713-276-5178 *(direct dial)*
713-276-6178 *(direct fax)*
mriordan@gardere.com
**GARDERE WYNNE SEWELL LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002-5011

*Proposed Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GMI USA MANAGEMENT, INC., *et al*[1] | Case No. 15-12552-SMB |
| Debtors. | (Jointly Administered) |

**MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO FED. R. BANKR. P. 9019(A) APPROVING COMPROMISE AND SETTLEMENT RELATED TO M/V JIA FOISON AND M/V JIA DA**

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

The Debtors, as debtors and debtors-in-possession, respectfully represent:

**Background**

**A.    General Background**

1.    The Debtors each filed a voluntary chapter 11 petition on September 15, 2015 (the "***Petition Date***"). Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are

---

[1] The Debtors in these chapter 11 cases comprise GMI USA Management, Inc. (1208), Global Maritime Investments Holdings Cyprus Limited, Global Maritime Investments Vessel Holdings Pte. Limited, Global Maritime Investments Cyprus Limited and Global Maritime Investments Resources (Singapore) Pte. Limited.

**PAGE 1**

continuing to operate their respective businesses and to manage their respective financial affairs as debtors in possession.

2. An order authorizing joint administration of these cases was entered on September 21, 2015 [Docket No. 14]. No trustee or examiner has been appointed in the Debtors' bankruptcy cases. On September 24, 2015 an official committee of unsecured creditors (the "*Creditors' Committee*") was designated.

3. The Debtors are engaged in three segments of the dry bulk shipping markets. A detailed factual background of the Debtors' business and operations, as well as the commencement of these chapter 11 cases, is more fully set forth in the *Declaration of Justin Knowles in Support of Original Petitions, First Day Pleadings, and in Accordance with LBR 1007-2* filed on the Petition Date [Docket No. 2] and the *Supplemental Declaration of Justin Knowles in Support of First Day Motions, Petitions, and in Accordance with Local Bankruptcy Rule 1007-2* [Docket No. 61].

    **B.**    *M/V* Jia Da and *M/V* Jia Foison

4. Debtor Global Maritime Investments Cyprus Limited ("**GMIC**") is the long-term charterer of *M/V* Jia Foison and *M/V* Jia Da (the "**Vessels**") pursuant to two time charter agreements (the "**Charterparties**", and each a "**Charterparty**"). *M/V* Jia Foison is owned by Jia Foison Shipping Co., Ltd., ("**Jia Foison Shipping**") and *M/V* Jia Da is owned by Jia Da Shipping Co., Ltd. ("**Jia Da Shipping**," and together with Jia Foison Shipping the "**Owners**"). The Debtors usually communicate to the Owners through the manager of the Vessel, HTM Shipping Co., Ltd. (the "**Manager**"). The Debtors, the Manager, and the Owners are collectively referred to herein as the "**Parties**." The Manager and the Owners are collectively referred to herein as the "**Owner Parties**."

5. The charter on *M/V* Jia Da was rejected by the Debtor GMIC, effective September 18, 2015. [Dkt. No. 66]. The Charterparty and riders thereto provided that upon "redelivery" of the ship by the charterer (GMIC) to the Owner, the Owner would pay GMIC for the amount of bunkers on board the Vessel in excess of the bunkers on board when GMIC took delivery of the Vessel. Based on its course of dealing and industry knowledge GMIC believes that the ultimate economic interest in *M/V* Jia Da is the same or related to the economic interest owner of *M/V* Jia Foison. Accordingly, GMIC proposed that the funds it asserted were due from Owner of *M/V* Jia Da to GMIC be applied to post-petition charter hire due from GMIC to the owner of *M/V* Jia Foison.

6. Ultimately, the owner of *M/V* Jia Da disputed that: (i) a "redelivery" had taken place within the meaning of the Charterparty; (ii) that if a redelivery had taken place, the current market price for bunkers (which has fallen dramatically since the date of the Charterparty) should be the repurchase price as opposed to the price set forth in the Charterparty should be used for the amount due to GMIC; and (iii) that any amounts due from *M/V* Jia Da could not be applied to or offset against post-petition amounts due from GMIC for charter hire on *M/V* Jia Foison. Further, the owner maintains that these disputes were subject to mandatory arbitration.

7. GMIC has sub-chartered *M/V* Jia Foison to Caravel Shipping Limited or one or more affiliates thereof (the "**Sub-Charterer**"). Under the Sub-Charter, the Sub-Charterer is indebted to GMIC for, among other things, charter hire. On information and belief, the Sub-Charterer has further sub-chartered the Vessel to and an as yet unidentified third-party (who is assumed to be, and is referred to herein, as the "**Ultimate Charterer**").

8. The respective rights and obligations of the Debtors and Owner Parties under the Charterparties has been the subject of dispute and negotiations since before the Debtors filed

**PAGE 3**

these Chapter 11 Cases, and efforts to resolve these disputes have required substantial time and energy from the Debtors and their professionals.

9. After commercial discussions among the Parties failed, Jia Foison Shipping and the Manager took various actions to obtain payment of the charter hire owed by the Debtors on *M/V* Jia Foison. The Debtors' filed their *Emergency Motion to Enforce the Automatic Stay Pursuant to 11 U.S.C. §362* [Dkt. No. 46] (the "**Emergency Motion**") and *Application For Temporary Restraining Order and Issuance of an Order to Show Cause* [Dkt. No. 47] (the "**TRO Application**"), in response to self-help remedies taken by the Owner Parties.

10. The Court granted the Debtors' TRO Application and Emergency Motion entering the *Temporary Restraining Order and Order to Show Cause* [Dkt. No. 49] (the "**TRO**") on September 25, 2015, and an *Order of Permanent Injunction* [Dkt. No. 62] (the "**Injunction Order**") on October 2, 2015. The *Order of Permanent Injunction* enjoined Jia Foison Shipping, the Manager, "and any person or entity acting in concert therewith," from, *inter alia*: (1) attempting or purporting to attempt to terminate the Jia Foison Charterparty; (2) attempting to collect any amounts owed to the Debtors from the Sub-Charterer or any further sub-charterer; (3) interfering with the Debtors' rights as charterer under the Jia Foison Charterparty; and (4) asserting, or giving notice of the assertion of, liens on freight payable by the Sub-Charterer or any further sub-charterer to the Debtors.

11. Through the Manager, the Debtors provided Jia Foison Shipping copies of both the TRO and the Injunction Order on the same day these orders were respectively entered. Nevertheless, problems with the Owner Parties continued.

12. The Owner Parties eventually cooperated enough to permit *M/V* Jia Foison to enable the Jia Foison to continue its voyage. However, the Owner Parties continued to demand

payment from the Sub-Charterer of the hire that was rightly payable to the Debtors. The Sub-Charterer, familiar with the automatic stay, but wary of making sub-charter hire payments to the Debtors while the Owner Parties were making conflicting demands, has paid neither the Debtors, nor the Owner Parties. The Sub-Charterer is presumably holding on to these funds until its various obligations become clearer. The Sub-Charterer's non-payment has seriously impacted the Debtors' revenue streams. The Debtors are currently owed roughly $900,000 from the Sub-Charterer for sub-charter hire.

13. On, Friday, October 16, 2015, the Debtors filed a complaint styled *Global Maritime Investments Cyprus Limited v. M/V Jia Da, Her Engines, Tackle, Etc., In Rem, and Jia Da Shipping Co., Limited, In Personam* in the United States District Court for the District of Oregon (the "**Maritime Court**") as *M/V* Jia Da was traveling in to the Port of Portland. At the Debtors' request, the Maritime Court entered an arrest order for *M/V* Jia Da, and the Vessel was arrested a little later that day. The Vessel's arrest re-opened serious settlement discussions amongst the Parties who undertook an effort to craft an acceptable resolution that minimizes and avoids the expenses and uncertainties of continued litigation.

14. The Charterparties are governed by United Kingdom law, and during this period, the Debtors consulted with UK counsel and reviewed opinions from the House of Lords dealing with similar facts to: (1) evaluate the likelihood of success in litigation; (2) weigh the risk of damages to third party contracts, for which such third parties might try to hold GMIC liable; and (3) consider the inherent risk and delay of litigation. After arms-length negotiations over the course of several days, the Parties reached an agreement that is memorialized in the Compromise Settlement Agreement filed herewith as Exhibit A. Based on their analysis of the considerations listed above, the Debtors believe the compromise set forth in the Compromise Settlement

**PAGE 5**

Agreement is more beneficial to their estates and creditors than the expected outcome of litigating the dispute between them, the Owners, and the Manager.

### Summary of the Settlement Agreement

15. The Parties have agreed as follows:

- The Debtors have terminated and the Bankruptcy Court has entered an order approving the Debtors' rejection of the Jia Da Charterparty [Dkt. No. 66]. The bunkers remaining on board *M/V* Jia Da will be valued on the basis of market/spot prices on the date of *M/V* Jia Da's redelivery by the Debtors (as confirmed by Platts).

- The Owner Parties will reinstate the time charter on *M/V* Jia Foison, release any and all liens on all subfreight or subcharter hire and complete the current voyage (which calls for two discharge ports in China), conditioned upon: (1) the Debtors curing, as soon as reasonably possible after entry of a 9019 Order, all defaults in the payment of charter hire from September 16, 2015 to completion of the voyage (currently estimated to be November 25th), and (2) the Owner Parties receiving appropriate assurances and/or guarantees that the Debtors will continue to perform under the time charter through completion of the voyage.

- The Owner Parties will waive any and all claims for pre-petition hire and early termination damages (including termination of any and all pending legal proceedings related thereto), with the understanding that any remaining bunkers due to the Debtors on completion of voyage will be valued on the basis of market/spot prices on the date of early termination of the time charter (as confirmed by Platts). The amounts due to the Debtors for bunkers onboard the Vessels hereunder shall be applied first to post-petition hire on the Jia Foison. The Owner Parties waive any other claims whatsoever they may have against the Debtors under the Jia Da Charterparty and Jia Foison Charterparty as long as the terms of this Settlement Agreement are complied with.

- The Debtors will make all reasonable efforts to effect the release of *M/V* Jia Da from its arrest in Portland, Oregon, and will dismiss the suit styled *Global Maritime Investments Cyprus Limited v. M/V Jia Da, Her Engines, Tackle, Etc., In Rem, and Jia Da Shipping Co., Limited, In Personam* in the United States District Court for the District of Oregon.[2]

- The Debtors will refrain from asserting any claims against *M/V* Jia Da, Jia Da Shipping, or the Manager (relating to *M/V* Jia Da) in the Bankruptcy Court (or any other jurisdiction) and waive any other claims whatsoever

---

[2] The Debtors secured *M/V* Jia Da's release from arrest on October 21, 2015.

**PAGE 6**

- they may have against the Owner Parties under the Jia Da Charterparty, except for bunkers remaining on board the vessel upon redelivery which will be valued on the basis of market/spot prices on that date (as confirmed by Platts) as long as the terms of this Settlement Agreement are complied with.

- After entry by the Bankruptcy Court of a 9019 Order, the Debtors will withdraw their claims against *M/V* Jia Foison, Jia Foison Shipping, and the Manager in the Bankruptcy Court (and refrain from asserting claims in any other jurisdiction), and waive any other claims whatsoever they may have against the Owner Parties under the Jia Foison Charterparty, except for bunkers remaining on board the vessel upon redelivery which will be valued on the basis of market/spot prices on that date (as confirmed by Platts) as long as the terms of this Settlement Agreement are complied with.

- The Parties reserve their respective rights regarding jurisdiction, choice of law and enforcement of this Settlement Agreement should either party fail to comply with the terms of the settlement agreement, including, but not limited to, the Owner Parties' right to object to the jurisdiction of the United States Bankruptcy Court for the Southern District of New York.

- The Parties will work together in good faith to resolve any other issues among them relating to the Vessels.

- The Parties expressly agree, covenant, and promise that they, or any one of them, will not file a pleading (including, without limitation a plan of reorganization or liquidation and/or a disclosure statement) or take or advance a position that conflicts with the terms of this Settlement Agreement.

## Jurisdiction and Venue

16. This Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of the Debtors' chapter 11 cases is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409. The predicate for the relief sought herein is Rule 9019(a), Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

**Relief Requested**

17.     The Debtors request entry of an order, substantially in the form filed herewith as **Exhibit "A**,**"** pursuant to Bankruptcy Rule 9019(a), approving that certain settlement agreement, dated November 5, 2015 (the "**Settlement Agreement**"), by and among the Debtors, Jia Da Shipping Co., Ltd, Jia Foison Shipping Co., Ltd., a copy of which is filed herewith as **Exhibits "B."**

**Ample Cause Exists to Approve the
Settlement Agreement Pursuant to Bankruptcy Rule 9019(a)**

18.     Bankruptcy Rule 9019(a) authorizes a court, after notice and a hearing, to approve a compromise or settlement of a controversy, providing, in relevant part, that "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Pursuant to Bankruptcy Rule 9019, bankruptcy courts can approve a compromise or settlement if it is in the best interest of the estate. *See Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness." *Id.*; *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

19.     Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). Compromises "are favored in bankruptcy because they minimize the costs of litigation and further the parties' interest in expediting the administration of a bankruptcy estate." *In re Hilsen*, 404 B.R. 58, 69 (Bankr. E.D.N.Y. 2009) (citations omitted).

**PAGE 8**

20. The applicable authorities direct a court to determine whether the settlement is "fair and equitable" and "in the best interests of the estate." *TMT Trailer Ferry*, 390 U.S. at 424; *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (a court need only find that the settlement is fair and equitable, reasonable and in the best interests of the debtors' estate). The court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

21. In determining whether to approve a settlement, an independent determination that the settlement is fair and reasonable is required. *Nellis v. Shugrue*, 165 B.R. 115, 122–23 (S.D.N.Y. 1994). The following factors are generally considered in determining whether to approve a settlement: (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the difficulties of collecting any litigated judgment; (iii) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; (iv) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; (v) the competence and experience of attorneys and other professionals who support the settlement; (vi) the relative benefits to be received by affected parties; (vii) the extent to which the settlement is the product of arm's-length bargaining and not the product of fraud or collusion; and (viii) the debtor's informed judgment that the settlement is fair and reasonable. *See TMT Trailer Ferry*, 390 U.S. at 424; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *Ionosphere*, 156 B.R. at 428 (citations omitted).

22. While a court must evaluate "all . . . factors relevant to a full and fair assessment of the wisdom of the proposed compromise," *TMT Trailer Ferry*, 390 U.S. at 424, there is no requirement for the court to conduct a "mini-trial" of the claims being settled or a full

independent investigation. *See In re W.T. Grant Co.*, 699 F.2d at 608; *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 505. Rather, a court should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant Co.*, 699 F.2d at 608 (internal citations omitted); *accord Drexel Burnham*, 134 B.R. at 505.

23. The Settlement Agreement readily satisfies the standards for approval. The Debtors, in consultation with their attorneys, have carefully and comprehensively analyzed their disputes with the Owner Parties and have concluded that the Settlement Agreement is in the best interests of their estates. The Owner Parties' waiver of prepetition claim amounts, commitment to pay for excess fuel on the Vessels upon redelivery, and commitment to make all reasonable efforts to inform third parties that the Owner Parties would take no action against them for paying amounts owed to the Debtors related to the Vessels.

24. As a result of the Settlement Agreement, the Debtors will resolve all disputes between and among the Debtors and the Owner Parties relating to the Vessels, including the amount of charter hire owed by the Debtors to the Owner Parties, the amount owed by the Owner Parties to the Debtors for excess fuel on the Vessels, and the identity of the parties rightfully entitled to sub-charter hire payments from the Sub-Charterer and Ultimate Charterer. This will eliminate the substantial cost and the uncertainty of litigating these issues, particularly in light of the fact that the Owner Parties have few or no assets in the United States unless a Vessel is in a U.S. port. This settlement will also facilitate the Debtors receipt of sub-charter hire payments for the Vessels. The Sub-Charterer, currently subject to conflicting claims to such sub-charter hire from the Debtors and the Owner Parties, has chosen to make payments to neither the Debtors or the Owner Parties while the dispute is ongoing. Even netted against the post-petition amounts owed to the Owner Parties, the Debtors estimate that the payments they will receive from the

Owner's Parties for excess fuel and the expected payment of the sub-charter hire when the Settlement Agreement is approved will augment the Debtors' estates by roughly half a million dollars.

25. Accordingly, the Settlement Agreement should be approved under Bankruptcy Rule 9019(a) as a valid exercise of the Debtors' reasonable business judgment and as being in the best interests of the Debtors' estates and all parties in interest.

## NOTICE

26. No trustee or examiner has been appointed in these chapter 11 cases. The Debtors will provide notice of this Motion to: (a) the United States Trustee of Region 2; (b) counsel for Francolin; (c) Activity S.A., Libra Financiere; (d) the fifty (50) largest unsecured creditors of these bankruptcy estates (on a consolidated basis); (e) counsel for the unsecured creditors' committee; (f) those persons who have formally appeared and requested notice in this case pursuant to Bankruptcy Rule 2002; and (g) the Internal Revenue Service and other governmental agencies required to receive notice under the Bankruptcy Rules or Local Rules. The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

27. No prior request for the relief sought in this motion has been made to this or any other court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that this Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: November 5, 2015

Houston, Texas

Respectfully submitted,

/s/*John P. Melko*
John P. Melko
Texas State Bar No. 13919600
713-276-5727 (*direct dial*)
713-276-6727 (*direct fax*)
jmelko@gardere.com
Michael K. Riordan
Texas State Bar No. 24070502
713-276-5178 *(direct dial)*
713-276-6178 *(direct fax)*
mriordan@gardere.com
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 2000
Houston, Texas  77002-5011

PROPOSED COUNSEL FOR THE DEBTORS