CARROLL, McNULTY & KULL LLC
John A. Orzel
120 Mountain View Boulevard
Basking Ridge, New Jersey  07920
Telephone:     (908) 605-2916
Facsimile:     (908) 848-6310

*Counsel to Caravel Shipping Ltd.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| **GMI USA MANAGEMENT, INC.,** *et. al.*[1] | : | Case No. 15-12552 (SMB) |
| | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |

-------------------------------------------------------------  X

**STATEMENT OF CREDITOR CARAVEL SHIPPING LIMITED
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
PURSUANT TO FED. R. BANKR. P. 9019(A) APPROVING COMPROMISE AND
SETTLEMENT RELATED TO M/V JIA FOISON AND M/V JIA DA WITH
RESERVATIONS**

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

Creditor and party in interest Caravel Shipping Limited (hereinafter referred to as "Caravel"), based upon the following and the Declaration of Mudit Paliwal (hereinafter "Paliwal Dec."), herewith respectfully supports the motion by debtors and debtors-in-possession (hereinafter referred to collectively as "GMICL") seeking an order pursuant to Fed. R. Bankr. P. 9019(A) approving a compromise and settlement related to the *m/v JAI FOISON* and *m/v JIA DA*, with reservation in the event that the terms of said proposed settlement are not promptly and completely carried-out by non-party vessel owners Jai Foison Shipping Co. Ltd. (hereinafter

---

[1] The Debtors in these Chapter 11 cases are: GMI USA Management, Inc.; Global Maritime Investments Holdings Cyprus Limited; Global Maritime Investments Vessel Holdings Pte. Limited; Global Maritime Investments Limited; and Global Maritime Investments Resources (Singapore) Pte. Limited.

1

referred to as "Jai Foison Shipping"), Jai Da Shipping Co, Ltd., (hereinafter referred to as "Jia Da Shipping") and their managers HTM Shipping Co., Ltd. (hereinafter referred to as "HTM Shipping" and the three referred to collectively as the "Head Owners").

**Background**

1. Caravel is a ship chartering company. (See Paliwal Dec. ¶ 2) Caravel entered into a time charter party with GMICL for the use of the *m/v JIA FOISON*, (hereinafter referred to as the "Charter") for the period of one time chartered trip from Europe to the Far East. (See Paliwal Dec. at ¶ 3) The Charter is subject to English Law with any disputes to be arbitrated in London. (See Paliwal Dec. at ¶ 3) The Charter was entered into by Caravel in order to fulfill Caravel's pre-existing contractual obligation to Granit Negoce SA (hereinafter referred to as "Granit") under which Caravel was to provide a suitable vessel to carry a cargo of barley in bulk from Rouen and La Pallice, France to ports in China. The Caravel/Granit voyage charter party is dated February 26, 2015 (hereinafter referred to as the "Sub-Charter"). (See Paliwal Dec. at ¶ 5);

2. As with most, if not all, chartering arrangements where there are several charter parties in a chain, the intent is to have the actual shipper of the cargo make payment for the carriage under either the last charter party in line or under bills of lading issued pursuant to that last charter party, and then have each successive party make payment under its contract up the chain until all the parties have been paid. The intermediate charters, such as Caravel and GMICL, essentially make their profits on the spread between the charter hire or freight payable under the successive charters;[2]

---

[2] Generally, "charter hire" is the payment due from a charterer under a time charter, such as the Caravel/GMICL charter. "Freight" is the payment due under a voyage charter, such as the Granit/Caravel charter party or the payment that is due under a bill of lading. (See Paliwal Dec. at ¶ 3, nt. 2)

2

3. The normal and anticipated business model broke down in the case of the *JIA FOISON* [3] when GMICL, apparently, failed to make regular charter hire payments under the charter party between GMICL and Jia Foison Shipping. At the time that the charter between Caravel and GMICL was negotiated, Caravel had no knowledge that GMICL was several weeks in arrears of hire or that GMICL was on the verge of filing for bankruptcy protection in the United States (See Paliwal Dec. at ¶ 3);

4. Prior to the delivery of the *JIA FOISON*, which was to take place at Rouen, France, Caravel placed 705.005 metric tons of bunkers (fuel oil used by the vessel) with a value of US$157,921.12 on board the *JIA FOISON* at the port of Flushing, Belgium on September 11, 2015. Under the Charter, Caravel was responsible to pay for bunkers used by the vessel during the time that the vessel is on hire. Due to fluctuations in the price of bunkers, it is common for bunkers to be provided to a vessel under charter at a port other than the delivery port. (See Paliwal Dec. at ¶ 4);

5. The *JIA FOISON* arrived at Rouen on September 12, 2015 and was delivered to Caravel on September 20, 2015. Caravel delivered the vessel to Granit on the same day. Even though the vessel was delivered after GMICL and its affiliated companies had filed for bankruptcy protection, Caravel hoped that the anticipated voyage would progress as intended by the parties and that there would be no violation of the automatic stay under these bankruptcy proceedings. (See Paliwal Dec. at ¶¶ 6 - 7);

6. Unfortunately for all parties concerned, events beyond Caravel's control caused the anticipated voyage of the *JIA FOISON* to sink into a morass of legal claims and negotiations that have resulted in the sequestration by a French court of the freight monies intended to pay Caravel

---

[3] Caravel only has knowledge of the *JIA FOISON* charter party. Caravel is not a party to the *JIA DA* charter.

under its charter with Granit and also resulting in Caravel having to incur tens of thousands of dollars in expenses;

7. On September 21, 2015 loading commenced and GMICL obtained a temporary order *inter alia* restraining all persons from taking any action to create, perfect, or enforce any lien against the property of GMICL or terminating or modifying any and all contracts and leases to which GMICL is a party. On that date, Caravel was advised by its agent in Rouen, France that the master of the vessel was demanding the return of the master's written authorization to issue bills of lading on behalf of the master that had previously been issued. An original on board bill of lading signed by or on behalf of the master of the carrying vessel is the cornerstone of the international sale of goods. Most letters of credit used to finance the sale of goods require an original bill of lading in order to receive payment under the letter of credit. Most charter parties, including the Charter, give the charterer the right to sign bills of lading on behalf of the master of the vessel. (See Paliwal Dec. at ¶¶8 - 9);

8. On September 21, Caravel was in communication with the Head Owners who demanded that Caravel pay charter hire due under the Charter directly to Head Owners because of GMICL's default. On September 22, 2015 in breach of the temporary order Head Owners served a notice of lien over sub-hires and sub-freights on Caravel. This placed Caravel in the position of either paying the charter hire due to GMICL directly to Head Owners, in violation of the automatic stay and this Court's Order, or paying the charter hire to GMICL and then being liable to have to pay charter hire a second time to Head Owners on account of the notice of lien. (See Paliwal Dec. at ¶10 - 11);

9. On September 25, 2015 again in breach of the temporary order Head Owners terminated the charter party with GMICL and withdrew the vessel. On the same date the Master said he

4

would no longer communicate with GMICL or Caravel as the vessel had been withdrawn from service. Accordingly, GMICL lost control of the vessel as of that date and no further communications were received by Caravel regarding the vessel's progress/position from either GMICL or Head Owners until 2 November 2015. The vessel was loading a full cargo of barley belonging to a third party and also had 705.005 metric tons of bunkers on board that were paid for by Caravel. (See Paliwal Dec. at ¶15);

10. On September 29, 2015 loading of the vessel at La Pallice, France, was completed. Because the master of the vessel refused to issue freight prepaid bills of lading, as required by the Charter, Granit proceeded to file an action in the Commercial Court of Land and Sea of La Rochelle, France seeking an order that the master of the vessel issue the demanded prepaid bills of lading. The French court issued an order that the bills of lading be issued. The freight prepaid bills were issued to Caravel and were held by the load port agent in France. Freight was earned upon shipment and payable within three banking days of the bills of lading being signed. Caravel would not release the bills of lading to Granit until Granit paid the freight due under the Sub-Charter. (See Paliwal Dec. at ¶16 - 17);

11. On October 2, 2015 GMICL obtained a permanent injunction forbidding Head Owners from attempting to terminate the charter party with GMICL and from attempting to collect any amounts owed from Caravel to GMICL and from asserting any notice of lien on freight payable by any sub-sub charterer to GMICL;

12. On October 2, 2015, contrary to the terms of the permanent injunction Head Owners served a notice of lien over sub-freights due from sub-sub charterers Granit to Caravel. (See Paliwal Dec. at ¶ 18). Due to the notice of lien issued by the Head Owners, Granit was reluctant

5

to make payment to Caravel and thereby run the risk of having to pay the freight twice. (See Paliwal Dec. at ¶ 21);

13. On October 9, 2015 following Head Owners' withdrawal of the vessel and GMICL's non-performance of the Charter Caravel sent GMICL a message which included the following:

> "It is not our desire in any way to act in contempt of the US Court. It is our intention to act only lawfully. Unless it would be in contempt so to do, which we do not believe it is, we accept your conduct as a repudiation and/or renunciation of the charterparty entitling us to treat the charterparty as terminated and at an end. Should it be necessary, we are prepared to seek relief from the bankruptcy court. Given the exigencies of the contractual situation relating to our voyage charterers and the fact that you have to date been unable to obtain head owners' consent to restore the vessel to your service, we have no choice but to act immediately." (See Paliwal Dec. at ¶ 19);

14. As a matter of English law (which governs the relevant Charter) GMICL were in repudiatory breach and Caravel was entitled to treat the c/p with GMICL as at an end. (See Paliwal Dec. at ¶ 20 and Opinion of Timothy Young, Q.C., annexed thereto);

15. On October 14, 2015, Granit instituted a further action in the Commercial Court of Land and Sea of La Rochelle, France seeking an order that Granit be allowed to make payment of the freight into escrow and thereby receive the original bills of lading so they could be presented before they became stale on 20 October 2015 under the letter of credit opened by the buyers of the cargo. An order was issued by the French court on October 16, 2015 directing that the freight be paid into an account maintained by the President of the Law Society of La Rochelle, France and that the original bills of lading be released. The freight will only be released to the

6

party entitled to it by virtue of an agreement between Granit, Caravel and Head Owners or upon an arbitration award or Court order confirming who is entitled to it. (See Paliwal Dec. at ¶ 21);

16. Pursuant to the French court order, Granit paid the freight into the account of the President of the Law Society and the bills of lading were released by the load port agents to Granit. (See Paliwal Dec. at ¶ 21). It is believed that Granit presented the bills of lading under the letter of credit and were paid for the cargo;

17. In an effort to protect itself, on October 21, 2015 Caravel obtained a conservatory order from the French court over the freight monies deposited with the President of the Law Society. (See Paliwal Dec. at ¶ 22). Caravel commenced London arbitration proceedings against Granit on 12 October 2015 and Head Owners on 30 October 2015 (See Paliwal Dec. at ¶ 23)

18. On November 5, 2015 Head Owners and GMICL signed an agreement in respect to the *JIA DA* and the *JIA FOISON* subject to the Bankruptcy Court approving the terms of the agreement by entry of a final 11 § 9019 order. Under the settlement agreement the Head Owners will reinstate the charter party with GMICL and will release all liens on all sub-freights or sub-charter hire and complete the voyage;

19. As matters stand the settlement agreement has not been approved, the Head Owners have not released the notices of lien over sub-hire and sub-freights and the freight that should have been paid to Caravel by Granit remains in the bank account of the President of the Law Society of La Rochelle where it will remain until it is released to a party pursuant to an agreement between Granit, Caravel and Head Owners or an arbitration award or court order determining who is entitled to the freight is issued. Head Owners and Granit have not given any indication that they will agree to the release of the freight to Caravel;

7

20. In paragraph 12 of the present motion GMICL states that Caravel currently owes "roughly" US$900,000 for sub-charter hire. No statement of account has been produced by GMICL but assuming the vessel was delivered on 20th September and the Caravel Charter was terminated on October 9, only 19 days hire at US$12,500 less commission or US$237,500 (less commission) would be due. If the Charter remained in place beyond October 9, until 12 November 2015, the total hire would be 54 days at US$12,500 or US$675,000 less commission. Aside from the discrepancy in the hire amounts, GMICL's motion does not address the fact that Caravel has also paid for bunkers and port disbursements in France totaling US$214,953.61 and US$211,764.22 respectively (See Paliwal Dec. at ¶¶ 4 & 16);

21. Without prejudice to any other claims or defenses that Caravel may be entitled to assert under the Charter, due to the difficulties caused by the GMICL bankruptcy and GMICL's failure to cure the non-payment breach of the charter party between Head Owners and GMICL, the vessel was contractually "off hire" for certain periods of time for which Caravel is not required to pay charter hire to GMICL. In addition, the vessel has been slow steaming throughout the voyage so the voyage has lasted longer than it should. The Charter provides for minimum performance while under charter to Caravel. If the vessel failed to meet the minimum performance provided for in the Charter Caravel is entitled to make an under-performance claim against GMICL;

22. Contemporaneous with GMICL's notice to Caravel that there was a settlement agreement between GMICL and Head Owners, GMICL made a demand that Caravel arrange for the bunkering of the vessel at Singapore and also nominate agents at the discharge port. One of the reasons given for pressing the demand is that the vessel is currently transiting the Malacca straights, an area known to be subject to pirate attacks. There is, however, no provision in the

8

charter party between Head Owners and GMICL (which has yet to be reinstated) that prohibits the Head Owners or GMICL from bunkering the vessel or ordering the vessel to simply anchor off Singapore until the situation between Head Owners and GMICL is clarified by order of this Court. Indeed under the charterparty between Head Owners and GMICL have an obligation to provide bunkers for the vessel.

## Argument

23. Caravel, while not a party to the settlement agreement, believes that the proposed settlement is the most pragmatic way to resolve the current impasse between Head Owners and GMICL. The settlement agreement resolves the dispute between Head Owners and GMICL and restores the *JIA FOISON* to the charter party between Head Owners and GMICL. It follows that once the vessel is restored to GMICL, that the vessel will be restored to the Charter between GMICL and Caravel subject to all the defenses and claims available to Caravel and any agreement which may be reached between Head Owners, GMICL and Caravel as to the completion of the voyage. In so far as the proposed settlement agreement finally restores the vessel to the Charter and subject to the abovementioned reservations, Caravel supports GMICL's present motion;

24. Caravel's reservation with regard to the present motion arises from Head Owners' continual flagrant breach of the automatic stay and the subsequent Orders of this Court. As Head Owners have maintained that they are not subject to the jurisdiction of this Court while the settlement agreement provides the framework for a resolution of the dispute between Head Owners and GMICL, it does not logically follow that the resolution of that dispute will then result in the release of the freight that is being held by the President of the Law Society of La Rochelle. The order of the French court that provides for payment of the freight to the President

of the Law Society specifies that the funds will be released only upon Caravel, Granit and Head Owners agreeing who shall be entitled to the freight or upon a final and unappealable decision of a competent arbitration tribunal and/or judicial court confirming the beneficiary of the funds There is no guarantee that Granit or the previously recalcitrant Head Owners will agree to or cooperate with regard to the release of the funds. The release of the funds will allow Caravel to pay charter hire to GMICL subject to the reservations mentioned above;

25. As noted above and in the accompanying Declaration of Mudit Paliwal, charter party chains such as that which is in place with regard to the *JIA FOISON* rely upon payment of freight or hire by the last party in the chain to each preceding party until the ultimate provider of the vessel is paid. Without payment to Caravel of the freight that is currently being held by the President of the Law Society of La Rochelle, Caravel's ability to pay hire to GMICL will be severely impacted. Caravel has already incurred approximately US$500,000 in expenses. It would appear that it is in Head Owners' best interest to cooperate in obtaining the release of the freight; however, there is nothing to compel this cooperation. The cooperation of Granit is even more tenuous. Granit has paid the freight and has obtained the original bills of lading. While there is no reason for Granit to refuse to cooperate, there is also no guarantee that it will cooperate or if it does cooperate, that such cooperation will be sufficiently fast so as to allow for the payment of charter hire up the chain;

26. Because of the uncertainties that arise from the settlement agreement, in particular, the uncertainty that the funds being held by the President of the Law Society of La Rochelle will be released in an expeditious manner, Caravel requires sufficient time to obtain the release of the freight in the event GMICL's motion is granted and Caravel reserves its right to apply to this

Court in the event that the funds are not released expeditiously or at all for an appropriate remedy to protect Caravel from having to effect payment of hire to GMICL under the Charter;

27. Furthermore, the settlement agreement purports to release any claims as between Head Owners and GMICL, save for claims relating to bunkers.  Caravel reserves its rights to assert any and all claims or defenses related to the performance of the Charter of the *JIA FOISON*.  Caravel has been forced to incur significant expenses, including but not limited to expenses relating to GMICL's non-performance of the Charter, the withdrawal of the vessel, the refusal of the master to issue bills of lading and Head Owners' issuance of the notices of lien.  Caravel will also be asserting off hire claims and claims relating to the performance of the vessel and the costs it has incurred and also the vessel had approximately 805 metric tons of bunkers on board;

WHEREFORE, Caravel respectfully requests that this Court grant the relief requested in the present motion by Debtors and Debtors-in-possession and for such additional, further or different relief as is just and proper.

Dated: November 12, 2015
      New York, New York

    Respectfully submitted,
    CARROLL, McNULTY & KULL  LLC
    *Attorneys for Caravel Shipping Limited*

    By:   /s/ John A. Orzel
          John A. Orzel
          120 Mountain View Boulevard
          Basking Ridge, New Jersey 07920
          Telephone:   (908) 605-2916
          Facsimile:    (908) 848-6310
          E-mail:        jorzel@cmk.com