**Hearing Date: _____, 201\_ at _____ (prevailing Eastern Time)**
**Objection Date: _____, 201\_ at _____ (prevailing Eastern Time)**

John P. Melko
713-276-5727 (*direct dial*)
713-276-6727 (*direct fax*)
jmelko@gardere.com
Michael K. Riordan
713-276-5178 (*direct dial*)
713-276-6178 (*direct fax*)
mriordan@gardere.com
**GARDERE WYNNE SEWELL LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002-5011

*Counsel to the Debtors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GMI USA MANAGEMENT, INC., *et al*[1] | ) | Case No. 15-12552-SMB |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MOTION OF DEBTORS FOR ORDER AUTHORIZING (I) THE SALE OF EQUITY INTERESTS IN BULK PANAMAX POOL LIMITED FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; AND (II) THE ASSUMPTION AND ASSIGNMENT OF RELATED COMMERCIAL MANAGEMENT CONTRACT**

---

[1]     The Debtors in these chapter 11 cases comprise GMI USA Management, Inc. (1208), Global Maritime Investments Holdings Cyprus Limited, Global Maritime Investments Vessel Holdings Pte. Limited, Global Maritime Investments Cyprus Limited and Global Maritime Investments Resources (Singapore) Pte. Limited.

The Debtors hereby move the Court (the "**Motion**") for entry of an order (1) authorizing the sale of Debtor Global Maritime Investments Holdings Cyprus Ltd.'s ("**Slipway**") equity interests (the "**Equity Interests**") in Bulk Panamax Pool Limited ("**PoolCo**") pursuant to Sections 105 and 363(b), (f), and (m) of the Bankruptcy Code;  (2) assumption and assignment of the Commercial Management Agreement (as defined below) by Debtor Global Maritime Investments Cyprus Ltd. (collectively, the "**Sale Transaction**"); and (3) granting any related relief necessary to the implementation of the proposed order. In support of the Motion, the Debtors respectfully state as follows:

<u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(N) and (O). Venue of the Debtors' chapter 11 cases is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief sought herein are Sections 105 and 363 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002 and 6004, Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules of Bankruptcy Procedure 6004-1 and 6005-1 (the "**Local Rules**").

<u>BACKGROUND</u>

A.      <u>General Background</u>

2.      The Debtors each filed a voluntary chapter 11 petition on September 15, 2015 (the "**Petition Date**"). Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are continuing to operate their respective businesses and to manage their respective financial affairs as debtors in possession.

3.      An order authorizing joint administration of these cases was entered on September 21, 2015 [Docket No. 14]. No trustee or examiner has been appointed in the Debtors'

bankruptcy cases.  On September 24, 2015 an official committee of unsecured creditors (the "**Committee**") was designated.

4.      The Debtors are engaged in three segments of the dry bulk shipping markets. A detailed factual background of the Debtors' business and operations, as well as the commencement of these chapter 11 cases, is more fully set forth in the *Declaration of Justin Knowles in Support of Original Petitions, First Day Pleadings, and in Accordance with LBR 1007-2* filed on the Petition Date [Docket No. 2] and the *Supplemental Declaration of Justin Knowles in Support of First Day Motions, Petitions, and in Accordance with Local Bankruptcy Rule 1007-2* [Docket No. 61].

### B.      PoolCo Background

5.      Slipway is sole owner of PoolCo.  PoolCo is a shipping pool comprised of mid to large size dry bulk ships.  A shipping pool is in some ways similar to a co-op.  The principal consideration for the formation of the pool is to mitigate commercial utilization risks associated with operating vessels.  The expectation is that a pool of ships has a greater likelihood of having a ship in position near to the port where a shipper or customer has a cargo which it intends to have transported to an agreed port of delivery.  The prospect of one of the pool's ships being in position is greater than any individual ship just happening to be nearby and available.   From a customer perspective, the anticipation is that a pool will be able to offer a greater degree of service through increased vessel availability.   The shipowners (direct owners or long term charterers) contribute the use of their ships to PoolCo by charter agreement (the "**Pooling Vessels**").   PoolCo provides commercial management services (obtaining employment or "fixing") for the Pool Vessels either directly, or in the case of PoolCo, via a contract with a third-party commercial manager. Revenues received by PoolCo from Pool Vessel employment generated by the use of the Pool Vessels, net of pool expenses, are then shared among all Pool

Vessels, regardless of individual Pool Vessel utilization. The Pool Vessels are given "pool points" based on the characteristics of the ships contributed, providing a mechanism for allocating the net revenues received by PoolCo. Thus, two ships may have a different number of pool points due to differences in equipment (*e.g.*, cranes), efficiency, age, etc. and the share of revenues received by the individual Pool Vessel is adjusted accordingly. The operating costs of the Pool Vessels, excluding certain voyage costs such as bunkers and port expenses, are incurred and paid directly by the respective Pool Vessel owner. PoolCo's operations are governed by the Pooling Agreement, which set the terms and conditions of PoolCo management, including the entry and exit of Pool Vessels. Currently, Poolco has 6 ships owned by third parties under management. Previously, it managed 5 of the Debtors' ships in addition to the third party ships, but the Debtors have since rejected the underlying charters and withdrawn those ships from the pool.

6.      At the end of each month, the pool manager distributes the earnings of the Pool Vessels to the pool participants pro rata, according to their pool points. Pool expenses, largely made up of voyage costs, including bunkers and port fees, are deducted from the gross revenues of the pool to arrive at pool earnings.    The working capital of PoolCo, if any, consists of bunkers onboard when an owner delivers its ship to the pool, or cash contributed by the owner in the event the ship is low on fuel and must be re-fueled or "bunkered" shortly. The non-voyage costs and expenses of operating PoolCo are paid through management fees and/or commission based on the gross revenue of the individual Pool Vessels. The net revenues collected belong to the ship owners, pursuant to the pooling agreement and their pool points. A true and correct copy of the Pooling Agreement is attached hereto as **Exhibit B**.

7.      Currently, PoolCo has entered into two agreements to provide management services on behalf of the pool. The first contract (the "**UK Management Contract**") is between PoolCo and non-Debtor GMI Resources UK LLP (the "**UK Manager**") whereby the manager provides the following services:

    i.    Arranging for the provision of bunker fuels for the quality specified by the Pool Vessel owner as required for the Pool Vessel's trade;

    ii.    Voyage estimating, accounting and calculation of hire, freights, demurrage/dispatch monies due to the Pool Vessel's owners related to the commercial operation of the Pool Vessels;

    iii.    Issuing voyage instructions and handling all communication with each Pool Vessel's master regarding all loading, discharging and commercial operations;

    iv.    Appointing agents;

    v.    Appointing stevedores; and

    vi.    Arranging surveys associated with the commercial operation of the Pool Vessels.

As compensation for these services, the manager is paid $300 per day per Pool Vessel.

8.      The second management contract (the "**Commercial Management Contract**"), attached hereto as **Exhibit D**, is between PoolCo and Global Maritime Investments Cyprus Limited ("**GMIC**" or "**Commercial Manager**").  Under the Commercial Management Contract, GMIC provides the following services:

    i.    Provision of corporate services to PoolCo;

    ii.    all matters related to the admission of new participants;

    iii.    all matters relating to the admission to the pool of new pool vessels;

    iv.    all matters relating to the chartering in of chartered-in vessels, including without limitation the agreement of charterparties with the owners or disponent owners of such vessels;

    v.    all matters relating to budgeting, forecasting, accounting and reporting for the pool members;

vi.    the collection and holding of pool revenue and working capital, and payment of pool expenses (other than pool expenses which are under the Pool Agreement).

As compensation for these services, GMIC is entitled to 1.25% of pool revenues.

9.    As described in greater detail below, the Commercial Management Contract is burdensome to the Debtors estates, and the Debtors seek to assign it to the Purchasers (as defined below).

10.    PoolCo's business was started around April 2015.  In the early months, though a legally separate entity, Poolco was run more like a division of its affiliates.  Before PoolCo established separate bank account in August, it used the bank accounts of GMI Ltd., a Cayman Islands non-debtor affiliate ("**GMI Cayman**").  The PoolCo cash that came into the GMI Cayman bank accounts was then swept into GMIC's accounts.  Rather than send wire transfers or checks, PoolCo and GMIC simply agreed to offset the cash collected by GMI Cayman and swept to GMIC against earnings on the vessels GMIC had contributed to PoolCo's pool. The intercompany accounts receivable and payable were recorded correctly from a bookkeeping standpoint (*i.e.*, debit "Cash" and credit "Accounts Payable" for receipts; and debit Intercompany Accounts Receivable and credit Cash for upstream transfers) , but were incomplete in an accounting sense.  What was lacking was a realization that GMI Cayman was in the loop only as a convenience for the time when PoolCo didn't have separate bank accounts.  Because the GMI Cayman accounts were largely inactive, their use was convenient, but after receipt of the cash attributable to PoolCo, the cash was swept into the GMIC operating accounts.   At that point, GMIC more logically should have recorded both the receipt of cash and the liability to the Pool.  Instead, by parsing the transfers literally, the true nature of the transaction wasn't accurately reflected by the intercompany accounts.

11.     Over the four months since its inception, PoolCo took steps to stand on its own. In August, separate accounts were opened and the accounting reconciled.  As part of the accounting reconciliation, it was agreed PoolCo was a net creditor to the other GMI entities on a consolidated basis by $251,786.50, and this payable was due from GMI Cayman.  However, since the petition date, GMIC has accrued distributions of $319,457.93 (as of November 15, 2015) on account of the vessels it previously had in the pool and amounts owed under the Commercial Management Contract.   These accrued amounts have shifted PoolCo to being a net debtor to the consolidated GMI entities in the amount of $67,671.43 (as of November 15, 2015).

12.     As described in greater detail below, these intercompany obligations will be reconciled in connection with, and prior to the completion of, the Sale Transaction.  However, this reconciliation will not be a simple offset payment by PoolCo of $67,671.43.   Instead, PoolCo will pay the post-petition distributions owing to GMIC for its pool vessels and the Commercial Management Contract ($319,457.93 as of November 15, 2015) and PoolCo will take on a lifting under a contract held by GMI Cayman (as described below) and waive the $251,786.50 payable from GMI Cayman.

### C.     Sale Transaction Background

13.     After the Petition Date, the Debtors' management has, from time to time marketed the Equity Interests and the Commercial Management Agreement.  One company expressed an interest in an assignment of the pool's charter agreements with owners, but did not offer remuneration to the debtors for the assets.  The original founders of GMI have been operating the pool since the petition date.  They have formed a company M2M Shipping Co. Ltd. (the "**Purchasers**"), which has offered to buy the Equity Interests and Commercial Management Agreement upon the terms listed in the offer letter attached hereto **as Exhibit C**. In summary, the Purchasers offer to:

- Purchase the equity of PoolCo from Slipway for US$ 1.00;

- Enter into an agreed intercompany account reconciliation involving GMIC and GMI Cayman, under which:

  o PoolCo will pay GMIC US$ 319,457.93[2];

  o GMI Cayman will place the CSN lifting (a voyage under a GMI Cayman time charter) with a PoolCo vessel, on a back to back basis (*i.e.*, at cost);[3]

  o In consideration of the reconciliation with GMIC and GMI Cayman's placement of the CSN lifting, PoolCo will waive all intercompany payables from GMI Cayman (approximate net amount of US$ 251,786.50);

  o In consideration of the reconciliation between GMIC and PoolCo, GMI Cayman will waive all intercompany payables from GMIC related to PoolCo;

- Pay GMIC US$10,000, for assignment of the Commercial Management Contract;

- Ensure that the Debtors retain access to two employees and the necessary office space and logistical support for them to continue supporting the Debtors during these Chapter 11 Cases for $25,000 per month.[4]

14.    Having found no other interested bidders, the Debtors believe that this transaction is in the best interests of the estate.  The Debtors, in cooperation with their professionals, have evaluated the Equity Interests and the Commercial Management Agreement and have determined

---

[2]    The amounts listed in this paragraph are estimates based on prior accountings, and will be updated for the reconciliation.

[3]    On its face, the lifting under the CSN charter agreement should be profitable for PoolCo. GMIC internal brokers were unable to find a third party ship to undertake the voyage for GMIC or GMI Cayman. The Debtors Chief Restructuring Officer then utilized outside brokers to find a willing owner and was unable. The reasons were two-fold: (i) counterparty risk of dealing with a chapter 11 liquidating debtor; and (ii) the risk that the owner would not be able to find a return cargo for the from the delivery point in Brazil in a reasonable period of time, and would have to sail back to its home market "in ballast", *i.e.*, empty of cargo.  GMI Cayman had the option of foregoing the lifting under the contract. However, the CSN charter agreement will terminate under its terms if GMI Cayman passes on three liftings offered to it under the contract.  GMI Cayman had already passed on two liftings and was struggling to place the current lifting due to the Chapter 11 Cases until this agreement was struck.

[4]    To date, the Debtors have paid GMI UK Resources Ltd. for providing personnel and other overhead costs. These personnel will be transferred to the Purchasers' entity in connection with the Sale Transaction.  The Purchasers' have committed to continue providing the agreed upon number of personnel as the Debtors need them.

that they have no inherent value to the Debtors and the Debtors lack the resources to continue operating the pool on an ongoing basis.

15.    The Debtors have no (and under applicable agreements, will never have a) meaningful economic interest in PoolCo based on the Equity Interests.[5]   The Commercial Management Agreement has been historically cash flow negative from the inception of the pool, and there is no reasonable basis for the Debtors to believe that will change – during the prepetition period the Debtors were, at times, receiving a share of revenues under the Commercial Management Agreement for as many as 12 ships.  The pool has since contracted to only 6 ships, with additional pool members recently indicating their intent to withdraw from the pool.  The impact of the Chapter 11 filing has meaningfully reduced the number of third-parties interested in contracting the Pool Vessels, and it is likely that the pool will simply dissolve if it remains associated with these Chapter 11 Cases much longer.

16.    The failure of the pool would have a serious negative impact on the Debtors that would not be obvious at first sight.  As noted in footnote 4 herein, the Debtors have contracted for personnel and office space with the UK Manager.  The UK Manager's available personnel are located in a single office and support two separable operations: (1) the Debtors; and (2) PoolCo.  As a result, the Debtors and PoolCo split overhead costs.  If the pool dissolved, the Debtors would likely face increased overhead costs in the near term, and disruption of operations as well as potentially increased overhead costs in the medium term if the Debtors were forced to find new personnel and office space.  The Sales Transaction addresses these concerns by ensuring personnel familiar with the Debtors and office space are available at a preferable price.

---

[5]    Under the Pooling Agreements, Slipway is theoretically permitted to receive dividends, but not exceeding $500 per year.

17.     The Debtors have considered filing a chapter 11 case for PoolCo as well, but have reasonably concluded that it would not be beneficial.  The Pooling Agreement provides that a ship owner may for voluntarily withdraw a ship from the pool, without penalty, upon 90 days notice.  In the event of a chapter 11 filing, within that 90 day period, any pool participant could move to compel the PoolCo to assume or reject its charter agreement or to provide adequate protection.  The Debtors believe it would be difficult, if not impossible, to fix cargoes for a ship which has given notice of withdrawal. If multiple shipowners withdrew their ships from the pool at once, PoolCo, as a Chapter 11 debtor, would not be able to pay amounts due to the withdrawing pool members for reimbursement of their working capital contributions (essentially the value of the fuel onboard the ships that each member put into the pool).

18.     The ability of the pool members to withdraw from the pool is likely a contributing factor to the lack of interest the Debtors received when marketing the Equity Interests and Commercial Management Agreement, while the Purchasers (the pool's initial founders) are interested in taking them on.  PoolCo is essentially a relationship driven enterprise, and the Purchasers brought the other members into the pool through their relationships with these ship owners.  The Debtors have approached other operators of bulk pool in efforts to market PoolCo. To date, the Purchasers are the only party willing to pay for the Equity Interests and Commercial Management Agreement.  Other operators were either non-committal, or were interested only in assuming management of the pool vessels for no remuneration.  These operators indicated they believed they'd be relieving the Debtors of obligations.

19.     In the event of a Chapter 11 filing or a sale of the Equity Interests to a third party, the pool would likely dissolve, leaving the owner with working capital reimbursement obligations.  It is highly unlikely that the Debtors would be able to bring in new pool participants

to replace those that would leave, as the Debtors have already experienced, and have been expressly informed in at least one instance, that other shipping businesses are unwilling to enter into any new deals with the Debtors while they are in these chapter 11 cases due to counterparty risk.

20.     The proposed sale makes sound business sense and is a valid exercise of the Debtors business judgment. On the whole, the Debtors are benefitted. Any sale in bankruptcy is subject to scrutiny, and most are subject to higher and better offers. In this instance, the buyer understands that sale will be exposed to the market, that a separate data room for the pool has been established and that no breakup fee will be payable in the event of an overbid.

## RELIEF REQUESTED

21.     By this motion, the Debtors request entry of an order or orders (the **"Order"**), substantially in the form attached hereto as **Exhibit A**, that will, *inter alia,* authorize, but not direct, the sale and assignment of the PoolCo Equity Interests and the Commercial Management Agreement pursuant to section 105, 363(b), (f) and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, 9008 and 9014, by GMIC to Purchasers, under the general terms of the Offer Letter, and free and clear of all liens, claims, encumbrances and other interests (other than certain permitted encumbrances and assumed liabilities as may be specifically set forth in the applicable Offer Letter).

## THE SALE OF EQUITY INTERESTS IS WARRANTED AND IN THE BEST INTERESTS OF THE DEBTORS AND THEIR STAKEHOLDERS

### A.     Sale of the Equity Interests

22.     Ample authority exists for approval of the proposed Sale Transaction. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11

U.S.C. § 363(b)(1). In applying this provision, courts in this and other circuits have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor. *See, e.g., Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.),* 973 F.2d 141, 143-145 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp*.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Sch., Inc.),* No. 96 Civ. 3576 (PKL), 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997); *In re Del. & Hudson Ry. Co*., 124 B.R. 169, 176 (D. Del. 1991); *In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002).

### B.    The Debtors Are Providing Adequate and Reasonable Notice

23.    The Debtors propose the following notice and other procedures to be implemented in connection with the Sale Transaction:

(1)    Notice of Sale Hearing: Within 24 hours of the Court setting a hearing for this Motion (the "**Hearing**"), the Debtors (or their agents) shall:

Provide notice of the Hearing, with contents complying with applicable Bankruptcy Rules, Local Rules, and local guidelines, by email, mail, facsimile or overnight delivery service upon: (a) the United States Trustee for Region 2; (b) counsel to the  Committee; (c) counsel for Francolin (the "**DIP Lender**"); (d) Activity S.A., Libra Financiere; (e) the fifty (50) largest unsecured creditors of these bankruptcy estates (on a consolidated basis); (f) those persons who have formally appeared and requested notice in this case pursuant to Bankruptcy Rule 2002; (g) the Internal Revenue Service and other governmental agencies required to receive notice under the Bankruptcy Rules or Local Rules; (h) all known entities that have previously expressed a bona fide interest in purchasing the Equity Interests or Commercial Management Agreement in the six (6) months preceding the date of the Motion (if any); (i) all entities known or reasonably

believed to have asserted a lien, encumbrance, claim or other interest in any of the Equity Interests or Commercial Management Agreement;[6] and (j) all members of the PoolCo ship pool (collectively, the **"Sale Notice Parties"**).

24.      By motion filed contemporaneously herewith, the Debtors are requesting that the Court reduce the notice period for this Motion to 13 days, though the Debtors propose to permit objections to the Motion until 24 hours prior to the Hearing to compensate for the reduced notice period. Thus all parties in interest are provided more than sufficient notice and time to review the proposed sale and lodge objections, if any.  Moreover, the Debtors have conferred with counsel for the DIP Lender and Committee and have provided them a draft of this Motion to review prior to filing.   Neither of these parties in interest have stated an intent to object to the Sale Transaction or the Motion.

### C.      The Sale Price is Fair and Reasonable

25.      The Debtors are receiving US$ 10,001 cash, reconciliation of intercompany debts that will result in a payment of over $300,000 from PoolCo to the Debtors, and guaranteed support staff for the remainder of these Chapter 11 Cases, in exchange for effectively valueless equity interests in PoolCo and a cash flow negative contract that the Debtors reasonably believe will not have a positive value for the foreseeable future, and particularly for parties other than the Purchasers.  The Debtors submit that this price is fair and reasonable under the circumstances.

### D.      The Purchasers Are Proceeding in Good Faith

26.      The Purchasers, [7] as minority beneficial owners and former senior management of the Debtors, are insiders of the Debtors.  However, the Purchasers stepped down from their roles

---

[6]      As of the date of this filing, the Debtors are not aware of any such lien, encumbrance, claim or other interest in the Equity Interests aside from any liens arising in connection with the post-petition financing provided by the DIP Lender in these chapter 11 cases.

[7]      The offer in the Offer Letter is made by the entity M2M Shipping Ltd., which would be the party legally acquiring the Equity Interests and Commercial Management Contract.  M2M Shipping Ltd is owned and

with the Debtors as of the Petition Date, and have effectively been replaced by Justin Knowles, Chief Restructuring Officer for the Debtors, whose retention is the subject of a motion currently before this Court. The proposed Sale Transaction was negotiated at arms-length by undersigned counsel; Kenneth Becker, Financial Advisor for the Debtors; and Justin Knowles, the Debtors' Chief Restructuring Officer—experienced professionals with no prior connections with the Purchasers, and over whom the Purchasers have no legal or economic authority. The Purchasers are not receiving releases or indemnities from the Debtors in connection with the Sale Transaction. Accordingly, the Debtors submit that the Sale Transaction has been negotiated, and the Purchases have acted, in good faith.

## SALE OF THE EQUITY INTERESTS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS

27.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate:

> free and clear of any interest in such property of an entity other than the estate if (1) applicable non-bankruptcy law permits the sale of such property free and clear of such interest, (2) such entity consents, (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (4) such interest is in bona fide dispute, or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

28.     The Debtors believe that the proposed Sale Transaction satisfies one or more of the tests of section 363(f) of the Bankruptcy Code are satisfied with respect to the transfer of the Equity Interests. In particular, the Debtors believe that they meet, among others, the test set forth in section 363(f)(5). Any parties in interest that assert liens, claims, encumbrances or other

---

managed by one or more of Steven Rodley, Stuart Rae, and Paul Barbour—the Debtors' founders, minority beneficial interest holders in the Debtors, and the Debtors' former senior management.

interests in, to, or against the Equity Interests and Commercial Management Contract will be adequately protected by having their liens, if any, attach to the proceeds of the Sale Transaction, in the same order of priority, with the same validity, force and effect that such parties had prior to the Sale Transaction, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto. Accordingly, section 363(f) of the Bankruptcy Code authorizes the transfer and conveyance of the Equity Interests and Commercial Management Contract free and clear of all liens, claims, encumbrances and all other interests.

29.    For the avoidance of doubt, notwithstanding anything to the contrary contained in this Motion or otherwise: (i) the right of the DIP Lender to consent to the sale of any portion of its collateral, including, without limitation, the Equity Interests and the Commercial Management Agreement, on terms and conditions acceptable to the DIP Lender, shall be expressly preserved and not modified, waived or impaired in any way by the Sale Transaction, and (ii) all cash proceeds generated from the sale of the Equity Interests and Commercial Management Contract shall be paid in accordance with any orders on the Debtors' *Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Secured Superpriority Post-Petition Financing; and (B) Prescribing Form and Manner of Notice and Scheduling a Final Hearing* [Dkt. No. 5].

## PROTECTIONS AS A GOOD FAITH PURCHASER

30.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) of the Bankruptcy Code is later reversed or modified on appeal. Specifically, section 363(m) provides:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not

> such entity knew of the pendency of the appeal, unless such
> authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code "affords 'finality to judgment by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids.'" *Reloeb Co. v. LTV Corp.* (*In re Chateaugay Corp.*), No. 92 Civ. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (quoting *Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt. Corp.)*, 895 F.2d 845, 847 (1st Cir. 1990)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.").

31.    The Second Circuit has indicated that, generally, a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *see also In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997) (same; holding that purchaser's status as an insider was not *per se* bad faith).

32.    Here, the Sale Transaction will be the product of arm's length, good-faith negotiations after the Debtors marketed the Equity Interests and Commercial Management

Agreement during the pendency of these chapter 11 cases. Based upon the record to be made at the Sale Hearing, the Debtors will request a finding that each Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**<u>Assumption and Assignment of Selected Contracts</u>**

33.     The Debtors seek authorization to assume and assign the Commercial Management Contract to the Purchasers. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). A debtor's decision to assume an executory contract or unexpired lease must be an exercise of its sound business judgment for the court to approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp*.), 4 F.3d 1095, 1099 (2d Cir. 1993).

34.     Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Therefore, upon the closing of the Sale Transaction (or the effective date of a plan, whichever is earlier), the Debtors will be relieved of their obligations under the Commercial Management Contract, which is cash flow negative and expected to remain so, thereby decreasing the obligations of the estate and creating value for creditors.

35.     Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under contracts that will be assumed must be cured or that adequate assurance be provided to the contract counterparties that such defaults will be promptly cured.  The Debtors' assumption of

the Commercial Management Contract will be contingent upon payment of the Purchasers to cure monetary defaults under the Commercial Management Contract, if any.

36.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr D.N.J. 1988) (internal citations omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (holding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Adequate assurance should not be an issue given that the Purchasers will also be equity owners of PoolCo, the counterparty to the contract, upon consummation of the Sale Transaction. Moreover, the Purchasers are already providing the personnel the Debtors are using to provide services under the Commercial Management Contract, so there should be no disruption in such services when the Purchasers take over the contract.

## EXTRAORDINARY TERMS

37.     **The proposed Sale Transaction is to an Insider or Insiders**: As noted above, he Purchasers, as minority beneficial owners and former senior management of the Debtors, are insiders of the Debtors.  However, the Purchasers stepped down from their roles with the Debtors as of the Petition Date, and have effectively been replaced by Justin Knowles, Chief

Restructuring Officer for the Debtors, whose retention is the subject of a motion currently before this Court.  The proposed Sale Transaction was negotiated at arms-length by undersigned counsel; Kenneth Becker, Financial Advisor for the Debtors; and Justin Knowles, the Debtors' Chief Restructuring Officer—experienced professionals with no prior connections with the Purchasers, and over whom the Purchasers have no legal or economic authority.  The Purchasers are not receiving releases or indemnities from the Debtors in connection with the Sale Transaction.  Accordingly, the Debtors submit that the Sale Transaction has been negotiated, and the Purchases have acted, in good faith.

38.    **No Auction:** The Debtors, in conjunction with their professionals, have marketed the Equity Interests and Commercial Management Agreement from time to time during these chapter 11 cases to other bulk pool operators and received (1) no offers for the Equity Interests; and (2) one offer for the Commercial Management Contract involving no monetary consideration for the Debtors.  The Debtors, exercising their business judgment in consultation with the Debtors' professionals, have determined that the proposed Sale Transaction is very likely the highest and best offer the Debtors would receive even with formal auction procedures in place. Moreover, auction procedures would cause the Debtors to incur additional costs and delay consummation of the Sale Transaction, in which time the pool could dissolve.

39.    **Deadlines that Effectively Limit Notice:**  As noted, the Debtors are filing, contemporaneously herewith, a motion to shorten the notice period for this Motion to 13 days, though the Debtors propose to permit objections to the Motion until 24 hours prior to the Hearing to compensate for the reduced notice period. Thus all parties in interest are provided more than sufficient notice and time to review the proposed sale and lodge objections, if any.  Moreover, the Debtors have conferred with counsel for the DIP Lender and Committee and have provided

them a draft of this Motion to review prior to filing.  Neither of these parties in interest have stated an intent to object to the Sale Transaction or the Motion.  The Debtors are requesting such shortened notice due to concerns about the stability of the pool and the potential for ship owners to notice their withdrawal if an order on this Motion is not entered prior to January 1, 2016.

40.    **Request for relief from Bankruptcy Rules 6004(h) and 6006(d):** As discussed immediately below, the Debtors' request for relief from the stays under these Bankruptcy Rules are also based on the potential for ship owners to withdraw their ships from the pool if the Sale Transaction is not consummated and closed shortly after entry of an Order approving the Motion.

<u>**REQUEST FOR RELIEF PURSUANT TO
BANKRUPTCY RULES 6004(H) AND 6006(D)**</u>

41.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

42.    Due to the indications from certain pool members of plans to withdraw from the pool if not sold soon, the Debtors believe that the Sale Transaction must be consummated as soon as practicable to preserve whatever operational value exists in PoolCo.  Accordingly, the Debtors request that the Sale Authorization Order approving the sale of the Equity Interests be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## NOTICE

43.     The Debtors have provided notice of this motion to the Sale Notice Parties. The Debtors respectfully submit that no further notice of this motion is necessary.

## NO PRIOR REQUEST

44.     No prior request for the relief sought in this motion has been made to this or any other court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that this Court grant the relief requested herein and such other and further relief as is just and proper.


Dated: December 16, 2015

        Houston, Texas


        Respectfully submitted,


        /s/ *John P. Melko*
        John P. Melko
        Texas State Bar No. 13919600
        713-276-5727 (*direct dial*)
        713-276-6727 (*direct fax*)
        jmelko@gardere.com
        Michael K. Riordan
        Texas State Bar No. 24070502
        713-276-5178 (*direct dial*)
        713-276-6178 (*direct fax*)
        mriordan@gardere.com
        GARDERE WYNNE SEWELL LLP
        1000 Louisiana, Suite 2000
        Houston, Texas  77002-5011

        COUNSEL FOR THE DEBTORS