FIRST ORIGINAL

| | |
|---|---|
| 1. Shipbroker<br>H Clarkson and Co. Ltd<br>St Magnus House,<br>3 Lower Thames Street,<br>London,<br>EC3R 6HE | **BIMCO STANDARD BAREBOAT CHARTER**<br>**CODE NAME: "BARECON 2001"**<br>PART I |
| | 2. Place and date<br>Athens, Greece<br>3rd April 2013 |
| 3. Owners/Place of business (Cl. 1)<br>Pegasus Shipping Pte. Ltd Guaranteed by Yangzijiang Shipping Pte. Ltd | 4. Bareboat Charterers/Place of business (Cl. 1)<br>Global Maritime Investments Cyprus Limited or its guaranteed nominee |
| 5. Vessel's name, call sign and flag (Cl. 1 and 3)<br><br>Singapore | |
| 6. Type of Vessel<br>Bulk Carrier | 7. GT/NT |
| 8. When/Where built<br>Nov 2015<br>Jiangsu New Yangzi Shipbuilding Co., Ltd. | 9. Total DWT (abt.) in metric tons on summer freeboard<br>about 81,800 dwt scantling |
| 10. Classification Society (Cl. 3)<br>Lloyd's Register | 11. Date of last special survey by the Vessel's classification society<br>N/A |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3) | |
| 13. Port or Place of delivery (Cl. 3)<br>See Clause 34 | 14. Time for delivery (Cl. 4)<br>See Clause 34 | 15. Cancelling date (Cl. 5)<br>N/A |
| 16. Port or Place of redelivery (Cl. 15)<br>N/A | 17. No. of months' validity of trading and class certificates<br>upon redelivery (Cl. 15)<br>N/A |
| 18. Running days' notice if other than stated in Cl. 4<br>N/A | 19. Frequency of dry-docking (Cl. 10(g))<br>N/A |
| 20. Trading limits (Cl. 6)<br>Worldwide where is customary for a vessel of this type and size to trade, and permitted by Insurers | |
| 21. Charter period (Cl. 2)<br>See Clause 2 | 22. Charter hire (Cl. 11) |
| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(viii)) | |
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to<br>PART IV<br>fixed 5% per annum | 25. Currency and method of payment (Cl. 11)<br>United States Dollars |



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974
as "Barecon A" and "Barecon B" - Revised and amalgamated 1989, Revised 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen, issued November 2001

PART I

| | |
|---|---|
| 26. Place of payment; also state beneficiary and bank account (Cl. 11) | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional) |
| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12)<br>See Clause 48 | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies) |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g)) | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g)) |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3) | 33. Brokerage commission and to whom   payable (Cl. 27) |
| 34. Grace period (state number of clear banking days) (Cl. 28) | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30)<br>Clause 30(a) |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f))<br>N/A | |
| 37. Newbuilding Vessel (indicate with "yes" or "no"   whether PART III applies) (optional)<br>Yes | 38. Name and place of Builders (only to be filled in if PART III applies)<br>Jiangsu New Yangzi Shipbuilding Co., Ltd. Jingjiang City, Jiangsu Province, P.R. China |
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies)<br>Hull No. YZJ2013-1056 | 40. Date of Building Contract (only to be filled in if PART III applies)<br>[] |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1)<br>a)<br>b)<br>c) | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional)<br>No (see Rider Clause 43) | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional)<br>No |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies) | 45. Country of the Underlying Registry (only to be filled in if PART V applies) |
| 46. Number of additional clauses covering special provisions, if agreed | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | PANAYIOTIS C. KONTOS<br>DIRECTOR |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"BARECON 2001" Standard Bareboat Charter

1. **Definitions**
   In this Charter, the following terms shall have the
   meanings hereby assigned to them;
   "The Owners" shall mean the party identified in Box 3;
   "The Charterers" shall mean the party identified in Box 4;
   "The Vessel" shall mean the vessel named in Box 5 and
   with particulars as stated in Boxes 6 to 12.
   "Financial Instrument" means the mortgage, deed of
   covenant or other such financial security instrument as
   annexed to this Charter and stated in Box 28. See also
   the Additional Definitions in Clause 33.

2. **Charter Period**
   In consideration of the hire detailed in Box 22,
   the Owners have agreed to let and the Charterers have
   agreed to hire the Vessel for the period stated in Box 21
   of [eight consecutive years from delivery]
   ("The Charter Period"). The Charter Period shall,
   terminate automatically on transfer of title to
   Charterers (or nominee) on sale of the Vessel under
   Clause 43 ("Sale Termination").

3. ~~Delivery~~
   ~~(not applicable when Part III applies, as indicated in Box 37)~~
   ~~(a)    The Owners shall before and at the time of delivery~~
   ~~exercise due diligence to make the Vessel seaworthy~~
   ~~And in every respect ready in hull, machinery and~~
   ~~equipment for service under this Charter.~~
   ~~The Vessel shall be delivered by the Owners and taken~~
   ~~over by the Charterers at the port or place indicated in~~
   ~~Box 13 in such ready safe berth as the Charterers may~~
   ~~direct.~~
   ~~(b)    The Vessel shall be properly documented on~~
   ~~delivery in accordance with the laws of the flag State~~
   ~~indicated in Box 5 and the requirements of the~~
   ~~classification society stated in Box 10. The Vessel upon~~
   ~~delivery shall have her survey cycles up to date and~~
   ~~trading and class certificates valid for at least the number~~
   ~~of months agreed in Box 12.~~
   ~~(c)    The delivery of the Vessel by the Owners and the~~
   ~~taking over of the Vessel by the Charterers shall~~
   ~~constitute a full performance by the Owners of all the~~
   ~~Owners' obligations under this Clause 3, and thereafter~~
   ~~the Charterers shall not be entitled to make or assert~~
   ~~any claim against the Owners on account of any~~
   ~~conditions, representations or warranties expressed or~~
   ~~implied with respect to the Vessel but the Owners shall~~
   ~~be liable for the cost of but not the time for repairs or~~
   ~~renewals occasioned by latent defects in the Vessel,~~
   ~~her machinery or appurtenances, existing at the time of~~
   ~~delivery under this Charter, provided such defects have~~
   ~~manifested themselves within twelve (12) months after~~
   ~~delivery unless otherwise provided in Box 32.~~

4. ~~Time for Delivery~~
   ~~(not applicable when Part III applies, as indicated in Box 37)~~
   ~~The Vessel shall not be delivered before the date~~
   ~~indicated in Box 14 without the Charterers' consent and~~
   ~~the Owners shall exercise due diligence to deliver the~~
   ~~Vessel not later than the date indicated in Box 16.~~
   ~~Unless otherwise agreed in Box 18, the Owners shall~~
   ~~give the Charterers not less than thirty (30) running days'~~
   ~~preliminary and not less than fourteen (14) running days'~~
   ~~definite notice of the date on which the Vessel is~~
   ~~expected to be ready for delivery.~~
   ~~The Owners shall keep the Charterers closely advised~~
   ~~of possible changes in the Vessel's position.~~

5. ~~Cancelling~~
   ~~(not applicable when Part III applies, as indicated in Box 37)~~
   ~~(a)    Should the Vessel not be delivered latest by the~~
   ~~cancelling date indicated in Box 16, the Charterers shall~~
   ~~have the option of cancelling this Charter by giving the~~
   ~~Owners notice of cancellation within thirty six (36)~~
   ~~running hours after the cancelling date stated in Box~~
   ~~15, failing which this Charter shall remain in full force~~
   ~~and effect.~~

~~(b)    If it appears that the Vessel will be delayed beyond~~
~~the cancelling date, the Owners may, as soon as they~~
~~are in a position to state with reasonable certainty the~~
~~day on which the Vessel should be ready, give notice~~
~~thereof to the Charterers asking whether they will~~
~~exercise their option of cancelling, and the option must~~
~~then be declared within one hundred and sixty eight~~
~~(168) running hours of the receipt by the Charterers of~~
~~such notice or within thirty six (36) running hours after~~
~~the cancelling date, whichever is the earlier. If the~~
~~Charterers do not then exercise their option of cancelling,~~
~~the seventh day after the readiness date stated in the~~
~~Owners' notice shall be substituted for the cancelling~~
~~date indicated in Box 15 for the purpose of this Clause 5.~~
~~(c)    Cancellation under this Clause 5 shall be without~~
~~prejudice to any claim the Charterers may otherwise~~
~~have on the Owners under this Charter.~~

6. **Trading Restrictions**
   The Vessel shall be employed in lawful trades for the
   carriage of suitable lawful merchandise within the trading
   limits indicated in Box 20.
   The Charterers undertake not to employ the Vessel or
   suffer the Vessel to be employed otherwise than in
   conformity with the terms of the contracts of insurance
   (including any warranties expressed or implied therein)
   without first obtaining the consent of the insurers to such
   employment and complying with such requirements as
   to extra premium or otherwise as the insurers may
   prescribe.
   The Charterers also undertake not to employ the Vessel
   or suffer her employment in any trade or business which
   is forbidden by the law of any country to which the Vessel
   may sail or is otherwise illicit or in carrying illicit or
   prohibited goods or in any manner whatsoever which
   may render her liable to condemnation, destruction,
   seizure or confiscation. Upon occurance of any
   situation as stipulated above, the Charterers shall
   endeavour to release the vessel, to hold harmless the
   Owners, the Vessel and their respective right and
   interests, and shall compensate the Owners of any
   direct or indirect loss howsoever occured arising out
   of such occurrence.
   Notwithstanding any other provisions contained in this
   Charter it is agreed that nuclear fuels or radioactive
   products or waste are specifically excluded from the
   cargo permitted to be loaded or carried under this
   Charter. This exclusion does not apply to radio-isotopes
   used or intended to be used for any industrial,
   commercial, agricultural, medical or scientific purposes
   provided the Owners' prior approval has been obtained
   to loading thereof and the carriage of such cargo are
   insured.

7. **Surveys on Delivery and Redelivery**
   *(not applicable when Part III applies, as indicated in Box 37)*
   The Owners and Charterers shall each appoint
   surveyors for the purpose of determining and agreeing
   in writing the condition of the Vessel at the time of
   delivery and redelivery hereunder. The Owners shall
   bear all expenses of the On-hire Survey including loss
   of time, if any, and the Charterers shall bear all expenses
   of the Off-hire Survey including loss of time, if any, at
   the daily equivalent to the rate of hire or pro-rata thereof.

8. **Inspection**
   The Owners shall have the right at any time after giving
   reasonable notice to the Charterers to inspect or survey
   the Vessel or instruct a duly authorised surveyor to carry
   out such survey on their behalf:-
   (a)    to ascertain the condition of the Vessel and satisfy
   themselves that the Vessel is being properly repaired
   and maintained. The costs and fees for such inspection
   or survey shall be paid by the Owners unless the Vessel
   is found to require repairs or maintenance in accordance
   with Clause 10, order to

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



achieve the condition so provided; 134
(b)  in dry-dock if the Charterers have not dry-docked 135
Her in accordance with Clause 10(n). The costs and fees 136
for such inspection or survey shall be paid by the 137
Charterers; and 138
(c)  for any other commercial reason they consider 139
necessary (but not more than once annually and 140
provided it does not unduly materially interfere with 141
the commercial operation of the Vessel). The costs and 142
fees for such inspection and survey shall be paid by the 143
Owners. 144
All time used in respect of inspection, survey or repairs 145
shall be for the Charterers' account and form part of the 146
Charter Period. 147
The Charterers shall also permit the Owners to inspect 148
and make a copy of 149
the Vessel's log books whenever requested and shall 150
whenever required by the Owners furnish them with full 151
information regarding any casualties or other accidents
or damage to the Vessel.

9.  Inventories, Oil and Stores 152
A complete inventory of the Vessel's entire equipment, 153
outfit including spare parts, appliances and of all 154
consumable stores on board the Vessel shall be made 155
by the Charterers in conjunction with the Owners on 156
delivery and again on redelivery of the Vessel. The 157
Charterers and the Owners, respectively, shall at the 158
time of delivery and redelivery take over and pay for all 159
bunkers, lubricating oil, unbroached provisions, paints, 160
ropes and other consumable stores (excluding spare 161
parts) in the said Vessel at the then current market prices 162
at the ports of delivery and redelivery, respectively. The 163
Charterers shall ensure that all spare parts listed in the 164
inventory and used during the Charter Period are 165
replaced at their expense prior to redelivery of the 166
Vessel. 167

10.  Maintenance and Operation 168
(a)(i)Maintenance and Repairs - During the Charter 169
Period the Vessel shall be in the full possession 170
and at the absolute disposal for all purposes of the 171
Charterers and under their complete control in 172
every respect. The Charterers shall maintain the 173
Vessel, her machinery, boilers, appurtenances and 174
spare parts in a good state of repair, in efficient 175
operating condition and in accordance with good 176
commercial maintenance practice and, except as 177
provided for in Clause 14(l), if applicable, at their 178
own expense they shall at all times keep the 179
Vessel's Class fully up to date with the Classification 180
Society indicated in Box 10 and maintain all other 181
necessary certificates in force at all times. 182
(ii)  New Class and Other Safety Requirements - In the 183
event of any improvement, structural changes or 184
new equipment becoming necessary for the 185
continued operation of the Vessel by reason of new 186
class requirements or by compulsory legislation 187
costing (excluding the Charterers' loss of time) the 188
Owners shall immediately notify the Owners of
such proposed improvement, structural change,
or installment of the new equipment, provide the
Owners with the relevant requirement,
legislations, orders, and/or plans, and obtain the
Owners' written approval. Time and cost of such
improvement, change of installment (excluding
the Charterers' loss of time)
more than the percentage stated in Box 23, or if 189
Box 23 is left blank, 5 per cent, of the Vessel's 190
insurance value as stated in Box 29, then the 191
extent, if any, to which the rate of hire shall be varied 192
and the ratio in which the cost of compliance shall 193
be shared between the parties concerned in order 194
to achieve a reasonable distribution thereof as 195
between the Owners and the Charterers having 196

regard, inter alia, to the length of the period 197
remaining under this Charter shall, in the absence 198
of agreement, be paid by the Owners and such 199
payment shall be reimbursed by the Charterers
together with the interest calculated at the rate of
5% per annum. Such reimbursement shall be
made together with the Purchase Price to be
made by the Charterers in the event that the
Charterers exercise its Purchase Option or
obligation, as case may be, in accordance with
Clause 43. referred to the dispute resolution
method agreed in Clause 30.
(iii)  Financial Security - The Charterers shall maintain 200
financial security or responsibility in respect of third 201
party liabilities as required by any government, 202
including federal, state or municipal or other division 203
or authority thereof, to enable the Vessel, without 204
penalty or charge, lawfully to enter, remain at, or 205
leave any port, place, territorial or contiguous 206
waters of any country, state or municipality in 207
performance of this Charter without any delay. This 208
obligation shall apply whether or not such 209
requirements have been lawfully imposed by such 210
government or division or authority thereof. 211
The Charterers shall make and maintain all arrange- 212
ments by bond or otherwise as may be necessary to 213
satisfy such requirements at the Charterers' sole 214
expense and the Charterers shall indemnify the Owners 215
against all consequences whatsoever (including loss of 216
time) for any failure or inability to do so. 217
(b)  Operation of the Vessel - The Charterers shall at 218
their own expense and by their own procurement man, 219
victual, navigate, operate, supply, fuel and, whenever 220
required, repair the Vessel (provided that this does not 221
apply to repairs under Article IX of the Building 222
Contract) during the Charter Period
and they shall pay all charges and expenses of every 223
kind and nature whatsoever incidental to their use and 224
operation of the Vessel under this Charter, including 225
annual flag State fees and any foreign general 226
municipality or state taxes. The Master, officers 227
and crew of the Vessel shall be the servants of the Charterers 228
for all purposes whatsoever, even if for any reason 229
appointed by the Owners. 230
Charterers shall comply with the regulations regarding 231
officers and crew in force in the country of the Vessel's 232
flag or any other applicable law. In the event of 233
employment, change or dismissal of a manager, the
Charterers shall obtain prior written approval from
the Owners, the approval of which shall not be
unreasonably withheld.
(c)  The Charterers shall keep the Owners and the 234
mortgagee(s) advised of the intended employment, 235
planned dry-docking and major repairs of the Vessel, 236
as reasonably required. 237
(d)  Flag and Name of Vessel – During the Charter 238
Period, the Charterers shall have the liberty to name the 239
Vessel, paint the
Vessel in their own colours, install and display their 240
funnel insignia and fly their own house flag. The 241
Charterers shall also have the liberty, with the Owners' 242
consent, which shall not be unreasonably withheld, to 243
change the flag and/or the name of the Vessel during 244
the Charter Period. Painting and re-painting, instalment 245
and re-instalment, registration and re-registration, if 246
required by the Owners, shall be at the Charterers' 247
expense and time. 248
(e)  Changes to the Vessel – Subject to Clause 10(a)(ii), 249
the Charterers shall make no structural changes in the 250
Vessel or changes in the machinery, boilers, appurten- 251
ances or spare parts thereof without in each instance 252
first securing the Owners' approval thereof, without the 253
prior written consent of the Owners, not to be
unreasonably withheld or delayed. If the Owners
so agree, the Charterers shall, if the Owners so require, 254

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



restore the Vessel to its former condition before the 255
termination of this Charter. 256

(f) Use of the Vessel's Outfit, Equipment and 257
Appliances - The Charterers shall have the use of all 258
outfit, equipment, and appliances on board the Vessel 259
at the time of delivery, provided the same or their 260
substantial equivalent shall be returned to the Owners 261
on redelivery in the same good order and condition as 262
when received, ordinary wear and tear excepted. The 263
Charterers shall from time to time during the Charter 264
Period replace such items of equipment as shall be so 265
damaged or worn as to be unfit for use. The Charterers 266
are to procure that all repairs to or replacement of any 267
damaged, worn or lost parts or equipment be effected 268
in such manner (both as regards workmanship and 269
quality of materials) as not to diminish the value of the 270
Vessel. The Charterers have the right to fit additional 271
equipment at their expense and risk but the Charterers 272
shall remove such equipment at the end of the period if 273
requested by the Owners. Any equipment including radio 274
equipment on hire on the Vessel at time of delivery shall 275
be kept and maintained by the Charterers and the 276
Charterers shall assume the obligations and liabilities 277
of the Owners under any lease contracts in connection 278
therewith and shall reimburse the Owners for all 279
expenses incurred in connection therewith; also for any 280
new equipment required in order to comply with radio 281
regulations. 282

(g) Periodical Dry-Docking - The Charterers shall dry- 283
dock the Vessel and clean and paint her underwater 284
parts whenever the same may be necessary, but not 285
less than once during the period stated in Box 19 or, if 286
Box 19 has been left blank, every sixty (60) calendar 287
months after delivery or such other period as may be 288
in accordance with the requirements of required by the 289
Classification Society or flag State.

11. **Hire [also see Clause 36]** 290
(a) The Charterers shall pay hire due to the Owners 291
punctually in accordance with the terms of this Charter 292
in respect of which time shall be of the essence. 293
(b) The Charterers shall pay to the Owners for the hire 294
of the Vessel a lump sum in the amount indicated in 295
Box 22 which shall be payable not later than every thirty 296
(30) running days in advance, the first lump sum being 297
payable on the date and hour of the Vessel's delivery to 298
the Charterers. Hire shall be paid continuously 299
throughout the Charter Period. 300
(c) Payment of hire shall be made in cash without 301
discount in the currency and in the manner indicated in 302
Box 25 and at the place mentioned in Box 26. 303
(d) Final payment of hire, if for a period of less than 304
thirty (30) running days, shall be calculated proportionally 305
according to the number of days and hours remaining 306
before redelivery and advance payment to be effected 307
accordingly. 308
(e) Should the Vessel be lost or missing, hire shall 309
cease from the date and time when she was lost or last 310
heard of. The date upon which the Vessel is to be treated 311
as lost or missing shall be ten (10) days after the Vessel 312
was last reported or when the Vessel is posted as 313
missing by Lloyd's, whichever occurs first. Any hire paid 314
in advance to be adjusted accordingly. 315
(f) Any delay in payment of hire shall entitle the 316
Owners to interest at the rate per annum as agreed 317
in Box 24. If Box 24 has not been filled in, the three months 318
Interbank offered rate in London (LIBOR or its successor) 319
for the currency stated in Box 25 as quoted by the British 320
Bankers' Association (BBA) on the date when the hire 321
fell due, increased by 2 per cent., shall apply. 322
(g) Payment of interest due under sub-clause 11(f) 323
shall be made within seven (7) running days of the date 324
of the Owners' invoice specifying the amount payable 325
or, in the absence of an invoice, at the time of the next 326
hire payment date. 327

12. **Mortgage [see clause 48]** 328
(only to apply if Box 28 has been appropriately filled in) 329
*) (a) The Owners warrant that they have not effected 330
any mortgage(s) of the Vessel and that they shall not 331
effect any mortgage(s) without the prior consent of the 332
Charterers, which shall not be unreasonably withheld. 333
*) (b) The Vessel chartered under this Charter is financed 334
by a mortgage according to the Financial Instrument. 335
The Charterers undertake to comply, and provide such 336
information and documents to enable the Owners to 337
comply, with all such instructions or directions in regard 338
to the employment, insurances, operation, repairs and 339
maintenance of the Vessel as laid down in the Financial 340
Instrument or as may be directed from time to time during 341
the currency of the Charter by the mortgagee(s) in 342
conformity with the Financial Instrument. The Charterers 343
confirm that, for this purpose, they have acquainted 344
themselves with all relevant terms, conditions and 345
provisions of the Financial Instrument and agree to 346
acknowledge this in writing in any form that may be 347
required by the mortgagee(s). The Owners warrant that 348
they have not effected any mortgage(s) other than stated 349
in Box 28 and that they shall not agree to any 350
amendment of the mortgage(s) referred to in Box 28 or 351
effect any other mortgage(s) without the prior consent 352
of the Charterers, which shall not be unreasonably 353
withheld. 354
*) (Optional, Clauses 12(a) and 12(b) are alternatives; 355
indicate alternative agreed in Box 28). 356

13. **Insurance and Repairs** 357
(a) During the Charter Period the Vessel shall be kept 358
insured by the Charterers at their expense against hull 359
and machinery, war and Protection and Indemnity risks 360
(and any risks against which it is compulsory to insure 361
for the operation of the Vessel, including maintaining 362
financial security in accordance with sub-clause 363
10(a)(iii)) in such form as the Owners shall in writing 364
approve. Such approval shall not be un-reasonably 365
withheld. Such insurances shall be arranged by the 366
Charterers to protect the interests of both the Owners 367
and the Charterers and the mortgagee(s) (if any), and 368
The Charterers shall be at liberty to protect under such 369
insurances the interests of any managers they may 370
appoint. Insurance policies shall cover the Owners and 371
the Charterers according to their respective interests. 372
Subject to the provisions of the Financial Instrument, if 373
any, and the approval of the Owners and the insurers, 374
the Charterers shall effect all insured repairs and shall 375
undertake settlement and reimbursement from the 376
insurers of all costs in connection with such repairs as 377
well as insured charges, expenses and liabilities to the 378
extent of coverage under the insurances herein provided 379
for. 380
The Charterers also to remain be responsible for and to 381
effect repairs and settlement of costs and expenses 382
incurred thereby in respect of all other repairs not 383
covered by the insurances and/or not exceeding any 384
possible franchise(s) or deductibles provided for in the 385
insurances. 386
All time used for repairs under the provisions of sub- 387
clauses 10 (b) and 13(a) and for repairs of latent defects 388
according 389
to Clause 3(c) above, including any deviation, shall be 390
for the Charterers' account. 391
(b) If the conditions of the above insurances permit 391
additional insurance to be placed by the parties, such 392
cover shall be limited to the amount for each party set 393
out in Box 30 and Box 31, respectively. The Owners or 394
the Charterers as the case may be shall immediately 395
furnish the other party with particulars of any additional 396
insurance effected, including copies of any cover notes 397
or policies and the written consent of the insurers of 398
any such required insurance in any case where the 399
consent of such insurers is necessary. 400

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



(c)   The Charterers shall upon the request of the
Owners, provide information and promptly execute such
documents as may be required to enable the Owners to
comply with the insurance provisions of the Financial
Instrument.

(d)   Subject to the provisions of the Financial Instru-
ment, if any, sShould the Vessel become an actual,
constructive, compromised or agreed total loss under
the insurances required under sub-clause 13(a), all
insurance payments for such loss shall be paid to the
Owners who shall hold the same on trust to distribute
the moneys as soon as possible between the
Owners and the Charterers according to their respective
interests. The Charterers undertake to notify the Owners
and the mortgagee(s), if any, of any occurrences in
consequence of which the Vessel is likely to become a
total loss as defined in this Clause.

(e)   The Owners shall upon the request of the
Charterers, promptly execute such documents as may
be required to enable the Charterers to abandon the
Vessel to insurers and claim a constructive total loss.

(f)   For the purpose of insurance coverage against hull
and machinery and war risks under the provisions of
sub-clause 13(a), the value of the Vessel is the sum
indicated in Box 29.

14.   Insurance, Repairs and Classification
(Optional, only to apply if expressly agreed and stated
in Box 29, in which event Clause 13 be considered
deleted).
(a)   During the Charter Period the Vessel shall be kept
insured by the Owners at their expense against hull and
machinery and war risks under the form of policy or
policies attached hereto. The Owners and/or insurers
shall not have any right of recovery or subrogation
against the Charterers on account of loss of or any
damage to the Vessel or her machinery or appurt-
enances covered by such insurance, or on account of
payments made to discharge claims against or liabilities
of the Vessel or the Owners covered by such insurance.
Insurance policies shall cover the Owners and the
Charterers according to their respective interests.
(b)   During the Charter Period the Vessel shall be kept
insured by the Charterers at their expense against
Protection and Indemnity risks (and any risks against
which it is compulsory to insure for the operation of the
Vessel, including maintaining financial security in
accordance with sub-clause 10(a)(iii)) in such form as
the Owners shall in writing approve which approval shall
not be unreasonably withheld.
(c)   In the event that any act or negligence of the
Charterers shall vitiate any of the insurance herein
provided, the Charterers shall pay to the Owners all
losses and indemnify the Owners against all claims and
demands which would otherwise have been covered by
such insurance.
(d)   The Charterers shall, subject to the approval of the
Owners or Owners' Underwriters, effect all insured
repairs, and the Charterers shall undertake settlement
of all miscellaneous expenses in connection with such
repairs as well as all insured charges, expenses and
liabilities, to the extent of coverage under the insurances
provided for under the provisions of sub-clause 14(a).
The Charterers to be secured reimbursement through
the Owners' Underwriters for such expenditures upon
presentation of accounts.
(e)   The Charterers to remain responsible for and to
effect repairs and settlement of costs and expenses
incurred thereby in respect of all other repairs not
covered by the insurances and/or not exceeding any
possible franchise(s) or deductibles provided for in the
insurances.
(f)   All time used for repairs under the provisions of
sub-clauses 14(d) and 14(e) and for repairs of latent
defects according to Clause 3 above, including any

deviation, shall be for the Charterers' account and shall
form part of the Charter Period.
The Owners shall not be responsible for any expenses
as are incident to the use and operation of the Vessel
for such time as may be required to make such repairs.
(g)   If the conditions of the above insurances permit
additional insurance to be placed by the parties such
cover shall be limited to the amount for each party set
out in Box 30 and Box 31, respectively. The Owners or
the Charterers as the case may be shall immediately
furnish the other party with particulars of any additional
insurance effected, including copies of any cover notes
or policies and the written consent of the insurers of
any such required insurance in any case where the
consent of such insurers is necessary.
(h)   Should the Vessel become an actual, constructive,
compromised or agreed total loss under the insurances
required under sub-clause 14(a), all insurance payments
for such loss shall be paid to the Owners, who shall
distribute the moneys between themselves and the
Charterers according to their respective interests.
(i)   If the Vessel becomes an actual, constructive,
compromised or agreed total loss under the insurances
arranged by the Owners in accordance with sub-clause
14(a), this Charter shall terminate as of the date of such
loss.
(j)   The Charterers shall upon the request of the
Owners, promptly execute such documents as may be
required to enable the Owners to abandon the Vessel
to the insurers and claim a constructive total loss.
(k)   For the purpose of insurance coverage against hull
and machinery and war risks under the provisions of
sub-clause 14(a), the value of the Vessel is the sum
indicated in Box 29.
(l)   Notwithstanding anything contained in sub-clause
10(a), it is agreed that under the provisions of Clause
14, if applicable, the Owners shall keep the Vessel's
Class fully up-to-date with the Classification Society
indicated in Box 10 and maintain all other necessary
certificates in force at all times.

15.   Redelivery
At the expiration of the Charter Period the Vessel shall
be redelivered by the Charterers to the Owners at a
safe and ice-free port or place as indicated in Box 16, in
such ready safe berth as the Owners may direct. The
Charterers shall give the Owners not less than thirty
(30) running days' preliminary notice of expected date,
range of ports of redelivery or port or place of redelivery
and not less than fourteen (14) running days' definite
notice of expected date and port or place of redelivery.
Any changes thereafter in the Vessel's position shall be
notified immediately to the Owners.
The Charterers warrant that they will not permit the
Vessel to commence a voyage (including any preceding
ballast voyage) which cannot reasonably be expected
to be completed in time to allow redelivery of the Vessel
within the Charter Period. Notwithstanding the above,
should the Charterers fail to redeliver the Vessel within
The Charter Period, the Charterers shall pay the daily
equivalent to the rate of hire stated in Box 22 plus 10
per cent, or to the market rate, whichever is the higher,
for the number of days by which the Charter Period is
exceeded. All other terms, conditions and provisions of
this Charter shall continue to apply.
Subject to the provisions of Clause 10, the Vessel shall
be redelivered to the Owners in the same or as good
structure, state, condition and class as that in which she
was delivered, fair wear and tear not affecting class
excepted.
The Vessel upon redelivery shall have her survey cycles
up to date and trading and class certificates valid for at
least the number of months agreed in Box 17.

16.   Non-Lien

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## "BARECON 2001" Standard Bareboat Charter

The Charterers will not suffer, nor permit to be continued, 547
any mortgage,
any possessory lien, any maritime lien or any other 548
encumbrance incurred by them or their
agents, which might have priority over the title and 549
interest of the Owners in the Vessel. The Charterers 550
further agree to fasten to the Vessel in a conspicuous 551
place and to keep so fastened during the Charter Period 552
a notice reading as follows. 553
"This Vessel is the property of (name of Owners). It is 554
under charter to (name of Charterers) and by the terms 555
of the Charter Party neither the Charterers nor the 556
Master have any right, power or authority to create, incur 557
or permit to be imposed on the Vessel any lien or 558
maritime lien 559
whatsoever." 559

### 17.  Indemnity 560
(a)  The Charterers shall indemnify the Owners against 561
any loss, damage or expense incurred by the Owners 562
arising out of or in relation to the operation of the Vessel 563
by the Charterers, and against any lien and/or maritime 564
lien of whatsoever
nature arising out of an event occurring during the 565
Charter Period. If the Vessel be arrested or otherwise 566
detained by reason of claims or liens arising out of her 567
operation hereunder by the Charterers, the Charterers 568
shall at their own expense take all reasonable steps to 569
secure that within a reasonable time the Vessel is 570
released, including the provision of bail. 571
Without prejudice to the generality of the foregoing, the 572
Charterers agree to indemnify the Owners against all 573
consequences or liabilities arising from the Master, 574
officers or agents signing Bills of Lading or other 575
documents. 576
(b)  If the Vessel be arrested or otherwise detained by 577
reason of a claim or claims against the Owners or their 578
Affiliates, the
Owners shall at their own expense take all reasonable 579
steps to secure that within a reasonable time the Vessel 580
is released, including the provision of bail. 581
In such circumstances the Owners shall indemnify the 582
Charterers against any loss, damage or expense 583
incurred by the Charterers (including hire paid under 584
this Charter) as a direct consequence of such arrest or 585
detention. 586

### 18.  Lien 587
The Owners to have a lien upon all cargoes, sub-hires 588
and sub-freights belonging or due to the Charterers or 589
any sub-charterers and any Bill of Lading freight for all 590
claims under this Charter, and the Charterers to have a 591
lien on the Vessel for all moneys paid in advance and 592
not earned. 593

### 19.  Salvage 594
All salvage and towage performed by the Vessel shall 595
be for the Charterers' benefit and the cost of repairing 596
damage occasioned thereby shall be borne by the 597
Charterers. 598
The Charterers shall report any such salvage or 598
towage to be performed to the Owners.

### 20.  Wreck Removal 599
In the event of the Vessel becoming a wreck or 600
obstruction to navigation the Charterers shall indemnify 601
the Owners against any sums whatsoever which the 602
Owners shall become liable to pay and shall pay in 603
consequence of the Vessel becoming a wreck or 604
obstruction to navigation. 605

### 21.  General Average 606
The Owners shall not contribute to General Average. 607

### 22.  Assignment, Sub-Charter and Sale 608
(a)  The Charterers shall not assign this Charter nor 609
sub-charter the Vessel on a bareboat basis except with 610

the prior consent in writing of the Owners, which shall 611
not be unreasonably withheld, and subject to such terms 612
and conditions as the Owners shall approve. 613
(b)  The Owners shall not sell the Vessel during the 614
currency of this Charter (other than the Charterers), 615
~~except with the prior written~~ 615
~~consent of the Charterers, which shall not be unreason-~~ 616
~~ably withheld, and subject to the buyer accepting an~~ 617
~~assignment of this Charter.~~ 618

### 23.  Contracts of Carriage 619
*) (a)  The Charterers are to procure that all documents 620
issued during the Charter Period evidencing the terms 621
and conditions agreed in respect of carriage of goods 622
shall contain a paramount clause incorporating any 623
legislation relating to carrier's liability for cargo 624
compulsorily applicable in the trade; if no such legislation 625
exists, the documents shall incorporate the Hague-Visby 626
Rules. The documents shall also contain the New Jason 627
Clause and the Both-to-Blame Collision Clause. 628
*) ~~(b)  The Charterers are to procure that all passenger~~ 629
~~tickets issued during the Charter Period for the carriage~~ 630
~~of passengers and their luggage under this Charter shall~~ 631
~~contain a paramount clause incorporating any legislation~~ 632
~~relating to carrier's liability for passengers and their~~ 633
~~luggage compulsorily applicable in the trade; if no such~~ 634
~~legislation exists, the passenger tickets shall incorporate~~ 635
~~the Athens Convention Relating to the Carriage of~~ 636
~~Passengers and their Luggage by Sea, 1974, and any~~ 637
~~protocol thereto.~~ 638
*) ~~Delete as applicable.~~ 639

### 24.  Bank Guarantee 640
~~(Optional, only to apply if Box 27 filled in)~~ 641
~~The Charterers undertake to furnish, before delivery of~~ 642
~~the Vessel, a first class bank guarantee or bond in the~~ 643
~~sum and at the place as indicated in Box 27 as guarantee~~ 644
~~for full performance of their obligations under this~~ 645
~~Charter.~~ 646

### 25.  Requisition/Acquisition 647
(a)  In the event of the Requisition for Hire of the Vessel 648
by any governmental or other competent authority 649
(hereinafter referred to as "Requisition for Hire") 650
irrespective of the date during the Charter Period when 651
"Requisition for Hire" may occur and irrespective of the 652
length thereof and whether or not it be for an indefinite 653
or a limited period of time, and irrespective of whether it 654
may or will remain in force for the remainder of the 655
Charter Period, this Charter shall not be deemed thereby 656
or thereupon to be frustrated or otherwise terminated 657
and the Charterers shall continue to pay the stipulated 658
hire in the manner provided by this Charter until the time 659
when the Charter would have terminated pursuant to 660
any of the provisions hereof always provided however 661
that in the event of "Requisition for Hire" any Requisition 662
Hire or compensation received or receivable by the 663
Owners shall be payable to the Charterers during the 664
remainder of the Charter Period or the period of the 665
"Requisition for Hire" whichever be the shorter. However, 666
if the Requisition of Hire shall continue for more than
365 days, then the Charterers may, at any time
thereafter, terminate this Charter.
(b)  In the event of the Owners being deprived of their 667
ownership in the Vessel by any Compulsory Acquisition 668
of the Vessel or requisition for title by any governmental 669
or other competent authority (hereinafter referred to as 670
"Compulsory Acquisition"), then, irrespective of the date 671
during the Charter Period when "Compulsory Acqui- 672
sition" may occur, this Charter shall be deemed 673
terminated as of the date of such "Compulsory 674
Acquisition". In such event Charter Hire to be considered 675
as earned and to be paid up to the date and time of 676
such "Compulsory Acquisition". 677

### 26.  War 678

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



(a) For the purpose of this Clause, the words "War 679
Risks" shall include any war (whether actual or 680
threatened), act of war, civil war, hostilities, revolution, 681
rebellion, civil commotion, warlike operations, the laying 682
of mines (whether actual or reported), acts of piracy, 683
acts of terrorists, acts of hostility or malicious damage, 684
blockades (whether imposed against all vessels or 685
imposed selectively against vessels of certain flags or 686
ownership, or against certain cargoes or crews or 687
otherwise howsoever), by any person, body, terrorist or 688
political group, or the Government of any state 689
whatsoever, which may be dangerous or are likely to be 690
or to become dangerous to the Vessel, her cargo, crew 691
or other persons on board the Vessel 692
(b) The Vessel, unless the written consent of the 693
Owners be first obtained, shall not continue to or go 694
through any port, place, area or zone (whether of land 695
or sea), or any waterway or canal, where it reasonably 696
appears that the Vessel, her cargo, crew or other 697
persons on board the Vessel, in the reasonable 698
judgement of the Owners, may be, or are likely to be, 699
exposed to War Risks, unless the insurers have 700
granted permission for the Vessel to trade in such
place/places/zone. Should the Vessel be within any
such place as aforesaid, which only becomes danger- 701
ous, or is likely to be or to become dangerous, after her 702
entry into it, the Owners shall have the right to require 703
the Vessel to shall leave such area unless the insurers 704
have granted permission for the Vessel to trade in
such place/places/zone.
(c) The Vessel shall not load contraband cargo, or to 705
pass through any blockade, whether such blockade be 706
imposed on all vessels, or is imposed selectively in any 707
way whatsoever against vessels of certain flags or 708
ownership, or against certain cargoes or crews or 709
otherwise howsoever, or to proceed to an area where 710
the Vessel be subject, or is likely to be subject to a 711
belligerent's right of search and/or confiscation. 712
(d) If the insurers of the war risks insurance, when 713
Clause 14 is applicable, should require payment of 714
premiums and/or calls because, pursuant to the 715
Charterers' orders, the Vessel is within, or is due to enter 716
and remain within, any area or areas which are specified 717
by such insurers as being subject to additional premiums 718
because of War Risks, then such premiums and/or calls 719
shall be reimbursed by the Charterers to the Owners at 720
the same time as the next payment of hire is due. 721
(e) The Charterers shall be obliged to have the liberty 722
(i) to comply with all compulsory orders, directions, 723
recommend-
ations or advice as to departure, arrival, routes, 724
sailing in convoy, ports of call, stoppages, 725
destinations, discharge of cargo, delivery, or in any 726
other way whatsoever, which are given by the 727
Government of the Nation under whose flag the 728
Vessel sails, or any other Government, body or 729
group whatsoever acting with the power to compel 730
compliance with their orders or directions; 731
(ii) to comply with all compulsory the orders, directions 732
or recom-
mendations of any war risks underwriters who have 733
the authority to give the same under the terms of 734
the war risks insurance; 735
(iii) to comply with the terms of any resolution of the 736
Security Council of the United Nations, any 737
directives of the European Community, the effective 738
orders of any other Supranational body which has 739
the right to issue and give the same, and with 740
national laws aimed at enforcing the same to which 741
the Owners are subject, and to obey the orders 742
and directions of those who are charged with their 743
enforcement; 744
(f)  In the event of outbreak of war (whether there be a 745
declaration of war or not) (i) between any two or more 746
of the following countries the United States of America; 747

Russia; the United Kingdom; France; and the People's 748
Republic of China, (ii) between any two or more of the 749
countries stated in Box 36, both the Owners and the 750
Charterers shall have the right to cancel this Charter, 751
whereupon the Charterers shall redeliver the Vessel to 752
the Owners in accordance with Clause 15. If the Vessel 753
has cargo on board after discharge thereof at 754
destination, or if debarred under this Clause from 755
reaching or entering it at a near, open and safe port as 756
directed by the Owners, or if the Vessel has no cargo 757
on board, at the port at which the Vessel then is or if at 758
sea at a near, open and safe port as directed by the 759
Owners. In all cases hire shall continue to be paid in 760
accordance with Clause 11 and except as aforesaid all 761
other provisions of this Charter shall apply until 762
redelivery. 763

27.  Commission 764
The Shipbroker to collect from the Owner 1% (one per 765
cent) on all gross payments made by the Charterer to
the Owner as defined in Clauses, 36.4, 43.2, 43.3 and
45.1.
The Charterers are entitled to reduce 1% address
commission from the hire. The Owners to pay a
commission at the rate indicated
in Box 33 to the Brokers named in Box 33 on any hire 766
paid under the Charter. If no rate is indicated in Box 33 767
the commission to be paid by the Owners shall cover 768
the actual expenses of the Brokers and a reasonable 769
fee for their work. 770
If the full hire is not paid owing to breach of the Charter 771
by either of the parties the party liable therefor shall 772
indemnify the Brokers against their loss of commission. 773
Should the parties agree to cancel the Charter, the 774
Owners shall indemnify the Brokers against any loss of 775
commission but in such case the commission shall not 776
exceed the brokerage on one year's hire. 777

28.  Termination [as per see Clause 46 and 47] 778
(a)  Charterers' Default 779
The Owners shall be entitled to withdraw the Vessel from 780
the service of the Charterers and terminate the Charter 781
with immediate effect by written notice to the Charterers if: 782
(i)  the Charterers fail to pay hire in accordance with 783
Clause 11.  However, where there is a failure to 784
make punctual payment of hire due to oversight, 785
negligence, errors or omissions on the part of the 786
Charterers or their bankers, the Owners shall give 787
the Charterers written notice of the number of clear 788
banking days stated in Box 34 (as recognised at 789
the agreed place of payment) in which to rectify 790
the failure, and when so rectified within such 791
number of days following the Owners' notice, the 792
payment shall stand as regular and punctual. 793
Failure by the Charterers to pay hire within the 794
number of days stated in Box 34 of their receiving 795
the Owners' notice as provided herein, shall entitle 796
the Owners to withdraw the Vessel from the service 797
of the Charterers and terminate the Charter without 798
further notice; 799
(ii)  the Charterers fail to comply with the requirements of: 800
(1) Clause 6 (Trading Restrictions) 801
(2) Clause 13(a) (Insurance and Repairs) 802
provided that the Owners shall have the option, by 803
written notice to the Charterers, to give the 804
Charterers a specified number of days grace within 805
which to rectify the failure without prejudice to the 806
Owners' right to withdraw and terminate under this 807
Clause if the Charterers fail to comply with such 808
notice; 809
(iii)  the Charterers fail to rectify any failure to comply 810
with the requirements of sub-clause 10(a)(i) 811
(Maintenance and Repairs) as soon as practically 812
possible after the Owners have requested them in 813
writing so to do and in any event so that the Vessel's 814

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## "BARECON 2001" Standard Bareboat Charter

insurance cover is not prejudiced. 815

**(b) Owners' Default [Note: Clause 47]** 816
If the Owners shall by any act or omission be in breach 817
of their obligations under this Charter to the extent that 818
the Charterers are deprived of the use of the Vessel 819
and such breach continues for a period of fourteen (14) 820
running days after written notice thereof has been given 821
by the Charterers to the Owners, the Charterers shall 822
be entitled to terminate this Charter with immediate effect 823
by written notice to the Owners. 824
825
**(c) Loss of Vessel** 826
This Charter shall be deemed to be terminated if the 827
Vessel becomes a total loss or is declared as a 828
constructive or compromised or arranged total loss. For 829
the purpose of this sub-clause, the Vessel shall not be 830
deemed to be lost unless she has either become an 831
actual total loss or agreement has been reached with 832
her underwriters in respect of her constructive, 833
compromised or arranged total loss or if such agreement 834
with her underwriters is not reached it is adjudged by a 835
competent tribunal that a constructive loss of the Vessel 836
has occurred. 837
**(d)** Either party shall be entitled to terminate this 838
Charter with immediate effect by written notice to the 839
other party in the event of an order being made or 840
resolution passed for the winding up, dissolution, 841
liquidation or bankruptcy of the other party (otherwise 842
than for the purpose of reconstruction or amalgamation) 843
or if a receiver is appointed, or if it suspends payment, 844
ceases to carry on business or makes any special 845
arrangement or composition with its creditors 846
**(e)** The termination of this Charter shall be without 847
prejudice to all rights accrued due between the parties 848
prior to the date of termination and to any claim that 849
either party might have. 850

**29. Repossession** 851
In the event of the termination of this Charter in 852
accordance with the applicable provisions of Clauses 28, 852
46 and 47, 852
the Owners shall have the right to repossess the Vessel 853
from the Charterers at her current or next port of call, or 854
at a port or place convenient to them without hindrance 855
or interference by the Charterers, courts or local 856
authorities. Pending physical repossession of the Vessel 857
in accordance with this Clause 29, the Charterers shall 858
hold the Vessel as gratuitous bailee only to the Owners. 859
The Owners shall arrange for or an authorised represent- 860
ative to board the Vessel as soon as reasonably 861
practicable following the termination of the Charter. The 862
Vessel shall be deemed to be repossessed by the 863
Owners from the Charterers upon the boarding of the 864
Vessel by the Owners' representative. All arrangements 865
and expenses relating to the settling of wages, 866
disembarkation and repatriation of the Charterers' 867
Master, officers and crew shall be the sole responsibility 868
of the Charterers. 869

**30. Dispute Resolution [as per Clause 59]** 870
\*) **(a)** This Contract shall be governed by and construed 871
in accordance with English law and any dispute arising 872
out of or in connection with this Contract shall be referred 873
to arbitration in London in accordance with the Arbitration 874
Act 1996 or any statutory modification or re-enactment 875
thereof save to the extent necessary to give effect to 876
the provisions of this Clause. 877
The arbitration shall be conducted in accordance with 878
the London Maritime Arbitrators Association (LMAA) 879
Terms current at the time when the arbitration proceed- 880
ings are commenced. 881
The reference shall be to three arbitrators. A party 882
wishing to refer a dispute to arbitration shall appoint its 883
arbitrator and send notice of such appointment in writing 884
to the other party requiring the other party to appoint its 885
own arbitrator within 14 calendar days of that notice and 886

stating that it will appoint its arbitrator as sole arbitrator 887
unless the other party appoints its own arbitrator and 888
gives notice that it has done so within the 14 days 889
specified. If the other party does not appoint its own 890
arbitrator and give notice that it has done so within the 891
14 days specified, the party referring a dispute to 892
arbitration may, without the requirement of any further 893
prior notice to the other party, appoint its arbitrator as 894
sole arbitrator and shall advise the other party 895
accordingly. The award of a sole arbitrator shall be 896
binding on both parties as if he had been appointed by 897
agreement. 898
Nothing herein shall prevent the parties agreeing in 899
writing to vary these provisions to provide for the 900
appointment of a sole arbitrator. 901
In cases where neither the claim nor any counterclaim 902
exceeds the sum of US$50,000 (or such other sum as 903
the parties may agree) the arbitration shall be conducted 904
in accordance with the LMAA Small Claims Procedure 905
current at the time when the arbitration proceedings are 906
commenced. 907

\*) **(b)** This Contract shall be governed by and construed 908
in accordance with Title 9 of the United States Code 909
and the Maritime Law of the United States and any 910
dispute arising out of or in connection with this Contract 911
shall be referred to three persons at New York, one to 912
be appointed by each of the parties hereto, and the third 913
by the two so chosen; their decision or that of any two 914
of them shall be final, and for the purposes of enforcing 915
any award, judgement may be entered on an award by 916
any court of competent jurisdiction. The proceedings 917
shall be conducted in accordance with the rules of the 918
Society of Maritime Arbitrators, Inc. 919
In cases where neither the claim nor any counterclaim 920
exceeds the sum of US$50,000 (or such other sum as 921
the parties may agree) the arbitration shall be conducted 922
in accordance with the Shortened Arbitration Procedure 923
of the Society of Maritime Arbitrators, Inc. current at 924
the time when the arbitration proceedings are commenced. 925

\*) **(c)** This Contract shall be governed by and construed 926
in accordance with the laws of the place mutually agreed 927
by the parties and any dispute arising out of or in 928
connection with this Contract shall be referred to 929
arbitration at a mutually agreed place, subject to the 930
procedures applicable there. 931
**(d)** Notwithstanding (a), (b) or (c) above, the parties 932
may agree at any time to refer to mediation any 933
difference and/or dispute arising out of or in connection 934
with this Contract. 935
In the case of a dispute in respect of which arbitration 936
has been commenced under (a), (b) or (c) above, the 937
following shall apply:- 938
**(i)** Either party may at any time and from time to time 939
elect to refer the dispute or part of the dispute to 940
mediation by service on the other party of a written 941
notice (the 'Mediation Notice') calling on the other 942
party to agree to mediation. 943
**(ii)** The other party shall thereupon within 14 calendar 944
days of receipt of the Mediation Notice confirm that 945
they agree to mediation, in which case the parties 946
shall thereafter agree a mediator within a further 947
14 calendar days, failing which on the application 948
of either party a mediator will be appointed promptly 949
by the Arbitration Tribunal ('the Tribunal') or such 950
person as the Tribunal may designate for that 951
purpose. The mediation shall be conducted in such 952
place and in accordance with such procedure and 953
on such terms as the parties may agree or, in the 954
event of disagreement, as may be set by the 955
mediator. 956
**(iii)** If the other party does not agree to mediate, that 957
fact may be brought to the attention of the Tribunal 958
and may be taken into account by the Tribunal when 959
allocating the costs of the arbitration as between 960
the parties. 961

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest. — 962 963 964

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration. — 965 966 967 968 969 970

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses. — 971 972 973 974

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration. — 975 976 977 978 979

*(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)* — 980 981

(e) If Box 35 in Part I is not appropriately filled in, sub-clause 30(a) of this Clause shall apply. Sub-clause 30(d) shall apply in all cases. — 982 983 984

*) Sub-clauses 30(a), 30(b) and 30(c) are alternatives; indicate alternative agreed in Box 35. — 985 986

31. **Notices [as per Clause 60]** — 987
(a) Any notice to be given by either party to the other party shall be in writing and may be sent by fax, telex, registered or recorded mail or by personal service. — 988 989 990
(b) The address of the Parties for service of such communication shall be as stated in Boxes 3 and 4 respectively. — 991 992 993

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

OPTIONAL
PART

## PART III
### PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
(Optional, only to apply if expressly agreed and stated in Box 37)

1. **Specifications and Building Contract** — 1
   (a) The Vessel shall be constructed in accordance with — 2
   the Building Contract (hereafter called "the Building — 3
   Contract" as defined in Clause 33) as annexed to this — 4
   Charter, made between the
   Builders and the Owners and in accordance with the — 5
   specifications and plans annexed thereto, such Building — 6
   Contract, specifications and plans having been counter- — 7
   signed as approved by the Charterers. — 8
   (b) No change shall be made in the Building Contract or — 9
   in the specifications or plans of the Vessel as approved by — 10
   the Charterers as aforesaid, without the Charterers' — 11
   consent. — 12
   (c) The Charterers shall have the right to send their — 13
   representative to the Builders' Yard to inspect the Vessel — 14
   during the course of her construction to satisfy themselves — 15
   that construction is in accordance with such approved — 16
   specifications and plans as referred to under sub-clause — 17
   (a) of this Clause. — 18
   (d) The Vessel shall be built in accordance with the — 19
   Building Contract and shall be of the description set out — 20
   therein. Subject to the provisions of sub-clause 2(c)(iv) — 21
   hereunder, the Charterers shall be bound to accept the — 22
   Vessel from the Owners, completed and constructed in — 23
   accordance with the Building Contract, on the date of — 24
   delivery by the Builders. The Charterers undertake that — 25
   having accepted the Vessel they will not thereafter raise — 26
   any claims against the Owners in respect of the Vessel's — 27
   performance or specification or defects, (except for the — 28
   defects covered by the warranty), if any.
   Nevertheless, in respect of any repairs, replacements or — 29
   defects which appear within the first 12 months from — 30
   delivery by the Builders, the Owners shall endeavour to — 31
   compel the Builders to repair, replace or remedy any defects — 32
   or to recover from the Builders any expenditure incurred in — 33
   carrying out such repairs, replacements or remedies. — 34
   However, the Owners' liability to the Charterers shall be — 35
   limited to the extent the Owners have a valid claim against — 36
   the Builders under the guarantee clause of the Building — 37
   Contract (a copy whereof has been supplied to the — 38
   Charterers). The Charterers shall be bound to accept such — 39
   sums as the Owners are reasonably able to recover under — 40
   this Clause and shall make no further claim on the Owners — 41
   for the difference between the amount(s) so recovered and — 42
   the actual expenditure on repairs, replacement or — 43
   remedying defects or for any loss of time incurred. — 44
   Any liquidated damages for physical defects or deficiencies — 45
   shall accrue to the account of the party stated in Box 41(a) — 46
   or if not filled in shall be shared equally between the parties. — 47
   The costs of pursuing a claim or claims against the Builders — 48
   under this Clause (including any liability to the Builders) — 49
   shall be borne by the party stated in Box 41(b) or if not — 50
   filled in shall be shared equally between the parties. — 51

2. **Time and Place of Delivery – see Clause 34** — 52
   (a) Subject to the Vessel having completed her — 53
   acceptance trials including trials of cargo equipment in — 54
   accordance with the Building Contract and specifications — 55
   to the satisfaction of the Charterers, the Owners shall give — 56
   and the Charterers shall take delivery of the Vessel afloat — 57
   when ready for delivery and properly documented at the — 58
   Builders' Yard or some other safe and readily accessible — 59
   dock, wharf or place as may be agreed between the parties — 60
   hereto and the Builders. Under the Building Contract the — 61
   Builders have estimated that the Vessel will be ready for — 62
   delivery to the Owners as therein provided but the delivery — 63
   date for the purpose of this Charter shall be the date when — 64
   the Vessel is in fact ready for delivery by the Builders after — 65
   completion of trials whether that be before or after as — 66
   indicated in the Building Contract. The Charterers shall not — 67

be entitled to refuse acceptance of delivery of the Vessel — 68
and upon and after such acceptance, subject to Clause — 69
1(d), the Charterers shall not be entitled to make any claim — 70
against the Owners in respect of any conditions, — 71
representations or warranties, whether express or implied, — 72
as to the seaworthiness of the Vessel or in respect of delay — 73
in delivery. — 74
(b) If for any reason other than a default by the Owners — 75
under the Building Contract, the Builders become entitled — 76
under that Contract not to deliver the Vessel to the Owners, — 77
the Owners shall upon giving to the Charterers written — 78
notice of Builders becoming so entitled, be excused from — 79
giving delivery of the Vessel to the Charterers and upon — 80
receipt of such notice by the Charterers this Charter shall — 81
cease to have effect. — 82
(c) If for any reason the Owners become entitled under — 83
the Building Contract to reject the Vessel the Owners shall, — 84
before exercising such right of rejection, consult the — 85
Charterers and thereupon — 86
(i) if the Charterers do not wish to take delivery of the Vessel — 87
they shall inform the Owners within seven (7) running days — 88
by notice in writing and upon receipt by the Owners of such — 89
notice this Charter shall cease to have effect; or — 90
(ii) if the Charterers wish to take delivery of the Vessel — 91
they may by notice in writing within seven (7) running days — 92
require the Owners to negotiate with the Builders as to the — 93
terms on which delivery should be taken and/or refrain from — 94
exercising their right to rejection and upon receipt of such — 95
notice the Owners shall commence such negotiations and/ — 96
or take delivery of the Vessel from the Builders and deliver — 97
her to the Charterers; — 98
(iii) in no circumstances shall the Charterers be entitled to — 99
reject the Vessel unless the Owners are able to reject the — 100
Vessel from the Builders. — 101
(iv) If this Charter terminates under sub-clause (b) or (c) of — 102
this Clause, the Owners shall thereafter not be liable to the — 103
Charterers for any claim under or arising out of this Charter — 104
or its termination. — 105
(d) Any liquidated damages for delay in delivery under the — 106
Building Contract and any costs incurred in pursuing a claim — 107
therefor shall accrue to the account of the party stated in — 108
Box 41(c) or if not filled in shall be shared equally between — 109
the parties. — 110

3. **Guarantee Works** — 111
   If not otherwise agreed, the Owners authorise the — 112
   Charterers to arrange for the guarantee works to be — 113
   performed in accordance with the building contract terms, — 114
   and hire to continue during the period of guarantee works. — 115
   The Charterers have to advise the Owners about the — 116
   performance to the extent the Owners may request. — 117

4. **Name of Vessel** — 118
   The name of the Vessel shall be mutually agreed between — 119
   the Owners and the Charterers and the Vessel shall be — 120
   painted in the colours, display the funnel insignia and fly — 121
   the house flag as required by the Charterers. — 122

5. **Survey on Redelivery** — 123
   The Owners and the Charterers shall appoint surveyors — 124
   for the purpose of determining and agreeing in writing the — 125
   condition of the Vessel at the time of re-delivery. — 126
   Without prejudice to Clause 15 (Part II), the Charterers — 127
   shall bear all survey expenses and all other costs, if any, — 128
   including the cost of docking and undocking, if required, — 129
   as well as all repair costs incurred. The Charterers shall — 130
   also bear all loss of time spent in connection with any — 131
   docking and undocking as well as repairs, which shall be — 132
   paid at the rate of hire per day or pro rata. — 133

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



OPTIONAL
PART

## PART IV
### HIRE/PURCHASE AGREEMENT
(Optional, only to apply if expressly agreed and stated in Box 42)

On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the final payment of hire as per Clause 11 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for. — 1, 2, 3, 4, 5, 6, 7

*In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers.* — 8, 9

The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter. — 10, 11

The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid-off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account. — 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27

In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers. The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession. — 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38

The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment. — 39, 40, 41

The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description. — 42, 43, 44, 45, 46, 47, 48

The Buyers undertake to pay for the repatriation of the Master, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 3 (Part II) or to pay the equivalent cost for their journey to any other place. — 49, 50, 51, 52, 53

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



OPTIONAL
PART

# PART V
## PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY
*(Optional, only to apply if expressly agreed and stated in Box 43)*

**1.  Definitions**

For the purpose of this PART V, the following terms shall have the meanings hereby assigned to them.

"The Bareboat Charter Registry" shall mean the registry of the State whose flag the Vessel will fly and in which the Charterers are registered as the bareboat charterers during the period of the Bareboat Charter.

"The Underlying Registry" shall mean the registry of the state in which the Owners of the Vessel are registered as Owners and to which jurisdiction and control of the Vessel will revert upon termination of the Bareboat Charter Registration.

**2.  Mortgage**

The Vessel chartered under this Charter is financed by a mortgage and the provisions of Clause 12(b) (Part II) shall apply.

**3.  Termination of Charter by Default**

If the Vessel chartered under this Charter is registered in a Bareboat Charter Registry as stated in Box 44, and if the Owners shall default in the payment of any amounts due under the mortgage(s) specified in Box 28, the Charterers shall, if so required by the mortgagee, direct the Owners to re-register the Vessel in the Underlying Registry as shown in Box 45.

In the event of the Vessel being deleted from the Bareboat Charter Registry as stated in Box 44, due to a default by the Owners in the payment of any amounts due under the mortgage(s), the Charterers shall have the right to terminate this Charter forthwith and without prejudice to any other claim they may have against the Owners under this Charter.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



32.    **Interpretation**

32.1    The following Clauses shall be deemed to be incorporated as an integral part of the Charter. In the event of any conflict between the provisions of these Additional Clauses and the printed provisions of the Charter, the provisions of these Additional Clauses hereunder shall prevail to the extent of such conflict but no further.

32.2    The captions and headings of Clauses herein are inserted for convenience only and shall not be construed to have any restrictive effect on the text herein.

33.    **Additional Definitions**

The following expressions have the following meanings:

| | |
|---|---|
| **Affiliate** | In relation to any entity ("first entity"), any other entity which directly or indirectly Controls the first entity; is Controlled by the first entity; or is Controlled by an entity which Controls the first entity. |
| **Assignment of Insurance** | The assignment of the relevant Insurances and the relevant Requisition Compensation executed or to be executed by the Charterers in favour of the Owners in form and substance acceptable to the Owners |
| **Assigned Rights** | All of the Owner's rights, title, interest and all its benefits present and future in and under Article IV (*Supervision and Inspection*), V (*Modification, Changes and Extras*), VI (*Trials*) and IX (*Warranty of Quality*) under the Building Contract; |
| **Builder** | Jiangsu New Yangzi Shipbuilding Co., Ltd and Jiangsu Tianyuan Marine Import & Export Co., Ltd; |
| **Building Contract** | Means the shipbuilding contract dated 2nd April 2013 made by and between the Owners as the buyer and the Builder as seller bearing CONTRACT NO.: 2013NYZ262SIN in respect of the building and sale and purchase of the Vessel. |



| | |
|---|---|
| **Business Day** | Means a day other than a Saturday or Sunday or public or bank holiday on which the banks in New York, London, Athens and Shanghai are open for business generally. |
| **Classification Society** | Lloyd's Register |
| **Collateral Charter** | Means the Bareboat Charter Party dated 2nd of April, 2013 by and between Draco Shipping Pte. Ltd as owner and GMI Resources (Singapore) Pte Limited as charterer in respect of one (1) 82,000DWT Bulk Carrier bearing the Builder's Hull Number YZJ2013-1055. |
| **Collateral Charterer's Default** | Means the Chareterer's Default as defined in the Collateral Charter |
| **Collateral Owner's Default** | Means the Owner's Default as defined in the Collateral Charter |
| **Conditional Assigned Rights** | All of the Owner's rights, title, interest and all its benefits present and future in and under Article X (*Cancellation, Rejection and Rescission by the Buyer*) and Article XII (INSURANCE) Section 2 Part (b) Total Loss, of the Building Contract and the Refund Guarantee and in all moneys payable by the Builder and/or the Refund Guarantor to the Owner thereunder including, without prejudice to the generality of the foregoing, all claims for damages in respect of any breach by the Builder of the Construction Contract or by the Guarantor Bank of the Refund Guarantee |
| **Control** | Means the power of a person to secure that the affairs of a body corporate or limited liability company are conducted in accordance with the wishes of that person: |
| | (a)    by means of the holding of shares, or the possession of voting power, in or in relation to that or any other body |



corporate or limited liability company; or

(b) by virtue of any powers conferred by the constitutional or corporate documents, or any other document, regulating that or any other body corporate or limited liability company.

| | |
|---|---|
| **Delivery Date** | Means the date on which the Vessel is actually delivered to the Charterers as evidenced by the Protocol of Delivery and Acceptance in accordance with Clause 34.3 |
| **Facility Agreement** | Means the loan facility agreement to be entered into by and between the Owner as borrower and a mortgagee of the Vessel as lender in relation to financing of the Vessel. |
| **Flag State** | Singapore (the "**Flag State**") |
| **Liquidated Damage** | Means the amount induced on daily basis at the rate of USD 1,780 (Say United States Dollars One Thousand, Seven Hundred and Eighty Only) per day for the time period from the date when the Owner's receipt of the termination or rescission notice given by the Charterers in accordance with Clause 47.2 till the eighth anniversary of the Delivery Date. |
| **Manager** | Means first class manager as may be appointed by the Charterer, with the prior written consent of the Owner, as the manager of the Vessel. Prior written consent of the Owner, not to be unreasonably withheld or delayed . |
| **Manager's Undertaking** | In relation to the Vessel, an undertaking executed or to be executed by the Manager in favour of the Owners in form and substance acceptable to the Owners |



| | |
|---|---|
| **Upfront Charter-Hire** | The sum of USD 5,200,000 (being the total amount of the instalments under Clause 43), ignoring any deduction from the instalments on account of liquidated damages or otherwise |
| **Refund Guarantee** | Means the Refund Guarantee issued by Agricultural Bank of China in accordance with the Building Contract |
| **Refund Guarantor** | Agricultural Bank of China |
| **Shipyard** | Jiangsu New Yangzi Shipbuilding Co., Ltd |
| **ton, or t** | A metric ton |
| **Vessel** | One (1) 82,000DWT Bulk Carrier bearing the Builder's Hull Number YZJ2013-1056 more fully described the Building Contract thereof, to be constructed by the Owners on the terms set out in this Charter |

## 34. Delivery

34.1 The Vessel shall be delivered by the Owners and taken over by the Charterers simultaneously with the delivery between the Builders and the Owners provided always that:

(a) The Vessel has been constructed in accordance with the Building Contract.

(b) A set of documents necessary for the seaworthiness of the Vessel including but not limited to class and trading certificates, plans and instruction books etc, are handed to the Charterers. However, the Charterers shall provide to the Owners all necessary certificates, documents and information required for timely registration and vessel delivery from the Builder.

(c) It is unconditionally agreed between the Charterers and the Owners that the Owners' only obligation is to deliver the Vessel to the Charterers in the same condition and with the same equipment as delivered to the Owners by the Builder under the Building Contract provided that the Charterer's written confirmation of their acceptance of the Vessel has been received by the Owners. To the extent that the "Buyers' Supplied items" (as defined in the Building Contract and specifications) hereof, the Charterers shall be



responsible for the procurement and supply of all "Buyer's Supplied Items" at their sole cost and expenses.

34.2 Under the Building Contract the Builders have estimated that the Vessel will be ready for delivery to the Owners as therein provided but the delivery date for the purpose of this Charter shall be the date when the Vessel is in fact ready for delivery by the Builders to the Owners after completion of trials whether that be before or after as indicated in the Building Contract. The date of delivery for the purpose of this Charter shall be the date when the Ship is actually delivered by the Builders to the Owners pursuant to the Building Contract notwithstanding the date in Box 14 of Part I of this Charter. The Owner shall not under any circumstance be responsible for any losses or damage as a result of any delay in delivery of the Ship to the Charterer for whatsoever reason.

34.3 At the time of delivery, the Owners and the Charterers shall sign a Protocol of Delivery and Acceptance evidencing the same, and the Vessel shall be on hire upon signing of the Protocol of Delivery and Acceptance.

35.    **Condition Precedent**

35.1 The Owners shall not be obliged to charter the Vessel to the Charterers in accordance with the terms and conditions of this Charter unless the Owners, on or before the Delivery Date, have received all of the documents and other evidences listed in Part III of Schedule I (*Conditions Precedent*) in form and substance satisfactory to the Owners.

35.2 The conditions precedent set out in Part III Schedule I (Conditions Precedent) and this Clause 35 are for the sole benefit of the Owners and may be waived by the Owners in whole or in part, with or without conditions, on or before the Delivery Date without prejudice to the right of the Owners to require fulfilment of such conditions in whole or in part at any time thereafter.

36.    **Hire**

36.1 The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter. The Charterers' obligation to pay Hire under this Charter shall be absolute and unconditional under all circumstances (including but not limited to any part of lay-up period if any).

36.2 In the event that the Contract Price under the Building Contract is (on the net basis) adjusted upwards in accordance with Article III (*Adjustment of the Contract Price*) of the Building Contract, the Charterers shall, on or before the Delivery Date, pay to the Owner an additional upfront charter-hire payment (the "**Additional Upfront Charter-hire**") in the full amount of such upwards adjustment;

36.3 In the event that the Contract Price under the Building Contract is (on the net basis) adjusted downwards in accordance with Article III (*Adjustment of the Contract Price*)



of the Building Contract, the amount of the adjustment shall be paid on the Delivery Date;

36.4    The Charterers shall pay to the Owners for the hire of the Vessel at a daily rate and pro rata for part of a day as follows:

    (a)    from the Delivery Date and until and including the fourth anniversary of delivery:  USD 6,633 (United States Dollars six thousand six hundred and thirty three); then

    (b)    from the day next following and until and including the eighth anniversary of delivery:  USD 7,653 (United States Dollars seven thousand six hundred and fifty three); and then

    (c)    no further hire shall be payable until redelivery.

36.5    Hire shall be paid continuously throughout the Charter Period.

36.6    Hire shall be paid 30 days in advance, the first payment on the date of delivery and each successive payment on the first day of each successive period of 30 days.

36.7    Payment of hire shall be made in cash without discount in the currency and in the manner indicated in Box 25 and at the place mentioned in Box 26.

36.8    Final payment of hire, if for a period of less than thirty (30) running days, shall be calculated proportionally according to the number of days and hours remaining before redelivery and advance payment to be effected accordingly.   Should any hire nevertheless be overpaid, the Owners shall refund the same on redelivery.

36.9    All payments of hire shall be made on a Business Day. If the due date for payment falls on a day which is not a Business Day, payment shall fall due and be made on the immediately succeeding Business Day.

## 37.    Notice for Inspection and Information regarding itinerary

37.1    In respect of any inspection under Clause 8 the Owners shall advise the Charterers three (3) Banking Days in advance of the intended inspection, provided always that no such inspection shall hamper or delay the Vessel.

37.2    The Charterers shall advise the Owners of the Vessel's itinerary and employment whenever requested by the Owners in writing during the Charter Period.

## 38.    Lay-up Clause

38.1    The Charterers shall have the option of laying up the Vessel for all or any portion (exceeding 30 days) of the Charter Period, in which case Hire hereunder shall continue to be paid in full. In case of lay-up, the Charterers shall arrange for docking of the Vessel at their cost prior to Vessel being put back to service.



38.2    The lay up port or place shall be at the Charterers' option but shall always be safe and
acceptable to the Owners and the insurers. All cost and expenses incurred shall be for
the Charterers account.

38.3    The Charterers shall keep the Owners well informed of their intention and
arrangement regarding lay up.

### 39.    Repair and Improvement

39.1    Charterers shall repair the Vessel as required by Clause 13.

39.2    All class related repairs should be done under the supervision of the Classification
Society and to the classification surveyors' satisfaction. All repairs should be
arranged/done timely and properly.

39.3    In any case of casualty or accident for which estimated damages exceed the amount
of USD1,000,000 the Charterers shall notify the Owners promptly with full details
and information as to repair arrangement.

### 40.    Taxes during Charter Period

The following apply during the Charter Period

40.1    All taxes/dues on cargo and/or freight/vessel and/or hire to be for Charterers' account,
except corporation or income taxes or similar taxes or taxes on the hire levied in
Singapore . All dues, duties, charges and/or taxes on crew and/or stores etc to be for
Charterers' account.

### 41.    Charterers' General Covenants

The Charterers covenant with the Owners and undertake throughout the Charter Period that:

41.1    The Charterers shall provide the Owner with all the documents listed in Part I of
Schedule 1 *(Condition Precedent)* in form and substance satisfactory to the Owners.

41.2    They will provide the Owners with such information concerning the Vessel as the
Owners may from time to time reasonably require including (without limitation)
information regarding the employment, condition, geographical position and crewing
of the Vessel;

41.3    They will obtain and promptly renew from time to time, and will, whenever so
reasonably requested by the Owners in writing, promptly furnish copies to the
Owners of all such authorizations, approvals, consents and licenses (if any) as may be
required under any applicable law or regulation to enable the Charterers to perform
their obligations under this Charter or required for the validity or enforceability of
this Charter, and the Charterers shall in all material respects comply with the terms of
the same.

41.4    They will notify the Owners forthwith by telex or telefax of:



(a)     any accident to the Vessel or incident which is or is likely to be a total loss or a constructive or compromised or arranged total loss;

(b)     any occurrence resulting in the Vessel becoming or being likely to become a total loss or a constructive or compromised or arranged total loss;

(c)     any requirement or recommendation made by any insurer or classification society, or by any competent authority, which is not complied with within any time limit imposed by such insurer, classification society or authority; and

(d)     any arrest of the Vessel, or the exercise or purported exercise of any lien on the Vessel or any requisition of the Vessel for hire;

41.5    Acknowledge and confirm that the Vessel shall remain the property of the Owners unless and until purchased by Owners under Clause 43, and that the Charterers shall otherwise have no rights or interest therein otherwise than as Charterers hereunder and that the Charterers shall at no time do or permit to be done any act or thing which might prejudice the rights of the Owners in and to the Vessel;

41.6    The Charterers will provide the Owners with audited annual reports within 180 days from the year end and un-audited semi-annual reports certified by CFO within 90days from half year end.

## 42.    Ship management and maintenance

42.1    The Charterers are fully responsible for ship management (including crew and insurance arrangements and all other requirements for the Vessel) at their own risks and expenses.

42.2    The Charterers will procure that the Vessel is managed at all times only by a duly qualified affiliate of the Charterers or such managers which have been previously approved in writing by the Owners (such approval not to be unreasonably withheld).

42.3    The Charterers shall maintain the Vessel in accordance with the requirements of the Classification Society and to a standard not less than that to which the Charterers maintain the other vessels owned or managed by themselves or their Affiliates.

42.4    The Charterers warrant that they will during the whole Charter Period always comply well with all compulsory provisions, regulations, laws, orders, clauses, compulsory recommendations, directions whatsoever which may be given by any government, federal, state or municipal or other division or authority, competent authority at any time in any port/place/country in relation to use/operation of the Vessel, including but not limited to be fully compliant with the regulations and requirements of the ISPS code (International Ship and Port Facility Security code) and ISM in every respects, all costs/expenses incurred to be for the Charterers' account. The Charterers also warrant that they shall at all times hold the Owners harmless and keep the Owners free of any liabilities, losses, penalties, claims, proceedings, duties and/or fees,



whatsoever arising from the use/operation of the Vessel and cargo operation anytime in any case under this Charter.

42.5    The Charterers warrant that they shall on or prior to the Delivery Date provide the Owners with the Manager's Undertaking duly executed by the Manager.

### 43.    Sale and Purchase

43.1    The Charterers have the option to purchase the Vessel at any time on or after delivery ("**Purchase Option**") , The Purchase Option may be exercised by the Charterers giving notice in writing to the Owners, not less than three months before the date ("**Declared Date**") on which they choose to purchase the Vessel. Notice once given shall be irrevocable and binding on both parties.

43.2    If the Purchase Option is exercised, the price ("**Purchase Price**") shall be the Purchase Price for the Declared Date according to the following table.

| Date<br><br>(each shall be referred to as the "**Purchase Option Date**" and collectively the "**Purchase Option Dates**") | **Purchase Price** |
|---|---|
| On delivery | USD 21,570,000.00 |
| Six months | USD 21,100,000.00 |
| First anniversary | USD 20,750,000.00 |
| Eighteen months | USD 20,000.000.00. |
| Second anniversary | USD 19,400.000.00 |
| Thirty months | USD 18,700,000.00 |
| Third anniversary | USD 17,900,000.00. |
| Forty – two months | USD 17,400,000.00. |
| Fourth Anniversary | USD 16,400,000.00. |
| Fifty-four months | USD 14,900,000.00. |
| Fifth Anniversary | USD 14,400,000.00. |
| Sixty six months | USD 13,400,000.00 |
| Sixth Anniversary | USD 12,300,000.00. |



| Seventy eight months | USD 11,300,000.00 |
| Seventh anniversary | USD 10,100,000.00. |
| Ninety months | USD 8,900,000.00 |

43.3   If they do not exercise the Purchase Option, the Charterers are unconditionally obliged to purchase the Vessel on the eighth anniversary of delivery at a Purchase Price of USD8,100,000.00.

43.4   On any sale under this Clause 43, the Owners shall sell, and the Charterers shall buy, the Vessel on the terms as attached as Annex C .

44.   **General undertakings by the Owners**

44.1   The Owners undertake that until the end of the Charter Period:

(a)   The Owners shall provide the Charterers with all the documents listed in Part II of Schedule 1 *(Condition Precedent)* in form and substance satisfactory to the Charterers.

(b)   The Owners shall remain under the sole Control of Yangzijiang Shipping Pte. Ltd and the sole legal and beneficial shareholder shall be Yangzijiang Shipping Pte. Ltd.

(c)   The Owners shall undertake no business other than the ownership and financing of the Vessel, and shall incur no obligations or liabilities and own no property except for this purpose.

(d)   The Owners shall not (except as expressly provided for in this Charter) and their Affiliates shall not interfere with the quiet and peaceful use, possession and employment of the Vessel by the Charterers.

(e)   At any time during the Charter Period, the amount of the outstanding principle advanced by the Owner in relation to the Vessel under the Facility Agreement shall be no more than the aggregate amount of the Purchase Price on the immediate preceding Purchase Option Date and the Upfront Charter-Hire.

45.   **Upfront Charter-Hire and Refund of Upfront Charter-Hire**

45.1   The Charterers shall pay to the Owners the Upfront Charter-Hire in installments in the manner set out as follows:

(a)   The first instalment in the amount of United States Dollars One Million Three Hundred Thousand only (US$1,300,000.00), shall become due and payable and be paid by the Charterers within two (2) Banking Days after the Charterers have received a copy of the Notice of Assignment sent by the Owners to the Refund Guarantor and a copy of the Refund Guarantee.



Jiangsu Tianyuan Marine Import & Export Co,. Ltd shall confirm to the
Charterers receipt of the amount either by fax or email .

(b)    The 2nd instalment in the amount of United States Dollars One Million Three
Hundred Thousand only (US$1,300,000.00), shall become due and payable
and be paid by the Charterers within two (2) Banking Days after the
Charterers have received an e-mailed or telefaxed written payment demand
from the Owners together with a certificate issued by Lloyd's Registry stating
that the first steel plate has been cut in Builder's workshop (which is to take
place not earlier than 14 months prior to the contractual delivery date
stipulated in the Building Contract as annexed hereto). Jiangsu Tianyuan
Marine Import & Export Co,. Ltd shall confirm to the Charterers receipt of
the amount either by fax or email

(c)    The third instalment in the amount of United States Dollars Two Million Six
Hundred Thousand only (US$2,600,000.00), shall become due and payable
and be paid by the Charterers within two (2) banking days after the
Charterers have received a e-mailed or telefaxed written payment demand
from the Owner together with a certificate issued by Lloyd's Registry stating
that the launching of the Vessel has been carried out (which is to take place
not earlier than 6 months prior to the contractual delivery date stipulated in
the Building Contract as annexed hereto). Jiangsu Tianyuan Marine Import &
Export Co,. Ltd shall confirm to the Charterers receipt of the amount either
by fax or email

(d)    All payments made by the Charterers prior to delivery of the Vessel shall be
in the nature of advance to the Owners, and in the event this Charter Party is
rescinded or cancelled by the Charterers in accordance with the terms of this
Charter Party permitting such rescission or cancellation, the Owners shall
refund to the Charterers in United States Dollars the full amount of all sums
already paid by the Charterers to the Owners under this Charter Party,
together with interest (at the rate set out in respective provision thereof) from
the respective payment date(s) to the date of remittance by telegraphic
transfer of such refund to the account specified by the Charterers.

45.2    Upon the delivery of the Vessel from the Owners to the Charterers,  all above
mentioned instalments shall automatically become the sole property and benefit of the
Owners and will not under any circumstances be refundable to the Charterers In the
event that the Owners fail to deliver the Vessel to the Charterers on or before 29th of
June, 2016 (the "**Final Delivery Date**", such date shall be automatically extended in
accordance with the relevant articles contained in the Building Contract) due to any
reason which cannot be attributed to the Charterers (the "**Owner's Termination
Event**"), the Owners shall thereupon (and without limitation to any other right of the
Owners) repay to the Charterers the amount of the Upfront Charter-Hire, plus interest
at the annual rate of: fixed 5% .



45.3   The Owners will pay the Liquidated Damages to the Charterers within 30 Banking Days from the Owner's receipt of the termination or rescission notice given by the Charterers in accordance with Clause 47.2 , unless the termination of the Charter is by reason of default by the Charterers.

46.   **Termination for Charterers' default**

46.1   The Owners shall (in addition to any other rights they may have in relation to the event in question) be entitled to withdraw the Vessel from the service of the Charterers and terminate the Charter with immediate effect by written notice to the Charterers if any of the following occur (which shall constitute a repudiatory breach of contract) (in each case "**Charterers Default**"):

(a)   If the first instalment of the Upfront Charter-Hire is not received by the Owners in accordance with Clause 45.1(a), and the default is not remedied within **15 Banking Days** after Owners' notice to the Charterers in respect of the default; or

(b)   If the second or third instalment of the Upfront Charter-Hire is not received by the Owners within five (5) Banking Days after each due date thereof and the default is not remedied within 15 Banking Days after Owners' notice to the Charterers in respect of the default , or

(c)   If the Charterers fails to take delivery of the Vessel, when the Vessel is duly tendered for delivery by the Owners under the provisions of Clause 34hereof, or

(d)   If any other payment of hire under this Charter is not paid within 5 Banking Days following its due date;

(e)   If the Charterers fail to comply with their obligations under Clause 13 of this Charter in relation to insuring the Vessel, not remedied within 14 days after receiving notice in writing from the Owners;

(f)   If an order is be made (and not discharged within 60 days) or an effective resolution is passed for the administration or winding-up of the Charterers or if an administrative or other receiver is be appointed (and not removed within 60 days)of the whole or any substantial part of the property, undertaking or assets of the Charterers or if an administrator of the Charterers is appointed or if anything analogous to any of the foregoing shall occur under the laws of the place of the Charterers' incorporation; or

(g)   If the Charterers commit any material breach of the Charter, not remedied (if capable of remedy) within 30 days after receiving written notice from the Owners.

(h)   Termination of the Charter shall be without prejudice to the Owners' other rights.



     (i)     The Collateral Charterer's Default.

46.2    In the event of termination for Charterers' Default, or if the Owners otherwise terminate this Charter by reason of the Charterers' breach (regardless of the nature of such breach):

    (a)     any payment of the Upfront Charter-Hire not having fallen due shall cease to be payable;

    (b)     to the extent that the amount of such Upfront Charter-Hire exceeds the amount of such claims, the Owners shall refund the excess to the Charterers (without interest);

    (c)     to the extent that the amount of such Upfront Charter-Hire is less than the amount of such claims, the Owners shall be entitled to claim the excess from the Charterers; and

    (d)     the Charterers shall reimburse the Owners promptly, with interest at same rate as set out in Box 24, for any and all expenditures which the Owners may from time to time make, layout or expend in providing taxes, dues, assessments, governmental charges, fines and/or penalties lawfully imposed, repairs, attorneys fee and/or other matters as the Charterers are obligated herein to reimburse the Owners shall be as additional indebtedness due from the Charterers under this Charter, and shall be payable by the Charterers on demand. The Owners, though permitted so to do, shall be under no obligation to the Charterers to make any such expenditures

46.3    If the Owners exercise their right of termination, they shall notify the Charterers in writing or by telefax or e-mail confirmed in writing, and such termination or rescission shall be effective as of the date of receipt by the Charterers of the notice.

## 47.   Termination for Owners' default

47.1    The Charterers shall (in addition to any other rights they may have in relation to the event in question) be entitled to terminate the Charter with immediate effect by written notice to the Owners if any of the following occur (which shall constitute a repudiatory breach of contract) (in each case "**Owners Default**"):

    (a)     The Owners be adjudicated bankrupt or insolvent or a court order is made for the dissolution or winding-up of the Owners.

    (b)     The Owners file a petition for adjudication of bankruptcy or winding-up.

    (c)     A petition for adjudication of bankruptcy, dissolution or winding-up of the Owners are filed and the Owners fail to discharge such petition within thirty (30) days.

    (d)     The Owners files voluntarily or involuntarily an application for a compulsory composition with creditors or to take advantage of any insolvency law or an

answer admitting the material allegations of a petition filed against the Owners in any bankruptcy or insolvency proceedings.

(e)   Corporate action shall be taken by the Owners for the purpose of effecting any of the foregoing.

(f)   An encumbrancer takes possession of, or a receiver or trustee is appointed over, the whole or a material part of the assets of the Owners, or a distress or execution is levied on a material part of the property and assets of the Owners.

(g)   The Owners are dissolved, liquidated or cease to be registered as a [Singaporean] company.

(h)   If the Owners shall by any act or omission be in breach of their obligations under this Charter to the extent that the Charterers are deprived of the use of the Vessel and such breach continues for a period of thirty (30) running days after written notice thereof has been given by the Charterers to the Owners, the Charterers shall be entitled to terminate this Charter with immediate effect by written notice to the Owners.

(i)   The Collateral Owner's Default.

(j)   Termination of the Charter shall be without limitation to the Charterers' other rights. Without limitation to this, the Owners shall indemnify and hold harmless the Charterers in respect of all loss, damages, costs and expenses which the Charterers may suffer as a result of this Charter being terminated or the Vessel not being delivered into charter under this Charter, by reason of Owners' Default (or otherwise by reason of Owners' breach of this Charter).

47.2   If the Charterers exercise their right of termination, they shall notify the Owners in writing or by telefax or e-mail confirmed in writing, and such termination or rescission shall be effective as of the date of the Owner's receipt of such notice.

## 48.   Mortgages

48.1   The Owners may execute a mortgage or mortgages over the Vessel in favour of any reputable bank or financial institution, together with such collateral security, whether by way of assignments of the earnings and insurances of the Vessel and/or of the Owners' rights and benefits under this Charter or otherwise, as any such mortgagee may require.

48.2   The Charterers undertake that they will comply with all such instructions with regard to insurance, repair and customary maintenance of the Vessel and the payment of Hire and other moneys hereunder as any mortgagee or any assignee of the Owners' rights and benefits hereunder may give from time to time in accordance with and during the term of this Charter.

48.3    The Owners shall endeavour to obtain mortgagee(s)' Quiet Enjoyment Letter to the
Charterers to ensure that as long as the Charterers duly pay Hire and fulfil other
obligations under the Charter, their right to use the Vessel and the purchase of the
Vessel from the Owners in accordance with Clause 43 shall not be interfered with. .

49.    **Assignment**

The Owners shall have right to assign the benefits of this Charter to the mortgagee(s)
at anytime during the Charter Period. The Owners also shall have right to assign the
incomes under this Charter to the mortgagee(s) and the Charterers shall acknowledge
the notice of the assignment made by the Owners.

50.    **Flag**

The Vessel shall have been registered by the Owners at their own account in
Singapore and fly Singapore flag upon the date of delivery

51. .    **Indemnity**

51.1    Throughout the Charter Period with effect from the date of delivery of the Vessel, the
Charterers shall pay to the Owners, and indemnify and keep the Owners indemnified
against, all cost, charges, expenses, claims, proceedings (whether civil or criminal),
liabilities, losses, penalties, fines, duties and fees (including, but not limited to, legal
fees and expenses on a full indemnity basis) and taxes thereon of whatsoever nature
and howsoever arising of, caused by the Vessel or the Charterers and suffered by the
Owners, including (without prejudice to the foregoing) relating to or arising directly
or indirectly in any manner or for any cause or reason whatsoever out of a claim by,
or directive from, any governmental, judicial or regulatory authority, or any other
person howsoever, alleging breach of, or non compliance with, any state, national, or
international laws, agreements, regulations, conventions or rules pertaining to
pollution, the protection of human health, or the environment, whether from the
Vessel or some other vessel which has been in collision with the Vessel, or is
involved in some other incident of navigation or operation where the Vessel or the
Charterers or the managers of the Vessel are actually or allegedly liable (in whole or
in part) or otherwise at fault, and which is made or asserted against the Owners, any
mortgagee or mortgagees of the Vessel pursuant to Clause 48 above and/or the
Vessel, or out of any actual or threatened environmental incident relating to the
Vessel.

51.2    The indemnities contained in this Clause 51, and each other indemnity contained in
this Charter, shall survive after any termination or expiry of this Charter and any
breach of, or repudiation or alleged repudiation by the Charterers or the Owners, of
this Charter.



52.   **Charterers' Supplied Items**

The Charterers shall deliver to the Owners at the Shipyard the items as specified in
the Building Contract which the Charterers shall supply on its account by the time
designated by the Owners.

## Assignment of the Building Contract

53.   **Owner's Assignment**

53.1   The Owners hereby assign and agree to assign all of the Assigned Rights to the
Charterers.

53.2   All salaries and expenses of the supervisor, or any other employees employed by the
Charterers for the purpose of Article IV (*Supervision and Inspection*) assigned under
this Clause 53, shall be for the Charterer's account.

53.3   The Charterers undertake to duly and punctually perform all the obligations
corresponding to the Assigned Rights in such way which shall not unreasonably delay
the construction of the Vessel.

54.   **Owner's Conditional Assignment**

(B)   The Owners hereby assign and agree to assign all of the Conditional
Assigned Rights to the Charterers, **PROVIDED ALWAYS** that the Charterers
shall not exercise such Conditional Assigned Rights prior to 7 calendar days
before the Final Delivery Date.

55.   **Notice of Assignment**

The Owners hereby undertake that it will:

(a)   within 3 Banking Days upon execution of this Charter give notice hereof to the
Builder in the form of Schedule II (*Form of Notice of Assignment*) hereto; and

(b)   within 15 Banking Days upon execution of this Charter and issuance of the Refund
Guarantee, give notice hereof to the Refund Guarantor in the form of Schedule III
hereto by letter.

56.   **No Waive of Assigned Rights**

The Owners shall not, without the prior written consent of the Charterers, waive any Assigned
Rights and/or the Conditional Assigned Rights of the Owners under the Building Contract.

57.   **Indemnity under Assignment**

In the event that the Charterer exercises its right (such right being assigned to the Charterers
under Clause 54) of cancellation, rejection and/or rescission of the Building Contract pursuant
to any of the provision of the Building Contract specifically permitting the Owners in its
capacity as the buyers to do so and such exercise of such right proves to be wrongful pursuant



to an arbitration award obtained under Article XIII of the Building Contract, the Charterers shall pay such amount pursuant to the arbitration awards to the Builder and keep the Owners indemnified and harmless against any claims, penalties, damages, costs and orders under the arbitration awards.

In the event that the Builder fail to pay any amount awarded pursuant to an arbitration award obtained under Article XIII of the Building Contract, the Owners shall pay such amount pursuant to the arbitration awards to the Charterers and keep the Charterers indemnified and harmless against any claims, penalties, damages, costs and orders under the arbitration awards.

## GENERAL CLAUSES

### 58.   Patents, Trademarks and Copyrights

58.1   The machinery and equipment of the Vessel may bear the patent number, trademarks or trade names of the manufacturers. The Owners shall defend and save harmless the Charterers from patent liability or claims of patent infringement of any nature or kind, including costs and expenses for, or on account of any patented or patentable invention made or used in the performance of this Charter and also including cost and expense of litigation, if any.

58.2   Nothing contained herein shall be construed as transferring any patent or trademark rights or copyright in equipment covered by this Charter, and all such rights are hereby expressly reserved to the true and lawful owners thereof. Notwithstanding any provisions contained herein to the contrary, the Owners' obligation under this Clause should not be terminated by the passage of any specified period of time.

58.3   The Owners' indemnity hereunder does not extend to equipment or parts supplied by the Charterers to the Owners if any.

### 59.   Disputes and Arbitration

### 59.1   Applicable Law

(a)   This Charter and any non-contractual obligations arising in connection with it shall be governed by and construed in accordance with English law.

### 59.2   Arbitration

(a)   Any dispute arising out of or in connection with this Charter shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause

(i)   The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.




(ii)     The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint their arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint their own arbitrator within 14 calendar days of that notice and stating that it will appoint their arbitrator as sole arbitrator unless the other party appoints their own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint their own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint their arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

(iii)    Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

(iv)     In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(v)      In cases where the claim or any counterclaim exceeds the sum agreed for the LMAA Small Claims Procedure and neither the claim nor any counterclaim exceeds the sum of US$400,000.00 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Intermediate Claims Procedure current at the time when the arbitration proceeding are commenced.

(vi)     Where the reference is to three arbitrators the procedure for making appointments shall be in accordance with the procedure for full arbitration stated above.

59.3    The Owners shall not, and waives any right to, detain or arrest the Vessel or anything belonging to her once delivered by reason of any dispute of whatsoever nature arising between the Owners and the Charterers.

60.     **NOTICES**

60.1    Any and all notices and communications in connection with this Charter shall be

(a)     addressed as follows:

        To the Charterers:

To:       GMI Resources (Singapore) Pte Limited

          72  Anson  Road,  Anson  House  #12-02,
          Singapore 079911

Att:      Matthew Rudge, Managing Director

Telefax   +65 6511 1681
No.:

E-mail:   newbuildings@gmilimited.com


To the Owners

To:       Pegasus Shipping Pte. Ltd

          80 Robinson Road, #02-00, Singapore 068898,

          Tele No.: +65 6557 0188.:

Att:      Ms. Lui Hua

Telefax   +65 6557 0188
No.:

E-mail:   liuhua@yzjship.com


(b)    in writing and in the English language;

(c)    sent by email or telefax, or registered post or delivered by hand.

60.2    Notices shall be effective on actual receipt by either party by email or telefax or
        registered posted or through delivery by hand (which ever is earlier if the notice or
        communication is sent though more than one way).

60.3    All notices, correspondence and communications relating to this Charter and all
        documents supplied by or to the Owners in relation to this Charter shall be identified
        by being plainly marked:

        Hull No. YZJ2013-1056" (before delivery) or the name of the Vessel (after delivery);

61.    **Effective date of Contract**

       This Charter shall become effective when it has been signed by both Parties.



62. **Entire Agreement**

    (a)    This Charter constitutes the only and entire agreement between the Parties and supersedes and replaces any prior written or oral agreements, representations, statements or understandings between them relating to its subject matter.

    (b)    Each party confirms that it has not entered into this Charter on the basis of any representation or statement which is not expressly incorporated into this Charter. Without limiting the generality of the foregoing, neither party shall have any remedy in respect of any untrue representation or statement made to him upon which he may have relied in entering into this Charter, and a party's only remedy (if any) is for breach of contract. However, nothing in this Charter or the Specifications purports to exclude liability for any fraudulent statement or act.

    (c)    This Charter may not be released, discharged, supplemented, interpreted, amended, varied or modified in any manner except by an addendum in writing signed by a duly authorised representative of each of the Parties to this Charter.

63. **Confidentiality**

The terms of this Agreement and the substance of the negotiations in connection with it are confidential to the parties, who shall not disclose the same to any third party without the written consent of the other parties other than

    (a)    to the parties respective auditors, insurers and lawyers on terms which preserve their confidentiality;

    (b)    pursuant to an order of a court of competent jurisdiction or pursuant to any proper order or demand made by any competent authority or body where they are under a legal or regulatory obligation to make sure a disclosure;

    (c)    so far as it is necessary to enforce any of the terms of the Agreement.

64. This Charter may be executed in any number of counterparts (but shall not be effective until each party has executed at least one counterpart) and exchanged via telefax or email. Each of the counterparts, when executed and delivered, shall be an original and which together shall have the same effect as if each party had executed and delivered the same documents. Thereafter the original hard copies of this Charter shall be executed and exchanged by courier, which shall constitute the same instrument as the document executed in counterparts. For avoidance of doubt, this Charter shall be deemed fully executed when executed in counterparts and exchanged via telefax or email, irrespective of whether or not original hard copies are subsequently executed and exchanged.




## SCHEDULE I

## CONDITIONS PRECEDENT

### Part I

1.  **Security Parties**

    (a)    A copy of the constitutional documents of the Charterers, including
           Certificate of Incorporation, Business Registration Certificate and
           Memorandum and Articles of Association (or equivalent in its place of
           incorporation);

    (b)    A copy of resolutions of the board of directors and resolutions of
           shareholders of the Charterers, approving the execution of this Charter and
           the Assignment of Insurance and authorizing a person or persons to execute
           the same under seal (where appropriate), and any other notices and
           documents required in connection therewith, and the specimen signature(s) of
           such person(s).

### Part II

1.  **Owner's Documents**

    (a)    A copy of the constitutional documents of the Owners, including Certificate
           of Incorporation, Business Registration Certificate and Memorandum and
           Articles of Association (or equivalent in its place of incorporation);

    (b)    A copy of resolutions of the board of directors and resolutions of
           shareholders of the Charterers, approving the execution of this Charter and
           authorizing a person or persons to execute the same under seal (where
           appropriate), and any other notices and documents required in connection
           therewith, and the specimen signature(s) of such person(s).

## Part III

1.  Documents

    Duly executed originals of:

    (a)    the Manager's Undertaking; and

    (b)    the Assignment of Insurance

2.  **Other documents and evidence**

    (a)    the Upfront Charter-hire and the Additional Upfront Charter-hire having been
           received by the Owner; and

    (b)    any documents that the financing bank of the Owners may require.

    (c)    that the Vessel is, or immediately following the Delivery Date will be, insured
           in accordance with the provisions of this Charter and that all requirements of
           clause 13 of Part II in respect of such insurances have been complied with;

    (d)    that the Vessel is classified and maintained in the highest class (free of
           outstanding recommendations or conditions of class) with the Classification
           Society; and

    (e)    Such evidence as the Owner may require of the Charterer's compliance with
           the ISM Code, the ISPS Code and MARPOL and all other international code,
           convention, regulation applicable to the Ship.





**IN WITNESS** whereof this Agreement has been duly executed the day and year first above
written

For and on behalf of
Date:

PANAYIOTIS C. KONTOS
DIRECTOR

For and on behalf of
Date: