SHIPBUILDING CONTRACT

FOR

CONSTRUCTION AND SALE

OF

ONE (1) D/W 81,600 MT TYPE BULK CARRIER

(HULL NO. SS182)

BETWEEN

Global Maritime Investments Cyprus Limited or its guaranteed nominee

AS BUYER

AND

TSUNEISHI GROUP (ZHOUSHAN) SHIPBUILDING INC.

AS BUILDER

## INDEX

PAGE

PREAMBLE…………………………………………………….......    1

**ARTICLE I - DESCRIPTION AND CLASS**
  1.DESCRIPTION………………………………………….......    2
  2.DIMENSIONS AND CHARACTERISTICS…..……………………    2
  3.CLASSIFICATION,RULES AND REGULATIONS………………....    3
  4.SUBCONTRACTING……………………………………………    3
  5.REGISTRATION……………………………………………...    4

**ARTICLE II - CONTRACT PRICE AND TERMS OF PAYMENT**
  1.CONTRACT PRICE…………………………………………...    5
  2.CURRENCY…………………………………………………...    5
  3.TERMS OF PAYMENT………………………………………...    5
  4.METHOD OF PAYMENT………………………………………    6
  5.PREPAYMENT……………………………………………...    7
  6.SPECIAL CONDITIONS……………………………………….....    7
  7.PERFORMANCE GUARANTEE…………………………………...    7

**ARTICLE III - ADJUSTMENT OF CONTRACT PRICE**
  1.DELIVERY……………………………………………….....    8
  2.SPEED………………………………………….…………....    9
  3.FUEL CONSUMPTION………………………………………....    9
  4.DEADWEIGHT…………………………………………………   10
  5.INCREASE AND DECREASE…………………………………….   10

**ARTICLE IV - APPROVAL OF PLANS AND DRAWINGS AND INSPECTION
                 DURING CONSTRUCTION**
  1.APPOINTMENT OF BUYER'S REPRESENTATIVE………………....   11
  2.APPROVAL OF PLANS AND DRAWINGS……………………........   12
  3.INSPECTION BY REPRESENTATIVE…………………………….   12
  4.FACILITIES…………………………………………………   13
  5.LIABILITY OF BUILDER AND BUYER……………………………   14
  6.RESPONSIBILITY OF BUYER…………………………….……........   14

**ARTICLE V - MODIFICATIONS**
  1.MODIFICATIONS OF SPECIFICATIONS…………….....................   15
  2.CHANGE IN CLASS, ETC. ……………………………….............   15
  3.SUBSTITUTION OF MATERIALS…………………….................   16

## ARTICLE VI - TRIALS

1.NOTICE……………………………….……............................................ 17

2.WEATHER CONDITION…........................................................... 17

3.HOW CONDUCTED…................................................................ 17

4.METHOD OF ACCEPTANCE OR REJECTION............................................ 18

5.EFFECT OF ACCEPTANCE............................................................. 19

6.DISPOSITION OF SURPLUS CONSUMABLE STORES…........................... 19

## ARTICLE VII - DELIVERY

1.TIME AND PLACE...................................................................... 20

2.WHEN AND HOW EFFECTED........................................................ 20

3.DOCUMENTS TO BE DELIVERED TO BUYER..................................... 20

4.TENDER OF VESSEL…............................................................... 21

5.TITLE AND RISK….................................................................... 21

6.REMOVAL OF VESSEL............................................................... 21

## ARTICLE VIII – DELAYS AND EXTENSION OF TIME FOR DELIVERY
## (FORCE MAJEURE)

1.CAUSES OF DELAY......................................…................................ 22

2.NOTICE OF DELAY........................……........................................ 22

3.DEFINITION OF PERMISSIBLE DELAY........................................... 23

4.RIGHT TO RESCIND FOR EXCESSIVE DELAY…................................. 23

## ARTICLE IX - WARRANTY OF QUALITY

1.GUARANTEE ……………………….….......................................... 24

2.NOTICE OF DEFECTS…............................................................. 24

3.REMEDY OF DEFECTS…............................................................ 24

4.EXTENT OF BUILDER'S RESPONSIBILITY....................................... 25

## ARTICLE X - RESCISSION BY BUYER

1.NOTICE…….......................................................................... 26

2.REFUND BY BUILDER................................................................ 26

3.DISCHARGE OF OBLIGATIONS................................................... 26

4. ADDITIONAL RIGHTS OF RESCISSION........................................... 26

## ARTICLE XI - BUYER'S DEFAULT

1.DEFINITION OF BUYER'S DEFAULT……......................................... 28

2.INTEREST AND CHARGE...........……........................................... 28

3.EFFECT OF DEFAULT.....................……....................................... 28

4.SALE OF VESSEL........................................……........................ 29

**ARTICLE XII - INSURANCE**

    1.EXTENT OF INSURANCE COVERAGE................................................. 32

    2.APPLICATION OF RECOVERED AMOUNT............................................ 32

    3.TERMINATION OF BUILDER'S OBLIGATION TO INSURE.................. 33

**ARTICLE XIII - DISPUTE AND ARBITRATION**

    1.PROCEEDINGS........................................................................... 34

    2.NOTICE OF AWARD.................................................................... 35

    3.EXPENSES................................................................................ 35

    4.ENTRY IN COURT...................................................................... 35

    5.ALTERATION OF DELIVERY DATE............................................. 35

**ARTICLE XIV - RIGHT OF ASSIGNMENT**................................................. 36

**ARTICLE XV - TAXES AND DUTIES**

    1.TAXES AND DUTIES IN CHINA.................................................. 37

    2.TAXES AND DUTIES OUTSIDE CHINA........................................ 37

**ARTICLE XVI - PATENTS, TRADEMARKS, COPYRIGHTS, ETC.**

    1.PATENTS, TRADEMARKS AND COPYRIGHTS............................... 38

    2.GENERAL PLANS, SPECIFICATIONS AND WORKING DRAWINGS..... 38

**ARTICLE XVII - BUYER'S SUPPLIES**

    1.RESPONSIBILITY OF BUYER...................................................... 39

    2.RESPONSIBILITY OF BUILDER.................................................... 40

**ARTICLE XVIII - NOTICE**

    1.ADDRESS.................................................................................. 41

    2.LANGUAGE............................................................................... 41

**ARTICLE XIX - EFFECTIVE DATE OF CONTRACT**.................................... 42

**ARTICLE XX – INTERPRETATION**

    1.LAWS APPLICABLE................................................................... 43

    2.DISCREPANCIES....................................................................... 43

    3.ENTIRE AGREEMENT................................................................ 43

**END OF CONTRACT** ................................................................................ 44

THIS CONTRACT, made this 25th day of April, 2014, by and between Global Maritime Investment Cyprus Limited, a corporation organized and existing under the law of Greece, having its principal office at 2 Navarchou Nikodimou Athens 10557 Greece, or its guaranteed nominee (hereinafter called the "BUYER"), the party of the first part, and, TSUNEISHI GROUP (ZHOUSHAN) SHIPBUILDING INC., a corporation organized and existing under the laws of the People's Republic of China, having its principal office at Retiao Village, Xiushan Island, Daishan County, Zhoushan City, Zhejiang Province, the People's Republic of China ( hereinafter called the "BUILDER"), the party of the second part.

## WITNESSETH

In consideration of the mutual covenants herein contained, the BUILDER agrees to build, launch, equip and complete to the BUILDER's design at the BUILDER's Shipyard in Zhoushan, Zhejiang Province the People's Republic of China (hereinafter called the "Shipyard") and sell and deliver to the BUYER after completion and successful trial, One (1) D/W 81,600 MT Type Bulk Carrier, more fully described in ARTICLE I hereof (hereinafter called the "VESSEL"), and the BUYER agrees to purchase and take delivery of the VESSEL from the BUILDER and to pay for the same to the BUILDER, all upon the terms and conditions hereinafter set forth.

## ARTICLE I - DESCRIPTION AND CLASS

### 1. DESCRIPTION

The VESSEL shall have BUILDER's Hull No. SS182 and shall be constructed, equipped and completed in accordance with the provisions of this Contract, the Specifications, the General Arrangement Plan and the Maker List ( hereinafter collectively called the "Specifications" ) signed by each of the parties hereto for identification and attached hereto and made an integral part hereof.

### 2. DIMENSIONS AND CHARACTERISTICS

| | | | |
|---|---|---|---|
| Length, overall | : | Less than | 229.00 M |
| Length, between perpendicular | : | | 225.10 M |
| Breadth, moulded | : | | 32.26 M |
| Depth, moulded | : | | 20.00 M |
| Designed loaded draft, moulded | : | | 12.20 M |
| Full loaded draft, moulded | : | | 14.40 M |
| Gross tonnage | : | About 43,400 | |
| Propelling machinery | : | 1 set of MAN B&W 6S60ME-C8.2 Type Diesel Engine Max. continuous output 9,660kW × 89.0 R. P. M. Continuous service output 7,300kW × 81.1 R. P. M. (75.6%M.C.O.) | |
| Deadweight, guaranteed | : | Not less than 81,476 Metric Tons, on 14.40 M full loaded draft moulded in sea water of specific gravity of 1.025. | |
| Trial speed, guaranteed | : | Not less than 14.90 knots, at Continuous Service Output of 7,300kW of Main Engine under about 48,000 metric tons displacement condition with clean bottom under deep water and calm sea with no wind | |
| Fuel consumption, guaranteed | : | Not more than 159.2 gr/kw.hr, at Continuous Service Output of 7,300 kW at the shop trial with fuel oil having lower calorific value of 42.7 MJ/kg under the I.S.O. conditions. | |

The details of the above particulars as well as the definitions and method of measurements and calculations are as indicated in the Specifications.

3. CLASSIFICATION, RULES AND REGULATIONS

The VESSEL, including its machinery, equipment and outfitting shall be constructed in accordance with the rules (the edition and amendments thereto which have entered in to force as of the date of this Contract) of and under special survey of NIPPON KAIJI KYOKAI (hereinafter called the "Classification Society") and shall be distinguished in the Register by the symbol of NK, NS* (CSR, BC-A, BC-XII, GRAB 25, PSPC-WBT) (ESP) (IWS) (BWTS) MNS*, MO, Strengthened for heavy cargo loading where hold Nos. 2, 4 and 6 may be empty.

Decisions of the Classification Society as to compliance or non-compliance with their rules and regulations shall be final and binding upon the parties hereto.

The VESSEL shall also comply with the rules, regulations and requirements of other regulatory bodies including flag state as described in the Specifications which have entered in to force as of the date of this Contract, including such existing rules, regulations and requirements (accession to condition as of the date of this Contract) which are to be complied with by the delivery date.

All fees and charges incidental to the classification and with respect to compliance with the above referred rules, regulations and requirements shall be for account of the BUILDER.

The BUYER shall not be entitled to reject to take delivery of the VESSEL by reason of any minor or immaterial or insubstantial items not being in conformity and/or compliance with the Specifications nor any other express (in writing or oral) or implied rules and obligations of the BUILDER or any minor or immaterial or insubstantial defects existent in the VESSEL as of the date of delivery thereof, provided that such non-conformity or incompliance or defects shall not affect the VESSEL's safety, normal operation or operating costs in any material respect or degree, or issuance of Classification and Statutory Certificates free of conditions, recommendations, or its compliance with the rules of the Classification Society and shall be judged from the view point commonly and generally acknowledged as the standard of practice of Japanese shipbuilding companies. In the case of existence of such non-conformity or incompliance or defect, the BUILDER shall not be regarded to be in default of performance of this Contract and shall be released from its liabilities for any consequence thereof, except for its warranty liability which shall arise pursuant to ARTICLE IX hereof.

4. SUBCONTRACTING

The BUILDER may, at its sole discretion and responsibility, subcontract any portion of the construction work of the VESSEL.
The BUILDER shall remain fully liable for the due performance of such work as if done by the BUILDER at the Shipyard. However, the BUILDER shall give information and explanation of the hull and major sections of the VESSEL to the BUYER if the BUYER so requested reasonably and practicably. It is however agreed hereby that fabrication and assembly of any blocks must be performed by the BUILDER itself and at the Shipyard.

## 5. <u>REGISTRATION</u>

The VESSEL shall be registered by the BUYER at its own cost and expense under the laws of Singapore with its home port of Singapore at the time of its delivery and acceptance hereunder.                                                           (End of Article)

## ARTICLE II - CONTRACT PRICE AND TERMS OF PAYMENT

1. CONTRACT PRICE

The purchase price of the VESSEL is United States Dollars Thirty Three Million One Hundred Fifty Thousand only (US$33,150,000.-), net receivable by the BUILDER ( hereinafter called the "Contract Price"), which is exclusive of the BUYER's supplies as provided in ARTICLE XVII and shall be subject to upward or downward adjustment, if any, as hereinafter set forth in this Contract.

2. CURRENCY

Any and all payments by the BUYER to the BUILDER under this Contract shall be made in United States Dollars.

Banking charges including lifting charge, if any, shall be borne by the BUYER, but any charge made by the BUILDER's bank is to be for the account of the BUILDER.

3. TERMS OF PAYMENT

The Contract Price shall be paid by the BUYER to the BUILDER in Five (5) installments as follows ;

(a) 1st Installment :
The sum of United States Dollars Six Million Six Hundred Thirty Thousand only (US$6,630,000.-), shall be paid in cash upon signing of this Contract.

(b) 2nd Installment :
The sum of United States Dollars Three Million Three Hundred Fifteen Thousand only (US$3,315,000.-), shall be paid in cash upon commencement of steel cutting, to be held in attendance of and confirmed in writing by the Classification Society, of the VESSEL but not earlier than 13 months before scheduled delivery.

(c) 3rd Installment :
The sum of United States Dollars Three Million Three Hundred Fifteen Thousand only (US$3,315,000.-), shall be paid in cash upon keel-laying, to be held in attendance of and confirmed in writing by the Classification Society, of the VESSEL, but not earlier than 9 months before scheduled delivery .

(d) 4th Installment :
The sum of United States Dollars Three Million Three Hundred Fifteen Thousand only (US$3,315,000.-), shall be paid in cash upon launching, to be held in attendance of and confirmed in writing by the Classification Society, of the VESSEL, but not earlier than 5 months before scheduled delivery .

(e) 5th Installment :
The sum of United States Dollars Sixteen Million Five Hundred Seventy Five Thousand only (US$16,575,000), plus any increase or minus any decrease due to adjustments of the Contract Price hereunder, shall be paid in cash upon delivery of the VESSEL.

4.  <u>METHOD OF PAYMENT</u>

(a) 1st Installment :

The BUYER shall remit within three (3) business days by telegraphic transfer the amount of said Installment to the following account of the BUILDER:
(the "Nominated Bank Account") for account of the BUILDER after above mentioned signing of this Contract.

The Nominated Bank Account ;
INSTITUTION      :    CHINA CONSTRUCTION BANK ZHEJIANG
                     (SWIFT CODE: PCBCCNBJ)
BENEFICIARY   :    A/C:   3301 4054 3012 2000 0404
                     TSUNEISHI GROUP (ZHOUSHAN) SHIPBUILDING INC.
DETAILS OF PMT:    ZHEJIANG ZHOUSHAN BRANCH
                     RENMIN 68 M ROAD ZHOUSHAN   ZHEJIANG CHINA
INTERMEDIARY :    BANK OF AMERICA N.A.NEW YORK
                     (SWIFT CODE: BOFAUS3N)

(b) 2nd Installment :

The BUYER shall remit within three (3) business days by telegraphic transfer the amount of said Installment to the Nominated Bank Account for account of the BUILDER after receipt of Email or FAX notice from the BUILDER confirming commencement of steel cutting of the VESSEL, and attaching a written confirmation of this from the Classification Society.

(c) 3rd Installment :

The BUYER shall remit within three (3) business days by telegraphic transfer the amount of said Installment to the Nominated Bank Account for account of the BUILDER after receipt of Email or FAX notice from the BUILDER confirming keel laying of the VESSEL, and attaching a written confirmation of this from the Classification Society.

(d) 4th Installment :

The BUYER shall remit within three (3) business days by telegraphic transfer the amount of said Installment to the Nominated Bank Account for account of the BUILDER after receipt of Email or FAX notice from the BUILDER confirming launching of the VESSEL , and attaching a written confirmation of this from the Classification Society.

"launching of the VESSEL" shall deemed to have taken place when the VESSEL is safely free floating alongside the outfitting quay; provided that the Classification Society confirms in writing that the VESSEL is an adequate hull condition for launching.
Note: Wording "It is hereby confirmed that the VESSEL has been launched in an adequated hull condition." will be mentioned in the written confirmation from the Classification Society.

(e) 5th Installment :

The BUYER shall, at least three (3) business days prior to the scheduled date of delivery of the VESSEL, make a cash deposit to the Nominated bank Account for a period of ten (10) business and covering the amount of this installment (as adjusted in accordance with the provisions of this Contract), with an irrevocable instruction that the said amount shall be released to the BUILDER against presentation by the BUILDER to the BUILDER' s bank, of a copy of the Protocol of Delivery and Acceptance signed by the BUYER's and the BUILDER' s duly authorized representatives. Interest, if any, accrued from such deposit, shall be for the benefit of the BUYER.

If the delivery of the VESSEL is not effected on or before the expiry of the aforesaid ten (10) business days deposit period, the BUYER shall have the right to withdraw the said deposit plus accrued interest upon the expiry date (and the instruction to the bank shall so provide). However when the newly scheduled delivery date is notified to the BUYER by the BUILDER, the BUYER shall make the cash deposit in accordance with the same terms and conditions as set out above, unless the BUYER has the right to rescind this Contract and has exercised such right in accordance with this Contract.

No payment under this Contract, other than the 5th instalment (only in case that rejection of the VESSEL is permitted under Article IV hereof), shall be delayed or withheld by the BUYER on account of any dispute or disagreement of whatever nature arising between the parties hereto.

5.  PREPAYMENT

Prepayment of any Installment due on or before delivery of the VESSEL shall be subject to mutual agreement between the parties hereto.

6.  SPECIAL CONDITIONS

The terms "business day" as used in this Contract shall be defined as any day except Saturday, Sunday and legal holidays (a day which the laws of the relevant country or state or province treats as holiday or non-working day) in China and New York in United States of America.   On the other hand, "day" as used in this Contract shall be defined as any day including, for the avoidance of doubt, Saturday, Sunday and any legal holiday in China and New York in United States of America .

7.  PERFORMANCE GUARANTEE

The BUILDER shall, as a condition precedent to the obligation of the BUYER to pay the first instalment under paragraph 3 a) of this Article, deliver to the BUYER a letter of Performance Guarantee issued by Tsuneishi Shipbuilding Co., Ltd. ("**GUARANTOR**") as per attached "Appendix I" for the obligation of the BUILDER to refund any portion of the BUYER's advance payments under this Shipbuilding Contract.          (End of Article)

## ARTICLE III - ADJUSTMENT OF CONTRACT PRICE

The Contract Price shall be subject to adjustment, as hereinafter set forth, in the event of the following contingencies ( it being understood by the parties that any reduction of the Contract Price is by way of liquidated damages and not by way of penalty) :

1. <u>DELIVERY</u>

    (a) No adjustment shall be made and the Contract Price shall remain unchanged for the first thirty (30) days of delay in delivery of the VESSEL beyond the Delivery Date as defined in ARTICLE VII hereof (ending as of twelve o'clock midnight of the thirtieth (30th) day of delay).

    (b) If the delivery of the VESSEL is delayed more than thirty (30) days after the Delivery Date, then, in such event, beginning at twelve o'clock midnight of the thirtieth (30th) day after the date on which the delivery is required under this Contract, the Contract Price shall be reduced by deducting therefrom the sum of United States Dollars Six Thousand Four Hundred Fifty (US$6,450.-) for each day thereafter.
However, the total reduction in the Contract Price shall not be more than United States Dollars One Million and One Hundred Sixty One Thousand ( US$1,161,000.-) as would be the case for delay of one hundred Eighty (180) days, counting from midnight of the thirtieth (30th) day after the Delivery Date.

    (c) But, if the delay in delivery of the VESSEL should continue for a period of one hundred Eighty (180) days from the thirty-first (31st) day after the Delivery Date, then in such event, and after such period has expired, the BUYER may at its option rescind this Contract in accordance with the provisions of ARTICLE X hereof. The BUILDER may, at any time after the expiration of the aforementioned one hundred Eighty (180) days of delay in delivery, if the BUYER has not served notice of rescission as provided in ARTICLE X hereof, demand in writing that the BUYER shall make an election, in which case the BUYER shall, within fifteen (15) days after such demand is received by the BUYER, notify the BUILDER of its intention either to rescind this Contract or to consent to the acceptance of the VESSEL at an agreed future date; it being understood by the parties hereto that, if the VESSEL is not delivered by such future date, the BUYER shall have the same right of rescission upon the same terms and conditions as herein above provided.

    (d) For the purpose of this Article, the delivery of the VESSEL shall be deemed to be delayed when and if the VESSEL, after taking into full account all postponements of the Delivery Date by reason of permissible delays as defined in ARTICLE VIII and/or any other reasons under this Contract, is not delivered by the date upon which delivery is required under the terms of this Contract.

## 2. SPEED

(a) The Contract Price shall not be affected or changed by reason of the actual speed, as determined by the trial runs, being less than three-tenths (3/10ths) of one (1) knot below the guaranteed speed of the VESSEL.

(b) However, in the event of deficiency in actual speed as determined by trial runs being more than three-tenths (3/10ths) of one (1) knot below the aforementioned guaranteed speed of the VESSEL, the Contract Price shall be reduced for such deficiency in speed, by the following amount:

by US$ 64,500.- -------------3/10-4/10
by US$129,000.- ----------- 4/10-5/10
by US$193,500.- ----------- 5/10-6/10
by US$258,000.- ----------- 6/10-7/10
by US$322,500.- ----------- 7/10-8/10
by US$387,000.- ----------- 8/10-9/10
by US$451,500.- ----------- 9/10- 1.0
by US$516,000.- ----------- 1.0

(c) If the deficiency in actual speed of the VESSEL upon trial run is more than one (1) full knot below the guaranteed speed of the VESSEL, then the BUYER may, at its option, reject the VESSEL and rescind this Contract in accordance with the provisions of ARTICLE X hereof, or may accept the VESSEL at a reduction in the Contract Price, as above provided for one (1) full knot only, that is, a total reduction of United States Dollars Five Hundred Sixteen Thousand ( US$516,000.-) being the maximum.

## 3. FUEL CONSUMPTION

(a) The Contract Price shall not be affected or changed by reason of the fuel consumption of the VESSEL, as determined by shop trial as per the Specifications, being more than the guaranteed fuel consumption of the VESSEL, if such excess is not more than six percent (6%) over the guaranteed fuel consumption.

(b) However, commencing with and including an excess of six percent (6%) in the actual fuel consumption over the guaranteed fuel consumption of the VESSEL, the Contract Price shall be reduced by the following amount, up to a maximum of ten percent (10%) over the guaranteed fuel consumption of the VESSEL:

by US$ 64,500.- for 6% less than 7%
by US$129,000.- for 7% less than 8%
by US$193,500.- for 8% less than 9%
by US$258,000.- for 9% less than 10%
by US$322,500.- for 10%

(c) If such actual fuel consumption exceeds ten percent (10%) of the guaranteed fuel consumption of the VESSEL, the BUYER may, at its option, reject the VESSEL and rescind this Contract in accordance with the provisions of ARTICLE X hereof, or may accept the VESSEL at a reduction in the Contract Price as above specified for ten percent (10%) only, that is, at a total reduction of United States Dollars Three Hundred Twenty Two Thousand Five Hundred ( US$322,500.-).

## 4. DEADWEIGHT

In the event that the actual deadweight tonnage of the VESSEL is less than the Guaranteed Deadweight, and if such deficiency exceeds 816 metric tons, the Contract Price of the VESSEL shall be reduced for each full metric ton (and pro rata for fractions of a metric ton) of such decreased deadweight in excess of the said 816 metric tons, by the amount of United States Dollars Three Hundred Ninety ( US$390.-) only per metric ton.

If the deficiency in the actual deadweight tonnage of the VESSEL exceeds 2,000 metric tons below the Guaranteed Deadweight of the VESSEL, then the BUYER, at its option, may reject the VESSEL and rescind this Contract or may accept the VESSEL at a total reduction of United States Dollars Four Hundred Sixty One Thousand Seven Hundred Sixty ( US$461,760.-).

## 5. INCREASE AND DECREASE

(a) The payment of the liquidated damages provided for in this ARTICLE III shall be reflected by way of reduction of the final installment of the Contract Price due on delivery of the VESSEL only, and shall not be claimed in any other way, manner or method whatsoever.

(b) The reduction of the Contract Price provided for in (a) above shall be the nature of "liquidated damage". Therefore the BUYER shall not claim any other damages whatsoever by reason of delay in delivery or breach of guaranteed speed or breach of guaranteed deadweight or breach of guaranteed fuel consumption, as the case may be, regardless of the actual amount of the damages suffered by the BUYER.

(c) The reduction of the Contract Price provided for in (a) above shall be made only in the case that the VESSEL is in fact delivered by the BUILDER to the BUYER. If this Contract is rescinded or cancelled or terminated or otherwise comes to an end before delivery pursuant to this Contract or pursuant to any applicable laws or otherwise or if the BUYER refuses to take delivery of the VESSEL for any reason whatsoever, the BUYER shall not be entitled to claim the liquidated damage set out in this Article or any other damages whatsoever by reason of delay in delivery or breach of guaranteed speed or breach of guaranteed deadweight or breach of guaranteed fuel consumption, as the case may be.

(End of Article)

## ARTICLE IV - APPROVAL OF PLANS AND DRAWINGS
## AND INSPECTION DURING CONSTRUCTION

### 1. APPOINTMENT OF BUYER'S REPRESENTATIVE

The BUYER shall, at the BUYER's own cost and expense (including accommodation and meal fee), nominate Northeast Consulting Co., Ltd. or CPN SHIPMANAGEMENT (H.K.) CONSULTING LTD (hereinafter called the "Representative"), who shall act on behalf of the BUYER with full authorization for approval of plans and drawings and inspections during construction of the VESSEL.

The BUYER may send to Shipyard, at the BUYER's own cost and expense (including accommodation and meal fee), two (2) observers, who shall be noticed in advance in writing by the BUYER (hereinafter called the "Observers") after the commencement of steel cutting of the VESSEL until the delivery of the VESSEL including duration of Sea Trial. The Observers shall have, during construction of the VESSEL, the right to attend the tests and inspection of the VESSEL, its machinery and equipment, without any disturbance in the inspection and/or the construction schedule of the VESSEL, however, the Observers shall not have any direct contact with the BUILDER and the Observers shall communicate with the BUILDER only through the Representative.

Any decision, approval or advice of the personnel of the Representative which is given within their authority shall be deemed to have been given by the BUYER and once given in writing shall not be withdrawn, revoked or modified except with consent of the BUILDER save where and insofar as such decision approval or advice shall have been given by the Representative based on incorrect, misleading or untimely information provided by the BUILDER. The BUILDER shall be entitled to rely on any decision, approval, agreement, consent, comment, opinion, request, demand or response of the Representative and shall not be required to rectify any works already done on the basis of such reliance notwithstanding the BUYER (not through the Observers) later points out that such decision, approval, agreement, consent, comment, opinion, request, demand or response of the Representative was different from the BUYER's own.

The BUILDER hereby undertakes to give the reasonable and possible cooperation so that the necessary visas for the personnel of the Representative and Observers to enter China, and any necessary residence or work permits will be issued when applied by those personnel, provided that the Representative, their personnel and Observers meet with the rules, regulations, laws and practice of the People's Republic of China. The BUYER undertakes to give the BUILDER adequate notice information data and documents for the application for the visas or residence or work registration or permits.

The BUILDER shall provide any assistance reasonably required by the BUYER in obtaining visas and residence and work registration or permits for any other country where

work on the VESSEL is being, or tests or inspections, carried out.


## 2. APPROVAL OF PLANS AND DRAWINGS

(a) The BUILDER shall submit to the Representative two (2) copies each of the plans and drawings for its approval. The Representative shall, within twenty one (21) days after receipt thereof, send such approval or comments, if any, to the BUILDER by e-mail or fax or by other convenient written means if electric transmission is not acceptable.

(b) When and if the Representative shall have been dispatched by the BUYER to the Shipyard in accordance with Paragraph 1 of this Article after stage of Steel Cutting, the BUILDER may submit the remainder, if any, of the plans and drawings in the agreed list, and all corrections, to the Representative for his approval unless otherwise agreed upon between the parties hereto.

The Representative shall, within fourteen (14) days after receipt thereof, send such approval or comments, if any, to the BUILDER by e-mail or fax or by other convenient written means if electric transmission is not practicable.

(c) In the event that the Representative shall fail to return the plans and drawings with comments to the BUILDER within the time limit as hereinabove provided such plans and drawings shall be deemed to have been automatically approved without any comment. It is understood that a notice by e-mail or fax accompanied with the airway bill number from the Representative within the said time limit that the plans and drawings have been sent shall prevent the BUILDER from relying on this paragraph.

(d) The BUILDER shall submit to both the BUYER and the Observers one(1) copy of the plans and drawings for reference at the same time as sent to the Representative.


## 3. INSPECTION BY REPRESENTATIVE

Such necessary inspections of the VESSEL its machinery, equipment and outfitting shall be carried out by the Classification Society, other regulatory bodies and/or an inspection team of the BUILDER throughout the entire period of construction, in order to ensure that the construction of the VESSEL is duly performed in accordance with this Contract and the Specifications.

Performance Standard for Protective Coating (PSPC) for ballast tanks required by IMO shall be applied to the VESSEL. Inspections thereto shall be carried out by the BUILDER's qualified inspectors and be recorded in the Coating Technical File (CTF). Paint Maker's inspector shall also attend such inspections.

No application for inspection shall be made to the Representative. However, the schedule of the inspections shall be notified to the Representative well in advance and the Representative shall be given a free access to the inspections. If any queries on quality criteria

or procedures of inspection required by IMO PSPC, then the Representative can make comments for discussion with the BUILDER's qualified inspectors.

In any event, the BUILDER's qualified inspectors shall be solely responsible for final judgment as to compliance with IMO PSPC of which judgment shall bind upon all parties concerned.

The Representative shall have, during construction of the VESSEL, the right to attend such tests and inspections of the VESSEL, its machinery and equipment as are mutually agreed between the BUYER and the BUILDER, without any disturbance in the inspection and/or the construction schedule of the VESSEL. The BUILDER shall give a notice to the Representative reasonably in advance of the date and place of such tests and inspections to be mutually agreed between the parties for attendance of Representative. Failure of the Representative to be present at such tests and inspections after due notice of them as above provided shall be deemed to be a waiver of their right to be present.

In the event that the Representative discovers any construction or material or workmanship which is not deemed to conform to the requirements of this Contract and/or the Specifications, the Representative shall promptly give the BUILDER a notice in writing as to non-conformity. Upon receipt of such notice from the Representative, the BUILDER shall correct such non-conformity, if the BUILDER agrees to their view or the BUILDER shall notify the Representative in writing of the extent to which the BUILDER does not agree such conditions requiring corrective measures.

In all working hours during the construction of the VESSEL until delivery thereof, the Representative shall be given free and ready access to the VESSEL, its engines and accessories, and to any other place in the Shipyard where work is being done, or materials are being processed or stored, in connection with the construction of the VESSEL, including the yards, workshops and stores of the BUILDER and the premises of subcontractors of the BUILDER with prior consent of the Shipyard, which not be unreasonably withheld, who are doing work or storing materials in connection with the VESSEL's construction.

## 4. FACILITIES

The BUILDER shall furnish the Representative and Observers with adequate office space, with fax and telephone (international and national), computer connections (including broadband internet access), lighting and power and such other reasonable facilities according to the BUILDER's practice at, or in the vicinity of, the Shipyard as may be necessary to enable the Representative (and all its personnel) and the Observers to effectively carry out their duties.

With an ample prior notice by the BUYER, the BUILDER shall assist the BUYER to find suitable and convenient living quarters for the Representative's personnel and the Observers nearest possible to the Shipyard which living quarters shall be provided for the period stipulated herein at the BUYER's expense and responsibility.

5. LIABILITY OF THE BUILDER AND BUYER

The Representative shall at all times be deemed to be the employees of the BUYER and not of the BUILDER.

The BUILDER shall not be under any liability whatsoever to the BUYER, the Representative for personal injuries, including death, suffered during the time when he or they are on the VESSEL, or within the premises of either the BUILDER or its subcontractors, or are otherwise engaged in and about the construction of the VESSEL, unless, however, such personal injuries, including death were caused by a gross negligence of the BUILDER, or of any of its employees or agents or subcontractors.

The BUILDER shall not be under any liability whatsoever to the BUYER, the Representative damage to, or loss or destruction of property of the BUYER or of the Representative, unless such damage, loss or destruction were caused by a gross negligence of the BUILDER or of any of its employees or agents or subcontractors.

The BUYER shall be under no liability to the BUILDER for any personal injuries, including death, suffered by any employees of the BUILDER, or for any damage to or destruction of property belonging to the BUILDER, caused by the Representative or the Observers unless such injury or damage was caused by gross negligence of the Representative or the Observers.

6. RESPONSIBILITY OF BUYER

The BUYER shall undertake and assure that the Representative and the Observers shall carry out his duties hereunder in accordance with normal shipbuilding practice of the BUILDER and in such a way as to avoid any unnecessary increase in building cost, delay in the construction of the VESSEL, and/or any disturbance in the construction schedule of the BUILDER.

The BUILDER has the right to request the BUYER to replace any personnel of the Representative and the Observers who is deemed unsuitable and unsatisfactory for the proper progress of the VESSEL's construction. The BUYER shall investigate the situation by sending its representative(s) to the Shipyard if necessary, and if the BUYER considers that such BUILDER's request is justified, the BUYER shall effect such replacement as soon as conveniently arrangeable.

(End of Article)

## ARTICLE V - MODIFICATIONS

### 1. MODIFICATIONS OF SPECIFICATIONS

The BUYER understand and pays the respect for the BUILDER's policy and intention about the design of the VESSEL which is one of the series of the BUILDER's standard vessels as provided ARTICLE I.

The Specification may also be modified and/or changed by written agreement of the parties hereto, provided that such modifications and/or change or an accumulation thereof will not, in the BUILDER's reasonable judgement, adversely affect the BUILDER's planning or program in relation to the BUILDER's other commitments, and provided, further, that the BUYER shall first agree, before such modifications and/or changes are carried out, to alterations in the Contract Price, the Delivery Date and other terms and conditions of this Contract and Specifications occasioned by or resulting from such modifications and/or changes.

Such agreement may be effected by exchange of letters signed by the authorized representatives of the parties hereto or by email or fax confirmed by such letters manifesting agreements of the parties hereto which shall constitute amendments to this Contract and/or the Specifications. The BUILDER may make minor changes to the Specifications, if found necessary for introduction of improved production methods or otherwise, provided that the BUILDER shall first obtain the BUYER's approval which shall not be unreasonably withheld.
In case that the BUILDER and the BUYER did not agree to change or amend the Contract Price, the Delivery Date and other terms and conditions of this Contract and Specifications, the BUILDER shall have the right to refuse any modifications.

### 2. CHANGE IN CLASS, ETC.

In the event that, after the date of this Contract, any requirements as to class, or as to rules and regulations to which the construction of the VESSEL is required to conform according to Paragraph 3 of Article I hereof are altered or changed by the Classification Society or the other regulatory bodies authorized to make such alterations or changes, the following provisions shall apply :

(a) If such alterations or changes are compulsory for the VESSEL, either of the parties hereto, upon receipt of such information from the Classification Society or such other regulatory bodies, shall promptly transmit the same to the other in writing, and the BUILDER shall thereupon incorporate such alterations or changes into the construction of the VESSEL.   The BUYER and the BUILDER shall agree to reasonable and documented adjustments required by the BUILDER in the Contract Price, the Delivery Date and other terms and conditions of this Contract and the Specifications occasioned by or resulting from such alterations or changes as are reasonable in the circumstances ("Required Changes"), but if they are not able to agree the Required Changes, within fifteen(15) days of one party requesting the other in writing to agree the Required Changes, the BUILDER shall proceed to incorporate such alterations and change in the construction of the VESSEL and the Required

Changes shall be determined by Arbitration under Article XIII. If the VESSEL is completed in accordance with the Specifications (including such alterations) before such arbitration is awarded, the BUILDER shall deliver the VESSEL to the BUYER pursuant to Article VII and the BUYER shall simultaneously pay the unpaid balance of the Contract Price in full (except for increase thereof being disputed in such arbitration), awaiting an award of such arbitration after delivery.

(b) If such alterations or changes are not compulsory for the VESSEL, but the BUYER desires to incorporate such alterations or changes into the construction of the VESSEL, then, the BUYER shall notify the BUILDER of such intention.   The BUILDER may accept such alterations or changes, provided that such alterations or changes will not, in the judgement of the BUILDER, adversely affect the BUILDER's planning or program in relation to the BUILDER's other commitments, and provided, further, that the BUYER shall first agree to reasonable adjustments required by the BUILDER in the Contract Price, the Delivery Date and other terms and conditions of this Contract and the Specifications occasioned by or resulting from such alterations or changes.

Agreements as to such alterations or changes under this Paragraph shall be made in the same manner as provided in Paragraph 1 of this Article for modifications or changes to the Specifications.

## 3. SUBSTITUTION OF MATERIALS

In the event that any of the materials required by the Specifications or otherwise under this Contract for the construction of the VESSEL cannot be procured in time or are in short supply to maintain the Delivery Date of the VESSEL, despite the due diligence of the BUILDER, the BUILDER may, provided that the BUYER shall so agree in writing, and add no additional cost to the BUYER supply other materials of equivalent quality meeting the requirements of the Specifications, the Classification Society and of the rules, regulations and requirements with which the construction of the VESSEL must comply.

(End of Article)

## ARTICLE VI - TRIALS

### 1. NOTICE

The BUYER and the Representative shall receive from the BUILDER at least twenty one (21) days prior notice in writing or by email or fax of the time and place of the trial run of the VESSEL, and the BUYER shall promptly acknowledge receipt of such notice.

The BUYER shall have its representative(s) (and, if the BUYER wishes, any reasonable number of members of the intended crew on board the VESSEL to witness such trial run. Failure in attendance of the representative of the BUYER at the trial run of the VESSEL without entirely beyond his control reason after due notice to the BUYER as above provided shall be deemed to be a waiver by the BUYER of its right to have its representative on board the VESSEL at the trial run, and the BUILDER may conduct the trial run without the representative of the BUYER being present, and in such case the BUYER shall be obligated to accept (subject to sub-Article (4)) the VESSEL on the basis of a Trial Run Report confirming that the VESSEL on such trial run was found to conform with this Contract and the Specifications, confirmed by the Classification Surveyor as a witness.

### 2. WEATHER CONDITION

The trial run shall be carried out under the weather condition which is deemed favorable enough by the judgement of the BUILDER with the BUYER's representative's consent. In the event of unfavorable weather on the date specified for the trial run, the same shall take place on the first available day thereafter that the weather condition permits. It is agreed that, if during the trial run of the VESSEL, the weather should suddenly become so unfavorable that orderly conduct of the trial run can no longer be continued, the trial run shall be discontinued and postponed until the first favorable day next following, unless the BUYER shall assent in writing the acceptance of the VESSEL on the basis of the trial run already made before such discontinuance has occurred.

Any delay of trial run caused by such unfavorable weather condition shall operate to postpone the Delivery Date by the period of delay involved and such delay shall be deemed as a permissible delay in the delivery of the VESSEL.

### 3. HOW CONDUCTED

(a)    All expenses in connection with the trial run are to be for the account of the BUILDER and the BUILDER shall provide at its own expense the necessary crew to comply with conditions of safe navigation. The trial run shall be conducted in the manner prescribed in the Specifications, and shall prove fulfillment of the performance requirements for the trial run as set forth in the Specifications. The course of trial run shall be determined by the BUILDER.

(b) Notwithstanding the foregoing lubricating oil and grease necessary for the trial run of the VESSEL shall be supplied by the BUYER at the Shipyard prior to the time of trial run and the BUILDER shall pay the BUYER upon delivery of the VESSEL the cost of the quantities of lubricating oil and grease consumed during the trial run at the original purchase price.  In measuring the consumed quantity, fuel oil, lubricating oil and grease remaining in the main engine, other machinery and their pipes, stern tube and the like, shall be excluded. The quantity of lubricating oil and grease supplied by the BUYER shall be in accordance with the instruction of the BUILDER.

(c) Promptly after completion of the trial run, and any retrial under sub-Article 4, the BUILDER shall deliver to the BUYER a detailed written report of the results of the trial run (the "Trial Run Report")

## 4. METHOD OF ACCEPTANCE OR REJECTION

(a) Upon completion of the trial run, and provided it has delivered the Trial Run Report to BUYER, the BUILDER shall give the BUYER a notice by email or fax confirmed in writing of completion of the trial run, as and if the BUILDER considers that the results of the trial run indicate conformity of the VESSEL to this Contract and the Specifications. The BUYER shall, within three (3) business days after receipt of such notice from the BUILDER, notify the BUILDER by email or fax confirmed in writing of its acceptance of, or rejection of the VESSEL together with the reason thereof.

(b) However, should the results of the trial run indicate that the VESSEL, or any part thereof, including its equipment fails to meet the full requirements of this Contract and the Specifications or should the BUYER reject the VESSEL in accordance with sub-paragraph (a) or this sub-paragraph (b) then the BUILDER shall investigate with the representative the cause of failure or rejection and take the proper steps to be taken to remedy the same and shall make whatever corrections and alterations and/or retrial, in the presence of BUYER's representative and the Observers, as may be necessary, and upon notification by the BUILDER of completion of such alterations or corrections and/or retrial and submission of any further Trial Run Report, the BUYER shall, within three (3) business days thereafter, notify the BUILDER by email or fax confirmed in writing of acceptance of the VESSEL or of the rejection of the VESSEL together with the reason therefore on the basis of the alterations and corrections and/or retrial by the BUILDER.

(c) In the event that the BUYER fails to notify the BUILDER by email or fax confirmed in writing of the acceptance of or the rejection together with the reason therefore of the VESSEL within  the period as provided in the above Sub-paragraph (a) or (b), the BUYER shall be deemed to have accepted the VESSEL.

(d) The BUILDER may dispute the rejection of the VESSEL by the BUYER under this Paragraph, in which case the matter shall be submitted for final decision by arbitration in accordance with Article XIII hereof.

## 5. EFFECT OF ACCEPTANCE

Acceptance of the VESSEL as above provided shall be final and binding so far as conformity of the VESSEL to this Contract and the Specifications is concerned and shall preclude the BUYER from refusing formal delivery of the VESSEL, as hereinafter provided, if the BUILDER comply with all other procedural requirements for delivery as provided in Article VII hereof.

## 6. DISPOSITION OF SURPLUS CONSUMABLE STORES

Should any fuel oil and other consumable stores (if any) furnished by the BUILDER for the trial run remain on board the VESSEL at the time of acceptance thereof by the BUYER, the BUYER agrees to buy the same from the BUILDER at the original purchase price thereof, and payment by the BUYER shall be effected upon delivery of the VESSEL.

(End of Article)

## ARTICLE VII - DELIVERY

### 1. TIME AND PLACE

The VESSEL shall be delivered by the BUILDER to the BUYER at the Shipyard on or before 30th June, 2017 except that, in the event of delay in the construction of the VESSEL or any performance required under this Contract due to causes which under the terms of this Contract permit postponement of the date for delivery, the aforementioned date for delivery of the VESSEL shall be postponed accordingly.    The aforementioned date, or such later date to which the requirement of delivery is postponed pursuant to such terms, is herein called the "Delivery Date".

### 2. WHEN AND HOW EFFECTED

Provided that the BUYER shall have fulfilled all of its obligations stipulated under this Contract, delivery of the VESSEL shall be effected forthwith by the concurrent delivery by each of the parties hereto to the other of the PROTOCOL OF DELIVERY AND ACCEPTANCE, acknowledging delivery of the VESSEL by the BUILDER and acceptance thereof by the BUYER.

### 3. DOCUMENTS TO BE DELIVERED TO BUYER

Upon delivery and acceptance of the VESSEL, the BUILDER shall deliver to the BUYER the following documents, which shall accompany the PROTOCOL OF DELIVERY AND ACCEPTANCE :

(a) PROTOCOL OF TRIALS of the VESSEL made pursuant to the Specifications.

(b) PROTOCOL OF INVENTORY of the equipment of the VESSEL, including spare parts and the like, all as specified in the Specifications.

(c) PROTOCOL OF STORES OF CONSUMABLE NATURE referred to under Paragraph 3 (b) of Article VI hereof, including the original purchase price thereof.

(d) ALL CERTIFICATES including the BUILDER'S CERTIFICATE and CLASSIFICATION CERTIFICATE duly notarized and apostilled, free of conditions and recommendations, required to be furnished upon delivery of the VESSEL pursuant to this Contract and the Specifications. It is agreed that if, through no fault on the part of the BUILDER, the classification certificate and/or other certificates are not available at the time of delivery of the VESSEL, provisional certificates shall be accepted by the BUYER, provided acceptable to the Flag State and provided that the BUILDER shall furnish the BUYER with the formal certificates as promptly as possible after such formal certificates have been issued.

(e) DECLARATION OF WARRANTY of the BUILDER that the VESSEL is delivered to the BUYER free and clear of any liens, charges, claims, mortgages, or other encumbrances upon the BUYER's title thereto, and in particular, that the VESSEL is absolutely free of all burdens in the nature of imposts, taxes or charges imposed by the Chinese Governmental authorities (whether national or local), as well as of all liabilities of the BUILDER to its subcontractors, employees and crew, and of all liabilities arising from the operation of the VESSEL in trial runs, or otherwise, prior to delivery.

(f) DRAWINGS AND PLANS pertaining to the VESSEL as stipulated in the Specifications.

(g) COMMERCIAL INVOICE

(h) BILL OF SALE notarized and apostilled

All above documents to be delivered in English.

## 4. TENDER OF VESSEL

If the BUYER fails to take delivery of the VESSEL after completion thereof according to this Contract and the Specifications without any justifiable reason, the BUILDER shall have the right to tender delivery of the VESSEL after compliance with all procedural requirements as above provided.

## 5. TITLE AND RISK

Title to and risk of loss of the VESSEL shall pass to the BUYER only upon delivery and acceptance thereof having been completed as stated above; it being expressly understood that, until such delivery is effected, title to and risk of loss of the VESSEL and her equipment shall be in the BUILDER excepting risks of war, earthquakes and tidal waves.

## 6. REMOVAL OF VESSEL

The BUYER shall take possession of the VESSEL immediately upon delivery and acceptance thereof and shall remove the VESSEL from the premises of the Shipyard within five (5) days including Saturday, Sunday and Holiday in China after delivery and acceptance thereof is effected (or, if the BUILDER carries out work on non-conformity items after delivery, after the date such work is complete). If the BUYER shall not remove the VESSEL from the premises of the Shipyard within the aforesaid five (5) days, then, in such event the BUYER shall pay to the BUILDER the reasonable mooring charges of the VESSEL.

(End of Article)

## ARTICLE VIII - DELAYS AND EXTENSION OF TIME
## FOR DELIVERY (FORCE MAJEURE)

### 1. CAUSES OF DELAY

If, at any time before the actual delivery, either the construction of the VESSEL or any performance required as prerequisite of delivery of the VESSEL is delayed due to Acts of God; acts of princes or rulers; requirement of government authorities; war or other hostilities or preparations therefore; blockade; revolution, insurrections, mobilization, civil war, civil commotion or riots; vandalism; sabotages, strikes, lockouts or other labor disturbances (other than any limited to the BUILDER and/or its subcontractors) ; plague or other epidemics; quarantines; flood; typhoons, hurricanes, storms or other weather conditions not included in normal planning; earthquakes; tidal waves; landslides; fires, explosions, collisions or strandings; embargoes; import restrictions, inability to obtain delivery or delays in delivery of materials, machinery or equipment, provided that at the time of ordering the same could reasonably be expected by the BUILDER to be delivered in the time; prolonged failure, shortage or restriction of electric current, oil or gas; defects in materials, machinery or equipment which could not have been defected by the BUILDER using reasonable care; casting or forging rejects or the like not due to negligence, destruction of or damage to the Shipyard or works of the BUILDER, its subcontractors or suppliers, or of or to the VESSEL or any part thereof, by any causes herein described; delays in the BUILDER's other commitments resulting from any causes herein described which in turn delay the construction of the VESSEL or the BUILDER's performance under this Contract; breach or acts of prevention by the BUYER, other causes or accidents beyond control of the BUILDER, its subcontractors or suppliers of the nature indicated by the foregoing words; then and in any such case, the Delivery Date shall be postponed for a period of time which shall not exceed the total accumulated time of all such delays provided that (in all cases) the BUILDER shall take immediate and reasonable steps to overcome any delay by any reasonable means within their control including (but not limited to) obtaining alternative subcontractors (with the approval of the BUYER insofar as required by this Contract) or otherwise to overcome the permitted cause of delay or to minimise their effect including by replanning or rescheduling of work. Delays resulting from contingencies occurring simultaneously shall count as one delay only.

### 2. NOTICE OF DELAY

Within ten (10) days after the date of occurrence of any cause of delay, on account of which the BUILDER claims that it is entitled under this Contract to a postponement of the Delivery Date, the BUILDER shall notify the BUYER in writing or by email or fax confirmed in writing of the date such cause of delay occurred ("**Initial Notice**"). Likewise, within ten (10) days after the date of ending of such cause of delay, the BUILDER shall notify the BUYER in writing or by email or fax confirmed in writing of the date such cause of delay ended. The BUILDER shall also notify the BUYER of the period, by which the Delivery Date is postponed by reason of such cause of the delay, with all reasonable dispatch after it has been determined. Failure of the BUILDER to give an Initial Notice within the time limit specified above shall be deemed to be a waiver by the BUILDER of its right to claim any postponement of delivery in respect of any delay occurring earlier than ten (10) days before

BUILDER actually gives notice.   Failure of the BUYER to object to the BUILDER's claim for postponement of the Delivery Date within ten (10) days after receipt by the BUYER of such notice of claim shall be deemed to be a waiver by the BUYER of its right to object such postponement of the Delivery Date.

3. <u>DEFINITION OF PERMISSIBLE DELAY</u>

Delays on account of such causes as specified in Paragraph 1 of this Article and any other delays of a nature which under the terms of this Contract permits postponement of the Delivery Date shall be understood to be permissible delays and are to be distinguished from unauthorized delays on account of which the Contract Price is subject to adjustment as provided for in Article III hereof.

4. <u>RIGHT TO RESCIND FOR EXCESSIVE DELAY</u>

If:

(a)    the total accumulated time of all delays on account of the causes specified in Paragraph 1 of this Article, amounts to one hundred eighty (180)days or more; or

(b)     the total accumulated time of all delays on account of the causes specified in Paragraph 1 of this Article, added to all other delays which are not permissible delays exceeds two hundred seventy (270) days or more

Any permissible delays which are caused by BUYER's breach of this Contract, or by any other act of prevention by the BUYER shall not be counted in the 180 or 270 day periods referred to in (a) and (b).

then, in such event, the BUYER may rescind this Contract in accordance with the provisions of Article X hereof.   The BUILDER may, at any time after the accumulated time of the aforementioned delays justifying rescission by the BUYER, demand in writing that the BUYER shall make an election, in which case the BUYER shall, within twenty (20) days after such demand is received by the BUYER, either notify the BUILDER of its intention to rescind this Contract or consent to a postponement of the Delivery Date to a specific future date; it being understood and agreed by the parties hereto that, if any further delay occurs on account of causes justifying rescission as specified in this Article, the BUYER shall have the same right of rescission upon the same terms as herein above provided.

(End of Article)

## ARTICLE IX - WARRANTY OF QUALITY

### 1. GUARANTEE

Subject to the provisions hereinafter set forth, the BUILDER undertakes to remedy, free of charge to the BUYER, any defects in the VESSEL which are due to mistakes in design, defective material and/or bad workmanship on the part of the BUILDER and/or its subcontractors, provided that the defects are discovered within a period of twelve (12) months after the date of delivery of the VESSEL and a notice thereof is duly given to the BUILDER as hereinafter provided.

For the purpose of this Article, the VESSEL shall include her hull, machinery, equipment and gear, but excludes any parts for the VESSEL which have been supplied by or on behalf of the BUYER.

### 2. NOTICE OF DEFECTS

The BUYER shall notify the BUILDER in writing, or by fax or E-mail confirmed in writing, of any defects for which claim is made under this guarantee as promptly as possible after discovery thereof.   The BUYER's written notice shall describe the nature and extent of the defects.   The BUILDER shall have no obligation for any defects discovered prior to the expiry date of the said twelve (12) months period, unless notice of such defects is received by the BUILDER not later than thirty (30) days after such expiry date.

### 3. REMEDY OF DEFECTS

(a) The BUILDER shall remedy, at its expense, any defects, against which the VESSEL is guaranteed under this Article, by making all necessary repairs or replacements at the Shipyard.

(b) However, if it is impractical to bring the VESSEL to the Shipyard, the BUYER may cause the necessary repairs or replacements to be made elsewhere which is deemed suitable for the purpose, provided that, in such event, the BUILDER may forward or supply replacement parts or materials to the VESSEL, unless forwarding or supplying thereof to the VESSEL would impair or delay the operation or working schedule of the VESSEL. In the event the BUYER proposes to cause the necessary repairs or replacements to be made to the VESSEL at any other shipyard or works than the Shipyard, the BUYER shall as soon as possible, give the BUILDER notice in writing or by fax or E-mail confirmed in writing of the time and place such repairs will be made, and if the VESSEL is not thereby delayed, or her operation or working schedule is not thereby impaired, the BUILDER shall have the right to verify by its own representative(s) the nature and extents of the defects complained of. The BUILDER shall, in such case, promptly advise the BUYER by fax or E-mail, after such examination has been completed, of its acceptance or rejection of the defects as ones that are covered by the guarantee herein provided.   Upon the BUILDER's acceptance of the defects as justifying remedy under this Article, or upon award of the arbitration so determining, the BUILDER shall immediately pay to the BUYER

for such repairs or replacements a sum equal to the reasonable cost of making the
same repairs or replacements in the Shipyard.

(c) In any case, the VESSEL shall be taken at the BUYER's cost and responsibility to
the place elected, ready in all respects for such repairs or replacements.

(d) Any dispute under this Article shall be referred to arbitration in accordance with the
provisions of Article XIII hereof.

## 4. EXTENT OF BUILDER'S RESPONSIBILITY

(a) The BUILDER shall have no responsibility or liability for any other defects whatsoever in
the VESSEL than the defects specified in Paragraph 1 of this Article.   The BUILDER
shall not in any circumstances be responsible or liable for any consequential or special
losses, damages or expenses including, but not limited to, loss of time, loss of profit or
earning or demurrage directly or indirectly occasioned to the BUYER by reason of the
defects specified in Paragraph 1 of this Article or due to repairs or other works done to the
VESSEL to remedy such defects.

(b)   The BUILDER shall not be responsible for any defects in any part of the VESSEL which
may subsequently to delivery of the VESSEL have been replaced or in any way repaired
by any other contractor, or for any defects which have been caused or aggravated by
omission or improper use and maintenance of the VESSEL on the part of the BUYER, its
servants or agents or by ordinary wear and tear or by any other circumstances whatsoever
beyond the control of the BUILDER.

(c)   The guarantee contained as herein above in this Article replaces and excludes any other
liability, guarantee, warranty and/or condition imposed or implied by the law, customary,
statutory or otherwise, by reason of the construction and sale of the VESSEL by the
BUILDER for and to the BUYER.

(End of Article)

## ARTICLE X - RESCISSION BY BUYER

1. NOTICE

The payments made by the BUYER prior to the delivery of the VESSEL shall be in the nature of advances to the BUILDER. In the event that the BUYER shall exercise its right of rescission or termination or cancellation of this Contract under and pursuant to any provisions of this Contract specifically permitting the BUYER to do so including but not limited to the paragraph 4 of this Article, then the BUYER shall notify the BUILDER in writing or by fax or E-mail confirmed in writing, and such rescission shall be effective as of the date notice thereof is received by the BUILDER.

2. REFUND BY BUILDER

Upon rescission or termination or cancellation of this Contract by the BUYER for any reason whatsoever, including, but not limited to Article III, Paragraph 4 of this Article and any other provisions of this Contract specifically permitting the BUYER to do so, the BUILDER shall promptly refund to the BUYER the full amount of all sums paid by the BUYER to the BUILDER on account of the VESSEL, and return all BUYER'S Supplies to BUYER at BUILDER'S cost (or, in the case of BUYER's Supplies which have been installed on the VESSEL, pay to the BUYER the original invoiced price of the same) unless the BUILDER proceeds to the arbitration under the provisions of Article XIII hereof. (in such case the BUILDER shall give a notice in writing thereof to the BUYER within 10 business days after receipt of the BUYER's notice of rescission of the Contract as described in the preceding paragraph). In such event, the BUILDER shall pay the BUYER interest at the rate of three percent (3%) per annum on the amount required herein to be refunded to the BUYER, computed from the respective dates on which such sums were paid by the BUYER to the BUILDER to the date of remittance by telegraphic transfer of such refund to the BUYER by the BUILDER provided, however, that the said rescission by the BUYER is made under the provisions of Paragraph 4 of Article VIII hereof then in such event the BUILDER shall not be required to pay any interest.

3. DISCHARGE OF OBLIGATIONS

Upon such refund by the BUILDER to the BUYER as provided for in Paragraph 2 above, all obligations, duties and liabilities of each of the parties hereto to the other under this Contract shall be forthwith completely discharged.

4. ADDITIONAL RIGHTS OF RESCISSION

In addition to its other rights of rescission the BUYER shall be entitled to rescind this Contract:

(a)     if an order or an effective resolution shall be passed or a petition filed by the GUARANTOR or the BUILDER, for the bankruptcy, dissolution or winding up of the

GUARANTOR or the BUILDER (except for the purpose of rehabilitation, reorganization, merger or amalgamation) or if an encumbrancer takes possession of or a receiver, liquidator or trustee is appointed over the whole or any part of the undertaking or property of the GUARANTOR or the BUILDER or if the GUARANTOR or the BUILDER becomes insolvent, is dissolved, liquidated or suspends payment generally of its debts or ceases to carry on its business or enters into any corporate workout process or makes any special arrangement or composition with its creditors, or declares or becomes subject to any moratorium on the payment of its debts, such as will adversely affect its ability to comply with this Contract or any analogous procedure or step is taken in any jurisdiction in relation to the GUARANTOR or the BUILDER; or

(b)     if the GUARANTOR or the BUILDER files voluntarily or involuntarily an application to take advantage of an insolvency law, or for restructuring; or

(c)     if the BUILDER intentionally abandons or refuses, by declaration of no intention/willingness,   construction of the VESSEL without any reason.

(End of Article)

# ARTICLE XI - BUYER'S DEFAULT

## 1. DEFINITION OF BUYER'S DEFAULT

The BUYER shall be deemed to be in default of performance of its obligations under this Contract in the following cases:

(a) If the BUYER fails to pay First, Second Third and Forth Installments to the BUILDER when such installments becomes due and payable under the provisions of Article II hereof;

(b) If the BUYER fails to pay the Fifth Installment to the BUILDER concurrently with the delivery of the VESSEL by the BUILDER to the BUYER as provided in Article II hereof; or

(c) If the BUYER fails to take delivery of the VESSEL, when the VESSEL is duly tendered for delivery by the BUILDER under the provisions of Article VII hereof;

## 2. INTEREST AND CHARGE

If the BUYER is in default of payment as to any Installment as provided in Paragraph 1 (a) and (b) of this Article, the BUYER shall pay interest on such Installment at three percent (3%) per annum from the due date thereof to the date of payment to the BUILDER of the full amount including interest; in case the BUYER shall fail to take delivery of the VESSEL as provided in Paragraph 1(c) of this Article, the BUYER shall be deemed in default of payment of the Fifth Installment and shall pay interest thereon at the same rate as aforesaid from and including the day on which the VESSEL is tendered for delivery by the BUILDER.   In any event of default by the BUYER, the BUYER shall also pay all charges and expenses incurred by the BUILDER in consequence of such default.

## 3. EFFECT OF DEFAULT

(a)   If any default by the BUYER occurs as provided in Article XI1, the Delivery Date shall be automatically postponed for a period of continuance of such default by the BUYER.

(b)   If any default by the BUYER provided in Article XI(1) continues for a period of fifteen (15) business days, the BUILDER may, at its option, rescind this Contract by giving notice of such effect to the BUYER by fax or E-mail confirmed in writing.   Upon receipt by the BUYER of such notice of rescission, this Contract shall forthwith become null and void and any of the BUYER's Supplies shall become the sole property of the BUILDER.   In the event of such rescission of this Contract, the BUILDER shall be entitled to retain any Installment of Installments theretofore paid by the BUYER to the BUILDER on account of this Contract.

(i)    if an order or an effective resolution shall be passed or a petition filed by the BUYER or its parent company (which expression means a company holds, directly or indirectly, more than 50% of the issued and outstanding shares of the BUYER or otherwise substantially controls of management of the BUYER),for the bankruptcy, dissolution or winding up of the BUYER or its parent company (except for the purpose of rehabilitation, reorganization, merger or amalgamation) or if an encumbrancer takes possession of or a receiver, liquidator or trustee is appointed over the whole or any part of the undertaking or property of the BUYER or its parent company or if the BUYER or its parent company becomes insolvent, is dissolved, liquidated or suspends payment generally of its debts or ceases to carry on its business or enters into any corporate workout process or makes any special arrangement or composition with its creditors, or declares or becomes subject to any moratorium on the payment of its debts, such as will adversely affect its ability to comply with this Contract or any analogous procedure or step is taken in any jurisdiction in relation to the BUYER or its parent company; or

(ii)    if the BUYER or its parent company files voluntarily or involuntarily an application to take advantage of an insolvency law, or for restructuring; or

(iii)    if the BUYER intentionally abandons or refuses, by express declaration of no intention/willingness, purchase of the VESSEL without any reason.

## 4. SALE OF VESSEL

(a)    In the event of rescission of this Contract as above provided, or in the case of any other termination or rescission of this Contract pursuant to the paragraph 3(b) of this Article or by reason of the breach of the BUYER, the following shall apply, it being agreed the the BUILDER must elect one of the options set out below:

(b)    if the VESSEL has already been completed when this Contract is so rescinded, the BUILDER shall have the right and power to sell the VESSEL in her complete state (this sale being categorized as "sale in her complete state")

(c)    if the VESSEL has not been completed but the keel of the VESSEL has already been laid on the building berth, as certified by the Classification Society when this Contract is so rescinded, the BUILDER shall have the option either (i) to sell the VESSEL in her incomplete state (this option (i) being categorized as "sale of the VESSEL in her incomplete state") or (ii) to continue the construction and sell and deliver her in her complete state when completed by way of entry into a new contract for construction and sale or otherwise (this option (ii) also being categorized as "sale of the VESSEL in her complete state");    provided that it should be presumed that the terms and conditions of such new contract for construction and sale shall be the same as those of this Contact (except for the contract price, method of payment, and unnecessary provisions related to the stage of the constructions already finished), ignoring any amendment to the specifications and other terms adopted into the new contract.

(d)    if the keel of the VESSEL has not yet been laid on the building berth, as certified by the Classification Society when this Contract is so rescinded, the BUILDER shall have the option either (iii) not to continue the construction of the VESSEL (this option (iii) being categorized as "discontinuation of construction") or (iv) to continue the construction and sell and deliver her in her complete state when completed (this option (iv) also being categorized as "sale of the VESSEL in her complete sate");

(e)    any sale of the VESSEL in her complete state or sale in her incomplete state shall be made at a public or private sale on such terms and conditions as the BUILDER thinks fit without being answerable for any loss or damage, provided the BUILDER shall use reasonable endeavours to obtain the best available price thereof

(f)    In the event of the sale of the VESSEL in its completed state, the proceeds of the sale received or receivable or to be received by the BUILDER shall be applied firstly to payment of all expenses attending such sale and otherwise incurred by the BUILDER as a result of the BUYER's default, and then to payment of all unpaid Installments of the Contract Price and interest on such Installments at the rate of three percent (3%) per annum from the respective due dates thereof to the date of application. Such application shall be made as of the date of entry into a contract for sale or new contract for construction and sale, regardless of whether the proceeds of sale have been paid or will be paid in installments until delivery or otherwise.

(g)    In the event of the sale of the VESSEL in its incompleted state, the proceeds of sale received or receivable or to be received by the BUILDER shall be applied firstly to all expenses attending such sale and otherwise incurred by the BUILDER as a result of the BUYER's default, and then to payment of all costs of construction of the VESSEL less the Installments so retained by the BUILDER and compensation to the BUILDER for a reasonable loss of profit due to the rescission of this Contract.

(f)    In either of the above events of the sale, if the proceeds of sale exceeds the total of amounts to which such proceeds are to be applied as aforesaid, the BUILDER shall promptly pay the excess to the BUYER without interest, provided, however, that the amount of such payment to the BUYER shall in no event exceed the total amount of Installments already paid by the BUYER and the cost of the BUYER's Supplies, if any.

(g)    if the proceeds of sale are insufficient to pay such total amounts payable as aforesaid, the BUYER shall promptly pay the deficiency to the BUILDER upon request.

(h)    In the case of the discontinuation of construction referred to in (d)(iii) above, the following shall be calculated:   the amount of all expenses incurred by the BUILDER as a result of the BUYER's default and all costs of construction of the VESSEL, plus compensation to the BUILDER for a reasonable loss of profit due to the rescission of this Contract, less the Installments so retained by the BUILDER and less the reasonable value of any equipment or materials purchased by the BUILDER for the VESSEL and of any BUYER's Supplies which shall not be returned but shall be retained as its own property to the BUYER.   If the result of the calculation is positive, the amount shall be

paid by the BUYER to the BUILDER. If the result of the calculation is negative, the amount shall be paid by the BUILDER to the BUYER without interest, provided, however, that the amount of such payment to the BUYER shall in no event exceed the total amount of Installments already paid by the BUYER and the cost of the BUYER's Supplies, if any.

(i)     notwithstanding anything to the contrary contained above, in the case of any cancellation termination or rescission of this Contract as referred to in (a) above, the Installments already paid by the BUYER to the BUILDER shall not be claimed for refund to the BUYER otherwise than by way of payment back to the BUYER pursuant to (f) or (h) above.

(j)     The foregoing shall be the sole and exclusive remedy of the BUILDER in the event of rescission of this Contract as above provided, or in the case of any other termination or rescission of this Contract by reason of the breach of the BUYER.

(End of Article)

## ARTICLE XII - INSURANCE

### 1. EXTENT OF INSURANCE COVERAGE

From the time of keel-laying of the VESSEL until the same is completed, delivered to and accepted by the BUYER, the BUILDER shall, at its own cost and expense, keep the VESSEL and all machinery, materials, equipment, appurtenances and outfit, delivered to the Shipyard for the VESSEL or built into, or installed in or upon the VESSEL, including the BUYER's Supplies fully insured with insurance companies under coverage corresponding to the Institute Clause for BUILDER's Risks.

The amount of such insurance coverage shall, up to the date of delivery of the VESSEL, be in an amount at least equal to, but not limited to, the aggregate of the payment made by the BUYER to the BUILDER including the value of the BUYER's Supplies.

The policy referred to herein above shall be taken out in the name of the BUILDER and all losses under such policy shall be payable to the BUILDER.

If the BUYER so requests, the BUILDER shall at the BUYER's cost procure insurance on the VESSEL and all parts, materials, machinery and equipment intended therefor against risks of earthquake, strikes, war peril or other risks not heretofore provided and shall make all arrangements to that end.   The cost of such insurance shall be reimbursed to the BUILDER by the BUYER upon delivery of the VESSEL.

### 2. APPLICATION OF RECOVERED AMOUNT

(a) Partial Loss:
In the event the VESSEL shall be damaged by any insured cause whatsoever prior to acceptance thereof by the BUYER and in the further event that such damage shall not constitute an actual or a constructive total loss of the VESSEL, the BUILDER shall apply the amount recovered under the insurance policy referred to in Paragraph 1 of this Article to the repair of such damage satisfactory to the Classification Society, and the BUYER shall accept the VESSEL under this Contract if completed in accordance with this Contract and Specifications.

(b) Total Loss:

However, in the event that the VESSEL is determined to be an actual or constructive total loss, the BUILDER shall, subject to the mutual agreement between the parties hereto, either:

i) Proceed in accordance with the terms of this Contract, in which case the amount recovered under said insurance policy shall be applied to the reconstruction and repair of the VESSEL's damage, provided the parties hereto shall have first agreed in writing as to such reasonable postponement of the Delivery Date and adjustment of other terms of this Contract including the Contract Price as may be necessary for the completion of such reconstruction; or

ii) Refund immediately to the BUYER the amount of all Installments paid to the BUILDER under this Contract either physical return of the BUYER's Supplies if not yet installed or the cost of BUYER's Supplies if already installed (as determined by the original invoiced price to the BUYER) without any interest whereupon this Contract shall be deemed to be rescinded and all rights, duties, liabilities and obligations of each of the parties to the other shall terminate forthwith.

If the parties hereto fail to reach such agreement within two (2)months after the VESSEL is determined to be an actual or constructive total loss, the provisions of Sub-paragraph (b) ii) as above shall be applied.


3. <u>TERMINATION OF BUILDER'S OBLIGATION TO INSURE</u>

The BUILDER's obligation to insure the VESSEL hereunder shall cease and terminate forthwith upon delivery thereof and acceptance by the BUYER.

(End of Article)

## ARTICLE XIII - DISPUTE AND ARBITRATION

1. PROCEEDINGS

    (a) Any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the (United Kingdom) Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

    (b) The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

    (c) The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

    (d) Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

    (e) In cases where neither the claim nor any counterclaim exceeds the sum of US$ 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

In cases where the claim or any counterclaim exceeds the sum agreed for the LMAA Small Claims Procedure and neither the claim nor any counterclaim exceeds the sum of US$400,000.00 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Intermediate Claims Procedure current at the time when the arbitration proceeding are commenced.

Where the reference is to three arbitrators the procedure for making appointments shall be in accordance with the procedure for full arbitration stated above.

The award of the arbitrators shall be final and binding on both parties.

Notwithstanding the preceding provisions of this Paragraph, it is recognized that in the event of any dispute or difference of opinion arising in regard to the construction of the VESSEL, her machinery or equipment, or concerning mistakes in design, quality of materials or workmanship thereof or thereon, such dispute may be referred to the Classification Society upon mutual written agreement of the parties hereto as far as the Classification Society agrees to determine such dispute. The decision of the Classification Society shall be final and binding upon the parties hereto.

## 2. NOTICE OF AWARD

The award shall immediately be given to the BUYER and the BUILDER in writing or by email or fax.

## 3. EXPENSES

The Arbitration Board shall determine which party shall bear the expenses of the arbitration or the portion of such expenses which each party shall bear.

## 4. ENTRY IN COURT

Judgment upon the award may be entered in any court having jurisdiction thereof.

## 5. ALTERATION OF DELIVERY DATE

In the event of reference to arbitration of any dispute arising out of matters occurring prior to delivery of the VESSEL, the award may include any postponement of the Delivery Date which the Arbitration Board may deem appropriate.

(End of Article)

## ARTICLE XIV - RIGHT OF ASSIGNMENT

Neither of the parties hereto shall assign this Contract to a third party unless prior consent of the other party is given in writing.

In case of assignment by the BUYER, such assignment shall further be subject to the approval of the relevant governmental authority, if any, and the BUYER shall remain liable under this Contract.

This Contract shall ensure to the benefit of and shall be binding upon the lawful successors or the legitimate assigns of either of parties hereto.

(End of Article)

## ARTICLE XV - TAXES AND DUTIES

### 1. TAXES AND DUTIES IN CHINA

The BUILDER shall bear and pay all taxes and duties imposed in China in connection with execution and/or performance of this Contract, excluding any taxes and duties imposed upon the BUYER's Supplies.

### 2. TAXES AND DUTIES OUTSIDE CHINA

The BUYER shall bear and pay all taxes and duties imposed outside China in connection with execution and/or performance of this Contract, excluding any taxes and duties imposed upon those items to be procured by the BUILDER for construction of the VESSEL.

(End of Article)

## ARTICLE XVI - PATENTS, TRADEMARKS, COPYRIGHTS, ETC.

### 1. PATENTS, TRADEMARKS AND COPYRIGHTS

Machinery and equipment of the VESSEL may bear the patent number, trademarks or trade names of the manufacturers.

The BUILDER shall defend and save harmless the BUYER from patent liability or claims of patent infringement of any nature or kind, including costs and expenses for, or on account of any patented or patentable invention made or used in the performance of this Contract and also including costs and expenses of litigation, if any.

Nothing contained herein shall be construed as transferring any patent or trademark rights or copyright in equipment covered by this Contract, and all such rights are hereby expressly reserved to the true and lawful owners thereof.

The BUILDER's warranty hereunder does not extend to the BUYER's Supplies.

### 2. GENERAL PLANS, SPECIFICATIONS AND WORKING DRAWINGS

The BUILDER retains all rights with respect to the Specifications, plans and working drawings, technical descriptions, calculations, test results and other data, information and documents concerning the design and construction of the VESSEL and the BUYER undertakes therefore not to disclose the same or divulge any information contained therein to any third parties, without the prior written consent of the BUILDER not to be unreasonably withheld, excepting where it is necessary for plan approval, supervision, usual operation, repair and maintenance of the VESSEL or its sale, which the BUILDER hereby permits. The rights of the BUYER under this sub-article 2 are assignable to any subsequent owner of the Vessel provided that such assignee shall agree to observe the same restrictions as are imposed on the BUYER under this Clause.

(End of Article)

## ARTICLE XVII - BUYER'S SUPPLIES

1. RESPONSIBILITY OF BUYER

(a) The BUYER shall, at its own risk, cost and expenses, supply and deliver to the
BUILDER all of the items to be furnished by the BUYER as specified in the
Specifications (hereinafter called "BUYER's Supplies") at warehouse or other storage
of the Shipyard in the proper condition ready for installation in or on the VESSEL, in
accordance with the time schedule designated by the BUILDER.

(b) In order to facilitate installation by the BUILDER of the BUYER's Supplies in or on
the VESSEL, the BUYER shall furnish the BUILDER with necessary specifications,
plans, drawings, instruction books, manuals, test reports and certificates required by
the rules and regulations.  The BUYER, if so requested by the BUILDER, shall,
without any charge to the BUILDER, cause the representatives of the manufacturers
of the BUYER's Supplies to assist the BUILDER in installation thereof in or on the
VESSEL and/or to carry out installation thereof by themselves or to make necessary
adjustments thereof at the Shipyard.

(c) Any and all of the BUYER's Supplies shall be subject to the BUILDER's reasonable
right of rejection, as and if they are found to be unsuitable or in improper condition
for installation.  However, if so requested by the BUYER, the BUILDER may
repair or adjust the BUYER's Supplies without prejudice to the BUILDER's other
rights hereunder and without being responsible for any consequences therefrom.   In
such case, the BUYER shall reimburse the BUILDER for all reasonable costs and
expenses incurred by the BUILDER in such repair or adjustment and the Delivery
Date, if thereby affected, shall be automatically postponed for a period of time
necessary for such repair or replacement.

(d) Should the BUYER fail to deliver any of the BUYER's Supplies within the time
designated, the BUYER may elect either that the Delivery Date shall be extended for
a period of such delay in delivery or that BUYER's supplies will not be installed in
or on the Vessel. In such event, the BUYER shall be responsible and pay to the
BUILDER for all losses and damages incurred by the BUILDER by reason of such
delay in delivery of the BUYER's Supplies and such payment shall be made upon
delivery of the VESSEL.  If delay in delivery of any of the BUYER's Supplies
exceeds thirty (30) days, then, the BUILDER shall be entitled to proceed (and if the
BUYER instructs the BUILDER to do so, is obliged to proceed) with construction of
the VESSEL without installation thereof in or on the VESSEL, without prejudice to
the BUILDER's other rights as herein above provided, and the BUYER shall accept
and take delivery of the VESSEL so constructed. In any case where the BUYER's
Supplies are omitted under this Article XVII.1 (d), and it is not possible to construct
the VESSEL without such supplies, or the omission would not comply with the rules
of the Classification Society, the BUILDER shall procure alternative supplies
complying with this Contract.  All delay caused by such procurement shall extend
the Delivery Date by the period of such delay, and BUYER shall pay the reasonable

additional cost of such supplies, and payment shall be made upon delivery of the VESSEL.

## 2. RESPONSIBILITY OF BUILDER

The BUYER's Supplies shall be at the risk of the BUILDER from time of delivery to it and the BUILDER shall be responsible for storing and handling with reasonable care of the BUYER's Supplies after delivery thereof at the Shipyard, and shall, at its own cost and expense, install them in or on the VESSEL, unless otherwise provided herein or agreed by the parties hereto, provided, always, that the BUILDER shall not be responsible for quality, efficiency and/or performance of any of the BUYER's Supplies.

(End of Article)

## ARTICLE XVIII - NOTICE

### 1. ADDRESS

Any and all notices and communications in connection with this Contract shall be addressed as follows:

To the BUYER:            Global Maritime Investment Cyprus Limited

                         2 Navarchou Nikodimou Athens 10557 Greece

                         Fax No. : +30 210 324 2363
                         Tel No. : +30 210 324 2353
                         Email : NewBuildings@gmilimited.com

To the BUILDER:   TSUNEISHI GROUP (ZHOUSHAN) SHIPBUILDING INC.

                         Retiao Village, Xiushan Island, Daishan County, Zhoushan City, Zhejiang Province, the People's Republic of China

                         Fax No. : + 86-(0)580-473-0082
                         Tel No. : + 86-(0)580-473-0052
                         Email   : 21260002120500212050001@tsuneishi.com

### 2. LANGUAGE

Any and all notices and communications in connection with this Contract shall be written in the English.

(End of Article)

## ARTICLE XIX - EFFECTIVE DATE OF CONTRACT

This Contract shall become effective as from the date of execution hereof by the parties hereto.

(End of Article)

# ARTICLE XX - INTERPRETATION

## 1. LAWS APPLICABLE

The parties hereto agree that the validity and interpretation of this Contract and of each Article and part thereof shall be governed by the laws of England.

## 2. DISCREPANCIES

All general language or requirements embodied in the Specifications are intended to amplify, explain and implement the requirements of this Contract. However, in the event that any language or requirements so embodied permit of an interpretation inconsistent with any provisions of this Contract, then, in each and every such event, the applicable provisions of this Contract shall prevail and govern.   The Specifications and Plan are also intended to explain each other, and anything shown on the Plan and not stipulated in the Specifications or stipulated in the Specifications and not shown on the Plan shall be deemed and considered as if embodied in both.   In the event of conflict between the Specifications and Plan, the Specifications shall prevail and govern.

## 3. ENTIRE AGREEMENT

This Contract contains the entire agreement and understanding between the parties hereto and supersedes all prior negotiations, representations, undertakings and agreements on any subject matter of this Contract.

(End of Article)

IN WITNESS WHEREOF, the parties hereto have caused this Contract to be duly executed on the day and year first above written in Singapore.


BUYER :                                          BUILDER :
Global Maritime Investment Cyprus                TSUNEISHI GROUP (ZHOUSHAN)
Limited                                          SHIPBUILDING INC.



By  :   Panayiotis C. Kontos                     By      Takao Kawamoto
Title :  Managing Director                       Title :   Chairman

### Appendix I

Date:

To : (== Buyer's Name===)

### PERFORMANCE GUARANTEE

Dear Sirs,

We refer to:

1 . (1) a Shipbuilding Contract for construction and sale of one (1) D/W 81,600 MT
Type Bulk Carrier (Hull No. SS---) (such contract as amended novated or trans
ferred from time to time, hereinafter called the "Shipbuilding Contract" ) whic
h will be dated --- , ---- by (==Buyer's Name==), (hereinafter called "Buyer")
or its nominee and TSUNEISHI GROUP (ZHOUSHAN) SHIPBUILDING INC.,
a company organized and existing under the laws of the People's Republic of
China (the "Builder");

(2) Any addendum to the Shipbuilding Contract.

2. In consideration of your executing, in your capacity as buyer, the Shipbuilding Contract and
for other good and valuable consideration (receipt and sufficiency acknowledged) for the
construction and sale of one (1) D/W 81,600 MT Type Bulk Carrier (Hull No. SS----)
(hereinafter called the "Vessel"), the undersigned, as primary obligor, not merely as surety,
hereby unconditionally and irrevocably:

(a) guarantees, jointly and severally, to you the full, timely and faithful performance and
discharge by the Builder of all of its obligations and responsibilities of whatsoever nature
(including, but not limited to, the delivery of the Vessel under Article VII of the Shipbuilding
Contract, the refundment of pre-delivery installment as provided in Sub-Article 2 of Article X
of the Shipbuilding Contract, warranty of quality as provided in Article IX of the
Shipbuilding Contract) under the Shipbuilding Contract and any addendum, amendment or
modification made or in the future to be made thereto (the undersigned hereby expressly
waiving notice of any such supplement, amendment or modification as may be agreed to by
the Builder), and should any breach thereof by the Builder occur the undersigned undertakes
to indemnify you immediately upon demand without deduction for all losses, expenses and
liabilities of whatsoever nature under the Shipbuilding Contract and any addendum and
amendment which you may suffer or incur by reason of such breach.

(b) As a separate and independent stipulation from that in 2(a), agrees to indemnify you against
any loss incurred by you as a result of the Shipbuilding Contract and/or any addendum,
amendment or modification made or in the future to be made thereto, being or becoming void,
voidable or unenforceable, whether by reason of any informality, legal limitation, disability or
incapacity on or of the Builder or any other fact or circumstance whatsoever whether known
to you or us or not, provided however, that our liability to you under such indemnity shall not
include any liability which we would not have borne to you if we were a party to the
Shipbuilding Contract as Builder instead of the Builder.

3. This Guarantee:

(a)  shall be a continuing security for the performance by the Builder of the Shipbuilding
Contract and any addendum, amendment or modification made or in the future to be made
thereto and the payment of all moneys and liabilities whatsoever from time to time owing

(whether actually or contingently) by the Builder to you thereunder and shall not be
satisfied by any intermediate or partial performance of such obligations;

(b) shall be in addition to, and shall not be prejudiced or affected by, any other secur
ity which may be from time to time held by you; and

(c) shall not be discharged or prejudiced by any time or concession given by you to t
he Builder or any other party, by any variation of or supplement to the Shipbuildi
ng Contract, any insolvency, bankruptcy, winding up, dissolution, striking off or ad
ministration of the Builder or by anything which you may do or omit to do, or b
y any such matter as is referred to in Clause 2(b) or by any other circumstance, a
ct, dealing or thing whatsoever which, but for the provisions of this Clause 3(a)
might operate to discharge you from liability

4. The payment by the undersigned under this Guarantee shall be made without requesting
you to take any or further procedure or step against the Builder in the event that the Builder
is in default of its obligations, liabilities and responsibilities as provided in the Shipbuilding
Contract and you have notified the undersigned of such default in writing. In the event that
any withholding or deduction is imposed by any law, the undersigned will pay such
additional amount as may be necessary in order that the actual amount received after
deduction or withholding shall equal to the amount that would have been received if such
deduction or withholding were not required.

5. The obligations of the undersigned hereunder shall be completely discharged if all of the
Builder's obligation under the Shipbuilding Contract are fully performed by the Builder or
the undersigned.

6. This Guarantee shall be governed by and interpreted in accordance with the laws of
England.

7. (a) Any dispute arising out of or in connection with this Guarantee shall be referred to
arbitration in London in accordance with the United Kingdom Arbitration Act 1996 or
any statutory modification or re-enactment thereof save to the extent necessary to give
effect to the provisions of this Clause.

(b) The arbitration shall be conducted in accordance with the London Maritime Arbitrators
Association (LMAA) Terms current at the time when the arbitration proceedings are
commenced.

(c) The reference shall be to three arbitrators. A party wishing to refer a dispute to
arbitration shall appoint its arbitrator and send notice of such appointment in writing to
the other party requiring the other party to appoint its own arbitrator within 14 calendar
days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless
the other party appoints its own arbitrator and gives notice that it has done so within the
14 days specified. If the other party does not appoint its own arbitrator and give notice
that it has done so within the 14 days specified, the party referring a dispute to
arbitration may, without the requirement of any further prior notice to the other party,
appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The
award of a sole arbitrator shall be binding on both parties as if he had been appointed
by agreement.

(d) Nothing herein shall prevent the parties agreeing in writing to vary these provisions to
provide for the appointment of a sole arbitrator.

(e) In cases where neither the claim nor any counterclaim exceeds the sum of US$ 50,000
(or such other sum as the parties may agree) the arbitration shall be conducted in
accordance with the LMAA Small Claims Procedure current at the time when the
arbitration proceedings are commenced.

In cases where the claim or any counterclaim exceeds the sum agreed for the LMAA Small
Claims Procedure and neither the claim nor any counterclaim exceeds the sum of
US$400,000.00 (or such other sum as the parties may agree) the arbitration shall be conducted
in accordance with the LMAA Intermediate Claims Procedure current at the time when the

arbitration proceeding are commenced.

Where the reference is to three arbitrators the procedure for making appointments shall be in accordance with the procedure for full arbitration stated above.

The award of the arbitrators shall be final and binding on both parties.

In witness of which we have executed this Guarantee as a Deed.


Very truly yours,
TSUNEISHI SHIPBUILDING CO., LTD.



Name:
Title :
Date: