# Time Charter

2ND ORIGINAL

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913—Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1    This Charter Party, made and concluded in Jersey on 08th day of April ~~19~~ 2014

2    Between KUMIAI NAVIGATION (PTE) LTD., Singapore as

3    Owners of the good _____ ~~Steamship~~/Motorship NACKS 209BC UNIT II of _____

4    of _____ ~~tons gross register, and _____ tons net register, having engines of _____ ~~indicated horse power~~

5    and ~~with hull, machinery and equipment in a thoroughly efficient state, and classed~~

6    _____ ~~of about _____ cubic feet bale capacity, and about _____ tons of 2240 lbs.~~

7    ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~

8    ~~allowing a minimum of fifty tons) on a draft of _____ feet _____ inches on _____ Summer freeboard, inclusive of permanent bunkers,~~

9    ~~which are of the capacity of about _____ tons of fuel, and capable of steaming, fully laden, under good weather~~

10    ~~conditions about _____ knots on a consumption of about _____ tons of best Welsh coal-best grade fuel oil-best grade Diesel oil.~~ See Clause 29, 30 as attached.

11    now Being constructed at Nantong COSCO KHI Ship Building Co., Ltd.

12    _____ and Global Maritime Investment Cyprus Limited or its guaranteed nominee as Charterers of the City of **Cyprus**.

13    Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14    about **7 firm years plus one (1) year plus one (1) plus one (1) year in Charterers Option.**
     **- Charterers to have 45 days MOLCHOPT on the final period before redelivery.**
     **If charterers do not exercise the option to extend the charter, the 7th year only shall be 45 days MOLCHOPT. If Charterers choose to extend the vessel,**
     **the 7 year period shall not be subject to 45 days MOLCHOPT and so on.**
     **- Each option to be declarable 3 months prior to the end of the then current period.**
     **At 81st month of the TC in case of the 1st option, 93rd month in case of the 2nd option, and 105th month in case of the 3rd option.**
     **- The New Hire Rate to count from 1st day after the previous year's period has expired.**

15    _____ within below mentioned trading limits.

16    Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17    the fulfilment of this Charter Party.

18    ~~Vessel to be placed at the disposal of the Charterers, at~~ The vessel shall be delivered to the Charterers at safe wharf in Builder's yard from 1st November, 2016 to 31st January 2017.
     **- Laycan to be narrowed back to back with Shipbuilding Contract.**

19
20    ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

21    ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery to be

22    ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and

23    ~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same~~

24    ~~time (and with full complement of officers, seamen, engineers and firemen~~ for a vessel of her tonnage), and to be employed, in loading, stowing and carrying lawful merchan-

25    ~~dise, including petroleum or its products, in proper containers, excluding~~ See Clause 38.

26    (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27    all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28    America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29    ~~Mexico, and/or South America _____ and/or Europe~~

30    ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31    ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic.~~

32    World wide trading within Institute Warranty Limits (I.W.L) between safe port(s), safe berth(s), safe anchorage(s) safely lie always afloat excluding Cuba, Lebanon, Cambodia, North Korea, Somalia, Cyprus, Ethiopia, Yemen, Libya, Syria, Nigeria, Iraq, Angola (including Cabinda), Eritrea, Sierra Leone excluded but Pepel to be allowed, Albania, Former Yugoslavia, Turkish occupied part of Cyprus, Liberia, Haiti, pacific Russian ports, Zaire, Sri Lanka, Myanmar and ports/area where the vessel is from time to time prohibited to call at by the national authorities under which she is registered, and any countries/areas/ports/place prohibited to call at from time to time due to boycott and/or being sanctioned by the USA and/or UN and/or NATO and/or EU and/or the flag state the vessel is registered from time to time.

33    To enter any areas designated as excluded areas by vessel's war risks insurers including Gulf of Aden / Somalia / Indian Ocean & West Africa, the Armed Guards are always on boards to supply anti-piracy equipment at Charterer's account.

34
35    as the Charterers or their Agents shall direct, on the following conditions:

36      1. That the Owners shall provide and pay for all provisions, wages, ~~immigration~~ and consular shipping and discharging fees of the Crew; shall pay for the

37    insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water ~~and lubricating oil~~ and maintain her class and keep

38    the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

39      2. That whilst on hire the Charterers shall provide and pay for all the fuel except ~~as otherwise agreed~~, Port Charges, ~~compulsory and customary~~ Pilotages, Agencies, Commissions.

40    Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41    a port for causes for which vessel / Owners are is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42    illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43    charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44    of six months or more. See Clause 101 as attached.

45    Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46    Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47    for dunnage, they making good any damage thereto.

48      ~~3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49    ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than _____ tons and not more than~~

50    _____ ~~tons and to be delivered with not less than _____ tons and not more than _____ tons.~~ See Clause 32 as attached.

This document is a computer generated NYPE 46 form printed by BIMCO's *Idea*. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original printed NYPE 1946 document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original printed NYPE 1946 document and this computer generated document.





2ND ORIGINAL

51   4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of **See Clause 97**
52   ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53   ~~stores, on~~ ~~summer freeboard,~~ per Calendar Month ~~day or pro-rata for any part of day,~~ commencing on and from the hour in G.M.T of the day of
her delivery, as aforesaid, and at
54   and after the same rate for any part of a day ~~month;~~ hire to continue until the hour in G.M.T of the day of her re-delivery in like good order and
condition, ordinary
55   wear and tear excepted, to the Owners (unless lost) at **The Charterers will do their utmost to make sure that the two vessels fixed with CP dtd 17th March,
2014 and CP dtd 08th April, 2014 are not to be redelivered within 9 months of each other.**
56   ~~unless otherwise mutually agreed. Charterers are to give Owners not less than~~ ~~days~~
57   ~~notice of vessels expected date of re-delivery, and probable port.~~ See Clause 33 as attached.
58   5. Payment of said hire to be made in ~~Singapore~~ New York in cash in United States Currency, ~~semi-monthly in advance 15 days in~~
advance, and for the last ~~half~~ month ~~in~~
59   part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60   due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61   hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62   terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~
63   ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64   ~~to have the privilege of using vessel at once, such time used to count as hire.~~ See also Clause 45 as attached
65   Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66   to ~~2 ½~~ 1.25% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67   of such advances.
68   6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may
69   direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~
70   ~~lie aground.~~
71   7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably and safely stow and
carry), also
72   accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73   tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
74   ~~paying Owners~~ ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
75   ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~
76   8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77   ~~boats~~ board. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment
and
78   agency; and Charterers are to load, stow, ~~and~~ trim and discharge the cargo at their expense under the supervision of the Captain, who is to sign Bills of
Lading for
79   cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
80   9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, ~~or~~ Engineers or crew, the Owners
shall on
81   receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82   10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83   with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84   rate of $1.00 per day actual expenses. ~~Owners to victual Pilots and Custom Officers, and also, when authorized by Charterers or their Agents, to~~
~~victual Tally~~
85   ~~Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling.~~
86   11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87   Captain shall keep a full and correct deck and engine Log of the voyage or voyages, which are to be ~~patent~~ made available to the Charterers or their
Agents on request, and furnish the Char-
88   terers, their Agents or Supercargo, ~~when required,~~ with a true copy of daily such Logs in the Charterers' forms to be supplied, showing the course
of the vessel and distance run and the con-
89   sumption of fuel and also any other information whatsoever required by the Charterers..
90   12. That the Captain shall use diligence in caring for the ventilation of the cargo.
91   ~~13. That the Charterers shall have the option of continuing this charter for a further period of~~ ~~~~
92   ~~~~
93   ~~on giving written notice thereof to the Owners or their Agents~~ ~~days previous to the expiration of the first-named term, or any declared option.~~
94   14. That if required by Charterers, time not to commence before **1st November, 2016.** and should vessel
95   not have given written notice of readiness on or before **31st January, 2017.** but not later than ~~4~~ 23:59 p.m. Charterers or
96   their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. Laycan to be narrowed back to back with
Shipbuilding Contract. Owners shall give 30 days approximate notice and 20/10/5 days approximate notices and 3/1 days definite notices of Delivery
including port of Delivery.
97   15. That in the event of the loss of time from deficiency and/or default of men or stores, fire, breakdown or damages to hull, machinery
98   grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, strike of Master, Officer
or crew or by any other cause
99   preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all extra expenses shall be deducted from the hire.
102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and ~~Steam~~ Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.
107  17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at ~~New York~~
London,

This document is a computer generated NYPE 46 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification
being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no
responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.

110     18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.

114     19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled in London, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~

116 York-Antwerp Rules 1990 or any amended thereto. ~~Hire not to contribute to General Average. 1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~

117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account of the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~

126     ~~In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~

132     ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~

133     20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.

135     21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136 convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137 time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

138 ___
139 ___

140     22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also
141 providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for
143 night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144 Charterers to have the use of any gear on board the vessel.

145     23. Vessel to work night and day, if required by Charterers , and all winches to be at Charterers' disposal during loading and discharging
146 steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,
147 deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148 port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150 thereby.

151     24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153 etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154 of which are to be included in all bills of lading issued hereunder:

U. S. A. Clause Paramount

155 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
156 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
157 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
158 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

Both to Blame Collision Clause

161 If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162 Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163 hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164 or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165 carrying ship or her owners to the other owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166 owners as part of their claim against the carrying ship or carrier.

167     25. The vessel shall not be required to enter any ice-bound port or place, or any port or place where lights or light-ships have been or are
168 about to be with-
drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or place or to get out after having completed loading or discharging.

170     26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

172     27. A commission of 2½ 1.00 per cent is payable by the Vessel and Owners to

173 **Maersk Broker**

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28. An address commission of 2½ per cent payable to_____ on the hire earned and paid under this Charter.

Clauses Nos. 29 through 102, as attached to be considered fully incorporated in this Charter Party.

This document is a computer generated NYPE 46 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification
being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no
responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document



2ND ORIGINAL

By cable authority from

The original Charter Party in our possession.                                                                As _____ - For Owners

BROKERS.

**CHARTERERS:**
Global Maritime Investment Cyprus Limited
or its guaranteed nominee

**OWNERS:**
KUMIAI NAVIGATION (PTE) LTD

**MR. PANAYIOTIS C. KONTOS**
**MANAGING DIRECTOR**

**TOMOMARU KUROYANAGI**
**MANAGING DIRECTOR**

This document is a computer generated NYPE 46 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

-1-

# "NACKS 209 BC UNIT-II"

2<sup>ND</sup>ORIGINAL



# RIDERS TO C/P DATED 8TH APRIL 2014.

### Owners' Full Style

| | |
|---|---|
| Name | : KUMIAI NAVIGATION (PTE) LTD |
| Address | : 1 Raffles Place #27-62 One Raffles Place, Singapore 048616 |
| Tel/Fax | : Tel. +65-6532-7001 / Fax +65-6532-7006 |
| P.I.C. | : Reverting |
| A/C No. | : Reverting |

### Charterer's Full Style

| | |
|---|---|
| Name | : Global Maritime Investment Cyprus Limited or its Guaranteed Nominee |
| Address | : 2 Navarcho Nikodimou, 10557 Athens, Greece |
| Tel/Fax: | Tel.    Fax - Reverting |

### Clause 29    The Vessel's Description (all about)

A 209,000-DWT Type Motor Bulk Carrier (NACKS) with attached specification (D.NO. 02-030) from Shipyard

Owners to provide a TC description to the Charterers accordingly once they obtain details from Shipyard.

### Clause 30    Speed and Consumption

"Temporary Guaranteed" Speed and consumption is to be assessed and agreed after the vessel's sea trials and "Final Guaranteed" Speed and consumption is to be mutually agreed within 6 months after delivery.

Charterers have the option to slow steam the vessel at any time during the course of this Charter Party but always subject to the requirement of safe navigation.

### Clause 31    Bunker

The Charterers and the Owners shall take over and pay for all fuel remaining on board the vessel on delivery/redelivery at last actual purchase price with supporting vouchers. Bunker on delivery/redelivery to be sufficient to reach nearest main bunkering port.

### Clause 32    Bunkers on Delivery/Redelivery

Owners and Charterers shall deliver and redeliver the vessel with sufficient bunkers to reach the nearest bunkering port, where the bunker mentioned in the Clause 51 (A) can be supplied at Charterers'/Owners' option respectively.

### Clause 33    Redelivery

Charterers shall give 60 days approximate notice, 45/30/20/15/10/5 days approximate notices and 3/1 days definite notice of redelivery including port of redelivery. Any changes in the expected time of redelivery exceeding 24 hours shall immediately be noticed to Owners.



15-12952-smb Doc 19-2 Filed 12/18/15 Entered 12/18/15 19:01:01 Exhibit B - Charter Agreement Pg 6 of 33 "NACKS 209BC UNIT-II"

-2-

### Clause 34    **Charter Party Cancellation**

In case of the vessel being lost, this Charter Party shall be automatically cancelled without any compensation to each other.

### Clause 35    **Deck & Engine Log**

Deleted.

### Clause 36    **Time**

Hours of delivery and redelivery are to be adjusted to GMT and payment of hire is to be based on the same time.

### Clause 37    **Reference of Fuel**

Wherever the word 'Fuel' appears in this charter, same is understood to mean 'Bunkers'.

### Clause 38    **Cargo Exclusions**

Charterers have the right to carry coal, iron ore pellets, iron ore lumps, iron ore concentrates, iron ore fines, manganese ore, sinter ore and coke(s) provided load/stowed/carried/discharged in accordance with IMO regulation / recommendation and the Vessel's Class.

Charterers may ask Owners to load the cargoes other than those above, but subject to Owner's prior approval which not to be unreasonably withheld. In which case, loading, lashing, trim with Master's satisfaction, and class permission if required.

The following cargoes are specifically excluded:

Livestock of any description, any goods of dangerous, injurious, flammable or corrosive nature, acids, ammonia, ammonium nitrate (but fertilizer grade which does not require CO2 or inert gas system in cargo hold is permitted), arms, ammunition, asbestos, asphalt, bonemeal, borax in bulk, bitumen, brown coal, calcium carbide, calcium hydrochloride, carbon black, caustic soda, cement, cement clinker, charcoal, chemical products, cotton, Chilean nitrates, copra and coprapods, creosoted goods, dangerous and hazardous cargoes, direct reduced iron, direct reduced iron ore pellets, explosives (black powder, blasting caps, loaded bombs, detonators, dynamite, TNT), ferro silicon, fishmeal, Fuel / Wastes, hot briquetted iron, hypochlorite (oxychloride) Indian coal (well understood that it means coal loaded in India), industrial waste, iron swarf, lime, logs, lumber, manioc/manioc pellets, metal sulphide, motor spirits, naphtha and its products, nickel or ore with a moisture content more than 40%, niger seed, nitrates, nuclear and radioactive materials and its waste, oil cakes, oil seeds and its products, pebbles, petroleum and it's byproducts, pitch in bulk, pond coal, quebracho, quicklime, resin, rocksalt, salt, saltpeter, scrap, seed cakes, sodium sulphate, spent oxide, sponge iron, steel swarf, sulphur, sunflower seed expellers, tar in bulk or any of its products, turnings and motor blocks, turpentine, wet hides, and any other cargoes (except coal) listed in Appendix B to IMSBC Code.

### Clause 39    **Break IWL**

Charterers shall have the option to break Institute Warranty Limits subject to Owner's prior approval and paying additional insurance premium for such breaking upon presentation of underwriter's invoice. Rebate on such additional premium, if any, to be refunded to Charterers.



15-12552-smb   Doc 109-2   Filed 12/18/15   Entered 12/18/15 19:01:01   Exhibit B -
Charter Agreement   Pg 7 of 33 er to "NACKS 209BC UNIT-II"

-3-

## Clause 40    Return Insurance

Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters (as and when received from Underwriters) by reason of the vessel being in port for extended periods qualifying for such returns.

## Clause 41    War Risk Insurance

Basic war risk insurance on the vessel (including any increase thereof) always to be for Owner's account. Any additional premium for war risk insurance on the vessel and officers/crew payable by reason of Charterers' orders shall be for Charterers' account, but all necessary procedures for the insurance shall be taken care of by Owners. Rebate on such additional premium, if any, to be refunded to Charterers.

## Clause 42    P. & I. Club

P. & I. Club, to be advised by the Owners before her delivery.

## Clause 43    Cargo Claim

Damage to and claim on cargo shall be settled in accordance with Inter-Club New York Produce Exchange Agreement 1996 and any amendment thereto.

## Clause 44    Protective Clause

This Charter Party is subject to the following clauses all of which are also to be included in all bills of lading or waybills issued hereunder:

### (A)    CLAUSE PARAMOUNT

"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, the Hague Rules or the Hague-Visby Rules, as applicable, or such other similar national legislation as may mandatory apply by virtue of origin or destination of the bills of lading, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such term shall be void to that extent, but no further."

### (B)    BOTH-TO-BLAME COLLISION CLAUSE

If the Ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non- carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owner of said goods, paid or payable by the other or non-carrying ship or her Owners to the owner of said goods and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying Ship or Carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

### (C)    NEW JASON CLAUSE



-4-

In the event of accident, danger, damage or disaster before or after the commencement of the
voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or
for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise,
the goods, Shippers, Consignees or owners of the goods shall contribute with the Carrier in
general average to the payment of any sacrifices, losses or expenses of a general average
nature that may be made or incurred and shall pay salvage and special charges incurred in
respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the
said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may
deem sufficient to cover the estimated contribution of the goods and any salvage and special
charges thereon shall, if required, be made by the goods, Shippers, Consignees or owners of
the goods to the Carrier before delivery.

### (D)    BIMCO CONWARTIME 2013

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers
or other operators who are charged with the management of the Vessel, and the Master; and
(ii) "War Risks" shall include any actual, threatened or reported:

war, act of war, civil war or hostilities; revolution; rebellion; civil commotion; warlike
operations; laying of mines; acts of piracy and/or violent robbery and/or capture/seizure
(hereinafter "Piracy"); acts of terrorists; acts of hostility or malicious damage; blockades
(whether imposed against all vessels or imposed selectively against vessels of certain flags or
ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body,
terrorist or political group, or the government of any state or territory whether recognised or
not, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous
or may become dangerous to the Vessel, cargo, crew or other persons on board the Vessel.

(b) The Vessel shall not be obliged to proceed or required to continue to or through, any port,
place, area or zone, or any waterway or canal (hereinafter "Area"), where it appears that the
Vessel, cargo, crew or other persons on board the Vessel, in the reasonable judgement of the
Master and/or the Owners, may be exposed to War Risks whether such risk existed at the time
of entering into this Charter Party or occurred thereafter. Should the Vessel be within any
such place as aforesaid, which only becomes dangerous, or may become dangerous, after
entry into it, the Vessel shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade
as set out in Sub-clause (a), or to proceed to an Area where it may be subject to search and/or
confiscation by a belligerent.

(d) If the Vessel proceeds to or through an Area exposed to War Risks, the Charterers shall
reimburse to the Owners any additional premiums required by the Owners' insurers and the
costs of any additional insurances that the Owners reasonably require in connection with War
Risks.

(e) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of
receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(f) If the Owners become liable under the terms of employment to pay to the crew any bonus
or additional wages in respect of sailing into an Area which is dangerous in the manner
defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed
to the Owners by the Charterers at the same time as the next payment of hire is due, or upon
redelivery, whichever occurs first.



-5-

(g) The Vessel shall have liberty:

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the Vessel sails, or other government to whose laws the Owners are subject, or any other government of any state or territory whether recognised or not, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any alternative port any cargo or part thereof which may expose the Vessel to being held liable as a contraband carrier;

(v) to call at any alternative port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment, detention or similar measures.

(h) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice. All costs, risk and expenses for the alternative discharge shall be for the Charterers' account.

(i) The Charterers shall indemnify the Owners for claims arising out of the Vessel proceeding in accordance with any of the provisions of Sub-clauses (b) to (h) which are made under any bills of lading, waybills or other documents evidencing contracts of carriage.

When acting in accordance with any of the provisions of Sub-clauses (b) to (h) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## Clause 45   Grace Period

Notwithstanding anything contained herein to the contrary, if at any time hire becomes due on a Saturday, Sunday or a national holiday, or outside normal office hours, payment shall be made on the last banking day preceding the date on which hire becomes due. Where there is any failure to pay hire on the due date because of an oversight or negligence, error or omission of Charterers' employees, bankers or their agents, or otherwise for any reason where there is an absence of intention to fail to make payment as set out, Owners shall give Charterers three (3) banking days notice (as recognized at the agreed place of payment) to rectify the failure, and where so rectified shall stand as a punctual and regular payment.

## Clause 46   Delivery Without B/L

In the event, at any time during the term of this Charter Party and any extension thereto, that Bills of Lading are not available at any discharging port and/or the actual discharging port is different from the destination appearing on the Bills of Lading, Owners shall nevertheless discharge the cargo carried by the vessel in compliance with Charterers' instructions upon a consignee nominated by Charterers in consideration of which the following Letter of

-8-

Indemnity shall be deemed to have been signed by Charterers and to be in full force and effect on each occasion when discharge as aforesaid takes place.

See ANNEX 1 (A), (B) and (C).

### Clause 47    Additional Equipment

The Charterers shall be at liberty to fit/weld any additional equipment and fitting for loading, discharging and/or cargo securing cargo. Such work shall be done after consultation and agreement of Owners and Vessel's Class at the Charterers' expense and time and the Charterers shall remove such equipment and fittings at their expenses and time prior to redelivery, if required by the Owners.

### Clause 48    ITF/Boycott

The Owners of the vessel guarantee that the minimum terms and conditions of employment of the crew of the vessel are now and will remain throughout the period of this Charter Party covered by an I.T.F. Agreement or a Bona Fide Agreement acceptable to the I.T.F.

In the event of loss of time incurred due to boycott, picketed, black-listed or similar incident of the vessel by shore and/or port labor or arising from government restrictions by reason of the vessels' ownership or flag or terms and conditions on which members of officers and crew on this or any other vessel in the same beneficial ownership or management are employed, the payment of hire shall cease for the time thereby lost, fuel consumed and any extra expense incurred during such period or thereby are to be for Owners' account.

### Clause 49    Non-Black Listed

To the best of Owners' knowledge, neither this vessel nor any other vessel under their ownership/management/charter has called at a Cuban port since 1st June, 1962 or been blacklisted by any Arab country.

### Clause 50    Eligibility for Bunkering

Owners warrant that the vessel is and will remain throughout the period of this Charter eligible for bunkers in the United States of America, its territories and possessions.

### Clause 51    Bunker Emission Clause

### BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).



(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

**Clause 52**   **Pollution**

(A)   If the Owners are required to establish and / or maintain both operation / management system (including but not limited to On-Board Procedures Manuals) and safety financial security or responsibility in respect of oil or other pollution damage to enable the vessel to lawfully enter, remain in or leave any port, place, territorial or contiguous waters of any country or states in performance of this Charter Party, the Owners shall make all arrangements whatsoever may be necessitated to satisfy such requirements at Owner's sole expense, in which cases the Vessel must have a valid certificates and documents of safety operation / management system and certificate of financial responsibility, if required by any law.

(B)   The Charterers shall be under no responsibility for all consequences (including Loss of Time) of oil or other pollution damage and any failure or inability of the Owners to do so as provided above and any loss of time incurred thereby shall be off-hired.

(C)   The Owners shall hold the Charterers harmless against all consequences (including Loss of Time) of oil or other pollution damage and any failure or inability of the Owners to do so as provided in the preceding paragraph (A).

(D)   When an escape or discharge of oil occurs from the Vessel and threatens to cause pollution damage to coastlines, Charterers may, at their option, and upon notice to Owners or Master, undertake such measures are reasonably necessary to prevent or mitigate such damage, UNLESS Owners promptly undertake same. Charterers shall keep Owners advised of the nature of the measures intended to be taken by it. Any of the aforementioned measures actually taken by Charterers shall be at Owners' expense (except to the extent that such escape or discharge was caused or contributed to by Charterers), PROVIDED that if Owners consider said measures should be discontinued, Owner may so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause and all further liability to Charterers thereunder shall thereupon cease. If any dispute shall arise between Owners and Charterers as to the reasonableness of the measures undertaken and/or the expenditures incurred by Charterers hereunder, such dispute shall be referred to arbitration as herein provided. The provisions of this Clause are not in derogation of such other rights as Charterers or Owners may have under this Charter, or may otherwise have or acquire by law or any international Convention.



-8-

## Oil Shifting Operation Between Vessel's Tanks

The Owners warrant that neither fuel oil, lubricating oil nor waste oil shall be shifted between tanks in the vessel during the vessel's stay in port under this charter except when such shifting operation is inevitable due to the vessel's structural feature, in an emergency, or for the purpose of trim adjustment during cargo operation, in which case, the master of the vessel shall promptly give notice of such oil shifting operation to Port Agents, Time-Charterers and secondary Charterers, and the shifting shall be done with utmost care in compliance with any Regulations and/or Customs of the Port Authority / the Cargo Receivers. In particular for the safety of such operation the chief engineer shall personally ascertain and check without fail that;-

(A)   The lines and valves of the vessel are correctly set for the intended shifting operation,

(B)   The oil level in the receiving tank goes up, the oil level in the sending tank goes down and the oil level in other tanks remain unchanged during the operation; and

(C)   After completion of the operation, the lines and valves of the vessel are set in the original position and the transfer pump is stopped.

**Clause 53**   **Loading & Discharging Regulation**

Vessel to comply with all applicable regulations (specific terminal requirements to be expected) governing loading and discharging of the cargo any expense or loss of time occasioned by non-compliance shall be for Owner's account.

**Clause 54**   **Communications**

Vessel shall be equipped with wireless telegraph and VHF telephone to comply with international regulations to allow vessel to communicate with land stations.

**Clause 55**   **Radio Pratique**

Vessel is and will be kept in possession of qualification for radio pratique during the charter period.

**Clause 56**   **Sanitation**

The Vessel to provide valid Sanitation Exemption Certificate on delivery. If this does not cover the whole period of the Charter and fumigation is necessary for renewal of Sanitation Exemption Certificate, such cost and time to be for Owner's account. However, Fumigation ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers' account.

**Clause 57**   **I.M.O.**

Vessel will comply with applicable IMO regulations throughout the charter period.

**Clause 58**   **Agents**

Owners to appoint Owners' Agents to attend all Owners matters such as cash advance, hospitalization, repatriation of crew, repairs, supply of ship's stores and provisions etc., in case Owners unable arrange same Charterers to agree to have their agents attend such matter solely at Owner's risk and expense with Owners paying Charterers' agents according to Charterers' tariff rate with their Agents.

-9-

### Clause 59   Tax

All taxes on cargo or voyage freights to be for Charterers' account, except income taxes and taxes on time charter hire levied in the country of the vessel's flag and/or registration and/or of her Owners' domicile. All dues, duties, charges and/or taxes on crew and/or stores to be for Owners' account.

### Clause 60   Smuggling

Any delay, expense and/or fine incurred on account of smuggling, to be for Charterer's account if caused by the Charterers' supercargo and/or their staff or agents, or to be for Owners' account if caused by the officers and/or crew and/or Owners' agents or personal whatsoever.

### Clause 61   Quarantine

Any time and expense of detention on account of quarantine due to epidemic illness, etc. of the Master, Officers and Crew to be for Owners' account and to be off-hire.

### Clause 62   Launch

Launch hire for crew to be for Owner's account unless the same is certified and proved being used for the Charterers' purpose only.

### Clause 63   Hold Cleaning on Redelivery

The vessel shall be redelivered by the Charterers to the Owners with clean swept holds. However the Charterers shall have the option of redelivering the vessel with hold as are discharged and left by stevedores subject to Charterers' payment of compensation of US$ 6,500 to Owners in lieu of hold cleaning.

### Clause 64   Crew

Vessel's crew to open and/or close hatches before, during and after stevedoring work, when and where required by the Charterers and/or their Agents and when permitted by shore labour regulations.

### Clause 65   Extra Work

The Vessel's officers and crew shall perform extra work, if so requested by the Charterers. The Charterers shall pay a compensation for such extra work according to Owners' standard tariff.

### Clause 66   Intermediate Hold Cleaning

Vessel's crew to clean swept or wash down the vessel's all holds during discharging or navigation to loading port when required by Charterers, for which charterers will pay Owners hold cleaning bonus according to following Tariff:

(A) Sweeping                 : USD 350 / Hold.
(B) Sweeping + Washing        : USD 400 / Hold.

Fresh water to be for Charterers' account in case supplied for the same purpose. The Owners, Master and Crew, although not responsible for the result of their hold cleaning, shall do their

best in cleaning holds and other stained parts in order to make the Vessel's holds acceptable to the surveyor /inspector for next cargo loading.

**Clause 67**   **B/L Sign Sea Waybill**

The master to sign Bills of Lading for all cargoes carried under this Charter Party. If required by Charterers, without prejudice to the terms and conditions of this Charter Party. Charterers and/or their agents are hereby authorized to sign Bills of Lading on Owners'/Masters' behalf according to mate's or tally clerk's receipts in which case Charterers shall indemnify vessel and Owners from all consequences arising there from.

In case of discharging cargo in Japan, Charterers and/or their agents may issue and sign non-negotiable sea waybills in lieu of Bill(s) of Lading with Owners' prior written authority and always in conformity with Mate's Receipt for those Shippers with whom Charterers have contracts allowing or required to use Seaway Bills. Seaway bills only allowed for coal or Iron ore cargo.

The seaway bill to be Bimco "Genwaybill" form incorporating the Hague Visby Rules and all clause of the charter party including arbitration London/English law clauses.

Charterers shall indemnify and keep Owners, the vessel and Owners' servants and agents harmless in respect of any liability, loss, damage or expense they may sustain by reason of delivering the cargo under the Sea Waybill, and/or the use of Sea Waybill, in accordance with Charterers' request.

Furthermore, the following steps shall be taken:

In case the Master is requested to authorize agents to sign Sea Waybill, the copy of Sea Waybill shall be sent by fax to the Master and the Owners soonest possible, latest before arrival at the discharging port.

Charterers shall give written discharging instruction including name of receivers, discharging port to the Master in time for arrival at the discharging port.

**Clause 68**   **Layup**

The Charterers shall have the right to order the laying-up of the vessel at any time and for any period of time at a place in Charterer's option and in the event of such lay-ups, the Owners shall promptly take steps to effect all the economies in operating costs including insurance which may be possible and give prompt credit to the Charterers in respect of such economies which to be agreed by both parties. At the request of the Charterers, at any time, the Owners shall furnish an estimate of the economies which would be possible in the event of a laying-up of the vessel, provided Charterers furnish Owners with details of lay-up place and duration of intended lay-up.

Should Charterers decide that for reasons of economy officers and crew should be paid off, then the cost of repatriation and, later, cost of rejoining, including laying-up preparation and reactivation cost and any expenses related thereto, are to be for Charterer's account. Charterers to give sufficient notice of their intention in this respect to enable Owners to make necessary arrangements for decommissioning and recommissioning.

**Clause 69**   **On-Hire**

Should the vessel be driven into port or anchored by stress of weather or by any cause for which the Charterers are responsible under this Charter Party, the vessel shall remain on hire.



-11-

## Clause 70    Deviation

(A) Should the vessel put back or put into port on account of accidents, engine breakdown damage to the vessel, or dry-docking or periodical survey and/or other reason, the hire shall be suspended from the time of her commencing to put back of put into such port until she is again ready to resume service in the same or equivalent position and the voyage resumed therefrom.

(B) The loss of time both in port and at sea or through deviation caused by deficiencies or illness of or accident to master, any of deck or engine officers or crew or other Owners' matters relating to the vessel including master's, officers' and/or engineers' license problems shall be entirely for Owners' account, and all expenses incurred including bunkers consumed during such time shall be for Owner's account.

## Clause 71    Stevedore Damage

Any damage caused by stevedores during the currency of this Charter Party shall be reported by the Master to the Charterers or their agents, in writing, within 48 hours of the occurrence or as soon as possible thereafter but latest when the damage could have been discovered by the exercise of due diligence. The Master shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in meantime.

Stevedore damage affecting seaworthiness or the proper working of the Vessel and/or her equipment, shall be repaired without delay to the Vessel after each occurrence in the Charterers' time and shall be paid for by the Charterers. Other repairs shall be done at the same time, but if this is not possible, same shall be repaired whilst Vessel is in dry dock in the Owners' time, provided this does not interfere with the Owner's repair work, or by Vessel's crew at the Owners' convenience. All costs of such repairs shall be for the Charterers' account. Any time spent in repairing stevedore damage shall be for the Charterers' account.

The Charterers shall pay for stevedore damage whether or not payment has been made by stevedores to the Charterers.

## Clause 72    Assignment

Owners and Charterers not to assign this charter or any benefit under it without obtaining Charterers' and Owners' prior consent respectively.

## Clause 73    Seizure, Arrest, Detention

Should the vessel be seized, arrested or detained by any authority or at the suit of any party during the Charter period, the Charterers' liability for seizure, arrest or detention is ceased immediately from the time of her seizure, arrest, detention and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure, arrest, detention is occasioned by any personal act or omission or default of the Charterers or their agents. Any extra expenses incurred by and/or during above seizure, arrest or detention including costs of bunker consumed are to be for Owner's account.

## Clause 74    Requisition

During the charter period, should the vessel be requisitioned by the government of the vessel's nationality, hire to cease from the time of her requisition. Any hire paid in advance and not earned and cost of bunkers remaining on board at the time of her requisition shall be refunded to Charterers' forthwith.

-12-

## Clause 75   Outbreak of War

If war or warlike operations break out involving any of the following countries: United Kingdom, U.S.A., Russia, France, The Peoples Republic of China, Germany, Japan, Singapore, both Owners and Charterers shall have the right of negotiating cancellation of this charter with each other.

## Clause 76   Deduction

Charterers shall have the liberty to deduct from the hire payments any amount disbursed for Owners' account in addition and without prejudice to any other right to deduct elsewhere herein provided. Charterers also to have the liberty to deduct from hire the estimated cost of bunkers remaining on board, together with the estimated amount of disbursements for Owners' account outstanding.

## Clause 77   Damage of Goods Carried

Owners to be responsible, as carriers, for shortage, loss of or damage to the goods carried hereunder as per Bills of Lading signed by Master or by Charterers or their agents as authorized by Clause 66 hereof in accordance with the provisions of Article III and IV (but Rule 6 of Article III excluded) of the Hague Rules dated Brussels 25th August, 1924.

## Clause 78   Double Banking Clause

(A) Vessel to lie alongside another vessel/coasters/lighters at a safe dock or wharf or place (including anchorage) for transhipment and/or discharge of the cargo and/or for bunkering, if so ordered by the port authority or when such operation to be carried out always under the supervision of Master regarding the general safety, who may at any time order the other vessel/coasters/lighters away from his vessel or remove his own vessel, meanwhile Charterers to take normal customary precaution for such operation.

(B) Charterers to have the privilege of ordering vessel to come alongside another vessel or vice versa, in order to transship or discharge the cargo or to supply bunkers at their convenience. However, Charterers to supply extra fenders, if necessary, and indemnify Owners/vessel against all cargo claims subsequent to such operation. Charterers also to indemnify Owners from any additional insurance premium, if paid by Owners, at Charterers' request, to cover additional risks for vessel and loss of hire arising from such operation, and Charterers to give Owners due advance notice of their intention to perform such operation advising approximate type and quantity of cargo involved, the other vessel concerned, destination of cargo and location of operation. Charterers, however, to indemnify Owners from any damages to vessel and/or loss of hire resultantly incurred from the unsafety of the operation, unless such loss(es) and/or damage(s) are recovered from the Owner's underwriters.

## Clause 79   ISM Clause

During the currency of this Charter Party, the Owners shall procure that both the Vessel and "The Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request, the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

-13-

**Clause 80    Newcastle Loading**

The Owners guarantee that the vessel can load coal at Newcastle under the vessel's current condition.

**Clause 81    Discharging**

The vessel shall be suitable for normal size grab discharge. The Charterers shall have the liberty to use bulldozers in the vessel's holds in due consideration of the Vessel's tanktop strength.

**Clause 82    WWF Requirement**

The Owners guarantee that the construction of the vessel with her cargo gear, fittings and other equipment shall comply with the requirements and/or recommendations of Australian shore labours and pilots.

**Clause 83    Communication Charge Etc.**

The Charterers shall pay the Owners US$1,500 (U.S. Dollars One Thousands Five Hundred Only) per month pro rata for all communications / entertainment / victualing.

**Clause 84    Dry Dock**

Charterers shall place the vessel within the range of Singapore/Japan or Far East at a convenient time and place to be mutually agreed between Owners and Charterers for Owners' class drydocking survey once in every thirty (30) months to thirty six (36) months at Owners' request. Owners shall give at least four (4) months prior notice to the Charterers. Owners shall have the right to place the vessel in drydock at any time in case of emergency.

Payment of hire shall be suspended from the commencement or deemed commencement of deviation for the purpose of the drydocking until vessel is again efficient in the same or equivalent distance position.

For the purpose of settlement of used bunkers by the Owners in accordance with this clause, Charterers' most recent actual purchased price shall be applicable with supporting vouchers.

**Clause 85    Governing Law**

This Charter Party shall be governed by and in accordance with English Law.

**Clause 86    On & Off-Hire Survey**

Joint on-hire survey to be carried out on delivery to ascertain the vessel's condition and bunker quantities remaining on board by one surveyor acceptable to the both parties. Time for the on-hire survey to be for Owner's account but cost for the on-hire survey to be shared equally by both parties.

Joint off-hire survey to be carried out on redelivery to ascertain the vessel's condition and bunker quantities remaining on board on redelivery by one surveyor acceptable to the both parties. Time for the off-hire survey to be for Charterers' account but cost for the off-hire survey to be shared equally by both parties.



Rider to "NACKS 209BC UNIT-II"

-14-

## Clause 87    A.Q.I.S.

The Owners and the Charterers hereby confirm that the both parties duly acknowledge the voluntary guidelines for "Controls on the discharge ballast water and sediments from her entering Australia from overseas" stipulated by Australia Quarantine and Inspection Service.

## Clause 88    BIMCO ISPS / MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## Clause 89    Idle Time and Underwater Cleaning

If the vessel remains idle for a period of 25 days or more, Charterers agree to allow the vessel to sail at full speed for about 4 hours every 7 days if local regulations permit.

Should the underwater parts become fouled by marine growth due to such extended stay(s), and should such underwater growth warrant cleaning of the Vessels' underwater parts, the owners will arrange for underwater cleaning including polishing of the propeller at Charterer's time and cost, the cost of which Charterers shall pay together with the next due hire payment, and all time used shall count as time on-hire.

Furthermore, if the vessel remains idle for a period of 20 days or more, the speed and consumption warranties as per charter party herein automatically invalidated until the next scheduled drydocking.

**Clause 90**     **Equipment**

"As of 14th March, 2014, Owners guarantee that the vessel is fully or partially suitable for the following port(s) (i.e. Port Dampier, Port Walcott, Port Hedland, PDM, Tubarao, GIT, Itaguai (CPBS terminals only) throughout the charter period provided that the vessel can always safely enter into/out the above port(s), failing which Owners shall be responsible for time lost and expenses directly incurred hereby.

Should additional time/extra costs for the above port call to be incurred due to ballast/de-ballast operation load line change and also to comply with local port regulations/special requirements for the usage of Wire ropes etc, to be for the Charterers' account.

Should regulations/restrictions change during the currency of this charter then both Owners and Charterers to discuss the best possible outcome in order to ensure smooth running of charter."

**Clause 91**     **(A) EU Advance Cargo Declaration Clause for Time Charter Parties 2012**

(a) If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU ("Exported") or loads cargo outside the EU destined for an EU port or place or passing through EU ports or places in transit ("Imported"), the Charterers shall, for the purposes of this Clause, comply with the requirements of the EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall, in their own name, and in their time and at their expense:

(i) Have in place an EORI number (Economic Operator Registration and Identification);

(ii) Provide the Owners with a timely confirmation of (i) above as appropriate; and

(iii) Where the cargo is being:

1. Exported: Submit, or arrange for the submission of, a customs declaration for export or, if a customs declaration or a re-export notification is not required, an exit summary declaration; or

2. Imported: Submit, or arrange for the submission of, an entry summary declaration. Unless otherwise permitted by the relevant customs authorities, such declarations shall be submitted to them electronically.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

15-12552-smb   Doc 19-2   Filed 12/18/15   Entered 12/18/15 19:01:01   Exhibit B -
Charter Agreement   Pg 20 of 33er to "NACKS 209BC UNIT-II"

-16-

## Clause 91 (B) BIMCO North American Advance Cargo Notification Clause for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or Canada or passing through US or Canadian ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or the Canada Border Services Agency regulations (Memorandum D3-5-2) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

(i) Have in place a SCAC (Standard Carrier Alpha Code)/Canadian Customs Carrier Code;

(ii) For US trade, have in place an ICB (International Carrier Bond);

(iii) Provide the Owners with a timely confirmation of (i) and (ii) above as appropriate; and

(iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs or by ACI (Automated Commercial Information) to the Canadian customs, and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## Clause 92 BIMCO PIRACY CLAUSE 2013

(a) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which, in the reasonable judgement of the Master and/or the Owners, is dangerous to the Vessel, cargo, crew or other persons on board the Vessel due to any actual, threatened or reported acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"), whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid which only becomes dangerous, or may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

(b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading or third parties caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of complying with such orders shall not be considered off-hire.

(c) If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:

15-12352-smb   Doc 19-2   Filed 12/18/15   Entered 12/18/15 19:01:01   Exhibit B - Charter Agreement   Pg 21 of 33 to "NACKS 209BC UNIT-II"

-17-

(i) to take reasonable preventative measures to protect the Vessel, crew and cargo including but not limited to re-routing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel (i.e. Armed Guard) and/or deploying equipment on or about the Vessel (including embarkation/disembarkation).

(ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group (including military authorities) whatsoever acting with the power to compel compliance with their orders or directions; and

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement; and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (d)(iii).

(d) Costs

(i) If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel, security personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

(iii) If the Vessel proceeds to or through an Area exposed to the risk of Piracy, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with Piracy risks which may include but not be limited to War Loss of Hire and/or maritime K&R.

(iv) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e) If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

(f) If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day after the seizure until release. The Charterers shall pay hire, or if the Vessel has been redelivered, the equivalent of Charter Party hire, for any time lost in making good any damage and deterioration resulting from the seizure. The Charterers



-18-

shall not be liable for late redelivery under this Charter Party resulting from the seizure of the Vessel.

(g) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail.

### Clause 93    GMI Eligibility Clause

Each party hereby represents and warrants that it is now and shall remain in compliance with all United Nations, European Union and United States (U.S.) government export control statutes, regulations, decrees, guidelines and policies including, without limitation, the export administration regulations ("ear") (15 c.F.R. Parts 730-774(2007)) of the U.S. Department of commerce and the anti-boycott and embargo regulations and guidelines issued under the ear as well as the various embargo regulations and guidelines of the U.S. Department of the treasury, office of foreign assets control and the USA Patriot Act (title III of pub. 107-56, signed into law October 26, 2001), as amended from time to time (collectively the "export control laws").

In the exercise of their respective rights and the performance of their respective obligations under this Charter Party, each party shall comply with all such export control laws applicable to the products, services and activities contemplated by this charter.

### Clause 94    GMI Mutual Security Clause

In the event that undisputed sums are owed under this Charter Party, the party to whom such sums are owed ("the non-defaulting party") may, provided that 3 working days' notice have been given to the other party ("the defaulting party"):

1.   Exercise a possessory lien over the cargo or any other cargo carried on another vessel to which a charter party between the parties relates; or

2.   Arrest this or any other vessel and/or bunkers owned or chartered by the parties; or

3.   Deduct such outstanding sums from any other amounts owed by the non-defaulting party to the defaulting party under this Charter Party or any other charter party or forward freight agreement between the parties.

## Additional Clauses

### Clause 95    Assignment Clause

If required by the Owner's financer, the Charterers shall agree to assign the Charter Party and/or Charter Hire agreed in favour of the Owner's financier.

The exact wording of notice of Assignment and Acknowledgement to be mutually agreed.

### Clause 96    Time Charter Hire

Hire to be paid 15 days in advance in cash. No address commission.

- USD 25,700 Per Day for firm period (7 Firm Years)
- USD 26,600 Per Day from 1st optional year (1 Year)
- USD 27,500 Per Day from 2nd optional year (1 Year)
- USD 28,400 Per Day from 3rd optional year (1 Year)



15-12552-smb   Doc 134-2   Filed 12/18/15   Entered 12/18/15 19:01:01   Exhibit B -
Charter Agreement   Pg 23 of 33er to "NACKS 209BC UNIT-II"

-19-

※ The above rate includes 1.25% commission to Maersk Broker Japan paid by the Owners.

## Clause 97   Purchase Option

Charterers have the option to purchase the vessel at any time from the end of 5th year including the optional years if declared.

- Purchase option to be declared by **3** months prior to the purchase.
- Purchase option price to start at USD **61.5** million and to be depreciated USD **2.5** million per year pro rata.
- In the event the purchase option is executed, MOA to be based on the Seller's Form (Nippon Sale 1999)
- 1% brokerage to Maersk Broker to be paid by Owners/Sellers.

## Clause 98   BIMCO Sanctions Clause for Time Charter Parties

(a) The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage, trade or on a voyage which, in the reasonable judgement of the Owners, will expose the Vessel, Owners, managers, crew, the Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any State, Supranational or International Governmental Organisation.

(b) If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-clause (b) anything is done or not done, such shall not be deemed a deviation.

(c) The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of Bills of Lading and/or sub-charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (b).

(d) The Charterers shall procure that this Clause shall be incorporated into all sub-charters and Bills of Lading issued pursuant to this Charter Party.

## Clause 99   AGM

In case the Vessel is ordered to call a port in high-risk area during high-risk period under the Asian Gypsy Moth (AGM) program of the Animal and Plant Health Inspection Service (APHIS), USA and/or the Canadian Food Inspection Agency (CFIA), the Charterers shall arrange the AGM inspection by authorized surveyor for procuring the Certificate of Freedom from AGM at their time and expenses. The Owners, Master, crew and related parties cooperate with Charterers to keep vessel harmless from above mentioned issues throughout voyages.

However, Charterers are responsible for all consequences arising from AGM issues, except the case that the vessel call the port(s) and place in question, due to Owners' matter.



15-12552-smb    Doc 19-2    Filed 12/18/15    Entered 12/18/15 19:01:01    Exhibit B -
Charter Agreement    Pg 24 of 33    to "NACKS 209BC UNIT-II"

-20-

**Clause 100    Fumigation Clause**

Charterers shall be allowed to arrange for the fumigation of the vessel's holds and/or cargo provided that any fumigation is carried out without crew assist strictly in accordance with the applicable IMO recommendations (IMO MSC.1/Circular 1264 and any subsequent amendments or replacements thereof) and that Charterers provide Owners with a Letter of Indemnity as per Owners' required wording. All time, risk, and any costs and expenses of whatever nature that are incurred as a result of or in connection with any fumigation, including but not limited to any costs associated with lodging the crew ashore should this be necessary at any stage, will be for Charterers' account.

**Clause 101    Indian Iron Ore Fines Clause**

Charterers to provide shipper's certificate of moisture + TML/FMP to the Master prior to loading. Basis aforementioned Owners to permit loading, unless Owners/Master can justify that the cargo is off specs. Owners' P. and I. Club are to appoint a qualified Surveyors at Owners' cost to supervise loading and keeping the Charterers well informed about such appointment. In the event that Charterers/shippers are unable to provide the moisture content certificate in time, then the time lost as a consequence to be for Charterers' account. Master/Surveyors to have the right to reject the cargo found not to meet the safe transportable moisture content limits of IMO, and Charterers to replace cargo with cargo meeting IMO criteria. The time lost relating to cargo quality issues, and related expenses, shall be for Charterers' account, the Owners/Master will extend their best co-operation to the Charterers/shippers to see that cargo is not rejected by any parties involved without valid reason/cause related to TML. However if cargo is at all rejected by Master/Surveyor then the rejected cargo to be jointly tested at mutually agreed test laboratory and report of which to be binding on both parties. Any time losses and expenses caused by Owners'/Master's reject of cargo and conducting survey/waiting for the result of same to be for Charterers' account and vessel should fully remain on-hire during the currency of aforementioned period in any case should the Master/Owners' reject the presented cargo and the joint survey test results declare the cargo to be within safe IMO limits, then the vessel is to be off-hire from the time of rejection and any time losses and expenses caused thereby, to be for Owners' account. All sample of cargo to be dully witnessed by Charterers and/or shippers and jointly surveyed as necessary (any sampling by Owners' P. and I. Club without Charterers'/shippers knowledge shall be treated null and void).

**Clause 102    Naming Clause**

Charterers to have right to name the vessel and to fly their colours (including funnel markings) for the duration of the Charter Party. Charterers to repaint the vessel back to Owners colours after redelivery at their time and cost.



-21-

## A: L.O.I FOR DELIVERING CARGO WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING

[*insert date*]
To :    KUMIAI NAVIGATION (PTE) LTD
The Owners of the [*insert name of ship*]
[*insert address*]

Dear Sirs

| | |
|---|---|
| Ship: | [*insert name of ship*] |
| Voyage: | [*insert load and discharge ports as stated in the bill of lading*] |
| Cargo: | [*insert description of cargo*] |
| Bill of lading: | [*insert identification numbers, date and place of issue*] |

The above cargo was shipped on the above ship by [*insert name of shipper*] and consigned to [*insert name of consignee or party to whose order the bill of lading is made out, as appropriate*] for delivery at the port of [*insert name of discharge port stated in the bill of lading*] but the bill of lading has not arrived and we, [*insert name of party requesting delivery*], hereby request you to deliver the said cargo to [*X[name of the specific party]or to such party as you believe to be or to represent X or to be acting on behalf of X*] at [*insert place where delivery is to be made*] without production of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows :-

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of delivering the cargo in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference , whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivery to the party to whom we have requested you to make such delivery.

5. As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to



to "NACKS 209BC UNIT-11"

-22-

be delivered to you, whereupon our liability hereunder shall cease.

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.


Yours faithfully
For and on behalf of
[*insert name of Requestor*]

The Requestor


.................................
Signature



15-12872-smb   Doc 10-2   Filed 12/18/15   Entered 12/18/15 19:01:01   Exhibit B -
Charter Agreement   Pg 27 of 33er to "NACKS 209BC UNIT-II"

-23-

## B: L.O.I FOR CHANGING CARGO DESTINATION

[*insert date*]
To :    KUMIAI NAVIGATION (PTE) LTD
The Owners of the [*insert name of ship*]
[*insert address*]

Dear Sirs

Ship:           [*insert name of ship*]
Voyage:      [*insert load and discharge ports as stated in the bill of lading*]
Cargo:        [*insert description of cargo*]
Bill of lading:   [*insert identification numbers, date and place of issue*]

The above cargo was shipped on the above ship by [*insert name of shipper*] and consigned to [*insert name of consignee or party to whose order the bill of lading is made out, as appropriate*] for delivery at the port of [*insert name of discharge port stated in the bill of lading*] but we, [*insert name of party requesting substituted delivery*], hereby request you to order the ship to proceed to and deliver the said cargo at [*insert name of substitute port or place of delivery*] ["*X[name of the specific party]or to such party as you believe to be or to represent X or to be acting on behalf of X*"] against production of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows :-

1.   To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of ship proceeding and giving delivery of the cargo against production of atleast one original bill of lading in accordance with our request.

2.   In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3.   If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference , whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4.   The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5.   This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.



-24-

Yours faithfully
For and on behalf of
[*insert name of Requestor*]

The Requestor

.............................
Signature



"NACKS 209BC UNIT-II"

-25-

### C: L.O.I FOR DELIVERING CARGO AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING AND WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING

[*insert date*]
To :   KUMIAI NAVIGATION (PTE) LTD
The Owners of the [*insert name of ship*]
[*insert address*]

Dear Sirs

| | |
|---|---|
| Ship: | [*insert name of ship*] |
| Voyage: | [*insert load and discharge ports as stated in the bill of lading*] |
| Cargo: | [*insert description of cargo*] |
| Bill of lading: | [*insert identification numbers, date and place of issue*] |

The above cargo was shipped on the above ship by [*insert name of shipper*] and consigned to [*insert name of consignee or party to whose order the bill of lading is made out, as appropriate*] for delivery at the port of [*insert name of discharge port stated in the bill of lading*] but we, [*insert name of party requesting substituted delivery*], hereby request you to order the vessel to proceed to and deliver the said cargo at [*insert name of substitute port or place of delivery*] to [*X[name of the specific party]or to such party as you believe to be or to represent X or to be acting on behalf of X*] without production of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows :-

1.  To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of ship proceeding and giving away delivery of the cargo in accordance with our request.

2.  In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3.  If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference , whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4.  If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivery to the party to whom we have requested you to make such delivery.

5.  As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you.



-26-

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully
For and on behalf of
[*insert name of Requestor*]

The Requestor

..............................
Signature



-27-

# CONTENTS

Clause 29    The Vessel's Description (all about)

Clause 30    Speed and Consumption

Clause 31    Bunker

Clause 32    Bunkers on Delivery/Redelivery

Clause 33    Redelivery

Clause 34    Charter Party Cancellation

Clause 35    Deck & Engine Log

Clause 36    Time

Clause 37    Reference of Fuel

Clause 38    Cargo Exclusions

Clause 39    Break IWL

Clause 40    Return Insurance

Clause 41    War Risk Insurance

Clause 42    P. & I. Club

Clause 43    Cargo Claim

Clause 44    Protective Clause

Clause 45    Grace Period

Clause 46    Delivery Without B/L

Clause 47    Additional Equipment

Clause 48    ITF/Boycott

Clause 49    Non-Black Listed

Clause 50    Eligibility for Bunkering

Clause 51    Bunker Emission Clause

Clause 52    Pollution

Clause 53    Loading & Discharging Regulation

Clause 54    Communications



-28-

| Clause 55 | Radio Pratique |
| Clause 56 | Sanitation |
| Clause 57 | I.M.O. |
| Clause 58 | Agents |
| Clause 59 | Tax |
| Clause 60 | Smuggling |
| Clause 61 | Quarantine |
| Clause 62 | Launch |
| Clause 63 | Hold Cleaning on Redelivery |
| Clause 64 | Crew |
| Clause 65 | Extra Work |
| Clause 66 | Intermediate Hold Cleaning |
| Clause 67 | B/L Sign Sea Waybill |
| Clause 68 | Lay-Up |
| Clause 69 | On-Hire |
| Clause 70 | Deviation |
| Clause 71 | Stevedore Damage |
| Clause 72 | Assignment |
| Clause 73 | Seizure, Arrest, Detention |
| Clause 74 | Requisition |
| Clause 75 | Outbreak of War |
| Clause 76 | Deduction |
| Clause 77 | Damage of Goods Carried |
| Clause 78 | Double Banking Clause |
| Clause 79 | ISM Clause |
| Clause 80 | Newcastle Loading |
| Clause 81 | Grab Discharging |
| Clause 82 | WWF Requirement |



-29-

Clause 83       **Communication Charges**

Clause 84       **Dry-Dock**

Clause 85       **Governing Law**

Clause 86       **On & Off-Hire Survey**

Clause 87       **A.Q.I.S**

Clause 88       **BIMCO ISPS / MTSA Clause for Time Charter Parties 2005**

Clause 89       **Idle Time and Underwater Cleaning**

Clause 90       **Equipment**

Clause 91(A)    **EU Advance Cargo Declaration**

Clause 91(B)    **BIMCO North American Advance Cargo Notification Clause for Time Charter Parties**

Clause 92       **BIMCO Piracy Clause 2013**

Clause 93       **GMI Eligibility Clause**

Clause 94       **GMI Mutual Security Clause**


**ADDITIONAL CLAUSES**

Clause 95       **Assignment Clause**

Clause 96       **Time Charter Hire**

Clause 97       **Purchase Option**

Clause 98       **BIMCO Sanctions Clause for Time Charter Parties**

Clause 99       **AGM**

Clause 100      **Fumigation Clause**

Clause 101      **Indian Iron Ore Fines Clause**

Clause 102      **Naming Clause**

