FIRST ORIGINAL

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party**, made and concluded in *London* ............................ day of *11th December,* ........... ~~19~~*2014*

2  Between *I.M.S. Maritime S.A., Panama, as nominated and guaranteed by ITOCHU Corporation* ....................................

3  Owners of the good ~~Steamship~~/Motorship *M/V "T.B.N." (Hull No, 1549) 81,600 DWT type Bulk Carrier to be constructed by Tsuneishi*
   *Shipbuilding Co., Ltd., Japan (See Clause no.52)* ....................................................................... ~~of~~ ...................

4  ~~of~~ .................... ~~tons gross register, and~~ ......................... ~~tons net register, having engines of~~ ........................... ~~indicated horse power~~

5  ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~ ......................

6  ~~at~~ .......... ~~of about~~ ............... ~~cubic feet bale capacity, and about~~ ..................... ~~tons of 2240 lbs.~~

7  ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,~~

8  ~~allowing a minimum of fifty tons) on a draft of~~ ............. feet ............. inches on ............. ~~Summer freeboard, inclusive of permanent bunkers,~~

9  ~~which are of the capacity of about~~ ............................... ~~tons of fuel, and capable of steaming, fully laden, under good weather~~

10 ~~conditions about~~ ............................ ~~knots on a consumption of about~~ ................ ~~tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~

11 ~~now~~

12 . and *Global Maritime Investments Cyprus Limited or its guaranteed nominee* Charterers of the City of *Athens, Greece (Head office: 2*
   *Nikodimou Street, Athens 10557, Greece)*

13     **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about *(See Clause No.86)* ........................................................................................................................

15 ....................................................................................................... within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17 the fulfillment of this Charter Party.

18 Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping the Dockmaster at the Builder's shipyard in Japan at any time day and* .
19 *night Sunday and Holiday included at Owners option. Owners to give 45 days tentative and 30/20/15/10/5 days expected*
   *delivery notices, 5/4/3/2/1 definite notices (See Clause No.85)*

20 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~
21 ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on ~~her delivery~~ *arrival at first*
   *load port after delivery* to be

22 ready to receive *Charterers intended* cargo with clean-swept holds *(See Clause No.31)* and tight, staunch, strong and in every way fitted for the service,
   having water ballast, winches and

23 ~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then~~ other power sufficient to run all the winches at one and the same
24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25 dise, ~~including petroleum or its products, in proper containers, excluding (See Clause No.55)~~

26 ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27 ~~all necessary fittings and other requirements for the account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
28 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29 ~~Mexico, and/or South America~~ ......................................................................................... and/or Europe
30 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31 ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32 *Within Institute Warranty Limits (See Clause No.35) excluding (See Clause No.41) via safe berth(s), safe port(s), safe*
33 *anchorages(s), always afloat, always accessible* .........................................................................................

34 ..................................................................................................................................................

35 as the Charterers or their Agents shall direct, on the following conditions:

36     1.    That the Owners shall provide and pay for all provisions, wages *immigration* and consular shipping and discharging fees of the Crew; shall pay for
   the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

39     2.    That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary*
   Pilotages, Agencies, Commissions, *Tallyman,*

40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43 charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~
44 ~~of six months or more.~~

45     Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47 for dunnage, they making good any damage thereto.

48     3.    ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ ........................ ~~tons and not more than~~
50 ........... ~~tons and to be re-delivered with not less than~~ ............... ~~tons and not more than~~ ................ ~~tons~~ *(As per Clause No.30)*

51     4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate ~~of~~ *to be agreed* ........................................



52 ......................................................................United States Currency ~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53 ~~stores, on~~..................................~~summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54 and after the same rate for any part of a ~~month~~ *day*; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) ~~at~~ *upon dropping last outward sea pilot at a safe port within Japan / Singapore range* ....

56 *only in Charterers' option, any time day and night Sunday and Holiday included* unless otherwise mutually agreed. Charterers are to give

57 Owners not less than *60/30/20/10/7* days

*tentative* notice of vessels expected date of re-delivery *and port,* and probable port *5/3/2/1 days definite notice of redelivery.*

58 5. Payment of said hire to be made in New York *(See Clause No. 78)* in cash in United States Currency, semi-monthly in advance *by T/T*

*remittance into the Owners designated account, in funds available to Owners on due date,* and for the last half month or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, *always subject to the anti-technicality / grace period provisions in Clause 37* without prejudice to any claim they (the Owners) may

otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68 6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or place that Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely

70 lie aground. *(See Clause 88)*

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74 ~~paying Owners~~...........................~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~ *No passengers allowed.*

75 ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, ~~and~~ trim *and discharging, lash, secure, dunnage* the cargo at their expense under the supervision of the

Captain, who is to sign Bills of Lading for

79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts *(See Clause 50 and Clause 100)*

80 9. ~~That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on~~

81 ~~receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments~~ *(See Clause No.56)*

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of ~~$1.00~~ *10.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual ~~Tally~~

85 ~~Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling.~~ *(See Clause 64)*

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs *in English,* showing the course of the vessel and distance run and the con-

89 sumption of fuel.

90 12. That the Captain shall use diligence in caring for the ventilation of the ~~cargo~~ *hold(s) as instructed by Charterers.*

91 13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~

92 ..............................................................................................................................................................................

93 ~~on giving written notice thereof to the Owners or their Agents~~....................................~~days previous to the expiration of the first named term, or any declared option.~~

94 14. That if required by Charterers, time not to commence before *(See Clause No.85)*.............................................................. ~~and should vessel~~

95 ~~not have given written notice of readiness on or before~~....................................................................... ~~but not later than 4 p.m. Charterers or~~

96 ~~their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.~~

97 15. That in the event of the loss of time from deficiency *and/or sickness and/or strike and/or default of officer and/or crew, or*

*deficiency* of ~~men or~~ stores, fire, breakdown or damages to hull, machinery or equipment,

98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101 thereof, and all *directly incurred* extra expenses shall be deducted from the hire.

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106 purpose of saving life and property.

107 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons *in London* ~~at New York,~~

108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be ~~shipping commercial~~ men *and members of L.*

*M.A.A. arbitration in London according to L.M.A.A. rules, English Law London arbitration to apply.*

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and/or sub-hires* for any amounts due under this Charter, including General

Aver-

111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which



113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 York-Antwerp Rules *1974 or any amendments thereto excluding 2004* ~~1924, at such port or place in the United States as may be selected by the~~
~~carrier, and as to matters not provided for by these~~

117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~

126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~

132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *It is understood that the Charter hire is not to contribute to General Average.*

133 20. Fuel ~~used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~
134 ~~cost of replacing same, to be allowed by Owners.~~ *Bunkers used by the vessel while off-hire to be for Owners' account.*

135 21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138 *(See Clause No.77)* ..........................................................................................................................................................................................

139 ..........................................................................................................................................................................................

140 22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *sufficient lights as onboard for night work* ~~lanterns and oil for~~

143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~
144 Charterers to have the use of any gear on board the vessel.

145 23. ~~Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~

151 24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder~~

155 U. S. A. Clause Paramount

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 Both to Blame Collision Clause

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~ *United States, Canadian and General Clause Paramount as attached as approximate in all Bills of Lading issued hereunder to be incorporated.*

167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. *Vessel not to be required to force ice nor follow ice breaker when inward bound.*

170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

172 27. A commission of 2 1/2 per cent is payable by the Vessel and Owners to

173 ..........................................................................................................................................................................................

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28. An ~~address commission of 2 1/2 per cent payable to~~ ...................................................... ~~on the hire earned and paid under this Charter.~~

*Rider Clause No.29 to 113 are to be treated as integral part of this Charter Party.*

As Owners

I.M.S. Maritime S.A.

By   :   Eiji Okazaki

Title   :   Director / President

As Charterers

Global Maritime Investments Cyprus Limited

By   :   Panayiotis C. Kontos

Title   :   Authorized Director

## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11ᵗʰ December, 2014

### Clause No.29 Stevedore Damage

Charterers are not to be responsible for stevedore damage or other damage to the Vessel unless notified in writing by the Master at the time of occurrence of damage or as soon as possible thereafter but within 48 hours from occurrence except hidden damage but in any case not later than upon completion of the voyage and/or discharge during which the damage was incurred. Hidden damage to be notified as soon as possible after discovery. Master shall cooperate with Charterers or their agents to obtain a written acknowledgment by the responsible parties causing damage unless the damage should have been made good, in the meantime, Charterers to remain ultimately responsible.

Charterers have the option of redelivering the Vessel without repairing stevedore damage provided such damage may remain for occasional repair when the ship is to dock for Owners' account and same is to be done simultaneously with Owner's work that Charterers pay the actual cost of repair for stevedore damage, not the time used. All damages affecting Class seaworthiness and Vessel's trading capabilities to be repaired by Charterers at Charterers' time and cost. The repair must be done up to Master's and Class surveyor's satisfaction.

### Clause No.30 Bunker Clause

Bunker quantity on delivery to be as on board with minimum quantity but sufficient to safely reach nearest bunkering port, and bunker on redelivery to be about the same quantity as delivery. Bunker price at delivery / redelivery to be the Platts mean published price on the date 7 days before at the same port of delivery/redelivery. If Platts is not published on the date 7 days before of delivery/redelivery then the day previously when Platts published to be taken as relevant price. If the Platts price is not available at the port of redelivery, then price at nearest published port in same country of the redelivery port to be taken. The Charterers are allowed to replenish bunkers before delivery at Charterers' expense, and the Owners are allowed to replenish bunkers before redelivery at Owners' expenses subject to the Charterers' prior approval which not to be unreasonably withheld.

Wherever the word "fuel" appears in this Time Charter Party, same is understood to mean "bunkers".

Owners are to notify charterers as reasonably/practically soon  in writing of any alleged off-specification bunkers supplied to the ship failing which any claims arising from the supply of the alleged off-specification bunkers will be barred and waived against Charterers

### Clause No.31 Hold Cleaning

Hold Cleanness

On arrival at first loading port after delivery, Vessel's holds to be clean, washed down by fresh water and dried up so as to receive/carry Charterers' intended cargo in all respects free of salt, rust scale and previous cargo residues to satisfaction of the independent surveyors, should Vessel not be approved by surveyors then the Vessel to be placed off-hire from the failure of inspection until Vessel is fully accepted and



1

### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

directly related expenses including bunkers consumed during off-hire incurred thereby
to be for Owners' account.

Intermediate Hold Cleaning

Provided local regulations/weather safety/time permit and if so required by Charterers,
crew are to perform intermediate hold cleaning in Charterers' time. Charterers to pay
**USD 525 per hold** cleaned payable to Owner. The crew will do such cleaning to the
best of their ability with available equipment on board but totally without guarantee that
the cargo holds will be accepted at the subsequent load port(s). In case holds are not
passed, Owners/Vessel shall not be responsible for any consequences arising
therefore and Vessel to remain on hire throughout. Materials required for Hold
Cleaning and fresh water used for washing down holds to be for Charterers' account.
However, in case of failure of hold inspection due to rust, vessel will be off hired from
the time of failure until vessel passes the hold inspection

### Clause No.32 Watchmen

Watchmen hired from shore for cargo to be for Charterers' account, for Vessel to be for
Owners' account provided specifically ordered by Master. Compulsory watchman to be
for Charterers' account.

### Clause No.33 On-Hire/Off-Hire Surveys

A joint on-hire and off-hire survey to be carried out upon delivery and redelivery to
ascertain Vessel's conditions on delivery/redelivery and bunkers' quantity remaining on
board on delivery/redelivery by an independent surveyor. Time for on-hire survey to be
for Owners' account and for off-hire for Charterers' account but costs to be equally
shared between both parties.

### Clause No.34 Redelivery

A. It is agreed that Owners at port of redelivery are to take over the Vessel
immediately ready, day or night Saturdays, Sundays included, on dropping last
outward sea pilot. With reference to Clause 4, it is understood that redelivery
notice(s) will be given by Time-Charterers in good faith and based upon
information given to them.

B. If Vessel will load next cargo at same port as redelivery port, then redelivery to be
when/where ready provided no hold cleaning to take place and provided loading
can take place at the same berth immediately after completion.

### Clause No.35 Insurance

Ref. Line 32 and Clause 41 of "Trading Exclusion", Basic war insurance premium for
worldwide trading shall be for Owners' account and premium for Hull and Machinery
and officers/crew and crew war bonus, if any, due to Vessel's trading to the war risk
premium areas where additional premium required by Owners' Underwriters shall be
for Charterers' account, but such trading always to be subject to Owners' prior approval
which not to be unreasonably withheld. Insurance/extra insurance not to exceed official



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

quotation by Lloyds underwriters, London, however, if such insurance is not obtainable commercially or through a government, the Owner shall have the right to refuse Vessel entering into war zone. In case a war risk situation develops after the Vessel has loaded a cargo, the terms of "CONWARTIME 2004" War clause to be applied. Any premium for blocking and trapping in war areas to be for Charterers' account.

Charterers have the right to break Institute Warranty Limits subject to Owners' prior approval which not to be unreasonably withheld. Charterers to reimburse extra insurance premium incurred thereby but not higher than quoted by Lloyds London and only payable against scanned copy of original invoice.

**Clause No.36 Agents**
Charterers will have their agents to attend Owners' minor/normal husbandry affairs without charging separate agency fees, however should there be an extraordinary matter such as dry-dock, crew change, special survey, major repair, general average work for Owners' account, Owners shall employ Charterers' agents as Owners' husbandry agents and pay agency as per local recognized tariff or Owners at their option shall appoint own husbandry agents at their expense.

**Clause No.37 Grace Period**
If there is any failure in punctual payment due to oversight or negligence or error or omission of Charterers' employee, Bankers or agents otherwise for any reason when there is absence of intention on behalf of the Charterers to fail to make payments as set out, Charterers shall be give by Owners three banking working days written notice to rectify the failure and when so rectified, the payment shall stand as punctual payment but if Charterers fail to rectify the payment within three banking working days, Owners to hold the option to put Charterers on notice that they are going to withdraw the vessel from the service.

**Clause No.38 Warranties**
Owners further warrant that this Vessel has not entered Cuban ports or place since 1st November 1962 nor will enter such port or place prior to delivery under this Charter Party. It is further understood that, to the best of Owners knowledge, this Vessel is not blacklisted by Arab countries, and also that Vessel is not restricted due to previous trading.

Vessel is not blacklisted by Canada/U.S.A. in relation to recent Yugoslavia etc.
Owners guarantee Vessel has not traded C.I.S. Pacific ports the past 2 years.

**Clause No.39 Master's Instructions**
The Master is to conform with Charterers' or their representatives' or their agents' instructions and to execute the voyage(s) with the same due care and diligence as if he was trading for Owners' own account. Charterers to furnish Master with voyage report forms and other relevant documents which the Master to return to Charterers reporting about voyages performed including log abstracts. Such documents to be written in English.



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

**Clause No.40 Condition Inspection**

Charterers to have the option of holding a condition inspection including hose testing for checking hatch sealing integrity at any time during currency of this Charter Party, the Owners and Master giving every facility and assistance to carry out this inspection which to be carried out without interrupting the working of the Vessel and without incurring expenses for the Owners.

**Clause No.41 Trading Exclusion (Areas)**

Trading to be worldwide between safe berths/ports, always safely afloat (Except Safely Aground as per Clause 6 of this Charter Party), always within IWL of the vessel's underwriters excluding war and warlike zone (as defined by Joint War Committee), any country banned by the flag state and United Nations, any country sanctioned by U.S.A. and E.U. and excluding Cambodia, Cuba, Democratic Republic of Congo, Eritrea, Haiti, Iran, Iraq (except for UN approved cargoes which Owners allow for discharging in Iraq), Kenya, Mozambique except southern part of Beira, Nigeria, North Korea, Russian Pacific ports, Syria, Somalia, Tanzania

Charterers shall try their best to avoid to trade the vessel for transit of Gulf of Aden or other high piracy risk areas. But Owners will consider case by case when Charterers have difficulty for other trade. In such case, detailed term and conditions shall be discussed based on BIMCO Piracy clause including but not limited to Armed Guards, K&R Insurance, and other protection measures to be arranged/paid by Charterers.

Should political situation and practices of international shipping change, Charterers and Owners may discuss in a bona-fide spirit to agree to include or exclude any countries.
(See Clause 35)

**Clause No.42 Lay-Up Clause**

The Charterers shall have the option of laying up the Vessel for all or any portion (exceeding 30 days) of the Charter period, in which case hire hereunder shall continue to be paid, but there shall be credited against such hire the whole amount which the Owner shall save (or reasonably should save) during such period of lay-up through reduction in expenses, less any extra expenses to which the Owner is put as a result of such lay-up.

Charterers to give Owners prior notice about their intention of lay-up in order for Owners to calculate economical impact (reduction of Owners cost) and prepare for reducing the costs.

**Clause No.43 Deviation/Off-Hire Clause**

In the event of the Vessel deviating (which expression includes drydocking, putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or for any purpose, unless caused by acts or omission or default of the Charterers, the hire shall be suspended as from the



## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11ᵗʰ December, 2014

commencement of such deviation until the time when the Vessel is again ready and in an efficient state to resume her service from a position not less favorable to Charterers than that at which the deviation commenced. In the event of Vessel for any cause or for any purpose aforesaid, putting, into any port other than the port for which she is bound on the instructions of Charterers, the port charge, pilotage and other expenses at such port shall be borne by Owners. Bunker price during off hire to be Charterers last purchase price.

### Clause No.44 Certificates

Vessel to be in possession of necessary international certificates, including deratization certificate, to comply with safety and health regulations and all current requirements at ports of call during the currency of this Charter Party. Vessel will comply with and be maintained in accordance with the requirements of the Commonwealth of Australia loading and unloading safety measure regulations, including Commonwealth of Australia Navigation regulations, order No.12 of 1986, including regulations dated 8.8 1986 and all cargo gear to be approved by Australian Waterside Workers Federation. Any time lost or expenses involved by not having or in obtaining such valid or approved certificate to be for Owners' account. Owners assure Charterers that conditions aboard this Vessel conform with SOLAS 1974 and the Vessels capacity plan should so indicate and refer to untrimmed hold ends. Vessel to have on board as approved grain loading manual from the Vessels' classification society.

### Clause No.45 Safety Regulations

It is understood that Vessel will comply with any international safety regulations and/or requirements in effect at ports of loading and/or discharging, a particular reference is United States Safety and Health Regulations for Longshoring (Public Law No. 85/742 Part 9). Should the Vessel not comply with nor not meet safety rules and regulations Owners will make immediate corrective measure and any stevedore standby time and other expenses involved including off-hire incurred due to vessel's non-compliance of international safety regulations will be for the Owners' account.

### Clause No.46
Deleted

### Clause No.47 Oil Pollution Clause – P and I Group Recommended Clause
Financial responsibility in respect of pollution

1. Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates:
(a) If the vessel is over 1,000 gross tons and is registered in, or is required to enter a port or offshore facility in the territorial sea of a State Party to the International Convention on Civil Liability for Bunker Oil Pollution Damage 2001, a Certificate issued pursuant to Article 7 of that Convention.
(b) If the vessel is constructed or adapted for the carriage of persistent oil in bulk as



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

cargo and is carrying more than 2,000 tons of such cargo, a Certificate issued pursuant to Article 7 of the International Convention on Civil Liability for Oil Pollution Damage, 1992, as applicable.

(c) If the vessel is over 300 gross tons and is required to enter US navigable waters or any port or place in the US, a Certificate issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with US Coast Guard Regulations, 33 CFR Part 138.

2. Notwithstanding anything whether printed or typed herein to the contrary,

(a) save as required for compliance with paragraph (1) hereof, owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

(b) Charterers shall indemnify owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which charterers and/or the holders of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

3. Charterers warrant that the terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this charter.

**Clause No.48**
Deleted

**Clause No.49 Protective Clause**
The New Jason Clause, Both-to-Blame Collision Clause, New Both-to-Blame Collision Clause and CONWARTIME 2004, P and I Bunkering Clause, as applicable, are all to be considered as part of this Charter Party and Bill(s) of Lading shall be subject to all said clause. The U.S.A. and Canada, Clause Paramount as applicable, or the Hague Rules as enacted in countries other than the U.S.A. and Canada, as applicable, to be incorporated in all Bill(s) of Lading and this Charter.

**Clause No.50 Bill(s) of Lading**
"No through Bill(s) of Lading to be issued
Neither the Charterers nor their agents permit the issue of any Bill(s) of Lading, Sea



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

Waybill(s) or other documents evidencing a contract of carriage (whether or not signed on behalf of the Owners, or on the Charterers' behalf, or on behalf of any sub-Charterers) incorporating, whether or not compulsorily applicable, the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against liability loss or damage which may result from any breach of the foregoing provisions of the clause".

Master is to sign the bills of lading for cargo as presented strictly in conformity with mate's or tally clerk's receipt without prejudice to the Charter Party. If requested, master to authorize Charterers or their agent to sign the bills of lading for cargo as presented strictly in conformity with mate's or tally clerk's receipt.

(See Clause 100 Sea Waybill Clause)

**Clause No.51 Radio Clause**
Deleted.

.

**Clause No.52 Vessel's Description (figures all about)**
One 81,600 DWT bulk carrier to be constructed and built newly by Tsuneishi Shipbuilding Co., Ltd Japan (the Builder), based on the Principal Particular (D1222082SP-3) Classed NK and Flagged Panama or its equivalent at Owners option.

- Vessel to be applied A60 insulation to fore bulkhead in E/R
- Mooring arrangement for NOSHIRO port to be applied
- Vessel to be fitted with ballast water treatment system.
- Hold Co2 extinguisher system is **Not** fitted
- **Strengthened for heavy cargo loading where hold no. 2, 4 & 6 may be empty**
- **Vessel can load grain/grain products without any extra lashing/securing**
- Vessel to be equipped with side rolling hatch covers and be suitable for grab and bulldozer discharge subject to vessel's tanktop strength.

**The Charterers questionnaire will be sent a few month/week before the delivery. To be completed by owners prior to delivery to the extent that Owners/Managers can.**

Tentative Guaranteed Speed/FO Consumption
Laden    : about 13.50 knots on about 31.50 MT/day IFO for main engine use only
Ballast   : about 14.50 knots on about 31.50 MT/day IFO for main engine use only
Above figures are under good weather condition upto and including Beaufort Scale 4 and Douglas Sea State 3.
"about" means the allowance of 0.5 knot for speed and 5% for Bunker Consumption

It is understood that all figures, and technical information, including speed / consumption figures, in this description, are on an about basis. Full description shall be provided to Charterers when same is made available to Owners by the shipyard.



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

Revised tentative speed and consumptions of the vessel to be advised to Charterers after completion of Sea Trial, and guaranteed speed consumption figures to be agreed on her actual performance of the vessel for first 6 months performance since delivery to Charterers. Guaranteed speed/consumption to be reviewed after completion of her 1st special survey with consideration of deterioration.

After the vessel's first special survey, the wording "tentative" to disappear from the vessel's description and speed and consumption figures agreed on her actual performance to be guaranteed and continuing throughout the period of this Charter Party.

**Bunkers specifications:**

at all times charterers to supply IFO 380cst which to be at least in accordance with ISS 8217: 2005 (e), RMG380. MDO according to ISO 8217 2005(e) DMB. MARPOL Annex vi to apply

Charterers have the option to supply ISO 8217 2005 (e) RMF 180 in ports where no IFO 380 cst is available

Vessel burns MDO for M/E when manouvering, navigating in / out and passing ports and in narrow / shallow / restricted / confined waters, rivers, canals and when the vessel carries out hold cleaning and bilge pumping.

All details are "about"

**Clause No.53 Australian Hold Ladders/Cranes**

Vessel to be fitted with hold ladders in accordance with Australian Navigation Act on delivery and Owners to maintain same in efficient order during the currency of this Charter Party. Cranes to be constructed and maintained in accordance with Australian navigation Act.

**Clause No.54 Cargo Claims**

Any liability to third parties for cargo claims to be borne by Owners/Charterers in accordance with the Interclub NYPE agreement dated May 1984 and any subsequent amendments.

**Clause No.55 Cargo Exclusions**

The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, injurious, flammable or corrosive nature unless carried in accordance with the requirements or recommendations of the competent authorities of the country of the Vessel's registry and of ports of shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must pass.

Notwithstanding provisions of above paragraph, in addition, the followings are specifically excluded:



## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11th December, 2014

Livestock of any description, scrap, arms, ammunition, explosive (black powder, blasting caps, loaded bombs, detonators, dynamite, TNT), nuclear and radioactive materials and its waste, tar in bulk, turnings and motor blocks, hot briquetted iron, petroleum and its by-products(except for Petcoke), pitch in bulk, borax in bulk, bitumen, quebracho, sodium sulphate, calcium hydrochloride, bonemeal, charcoal, turpentine, ferro silicon, resin, cotton, nitrate, lime, Chilean nitrate, copra, pond coal, pebbles, brown coal, Indian coal (well understood that it means coal loaded in India), sponge iron, asphalt, sunflower seed expellers, ammonium nitrate (but fertilizer grade which does not require $CO_2$ or inert gas system in cargo hold is permitted), naphtha and its products, direct reduced iron, direct reduced iron ore pellets, asbestos, fishmeal, wet hides, creosoted goods, calcium carbide, motor spirits, industrial waste, acids, logs, lumber and any other cargoes (except coal and sulphur) listed in Appendix B to BC code.

Oilseeds/oil cakes/seed cakes/soybean meal (as the case might be) are allowed provided loaded within IMO/Class regulations.

### In case of loading Salt and Sulphur
Maximum two (2) cargoes of salt and maximum two (2) cargoes of sulphur per year, but shall not be consecutive voyages and shall not be last voyage before redelivery which is to be loaded, stowed, carried and discharged strictly in accordance with applicable national/international regulations and/or IMO Code and recommendations at Charterers' risk and expenses. If required by Shippers and Owners, Charterers to arrange lime coating/washing or Hold Block Treatment in Charterers' option at the Charterers' time and expenses. To coat holds with lime which is supplied by Charterers to Master's satisfaction prior to loading salt and to arrange removal of the same to Master's satisfaction. Charterers may request the Vessel's crew to perform above removal of lime paying lumpsum USD 600 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port.

### In case of loading Cement
Maximum two (2) cargoes of cement per year, but shall not be consecutive voyages and shall not be last voyage before redelivery. Charterers may request the Vessel's crew to perform hold cleaning paying lumpsum USD 500 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port. Charterers shall provide the Vessel with one set each of a water toby and submerged pump to facilitate such extra works by the Vessel's crew. Owners to seal all hatches where such cargo loaded by marine tape or similar tape if required by Charterers, but cost of such tape to be reimbursed by Charterers upon completion of loading. The Vessel's bilge line will not be customarily used for discharge of bilge water after hold cleaning of cement.

### In case of loading Petcoke



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

Charterers have the liberty of carrying max two(2) cargoes of non oily petroleum coke (whether it be full or part cargo) each year, if exercised on following conditions:

a) The petroleum coke mentioned herein is only limited to the type of non-hazardous/non-dangerous green delayed type and/or calcined type.
b) If Charterers exercise such options, Charterers undertake to use the least number of holds possible, provided vessel's stability trim and stress permitting.
c) Such cargo to be loaded/stowed/trimmed/discharged strictly according latest IMO and/or any other latest regulations/rules applicable to such cargo.
d) Should any additional/special wash down of holds before loading be reasonably recommended/proposed/required by Master, Charterers undertake to arrange the same at their expense/time, however, Master and crew to always cooperate with Charterers.
e) After discharging Charterers to arrange at their expense/time any additional/special wash down of holds carrying such cargo by chemicals as Master reasonably consider if necessary, however, Master and crews to always cooperate with Charterers.
f) Such cargo not to be last cargo prior redelivery.
g) Any extra expenses resulting there from/incurred thereby and any detention through any of the above causes to be for Charterers' account.

### Clause No.56 Captain's Conduct
It is understood that if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers or Engineers, the Owners shall on receiving particulars of the complaint, investigate same and if necessary make a change in the appointment but this provision does not affect the Charterers' rights to advance any claims or require arbitration under Clause No.17 of disputes regarding the conduct of the Master in prosecution of voyages and in carrying out the orders and directions of the Charterers.

### Clause No.57 Itinerary
Deleted.
### Clause No.58 Breakdown of Cargo Gear
Deleted

### Clause No.59 Crew Service
Subject to local regulations permit, the following service in respect of loading and discharging, operation from officers and crew are included in hire.
1. Raising, lowering and rigging cranes and/or gangways in preparation for loading and discharging, if port regulation permits.
2. Opening and closing of hatches in connection with loading and discharging if local regulations allow, otherwise to be for Charterers' account.
3. Closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging, if port regulation permits.



10

### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

4. Maintaining sufficient electric power whilst loading and discharging including regular maintenance and shifting between berths.
5. Docking and undocking in connection with loading/discharging cargo or bunker. Necessary assistance in the Vessel's bunkering operation.
6. Officers and crew to shape up Vessel's hatches as much as possible prior to arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to seaworthiness, weather condition and safety of crew.

The above service shall be considered as a minimum and done as Charterers' servants and shall in no way be construed as and alternative to or reduction in the standard of services from officers and crew required under this Charter Party.

### Clause No.60 Charterers' Gear Maintenance
Deleted

### Clause No.61 Deck Cargo – Deleted
No Deck cargo allowed

### Clause No.62 Capture/Seizure/Detention/Arrest
Should the Vessel be captured / seized, or detained / arrested / boycotted by any authority or by any legal process during the currency of this Charter Party, the payment of hire shall be suspended until the time of her release and until the time she has been returned to the same or equivalent position, unless such capture / seizure, or detention / arrest is occasioned by any personal act or omission or default of the Charterers or their Agents. Any direct extra expenses, including the costs of bunkers consumed, incurred by and /or during the above capture / seizure, or detention / arrest shall be for Owners' account.

Charterers to have the option to cancel the balance of this Charter period after the vessel has been off-hire under this clause for more than 45 consecutive days without prejudice to any their rights the Charterers may have under this Charter. In such event, Owners and Charterers endeavour to discuss in good faith for any alternative solution(s).

### Clause No.63 Bimco Double Banking Clause
(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11ᵗʰ December, 2014

of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his opinion it is not safe to do so.

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

### Clause No.64 Lumpsum Amount for Cable/Entertainment/Victualling
Charterers to pay Owners lumpsum USD1,500 per month or pro rata for cable/entertainment/victualling, etc.

### Clause No.65 Time Calculation
The time for delivery/redelivery shall be adjusted to GMT.

### Clause No.66 In Lieu of Hold Cleaning
Charterers shall have the option to redeliver the Vessel without cleaning of holds against paying the Owners a lumpsum of USD7,000 in lieu of such cleaning. However, Charterers shall arrange, at their own account, dunnage removal by shore labour. Alternatively, subject to consent by crew and subject to port regulations, Charterers have the option of using crew for dunnage removal. Charterers shall remain responsible for the disposal and any cost related thereto.

### Clause No.67 Trim and Stability
Cargoes to be loaded and distributed in such a manner that the Vessel's bending moments, stress forces, trim and stability will not exceed permissible limitations. Vessel to be left in safe seaworthy trim for shifting between berth and all ports to Master's satisfaction.

### Clause No.68 Discharge of Cargo without Presentation of Original Bill(s) of Lading
Owners allow Charterers to discharge cargo without presentation of Original Bill(s) of Lading by providing Owners with Charterers Letter of Indemnity in accordance with Owners P and I Club form and wording before discharging. Letter of Indemnity to be signed by Charterers only.

In the event that Charters instruct the vessel to change discharging port after Bills of Lading have been issued. Owners agree to follow the instruction against LOI on



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

Owners' standard P&I Club wording signed by Charterers only received in advance.

**Clause No.69 Weather Routing**

The performance details of the Vessel given in this Charter Party are based upon performance in good weather conditions and the words good weather conditions shall mean any weather condition in which the wind force does not exceed Force 4 on the Beaufort Scale, sea condition up to sea state 3 on the Douglas Scale, and no adverse current.

Charterers shall supply weather services from DMI or other routing services elected by Charterers to the Master/Vessel during any period of time/any specified voyage while under the present Charter Party. The DMI or other routing services elected by Charterers service cost shall be for Charterers' account. The Master shall comply with the reporting procedures of the weather service and follow its recommendations with regard to optimum course(s), but the Master may deviate from the route If he has reasonable grounds to believe that such a route will compromise the safe navigation of the Vessel.

In the event the Charterers supply the Master with weather routing information, although not obliged to follow such routing information, the Master shall comply with the reporting procedure of that service. Should the Vessel's Master elect not to follow DMI or other routing service elected by Charterers' recommendations, both DMI or other routing service elected by Charterers and Charterers shall be advised by radio message giving reasons for non-compliance.

The Vessel is allowed to use Marine Diesel Oil when maneuvering and passing narrow/ restricted/ confined water, Including when the Vessel carries out hold cleaning and bilge pumping.

**Clause No.70 War Cancellation**

If war breaks out between any two or more of following countries: U.S.A., Russia., Peoples Republic of China, South Korea, Japan, UK, Greece and vessel's Flag State directly affecting the performance of the Charter Party, both Owners and Charterers shall have the option to cancel the Charter whereupon the Charterers shall redeliver the Vessel to the Owners. If she has the cargo on board after discharge thereof at destination or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board, at a port at which she stays, or if at sea a near and safe port as directed by the Charterers. In all cases hire shall be paid until the Vessel's redelivery.

**Clause No.71 Quarantine**

Normal quarantine time and expenses for the Vessel entering port shall be for the Charterers' account, but any time of detention and expenses for quarantine due to pestilence, epidemics among or illness of captain, officers and crew shall be for Owners' account.



## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11th December, 2014

**Clause No.72 Smuggling**

Any delay, expenses and/or fines incurred on account of smuggling shall be for Owners' account if caused by the officers and/or crew and shall be for the Charterers' account if caused by the Charterers' supercargo and/or their staff or agents.

**Clause No.73 Additional Equipments/Fittings**

The Charterers, subject to Owners' prior approval not to be unreasonably withheld, shall be at liberty to fit any additional equipment/fittings for loading, discharging and/or securing cargo and such fittings are not to affect the structure of the Vessel including coating in tanks etc. Such work shall be done at the Charterers' expenses and time and the Charterers shall remove such equipment and fitting and restore the Vessel to her original conditions including repair of coatings at their expenses and time prior redelivery.

Charterers' option to weld padeyes under Master's supervision and subject to Master's approval, which not to be unreasonably withheld and Charterers to remove padeyes. Charterers further option to redeliver Vessel without removal of padeyes in consideration of Charterers to pay Owners USD15 per padeye.

Vessel has no cement holes on hatches, however, Charterers have the option to make holes in each hatch for loading cement in bulk at their time and expenses, subject to Owners/Class confirmation.

**Clause No.74 U.S. Unique Bill(s) of Lading Identifier Clause**

The Charterers warrant that each transport documents accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a unique Bill(s) of Lading identifier as required by the U.S. Customs Regulations (19 CFR, Part 4 Section 4.7.a) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

**Clause No.75 Admixture Clause**

Deleted

**Clause No.76 IMO Clause**

The Charterers are to provide the Master with any evidence he may reasonably require to show that the cargo is packed, labeled, loaded, stowed, carried and discharged in accordance with IMO regulations, failing which the Master is entitled to refuse to load such cargo, or if already loaded, to unload it at Charterers' risk and expenses, however,



## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11th December, 2014

Charterers to be given reasonable amount of time to comply with Master's request prior Master/Owners taking corresponding action. In case local and/or national authorities require special documentation for any cargoes covered by IMO Code, Charterers are to list cargoes (always in accordance with the Charter Party-see also cargo exclusion Clause No.58) then they are to reimburse Owners for any extra expenses by Owners as a result of same.

### Clause No.77 Dry-Docking Clause

Owners have the option to place the vessel in drydock during the currency of this Charter at intervals of about 30 months for periodical drydocking (twice in every 5 years total 4 periodical drydocking in 10 years since delivery from shipyard), and Charterers shall bring the vessel to a port within the range of Japan – Singapore range for her drydocking. Owners will give 5 (five) months prior drydock notice to Charterers regarding the place of the vessel in drydock.

Owners have the right to place her into drydock at any time in case of emergency (See Clause 43)

### Clause No.78 Payments

The first hire and bunker value remaining on board on delivery to be paid within three (3) banking days after Vessel's delivery. Charterers are entitled to deduct estimated Owners' expenses /maximum USD 500 per port and bunker value on redelivery from last sufficient hire. The time for delivery/redelivery shall be adjusted to GMT.

Owners' bank account to be advised later when confirmed.

### Clause No.79 ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

### Clause No.80 Fumigation Clause

Vessel to be in possession of a valid deratization or exemption certificate throughout the duration of the Charter Party. Charterers are on written request permitted to fumigate Vessel's holds with or without cargo on board at loading and discharging port(s) or places en route at their risk and expenses and warrant that fumigants will not expose officers and crew as well as other persons on board the Vessel during and after the fumigation to any health hazard whatsoever and will comply with current IMO regulations. Charterers undertake to also pay Owners all necessary expenses incurred because of the fumigation including necessary expenses for accommodating and



**Additional Rider Clauses to
M/V TBN (Tsuneishi Hull No. 1549)
Charter Party Dated 11th December, 2014**

victualling Vessel's personnel ashore and to indemnify Owners in respect of any liability, loss, damage, or expenses which they may sustain because of the fumigation. Any time lost thereby counts as on-hire.

If requested by Charterers the Vessel is to be fumigated en route from loading port(s) to the first discharging port on condition that Charterers to arrange fumigator on board at Charterers cost/time/risk with submission of LOI on following conditions, or, instruct crew to fumigate on behalf of Charterers on following conditions.

1. In case of fumigator on board, Charterers shall furnish Owners the Letter of Indemnity (*sample as follows).
2. If fumigator not on board, Charterers shall arrange proper training and documentation for crew in such manner satisfying IMO recommendations by fumigator. Charterers confirm that crew assist in-transit fumigation on behalf of Charterers at Charterers risk/responsibility and in case of injury/disease by crew due to in-transit fumigation, Charterers will reimburse all costs incurred due to in-transit fumigation.
3. Initial setting of fumigants shall be made by the fumigator without involving crew members.
4. Charterers shall supply proper equipment for fumigation which to be retained until complete discharging of the cargo. Charterers to provide all the necessary apparatuses if needed according to local regulation/IMO regulation.
5. Charterers shall remove residue of fumigant where possible at the first port of discharging after fumigation completed at Charterers time/risk/cost.
6. Charterers' fumigation company shall be available to Ship/Owners/Ship managers for information and advise during entire voyage of in-transit fumigation.

*Sample of L.O.I.
Letter of Indemnity to be given in return for fumigation transit
[Charterers Letter Head]
Letter of Indemnity for In Transit Fumigation
To the Owners of the M/V XXXX        [*insert date*]

In consideration of your allowing our fumigator [*insert name of fumigator full name and ID number*], to join the above vessel from [*insert name of embarkation port*] to [*insert name of disembarkation port*] and to conduct the fumigation during the voyage, we, [*insert Charterers full company name*], hereby undertake to make no claim of any nature whatsoever against you, your crew members, your servants or agents, whether or not such claim be occasioned by the negligence act or default of you or any of you, not to claim against any person whom you or any or you may be liable to indemnify by contract or otherwise, and we also agree to relinquish any right which our fumigator may require to participate in salvage monies.

We also agree to indemnify you and such of you against any claim whatever by any person arising out of any act, omission or default by our fumigator onboard.



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11ᵗʰ December, 2014

We also undertake to insure and indemnify you against any charges or expenses which you may pay or become liable to pay for hospital, medical, loss of life, injury, illness, damage to personal effects or other property, burial, repatriation for any reason, deviation for the purpose of any reason, maintenance, fines or penalties on our account, and further to insure and indemnify you against any claim whatsoever by any person arising out of any act, omission or default by our fumigator during his (her) stay onboard the vessel.

It is further expressly agreed hereby that throughout this Guarantee the word "Owners" shall include the all crew members of the said vessel, the servants and agents of the Owners of the said vessel, whether afloat as shore, and any person or persons whom the said Owners may be liable to indemnify against such claims by contract or otherwise.

Yours Faithfully

**Clause No.81 Consumption of MDO**
The vessel to have the liberty of using diesel oil when entering and leaving port and for maneuvering in shallow narrow waters, canals and rivers.

**Clause No.82 Charterers' Colour**
Charterers have privilege of naming the vessel and flying their own funnel mark, hull side mark, bow mark at Charterers cost. Charterers shall on redelivery rename her in Owners name and repaint their funnel mark, hull side mark, bow mark as per Owners' standard at Charterers cost, risk and time Charters have the option to redeliver the vessel without renaming and/or repainting funnel , hull side mark and bow mark against paying the Owners actual costs incurred on Owners.

**Clause No.83**
Deleted

**Clause No.84 I.T.F.**
Owners guarantee that the Vessel's officers and crew on board are employed in accordance with I.T.F. standards or other bona fide Trade Union Agreement conforming to the I.T.F. standards.

**Clause No.85 The Laycan of the Vessel**
Between 1st July, 2016 and 31st December, 2016 at Owners option. Cancelling date is based on the terms and conditions of the shipbuilding contract between the Owners and the Builder.

Should the vessel fail to be delivered to the Owners by the yard for reasons outside of Owners/yard control then this Charter Party shall be considered null and void (save to the extent that Charterers rights under this CP shall remain in force during the period



17

## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11th December, 2014

up to the time when the Charter Party has been considered null and void). Should vessel fail to be delivered under this CP, except in circumstances where, for reasons of force majeure or for reasons outside the control of the shipyard, vessel is not delivered to Charterers, Owners to give proof/evidence as to why the vessel failed to deliver.

**Clause No.86 Time Charter Period**
Seven (7) firm years plus one (1) year plus one (1) year plus one (1) in Charterer's Option, 60 days more or less at Charterers Option on last actual year only. Each option to be declarable 3 months prior minimum period of present period. New hire rate to count as from last day of current period.

**Clause No, 87 Speed Claims/ Miss description**
If during the currency of this Charter Party the speed of the Vessel (as described in Clause 52) be reduced and/or oil fuel consumption be increased, Charterers, after receiving confirmation of such reduction of speed or increase in consumption from Owners, shall have the right to deduct from hire an amount equivalent to the time lost and/or cost of any extra fuel consumed (with supporting vouchers for bunker cost) in accordance with the conditions set out below.

The Charterers may appoint Weather Bureau to supply Weather Routing advice to the vessel during the duration of this Charter Party. The Master to comply with reporting procedures of the routing service and to follow the Weather Routing advice issued by the appointed Weather Bureau at all times except the emergency case and the case master has reasonable ground to believe that route recommended by weather bureau would affect vessel's and/or cargo's and/or crew's safety, in such exceptional case, vessel may depart from the recommended route and Master advise his decision with reason to Charterers.
Evidence of Weather conditions are to be taken from the vessel s deck logs and reports of the Weather Bureau but in the event of consistent discrepancy between the dock logs and report of the independent Weather Bureau, then the Weather Bureau findings shall be taken as ruling and binding all parties.

Performance to be reviewed at the end of each calendar year, any passages less than 24 hours to be excluded from performance settlement, and Owners to receive credit or compensation only to the extent that such credit or compensation shall be applied as offsets to the Charterers' claim for underperformance if any during the review period. (i.e. reduction in speed for 1 particular voyage may be offset against any increase in speed for another voyage, increase in bunker consumption for 1 particular voyage may be offset against any saving of bunkers for another voyage).

Charterers shall always make allowance for 0.5 knots speed / 5% consumption in respect of the "about" describing vessel's speed/consumption.

**Clause No.88**
Deleted



18

## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11ᵗʰ December, 2014

**Clause No.89 Hire**
With reference to Clause 5, Charterers shall pay semi-monthly in advance for the use and hire of the Vessel to Owners at following rate per day or pro rata including overtime :-

Firm years: US$ 14,500 (fourteen thousand five hundred dollars) or pro rata per day including overtime net receivable to Owners

Optional 8th year: US$ 15,250 (fifteen thousand two hundred fifty dollars) or pro rata per day including overtime net receivable to Owners

Optional 9th year: US$ 16,000 (sixteen thousand dollars) or pro rata per day including overtime net receivable to Owners

Optional 10th year: US$ 16,750 (sixteen thousand seven hundred fifty dollars) or pro rata per day including overtime net receivable to Owners

**Clause No.90 Purchase Option**
Charterers have the option to purchase the vessel under the "ADDENDUM No.1" which will be made separately by and between Charterers and Owners.

**Clause No.91 Adding Off Hire Period**
Charterers have the option to of adding such off hire period (excluding off-hire due to periodical, customary, class required dry-docking, but not excluding off hire arising from emergency drydock) to the Charter Period at the hire rate such off hire is incurred. Such option shall be declared by Charterers not later than 60 days before redelivery

**Clause No.92 AGM (Asian Gypsy Moth) Clause**
At the date of delivery to Charterers, Owners guarantee the vessel is free of any infestation by the AGM or its eggs. Consequently, at the date of re-delivery to Owners, Charterers guarantee the vessel is free of any infestation by the AGM or its eggs. During Charter Period, if Charterers order vessel to call at any of high risk ports designated by any authority(ies), Charterers to obtain AGM free certificate at Charterers expense.

**Clause No.93. Bottom Fouling**
In the event that the vessel is ordered by Charterers to stay for a prolonged period (prolonged period means one stay of more than 25 consecutive days) in a port or anchorage waiting for berth or otherwise, and, as a result, the vessel's hull is fouled and this fouling causes a loss of performance (based on pre-long stay voyage performance and after-long stay voyage performance), Charterers/Owners shall promptly arrange a joint underwater inspection by an independent survey company and underwater cleaning (if necessary), for which cost shall be equally shared Charterers / Owners.

If such hull fouling causes the loss of performance (based on pre-long stay voyage performance and after-long stay voyage performance), the vessel's performance



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

warranties are suspended in respect of the underperformance attributable to the fouling until the hull can be inspected and, if necessary, cleaned. If, despite the availability of her class society approved underwater inspection company(ies) or suitable cleaning companies, Owners refuse to give their permission for cleaning to be carried out then the speed and consumption warranties will be reinstated from the time of Owners' refusal.

**Clause No.94. Hatch Cover Condition**
The Owners guarantee that the Vessel's hatch covers are weathertight all through this Charter period and if any hatch cover is found defective, same shall be rectified at Owners' time and expenses to class surveyor's satisfaction. If such defects are not rectified before loading, the Vessel is considered to be off-hire until all hatch covers are satisfactory rectified. The Charterers also have the right to carry out suitable weather tightness test on all hatches at any time during the currency of this Charter Party.

**Clause No.95 Grain Fitted**
The Owners guarantee that the Vessel shall be suitable for carrying all kinds of grain in bulk without shifting board, bagging or securing except for special slack hatch condition deviated from standard condition as specified in the loading booklet of the Vessel. The Owners also guarantee that the Vessel can load part cargoes of grain and/or other cargoes and shift between ports with some holds empty and/or slack subject to the Master's approval which should be fully comply with SOLAS regulation and port regulation for stability of the Vessel.

**Clause No.96 Suez/Panama Canal Transit**
The Vessel is fully fitted for Panama/Suez Canal transit and in possession of necessary certificates on board in conformity with the current Canals' regulations/requirements.
Owners also confirm that the vessel will be compliant with the OP NOTICE TO SHIPPING No. N-1-2014 "Vessel Requirements" issued by Panama Canal Authority which will allow her to transit through the new larger locks

**Clause No.97**
Owners to guarantee the vessel to be fully covered by a member of International Group P&I Club through the Charter Party Period

**Clause No.98 Anti Corruption Clause**
Both Owners and Charterers undertake that they shall not, directly or indirectly, pay any bribe nor require any party to do so, nor otherwise act in violation of any applicable anticorruption law, including but not limited to, the United States Foreign Corrupt Practices Act 1977, the United Kingdom Bribery Act 2010 and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.



## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11th December, 2014

**Clause No.99 Sanction Clause**

Both Owners and Charterers confirm that they have not and shall not, whether directly or indirectly, engage in any business with or for the benefit of any government, entity or individual in sanctioned countries and any other geographic areas including but not limited to Cuba, Libya, Iran, North Korea, Sudan or Syria, if those business would be prohibited or sanctioned by the United States or the United Nations.

Both Owners and Charterers confirm that they have not and shall not participate or cooperate with the Arab League Boycott of Israel or any other boycott not participated in by the United States.

Owners and Charterers confirm that they are, and shall remain, in compliance with all economic and trade sanctions, policies, guidelines or regulations and anti-boycott legislation, policies guidelines or regulations issued by the OFAC, the U.S. Department of Commerce, the U.S. Department of the Treasury, the Directorate of Defense Trade Controls and the United States Customs and Border Patrol.

**Clause No.100 Sea Waybill Clause**

If requested by Charterers, Owners/Master to authorize Charterers and/or their agents to issue and sign Sea Waybill(s) instead of bills of lading, always in conformity with tally clerk and mates receipt.

When Sea Way bills are issued, the cargo is to be delivered to only to the consignee named in the Sea Waybill at the port declared by Charterers and stated in the Sea Waybill. Consignee to provide the Master/Owners documentary evidence that he is the consignee named in the Sea Waybill before commencement of discharging.

Charterers will not be required, where Sea Way Bills are issued under this clause, to issue a LOI or present Original Waybill to Owners / Master

Charterers hereby indemnify Owners and hold them harmless in respect of any liability, loss, damage or expenses which may arise by reason of the cargo being delivered by Sea Waybill(s)"

This clause to be applied for discharging at Japanese Private berth, Taiwanese Private Berth or Korean Private Berth only.

### Clause No.101 BIMCO EU Advance Cargo Declaration Clause for Time Charter Parties 2012

(a) If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU ("Exported") or loads cargo outside the EU destined for an EU port or place or passing through EU ports or places in transit ("Imported"), the Charterers shall, for the purposes of this Clause, comply with the requirements of the EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall, in their own name, and in their time and at their expense:



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

(i) Have in place an EORI number (Economic Operator Registration and Identification);

(ii) Provide the Owners with a timely confirmation of (i) above as appropriate; and

(iii) Where the cargo is being:

1. Exported: Submit, or arrange for the submission of, a customs declaration for export or, if a customs declaration or a re-export notification is not required, an exit summary declaration; or

2. Imported: Submit, or arrange for the submission of, an entry summary declaration.
   Unless otherwise permitted by the relevant customs authorities, such declarations shall be submitted to them electronically.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

### Clause No.102 RIGHTSHIP Clause
Owners to extend their co-operation to help Charterers to obtain RIGHTSHIP approval

### Clause No.103 Tax Clause
A)   All Taxes and/or dues on the Vessel and/or cargo and/or Freight arising out of the cargoes carried or the ports visited under this Charter Party shall be for Charterers account, except

B)   Income tax and/or tax on time Charter Hire levied on the Vessel by the country of the vessel's registration and/or her Owners domicile or residence which to be for Owners account.

C)   Regardless of the sub Clause A, Owners to ensure/proceed the exemption procedures stipulated under U.S. Tax Reform 1986 from US Gross Transportation tax which to be charged on Owners due to charter hire income earned during any voyage to/from the port in U.S.A.

### Clause No.104 NEW BOTH TO BLAME COLLISION CLAUSE
If the liability for any collision in which the Vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the Ship comes into collision with another Ship as a result of the negligence of the other Ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of this Ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying Ship or her Owners In so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or



22

## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11th December, 2014

payable by the other or non-carrying Ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying Ship or her Owners as part of their claim against the carrying Ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any Ship or Ships or object other than, or, in addition to, the colliding Ships or objects are at fault in respect to a collision or contact.

### Clause No.105 GENERAL AVERAGE AND THE NEW JASON CLAUSE
General average shall be payable according to the York Antwerp Rules 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### Clause No.106 NEW JASON CLAUSE
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statue, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving Ship is owned or operated by the carrier, salvage shall be paid for as full as if the said salving Ship or Ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

### Clause No.107 GENERAL PARAMOUNT CLAUSE
This Bill(s) of Lading shall have effect subject to the provision of any legislation relating to the Carriage of Goods by Sea which incorporates the rules relating to Bill(s) of Lading contained in the International convention dated Brussels 25th August, 1924, and which is compulsory applicable to the contract of carriage herein contained. When no such enactment is in force in the country of shipment the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily application the terms of the Carriage of Good by Sea act, 1924 of the United Kingdom or any statutory modification or re-enactment thereof shall apply.

### Clause No.108 U.S.A. CLAUSE PARAMOUNT
This Bill(s) of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16th, 1936 which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed as surrender by the carrier of any of its right or immunities or an increase of any of its responsibilities or liabilities under said act. The Provisions stated in said Act shall (exit



## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11th December, 2014

as may be otherwise specifically provided herein) govern before the good are loaded on and after they are discharged from the Ship and throughout the entire the goods are in custody of the carrier. The carrier shall not be liable in any capacity whatsoever for any delay, non-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the carrier.

### Clause No.109 CANADIAN CLAUSE PARAMOVNT

All other terms, Provisions and conditions of the Canadian Water Carriage of Good Act, 1936 and of the rules comprising schedule thereto are, so far as applicable, to govern the contract contained in this Bill(s) of Lading and the ship owners are to be entitled to the benefit of all privileges, rights and immunities contained in such Act and in the schedule thereto as if the same were herein specifically set out. If anything herein contained be inconsistent with the said provisions, it shall to the extent of such inconsistency and no further be null and void.

The carrier shall be under no responsibility whatsoever for loss of or damage to goods howsoever and where-so-ever occurring when such loss or damage arise prior to the loading in and/or subsequent to the discharge from the Carrier's Ship.

### Clause No.110 WAR RISKS CLAUSE FOR TIME CHARTERS, 2004 (CONWARTIME 2004)

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades    (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgment of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d)(i) the Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

   (ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f)   The Vessel shall have liberty:-
   (i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

   (ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

   (iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same



## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11th December, 2014

to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

## Clause No.111 ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002(MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of



### Additional Rider Clauses to
### M/V TBN (Tsuneishi Hull No. 1549)
### Charter Party Dated 11th December, 2014

all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision: "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners"

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

### Clause No.112 U.S. CUSTOMS ADVANCE NOTIFICATIONS/AMS CLAUSE FOR THE CHARTER PARTIES

(a) If the Vessel loads or carriers cargo destined for the U.S. or passing U.S. ports in transit, the Charterers shall comply with the current U.S. Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purpose of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);

ii) Have in place an ICB (International Carrier Bond);

iii) Provide the Owners with a timely confirmation of i) and ii) above; and

iv) Submit a cargo declaration by SMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shell indemnify, defend and hold harmless the Owners agent any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges



## Additional Rider Clauses to
## M/V TBN (Tsuneishi Hull No. 1549)
## Charter Party Dated 11th December, 2014

which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## Clause No.113 BUNKER FUEL SULPHUR CONTENT CLAUSE

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes. The Charterers shall indemnity, defend and hold harmless the Owners in respect of any loss, liability, delay fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:
   (i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
   (ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.
   Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessels' failure to comply with Regulations 14 and i8 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

[The End Rider Clauses]

